# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# ST. LOUIS DIVISION

| | |
|---|---|
| THE STATE OF ARKANSAS; THE STATE OF MISSOURI; THE STATE OF IOWA; THE STATE OF NEBRASKA; THE STATE OF NORTH DAKOTA; THE STATE OF SOUTH DAKOTA; A.F., a minor, by Sara Ford, her mother, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education; CATHERINE E. LHAMON, in her official capacity as Assistant Secretary for Civil Rights at the United States Department of Education; RANDOLPH WILLS, in his official capacity as Deputy Assistant Secretary for Enforcement at the United States Department of Education, <br><br> *Defendants*. | Case No.: 4:24-cv-636 |

---

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

---

1

Since 1972 Title IX has protected women and girls from discrimination "on the basis of sex" in educational programs and activities.  But last month, the Department of Education issued a rule radically reinterpreting that half-century-old statute and rolling back those protections.  *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024).

That rule takes effect August 1, 2024, and it requires States, schools, and universities to ignore biological sex in favor of self-professed "gender identity." Indeed, if allowed to take effect, that rule will gut the very athletic opportunities that Title IX was designed to provide; destroy the privacy protections women and girls currently enjoy in restrooms, locker rooms, shower facilities, and overnight accommodations; preempt numerous State laws; silence and threaten with investigation any student, faculty member, or administrator who doesn't share the Department's view of sex; and deny federal funding to any school or university that doesn't adhere to those views.

For numerous reasons, that rule violates the federal Constitution and the Administrative Procedures Act.  It should immediately be set aside.

## I.    Parties

1.      Plaintiff the State of Arkansas is a sovereign State of the United States of America.  Tim Griffin is the Attorney General of Arkansas.  Tim Griffin is

authorized to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts."  Ark. Code Ann. 25-16-703.

2.      Plaintiff the State of Missouri is a sovereign State of the United States of America.  Andrew Bailey is the Attorney General of Missouri.  General Bailey is authorized to "institute, in the name and on behalf of the state, all civil suits and other proceedings at law or equity requisite or necessary to protect the rights and interests of the state."  Mo. Rev. Stat. 27.060.

3.      Plaintiff the State of Iowa is a sovereign State of the United States of America.  Brenna Bird is the Attorney General of Iowa.  She is authorized by Iowa law to sue on the State's behalf under Iowa Code 13.2.  Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.

4.      Plaintiff the State of Nebraska is a sovereign State of the United States of America.   Michael T. Hilgers is the Attorney General of Nebraska. He is authorized to appear for the State in any civil matter in which the State has an interest.  Neb. Rev. Stat. 84-203.

5.      Plaintiff the State of North Dakota is a sovereign State of the United States of America.  North Dakota brings this suit through its Attorney General, Drew

3

H. Wrigley, who has the authority to represent the State in federal court.  N.D.C.C. 54-12-01.

6.      Plaintiff the State of South Dakota is a sovereign State of the United States of America.  Marty J. Jackley is the Attorney General of South Dakota. General Jackley is authorized "to appear for the state and prosecute or defend, in any court or before any officer, any cause or matter, civil or criminal, in which the state may be a party or interested."  S.D.C.L.1-1-1(2).

7.      Plaintiff A.F. is a 15-year-old female resident of Jonesboro, Arkansas. She is a Christian and believes that God created every person to be immutably either male or female.  In following her religious beliefs, she only addresses and refers to other people using pronouns or titles consistent with the person's sex.  She believes that, were she to use pronouns or titles that contradict the person's sex, she would violate her religious beliefs and be lying about what she knows to be true.

8.      A.F. is a 10th-grade student at Brookland High School, a public school in Brookland, Arkansas that is a recipient of federals funds subject to Title IX.  She uses the female-designated restrooms at her school and feels safe knowing that boys are not allowed to use the girls' restroom.  She does not want to use the restroom with a male, even if that male considers himself to be a female.  If male students were allowed to use the female restrooms at her school, she would do her best to avoid any women's restroom that a male could access.

4

9.     At Brookland High School, A.F. competes on the girls' basketball team and intends to keep competing in sports for her school throughout high school.  She uses the school locker room to change clothes for games.  At her school, the locker room is mainly an open area where girls on sports teams change clothes in front of their lockers.  Sometimes they must share a locker.  She and her teammates can see each other as they change clothes to prepare for games.  Like many girls, she desires privacy from the opposite sex while changing clothes.  If she were forced to share a locker room and change clothes in front of a male, or be present in the locker room while a male is changing clothes near her, she would suffer deep distress and embarrassment.  She would be forced to change in a different room or area to protect her privacy.

10.     A.F. would not shower in her locker room with a male nearby.  Like many girls, she desires privacy from the opposite sex while showering.  She feels safe and comfortable knowing that boys are not allowed in the girls' locker room and shower area.  It would cause her to feel extremely unsafe, anxious, and embarrassed to shower in the girls' locker room if males were allowed to be present in there.  To avoid this situation, she would instead stop showering in the women's locker room or seek out a safe place to shower that males could not access.

11.     A.F. travels on overnight trips with her sports teams during the school year and for overnight sports camps over the summer.  She often must travel to

different cities and stay multiple nights to play against other teams. Travel increases if her team makes the playoffs. This past year, her school volleyball and basketball teams made it through the playoffs and to the state championships. This required travel and overnight stays of about one week for each team championship. When traveling overnight for school activities, she often shares a room with other students. She desires privacy from the opposite sex while sleeping, changing clothes, and showering during overnight trips. She would feel deeply uncomfortable if she were forced to share a room with a male during an overnight trip.

12.   A.F. believes strongly in the importance of protecting women's sports and that men should not be allowed to compete on sports teams or in competitions that are designated for female athletes. If she and other female athletes are forced to compete against males, they would be at a competitive disadvantage due to the inherent physiological differences between female and male athletic capacities. This will result in female athletes like A.F. being displaced from sports teams and competitions by male athletes. Competing against male athletes will also increase the risk that female athletes like A.F. will be suffer injuries.

13.   A.F. also wishes to express her views about gender identity to her classmates and coaches at school, as she has in the past. This expression includes advocating that only women be allowed to play women's sports, that male athletes

who identify as female are not in fact female, and that it would be unfair to let these males play on women's sports teams.

14.     Defendant U.S. Department of Education is a federal agency.  It "is authorized and directed to effectuate" Title IX "by issuing rules, regulations, or orders of general applicability . . . consistent with achievement of the objectives of the statute."  20 U.S.C. 1682.

15.     Defendant Miguel Cardona is the U.S. Secretary of Education and is responsible for its administration, including implementing Title IX via rulemaking. 20 U.S.C. 3474; 20 U.S.C. 1682.  He is sued in his official capacity.

16.     Defendant Catherine Lhamon is the Assistant Secretary for Civil Rights at the Department of Education.  She is sued in her official capacity.

17.     Defendant Randolph Wills is the Deputy Assistant Secretary for Enforcement at the Department of Education.  He is sued in his official capacity.

## II.   Jurisdiction and venue

18.     This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. 1681–88, and the Administrative Procedure Act (the "APA"), 5 U.S.C. 553, 701–06. This Court has subject-matter jurisdiction under 28 U.S.C. 1331.

19.     This Court has jurisdiction under 28 U.S.C. 1331 (action arising under the laws of the United States), and 28 U.S.C. 1346 (agencies and employees of the federal government).

20.     An actual controversy exists between the parties under 28 U.S.C. 2201(a).

21.     This Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. 2201-02, 5 U.S.C. 705-06, and its inherent equitable powers.

22.     Venue is proper under 28 U.S.C. 1391(e)(1) because the State of Missouri resides in this District for purposes of the venue laws.  Defendants are United States agencies or officers sued in their official capacities.  The harms giving rising to this Complaint occurred and will continue to occur within this District.

23.     This Court has the authority to grant Plaintiffs the relief they request under the APA, 5 U.S.C. 705-06; the Declaratory Judgment Act, 28 U.S.C. 2201-02; and 28 U.S.C. 1361.

## III.   Background

24.     Title IX was enacted in 1972 and states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. 1681(a).

A.    <u>Title IX's text, structure, and history.</u>

25.    At the time of Title IX's enactment (and in the half-century since) "sex" was understood to mean biological sex—either male or female.  Sex is male or female—which "is an immutable characteristic determined" before "birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.); *see, e.g.*, *Sex*, *Webster's Third New International Dictionary* 2081 (1966) ("one of the two divisions of organic esp. human beings respectively designated male or female"); *Sex, Webster's New World Dictionary* (1972) ("[E]ither of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions."); *Sex*, *American Heritage Dictionary* (1969) ("a. The property or quality by which organisms are classified according to their reproduction functions. b. Either of two divisions, designated *male* and *female*, of this classification.").

26.    The plain meaning of Title IX's text confirms this reading.  As the en banc Eleventh Circuit recognized, "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment [in 1972] show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, *i.e.*, discrimination between males and females." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc).

27.     The structure of Title IX further underscores that "sex" means "sex"—not gender identity or any other distinct concept.  Title IX expressly states that it does not "prohibit any educational institution . . . from maintaining separate living facilities for the different sexes." 20 U.S.C. 1686.  That provision only makes sense if "sex" refers to the male-female binary and the associated physiological differences.

28.     Title IX is replete with further examples of "sex" being referred to as a binary:

a.  The statute excepts from its coverage a public undergraduate institution with a historic "policy of admitting only students of *one sex*," 20 U.S.C. 1681(a)(5) (emphasis added);

b.  Certain organizations whose memberships have "traditionally been limited to persons of *one sex*," *id.* 1681(a)(6) (emphasis added); "father-son or mother-daughter activities," so long as similar opportunities provided for "*one sex*" are provided for "*the other sex*," *id.* 1681(a)(8) (emphasis added); and

c.  Scholarships associated with participation in a beauty pageant "limited to individuals of *one* sex only," *id.* 1681(a)(9) (emphasis added).

29.     Title IX's explicit exclusions for sex-organizations further underscore that understanding.  *See, e.g.*, *id.* 1681(a)(6) (excluding membership practices of

10

college fraternities and sororities or to those of sex-segregated voluntary service organizations); *id.* 1681(a)(7) (excluding Boys and Girls State and Boys and Girls Nation).

30.    Title IX's treatment of sex as a male-female binary reflects the ordinary understanding of "sex" when the statute was passed.  After all, "[t]he phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications."  Ryan T. Anderson & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do*, at 9, The Heritage Found. (2017), https://perma.cc/VG5N-ZAYE.

B.    Early regulations implementing Title IX.

31.    The Department's predecessor agency first issued regulations implementing Title IX in 1975.  *See* 34 C.F.R. pt. 106.  These regulations treated sex as a binary, referring multiple times to "one sex," especially versus "the other sex," using the phrase "both sexes," and referencing "boys and girls" and "male and female teams."  *See, e.g.*, 34 C.F.R. 106.33, 106.34(a)(3), 106.36(c), 106.37(a)(3), 106.41(c), 106.51(a)(4), 106.58(a), 106.60(b), 106.61; *see also* 34 C.F.R. pt. 86 (1975).

32.    Consistent with Title IX's structure, the regulations also preserved certain sex-separated spaces.  These allowed recipients of federal funding to:

a.  "provide separate housing on the basis of sex," *id.* 106.32(b)(1);

11

b. "provide separate toilet, locker room, and shower facilities on the basis of sex," *id.* 106.33;

c. conduct "separate sessions for boys and girls" of sexual-education classes in elementary and secondary schools, *id.* 106.34(a)(3);

d. and "make requirements based on vocal range or quality which may result in a chorus or choruses of one or predominantly one sex," *id.* 106.34(a)(4).

33.     The original regulations likewise approved of sex separation in athletics in certain circumstances.  The regulations prohibited discrimination "on the basis of sex" in "interscholastic, intercollegiate, club or intramural athletics" but allowed a recipient to sponsor "separate teams for members of each sex" when team selection is "based upon competitive skill" or the sport is a "contact sport."  *Id.* 106.41(a)-(b).  The regulations further recognized that sex differentiation in athletics does not necessarily constitute sex discrimination, and in fact the failure to differentiate can amount to sex discrimination.  The rules required "equal athletic opportunity for members of both sexes," including in the distribution of athletic scholarships and the provision of facilities, equipment, and services, but provided that "aggregate expenditures for members of each sex" and "expenditures for male and female teams" need not necessarily be equal to comply with Title IX.  *Id.* 106.41(c); *see also id.* 106.37(c).

34.    The Department consistently interpreted "sex" as a binary male/female classification over the next decades.  For example, in 1997 guidance clarifying that Title IX covers same-sex sexual harassment, the Department stated, "both male and female students are protected from sexual harassment . . . even if the harasser and the person being harassed are members of the same sex."  *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034, 12,039 (Mar. 13, 1997), https://perma.cc/AT7Y-KCFC.  That same guidance stated that "Title IX does not prohibit discrimination on the basis of sexual orientation," because—as the Department then correctly recognized—"sex" refers to the status of being male or female, not that of having a heterosexual or homosexual orientation or based on "gender identity."  *Id.*; *see also id.* at 12,036.

35.    In stark contrast to that long established reading, in 2014, President Obama's Department of Education suddenly attempted to radically redefine sex and recast Title IX as a regulation about gender identity, rather than sex.  It did so first via a "Dear Colleague" letter asserting—for the first time—that "Title IX's sex discrimination prohibition extends to claims of discrimination" based solely on "gender identity."  U.S. Dep't of Educ., Off. for Civ. Rts., Questions and Answers on Title IX and Sexual Violence, at 5 (Apr. 29, 2014) (rescinded in 2017), https://perma.cc/Y7BD-XHFU.

36.    Then, in 2016, President Obama's Department went still further, issuing guidance claiming that, Title IX "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status." U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Title IX and Transgender Students, at 1 (May 13, 2016) (rescinded in 2017) ("2016 Guidance"), https://perma.cc/G5VG-ZNV9.   The 2016 Guidance claimed that failing to "treat students consistent with their gender identity" would constitute sex discrimination, even where a student's claimed gender identity differed from their sex. *Id.* at 3.  And it suggested funding recipients were required to compel their faculty and staff to "use pronouns and names consistent with a transgender student's gender identity" and must permit access to previously sex-separated restrooms, locker rooms, shower facilities, housing, and sports based solely on a student's proclaimed gender identity. *Id*. at 3-4.

37.    The Obama Administration's foray into gender-identity-based Title IX regulations was swiftly enjoined by the United States District Court for the Northern District of Texas, which concluded the 2016 Guidance was likely contrary to law. *See Texas v. United States*, 201 F. Supp. 3d 810, 816 n.4, 836 (N.D. Tex. 2016), clarified by No. 7:16-cv-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016). The Department subsequently withdrew its unlawful gender-identity guidance, *see infra* at ¶ 39, and that lawsuit was voluntarily dismissed.  *See* Pls.' Notice of

Voluntary Dismissal, *Texas v. United States*, No. 7:16-cv-00054-O (N.D. Tex. Mar. 3, 2017), ECF No. 128.

38.     The Obama Administration's unlawful gender-identity guidance also spurred litigation in the United States District Court for the Eastern District of Virginia.  A transgender-identifying high-school student relied on that guidance in arguing that a school policy requiring students' to use the bathroom associated with their sex, rather than their self-expressed gender identity, violated Title IX.  After the Fourth Circuit held that the Obama Administration's guidance was entitled to *Auer* deference, *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016), *vacated and remanded*, 580 U.S. 1168 (2017), and the district court entered an injunction against the school board on remand requiring it to allow the plaintiff to use the bathroom associated with the plaintiff's self-professed gender identity, *G.G. v. Gloucester Cnty. Sch. Bd.*, No. 4:15CV54, 2016 WL 3581852, at *1 (E.D. Va. June 23, 2016), *vacated*, 853 F.3d 729 (4th Cir. 2017), *as amended* (Apr. 18, 2017), the Supreme Court stayed the injunction, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 579 U.S. 961 (2016), and subsequently granted certiorari to consider the validity of the Title IX guidance, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 580 U.S. 951 (2016).  After the Department withdrew its unlawful Title IX guidance, the Supreme Court vacated the Fourth Circuit's decision and remanded

for further proceedings.  *Gloucester Cnty. Sch. Bd. v. G. G. ex rel. Grimm*, 580 U.S. 1168 (2017).

      C.    <u>Trump Administration's rescission of gender-identity guidance and 2020 regulations on sexual harassment and grievance procedures.</u>

39.    The Trump Administration withdrew the Department's gender-identity guidance in February 2017, returning to the pre-2014 understanding that Title IX's prohibition on sex-based discrimination means "sex," not gender identity.  U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Gender Identity Guidance (Feb. 22, 2017), https://perma.cc/H6E3-YBEZ.

40.    In 2020, the Department further amended its regulations to clarify the definition of "sexual harassment" for purposes of Title IX enforcement.  *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ("2020 Rule").  The Department adopted the Supreme Court's definition of harassment in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), that is, "conduct that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to education."  2020 Rule, 85 Fed. Reg. at 30,036.

41.    The Department explained that this standard was appropriate in the education context because it would capture "serious situations" while accounting for the fact that "younger students are still learning social skills and older students

benefit from robust exchange of ideas, opinions, and beliefs." *Id.* at 30,143. Moreover, the Department explained that "narrowly tailored" definition of hostile-environment harassment was necessary to ensure that Title IX is applied "in a manner consistent with respect for First Amendment rights, and principles of free speech and academic freedom, in education programs and activities." *Id.* at 30,142.

42.     A month after the Department issued its 2020 Rule, the Supreme Court decided *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020). *Bostock* held that Title VII's prohibition on sex discrimination bars an employer from firing an employee based on sexual orientation or transgender status. *Id.* at 651-52. In reaching that conclusion, *Bostock* interpreted Title VII's language prohibiting discrimination "because of" sex as a but-for causation standard, meaning that "[s]o long as the plaintiff's sex was one but-for cause of" an adverse employment action Title VII's coverage is triggered. *Id.* at 656, 659. And it concluded that "sex plays an unmistakable and impermissible role in [a] discharge decision" based on sexual orientation or transgender status. *Id.* at 660. That is because an employer who fires a male employee "for no reason other than the fact he is attracted to men . . . discriminates against him for traits or actions it tolerates in his female colleague"; similarly, an employer who fires a male who adopts a transgender identity as a female "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.*

17

43.    As relevant here, however, *Bostock* assumed that "sex" as used in Title VII in 1964 referred "only to the biological distinctions between male and female." *Id.* at 655.   And it expressly declined to "prejudge" whether its decision would "sweep beyond Title VII" to other statutes such as Title IX, or whether enforcing "sex-segregated bathrooms, locker rooms, and dress codes" would constitute discrimination under Title VII.  *Id.* at 681.  Finally, the Court did not consider what Title IX's different language—"on the basis of sex"—means in the context of discrimination.

44.    Following *Bostock*, some lower courts sought to expand the scope of other statutory sex-based provisions, including Title IX.  *See, e.g.*, *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1305 (11th Cir. 2020*), rev'd on reh'g en banc*, 57 F.4th 791 (holding, prior to the Eleventh Circuit holding the opposite on rehearing en banc, that "Title IX, like Title VII, prohibits discrimination against a person because he is transgender, because this constitutes discrimination based on sex"); *see also Brandt ex rel. Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing) (explaining that "there is reason to be skeptical that" the Equal Protection Clause's "protections reach" as far as Title VII, given that "their text is not similar in any way").

45.     The Department's Office of the General Counsel disagreed with the view of those few lower courts that *Bostock*'s reasoning applied to Title IX. Instead, it stated in a 2021 memorandum that the "Department's longstanding construction of the term 'sex' in Title IX [is] biological sex, male or female." Reed D. Rubinstein, Memorandum For Kimberly M. Richey, Acting Assistant Secretary of the Office for Civil Rights, re: *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) (Jan. 8, 2021), https://perma.cc/Q9YC-Q4Y2. Moreover, "sex" as "biological sex" is "the only construction consistent with the ordinary public meaning of 'sex' at the time of Title IX's enactment." *Id.* at 1-4. Finally, the memorandum determined that giving "sex" its ordinary meaning not only permits but requires a Title IX recipient providing "separate toilet, locker room, and shower facilities" or "separate athletic teams" to regulate entry based on sex, rather than gender identity. *Id.* at 7, 9.

D.     2021 interpretation of "sex" in Title IX.

46.     Soon after taking office, the Biden administration reversed that established, reasoned understanding. President Biden issued an executive order declaring that *Bostock* applied across all federal law, arguing that, "Under *Bostock*'s reasoning, laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 et seq.), . . . along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain

sufficient indications to the contrary." Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021).  Every federal agency was directed to review its existing regulations and develop a plan to align them with the executive order.  *Id.* at 7,024.

47.    Following that directive, the Department published in June 2021 guidance in which it "interpret[ed] Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity." *Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*.  86 Fed. Reg. 32,637 (June 22, 2021) ("2021 Guidance").

48.    The Department interpreted the phrase "on the basis of sex" in Title IX as having the same meaning as the phrase "because of . . . sex" in Title VII. *Id.* at 32,638-39.  It claimed that this interpretation "is most consistent with the purpose of Title IX"—"ensur[ing] equal opportunity and . . . protect[ing] individuals from the harms of sex discrimination." *Id*. at 32,639.  This was swiftly followed by other guidance documents explaining that the Department planned to "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department."  Suzanne B. Goldberg, Dear Educator letter on Confronting Anti-

LGBTQI+ Harassment in Schools, at 2 (June 23, 2021), https://perma.cc/A759-WKR9.

49.     Like the 2016 Guidance, the 2021 Guidance was quickly enjoined. *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022).  That injunction prevented the Department from enforcing the 2021 Guidance as to the 20-State plaintiff coalition.  That court concluded that it was likely the Biden administration acted unlawfully by "creat[ing] new rights and obligations" without complying with the APA's notice-and-comment requirements. *Id.* at 838.  The court identified two reasons why the 2021 Guidance "plausibly 'adopt[s] a new position inconsistent with . . . [the Department's] existing regulations." *Id.* at 839.  First, "Title IX does allow for sex-separation in certain circumstances," but "the Department's guidance . . .  appears to suggest such conduct will be investigated as unlawful discrimination." *Id.*  Second, the guidance "creates rights for students and obligations for regulated entities not to discriminate based on sexual orientation or gender identity that appear nowhere in Bostock, Title IX, or its implementing regulations." *Id.*  That injunction remains in effect today.

        E.      2022 proposed Title IX rule redefining "sex."

50.     In July 2022, the Department proposed amendments to its Title IX regulations that incorporated its previous guidance documents' atextual reading of Title IX. *Notice of Proposed Rulemaking re: Nondiscrimination on the Basis of Sex*

*in Education Programs or Activities Receiving Federal Financial Assistance*, 87

Fed. Reg. 41,390 (proposed July 12, 2022) (to be codified at 34 C.F.R. pt. 106). The

proposed rule defined sex discrimination under Title IX to "include[] discrimination

on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions,

sexual orientation, and gender identity." *Id.* at 41,571 (to be codified at 34 C.F.R.

106.10).

51. The proposed rule stated that, even where Title IX authorizes "different

treatment or separation on the basis of sex, a recipient must not carry out such

different treatment or separation in a manner that discriminates on the basis of sex

by subjecting a person to more than de minimis harm, unless otherwise permitted

by Title IX or this part." *Id.* (to be codified at 34 C.F.R. 106.31(a)(2)). The

Department further explained that "subject[ing] a person to more than de minimis

harm on the basis of sex" would include "[a]dopting a policy or engaging in a

practice that prevents a person from participating in an education program or activity

consistent with the person's gender identity." *Id.*

52. The proposed rule required a recipient to "take prompt and effective

action to end any sex discrimination that has occurred in its education program or

activity, prevent its recurrence, and remedy its effects." *Id.* at 41,572 (to be codified

at 34 C.F.R. 106.41(a)).

53.     This new definition of sex discrimination also affected the revised definition of harassment.    Previous Title IX regulations targeted "sexual harassment," which included (in relevant part) "unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." *Id.* at 41,410.  The proposed rule broadened Title IX's coverage to "sex-based harassment," defined to include "unwelcome sex-based conduct." *Id.* This expansion targeted "all forms of sex-based harassment, as opposed to only sexual harassment," including harassment based on sexual orientation or gender identity. *Id.*

54.     The proposed rule also sought to "make clear" that its Title IX regulations "would preempt" "any State or local law" conflicting with them. *Id.* at 41,404; *see also id.* at 41,569 (to be codified at 34 C.F.R. 106.6(b)).

55.     This rule purported to decline to address athletics, citing "a longstanding congressional view that athletics presents unique considerations," *Id.* at 41,537-38, and instead stated that the Department planned to address those issues in a separate rule.

56.     A 20-state coalition, including many of the Plaintiff States, filed comments opposing the proposed rule.  The States argued that interpreting "sex" to mean "gender identity" contravenes Title IX's text, structure, and purpose, as well

23

as longstanding Department regulations and practice.  The States also argued that the proposed rule would exceed Congress's Spending Clause authority; run afoul of the First Amendment by requiring colleges to compel speech; and potentially violate parental rights by forcing a school to accommodate a child's expressed gender identity without parental consent.

57.    The States further explained that the Department's proposed rule failed to address important policy considerations.  For example, the States explained that the Department had failed to consider the difficulty of even determining each student's gender identity in order to administer the proposed rule, given that gender identity is defined as a completely internal sense of self, which can change.  The proposed rule also did not adequately address safety concerns related to the effective elimination of sex-separated spaces such as locker rooms, restrooms, and dormitories.  The States pointed out the potential for voyeurism, harassment, and even violent crime due to allowing males into previously female-only spaces.  These concerns are most poignant in spaces frequented by vulnerable children.  Finally, the proposed rule failed to account for the harms incurred by female students, the primary intended beneficiaries of Title IX, from allowing males to participate in sex-separated activities as females simply by claiming a different gender identity.

F.     2023 proposed Title IX rule relating to athletics.

58.     The next year, the Biden Administration proposed another rule related

to Title IX, this time addressing how its new interpretation of sex would be applied

to athletics.  *See* 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) (to be codified at 34

C.F.R. pt. 106).  The proposed rule provided that:

> If a recipient adopts or applies sex-related criteria that would limit or
> deny a student's eligibility to participate on a male or female team
> consistent with their gender identity, such criteria must, for each sport,
> level of competition, and grade or education level: (i) Be substantially
> related to the achievement of an important educational objective; and
> (ii) Minimize harms to students whose opportunity to participate on a
> male or female team consistent with their gender identity would be
> limited or denied.

*Id.* at 22,891 (to be codified at 34 C.F.R. 106.41).

59.     The Department offered two examples of "important educational

objective[s]" that may qualify under the rule: "ensuring fairness in competition and

prevention of sports-related injury."  *Id.* at 22,872.  But the Department cautioned

that even these objectives would not pass muster unless they were "substantially

related to ensuring fairness in competition in [a] particular sport at the applicable

level of competition and grade or educational level."  *Id.* at 22,873.  Indeed, the

Department stressed that even criteria that were "substantially related" to achieving

an "important governmental objective" would violate the proposed sports rule if the

funding recipient "c[ould] reasonably adopt or apply alternative criteria that would

be a less harmful means of achieving the recipient's important educational objective." *Id.* at 22,877.

60. The Department admitted that "few, if any, sex-related eligibility criteria" would be able to surmount this high hurdle for elementary and middle school students. *Id.* at 22,860, 22,875. Such criteria at the high school level would only be "more likely" to satisfy the proposed rule. *Id*. at 22,875.

61. Arkansas, along with eighteen other States, submitted comments raising several concerns with the proposed athletics rule. First, as Arkansas explained, the Department was placing an unlawful premium on affirming the professed gender identities of students, over and above real harms to female athletes which would predictably occur due to physical differences between boys and girls. *See* Ark. Comment Letter at 2-6 (May 15, 2023) https://perma.cc/GB2A-CQKK. Second, Arkansas explained that the athletics proposal is "self-contradictory and utterly un-administerable" because it requires the use of self-identified gender identity to assess athletic performance in a case-by-case assessment with no clear standards or methodology. *Id.* at 6-7. Indeed, the murkiness of the standard is apparently a design feature of the proposed rule, placing a thumb on the scale in favor of deferring to a student's claimed gender identity in all cases. *Id.* Finally, Arkansas pointed out that the proposed athletics rule misinterpreted both Title IX and the Constitution. *Id.* at 8-12.

62.    Many other commentors presented similar concerns.    Alliance Defending Freedom argued, for example, that the major-questions doctrine and the "federalism clear-notice canon" indicate the Department lacked authority for the proposed athletics rule.  ADF Athletics Comment Letter at 6-8 (May 15, 2023) https://perma.cc/W846-9EMS.

G.    <u>The Final Rule.</u>

63.    On April 29, 2024, the Department published the Final Rule. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024).  The Final Rule dramatically and unlawfully reshapes Title IX in two primary ways.  First, it redefines what constitutes sex discrimination.  Second, it broadens the definition of prohibited "harassment."

*Redefining sex discrimination*

64.    The Final Rule redefines Title IX's prohibition on sex discrimination to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id*. (to be codified at 34 C.F.R. 106.10).  The Final Rule purports to preempt all "State or local laws or other requirements" that conflict with its terms, *id*. at 33,885, and it applies to any school "program or activity" regardless of whether the activity occurs within

the school—or even within the United States. *Id.* at 33,886 (to be codified at 34 C.F.R. 106.11).

65.     In setting out how this new definition of sex discrimination must be implemented, the Department begins by instructing that schools are permitted to maintain certain sex-segregated programs, activities, and facilities. *Id.* at 33,814. But the Department then says that schools cannot enforce these sex-based distinctions in a way that "causes . . . more than de minimis harm." *Id.* at 33,814, 33,816 (citing amended 34 C.F.R. 106.31(a)).   And the Final Rule explains that it necessarily inflicts more than de minimis harm—and thus violates Title IX—to prohibit any "'person'" from "'participating in . . . education program[s and] activit[ies] consistent with [the person's] gender identity,'" except as "otherwise permitted by Title IX or [the Title IX regulations]." *Id.* at 33,816, 33,819-20 (quoting amended 34 C.F.R. 106.31(a)).

66.     The Final Rule thus threatens to withhold federal funding from schools that do not allow students access to "restrooms and locker rooms" based on their purported gender identity or that have "appearance codes (including dress and grooming codes)" rooted in biological sex. *See, e.g.*, 89 Fed. Reg. at 33,816. Indeed, under the Final Rule, a funding recipient would violate Title IX's nondiscrimination prohibition by denying a transgender-identifying student access to a bathroom or locker room of the opposite sex. *See, e.g.*, *id.* at 33,818.

67. Additionally, the Final Rule states that it inflicts "more than de minimis harm" on students to even inquire into or seek confirmation of a student's gender identity. *Id.* at 33,819. In other words, a school cannot require documentary evidence of diagnosed gender dysphoria or another gender-based condition to permit participation in or use of a sex-separate activity or facility. *Id.* A funding recipient thus violates the Final Rule's interpretation of sex discrimination if it even tries to verify the access of those using facilities like an elementary or secondary school girls' bathroom or locker room. *Id.* at 33,818-19.

*Broadening the definition of harassment*

68. The Final Rule follows through on the proposed rule's approach to lower the standard for sexual harassment. The Final Rule jettisons the 2020 Rule's interpretation that had incorporated the Supreme Court's standard in *Davis*. *See supra* ¶¶ 40-41.

69. The Final Rule instead says that "[s]ex-based harassment, including harassment predicated on sex stereotyping or gender identity, is covered by Title IX if it is sex-based, unwelcome, subjectively and objectively offensive, and sufficiently severe *or* pervasive to limit or deny a student's ability to participate in or benefit from a recipient's education program or activity," 89 Fed. Reg. at 33,516 (emphasis added), rather than both "severe" and "pervasive" as *Davis* requires. This

means that even a "single serious" instance of unwelcome speech, or a pattern of non-severe incidents, might qualify. *Id.*

70.    The Final Rule also expands the definition of harassment to cover conduct that is "subjectively and objectively" offensive measured from "the complainant's position." *Id.* at 33,510.  For example, whether referring to a transgender-identifying male using male pronouns instead of female pronouns is "subjectively and objectively offensive" must be measured from the transgender-identifying male's point of view.

71.    The Final Rule also waters down the standard from what "limits" a person's "ability to participate" in an educational program or activity—requiring only "some impact" on a student's ability to participate, without any "particular limits or denials." *Id.* at 33,511.

72.    The Final Rule is such a dramatic departure from established Title IX practices and prior legal consensus that it is difficult to summarize its full impact. However, a few things are clear.  No State or recipient school can exclude a student from using the bathroom, locker room, or other private changing or showering space that aligns with that student's self-professed gender identity (which they cannot attempt to authenticate), no matter the student's sex.  And though the Final Rule purports to leave considerations about athletics for a different rulemaking, it is clear that States cannot maintain laws that require eligibility for sports teams and

competition to be based on an athlete's sex.  Finally, State laws that protect the rights of teachers and students to speak about gender and gender identity in ways that a student might view as offensive will be preempted.

73.    The Final Rule is set to take effect on August 1, 2024, prior to the beginning of the next school year.  *Id.* at 33,474.

## IV.    Plaintiffs' impending irreparable harm

74.    The Final Rule, if allowed to go into effect, will impose significant irreparable harms on Plaintiffs.

*Harms to Plaintiff States*

75.    Each of the Plaintiff States takes federal funds for educational programs and activities, subjecting them to Title IX's requirements.  See 89 Fed. Reg. at 33,541 ("[A]ll 50 States have accepted Federal funding for education programs or activities and are subject to Title IX as to those programs and activities.").

76.    If the Final Rule goes into effect, Plaintiff States would suffer the "irreparable harm of nonrecoverable compliance costs."  *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)); *cf. Kentucky v. Fed. Highway Admin.*, No. 5:23-cv-162-BJB, --- F. Supp. 3d ---, 2024 WL 1402443,

31

at *3 (W.D. Ky. Apr. 1, 2024) (noting such costs establish an injury for standing purposes).

77.     The Final Rule acknowledges that 106.32(1)(2) would require schools that do not already have policies requiring treatment of students on the basis of gender identity rather than sex to incur costs related to "review" of current policies, "updating of policies or training materials," and "train[ing] of employees or students on gender identity discrimination." 89 Fed. Reg. at 33,876.  Indeed, the Department estimates that simply "reading and understanding the final regulations" will impose a one-time cost of more than $24 million across all recipients. *Id.* at 33,867.  Given the government's sovereign immunity, these costs are not recoverable. *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) ("no guarantee of eventual recovery" of monies owed was irreparable harm).

78.     Enforcement of the Final Rule threatens to strip Plaintiff States of billions of dollars in federal funding and subject them to liability through private suits.  That lack of funding would threaten Plaintiff States' ability to provide educational programs to their citizens and the harm to children and others across Plaintiff States would be irreparable.

79.     The Arkansas General Assembly, for example, has a constitutional obligation to provide "a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and

opportunities of education."  Ark. Const., art. 14, sec. 1.  The State of Arkansas is constitutionally charged with ensuring the adequacy of education provided by its 1,058 public schools among 237 school districts.[1]

80.    Similarly, the Missouri General Assembly has a constitutional obligation "to establish and maintain free public schools for the gratuitous instruction of all persons in this state" and "to maintain the state university."  Mo. Const., art. IX secs. 1(a), 9(b).

81.    The Nebraska Constitution charges the Nebraska Legislature with "provid[ing] for the free instruction in the common schools of [Nebraska] of all persons between the ages of five and twenty-one years."  Neb. Const., art. VII, sec. 1.

82.    The North Dakota Legislative Assembly has a similar constitutional obligation to "provide for a uniform system of free public schools throughout the state, beginning with the primary and extending through all grades up to and including schools of higher education" N.D. Const. Art. 8, sec. 2. The Constitution also bestows power on the North Dakota Board of Higher Education to control and administer state higher education institutions. N.D. Const. Art. 8, sec. 6.

83.    The South Dakota Legislature has a constitutional duty "to establish and maintain a general and uniform system of public schools wherein tuition shall

---

[1] Ark. Dep't of Educ., *Arkansas K-12 Profile: 2023-2024*, https://adedata.arkansas.gov/Ark12

be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education."  S.D. Const., art. 8, sec. 1.

84.     Arkansas and its local programs receive at least $1.4 billion from the Department and expect that number to increase in future years.  *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/statetables/index. html; *see also* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/statetables/ index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

85.     Missouri and its local programs receive at least $3 billion from the Department and expect that number to increase in future years.  *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/statetables/index. html; *see also* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/statetables/ index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

86.     Iowa and its local programs receive at least $1.6 billion from the Department and expect that number to increase in future years.  *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/statetables/index. html; *see also* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/statetables/ index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

87.     Nebraska and its local programs receive at least $1.07 billion from the Department and expect that number to increase in future years.  *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/statetables/index. html; *see also* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/statetables/ index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

88.     North Dakota and its local programs receive at least $446 million from the Department and expect that number to increase in future years.  *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/

35

statetables/index.html; *see also* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/ statetables/index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

89.     South Dakota and its local programs receive at least $519 million from the Department and expect that number to increase in future years. *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/ statetables/index.html; *see also* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/ statetables/index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

90.     The Rule accordingly could deprive Plaintiff States and their educational systems of billions of dollars in crucial federal funding. The education institutions for which Plaintiffs States are responsible, and the children who rely on those institutions, will be irreparably harmed if they lose funding because of their reliance on a half-century of Title IX practice and legal precedent interpreting "sex" to mean biological sex.

91.     In addition to hurting the Plaintiffs' financial interests, the Rule also harms the Plaintiff States' sovereign interests, including by interfering with their

authority over education in their State, their democratically enacted laws, and their future ability to legislate. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (explaining a State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm"); *Arizona v. Yellen*, 34 F.4th 841, 845 (9th Cir. 2022) (concluding a State had standing where it alleged "infringement on its authority to set tax policy and its interest in being free from coercion impacting its tax policy"); *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1149 (11th Cir. 2023) (concluding States "suffered irreparable harm" where a statutory provision allegedly "affected the States' sovereign authority to tax"); *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("The States, too, have an interest in seeing their constitutionally reserved police power over public health policy defended from federal overreach.").

92.     Arkansas's Fairness in Women's Sports Act requires elementary, secondary, and collegiate sports teams and competitions to be expressly designated as (1) for males, (2) for females, or (3) coed. Ark. Code Ann. 6-1-107(c). The Act makes clear that any sex separation must be based on "biological sex," not gender identity. *Id.* And it prohibits female-designated sports teams from being open to those of the male sex. *Id.* -107(c)(2)(B).

93.     Missouri law generally prohibits schools from allowing "any student to compete in an athletics competition that is designated for the biological sex

opposite to the student's biological sex as correctly stated on the student's official birth certificate."   Mo. Rev. Stat. 163.048(3).   However, if the only available competition is male-designated, the statute allows females to participate.  *Id.*

94.   Iowa law similarly requires school sports teams to be designated as (1) for females, (2) for males, or (c) coeducational.  Iowa Code 261I.2.  That designation must be based on biological sex, not gender identity.  Iowa Code 261I.1(3).  And only females may play on female-designated sports teams or competitions.  Iowa Code 261I.2(1)(b).

95.   North Dakota law requires school sports teams and activities to be designated based on the participants' sex as (1) for males, (2) for females, or (3) coed.  N.D.C.C. 15-10.6-02.  "Sex" is defined as "the biological state of being female or male."  N.D.C.C. 15-10.6-01.  Athletic teams designated for females may not be open to males.  *Id* . N.D.C.C 15-10.6-03.

96.   South Dakota law requires sports teams and activities to be designated based on the participants' sex as (1) for males, (2) for females, or (3) coed.  S.D.C.L. 13-67-1.  "Sex" is defined as "biological sex" for purposes of South Dakota's law.  *Id.*  "Only female students, based on their biological sex, may participate" in female-designated athletic teams or competitions.  *Id.*

97.   School athletics plainly qualify as a "program or activity" subject to the face of the Final Rule's gender-identity infused sex discrimination approach.

38

While the Final Rule purports to reserve the ultimate criteria the Department will use to judge sex separation in sports, the Rule notes that "athletic competition raises unique considerations" that warrant "impos[ing] more than de minimis harm on individual students" in certain circumstances.  89 Fed. Reg. at 33,817, 33,819.  Of course, by acknowledging that sex separation will (at best) be warranted only sometimes, the Final Rule gives the game away that wholesale prohibitions on male participation in female-designated sports teams and competitions will be preempted by the Final Rule.  Indeed, the Department of Justice has recently confirmed this position in the *B.P.J.* litigation in the United States Court of Appeals for the Fourth Circuit.  *See* Br. for the United States as Amicus Curiae, at 27-28, *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir.)[2] (arguing that "categorical bans" which "exclude[] transgender students from participating on athletic teams consistent with their gender identity . . . violate the general nondiscrimination mandate in [Title IX] and the regulations") (citing 34 C.F.R. 106.41(a)).

98.    Thus, Plaintiff States' will be forced to choose between enforcing their sports laws or running afoul of the Final Rule's interpretation of sex discrimination.

---

[2] *Available at* https://www.justice.gov/d9/case-documents/attachments/2023/04/03/b.p.j._v._west_va_state_bd_of_educ._nos._23-1078_23-1130_4th_cir._04.03.23.pdf

99.    Arkansas's Given Name Act was enacted to protect the freedom of speech and expression of school faculty and students, and to protect the rights of parents.  It prohibits a school employee from addressing a student with (1) a "[p]ronoun or title that is inconsistent" with the student's "biological sex"; or (2) a "[n]ame other than the name listed on the . . . student's birth certificate" or a derivative of that name, unless the school employee "has the written permission" of the student's parent.  Ark. Code Ann. 6-1-108(d)(1).  The Act further provides that school employees and students shall not be sanctioned for declining to address a person by (1) a name other than that on the person's birth certificate, or (2) a "[p]ronoun or title that is inconsistent with the person's biological sex.  *Id.* -108(d)(2).

100.   North Dakota law provides that "a government entity may not adopt a policy requiring or prohibiting" "[a]n employee's use of an individual's preferred pronoun when addressing or mentioning the individual in work-related communications."  N.D.C.C. 14-02.4-15.2(1).

101.   The Final Rule would subject State and local entities to liability for sex-based harassment unless they require their employees to use pronouns attributed to the student's self-professed gender identity instead of according to the student's sex.  Thus, these States' laws cannot be enforced without running afoul of the Final Rule's interpretation of Title IX.

102.   The Final Rule would also risk subjecting local entities to damages and fees under 28 U.S.C. 1983 and 1988. Requiring employees to use an individual's preferred pronoun is an unconstitutional violation of the First Amendment absent the government satisfying heightened scrutiny. *See Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021); *see also Beard v. Falkenrath*, 97 F.4th 1109, 1117 (8th Cir. 2024) (no First Amendment right to have prison guards use your preferred pronouns).

103.   Arkansas law provides that public schools sponsoring or supervising an overnight trip involving students must ensure that students only share sleeping quarters with those of the same sex.  Ark. Code Ann. 6-10-137(a).  The Final Rule would preempt this law and require public schools to assign overnight sleeping quarters based on a student's professed gender identity rather than sex.

104.   Arkansas law requires public schools to designate multiple occupancy restrooms based on biological sex.  Multiple occupancy restrooms must be designated for the "exclusive use by the male sex" or the "exclusive use by the female sex."  Ark. Code Ann. 6-21-120(b)(1).

105.   Iowa law requires that schools "require a multiple occupancy restroom or changing area to be designated only for and use by persons of the same sex" and prohibits an individual from entering one of those areas "that does not correspond

with the person's sex."  Iowa Code 280.33(2).  "Sex" under Iowa law "means a person's biological sex as female or male." *Id.* -280.33(1)(b).

106.   Nebraska law allows school districts to "maintain[] separate toilet facilities, locker rooms, or living facilities for the different sexes." Neb. Rev. Stat. 79-2,124.  Governor Pillen of Nebraska has established through executive order a Women's Bill of Rights requiring "all state agencies, boards, and commissions" in rulemaking, enforcement, and adjudication to define a person's sex "as his or her biological sex." The order further requires that "[a]ny public school or school district . . . that collects vital statistics for the purpose of complying with antidiscrimination laws . . . shall identify each individual who is part of the collected data set as either male or female at birth." Neb. Exec. Order. No. 23-16 (Aug. 30, 2023).[3]

107.   North Dakota public universities must designate dormitory restrooms and showers as "exclusively for males or exclusively for females."  N.D.C.C. 15-10-68(1).  North Dakota law requires that sex-designated restrooms and showers "may only be used by members of that sex." *Id.* -68(2).

108.   The Final Rule preempts these laws and would require schools to allow students to use multiple occupancy restrooms based on the student's professed gender identity rather than the student's sex.

---

[3] Available at https://governor.nebraska.gov/sites/default/files/doc/press/EO%20No.%2023-16%20-%20Establishing%20a%20Women%27s%20Bill%20of%20Rights.pdf.

*Harms to Plaintiff A.F.*

109.   A.F. attends a public high school in Arkansas that is a recipient of federal funds and is therefore subject to Title IX.  If the Final Rule is allowed to go into effect, it will erase existing legal protections for female students and subject her to irreparable harms in numerous aspects of her school life.

110.   If the Final Rule goes into effect, A.F. may be forced to choose between following her religious beliefs or facing sanction from school officials.  She believes as a Christian that God created humans as immutably either male or female.  She does not use pronouns or titles inconsistent with a person's sex and denies that a person's belief that they are male or female, or desire to be a male or female, makes them male or female.  A.F. also expresses her views about gender identity at school with her classmates and coaches by, for example, explaining that men who identify as women are in fact men and should not be allowed to compete in women's sports.  But come August 1, A.F. fears she will be punished for expressing these views at her school and will be less vocal and more hesitant to speak these views to avoid punishment until she knows she can do so without being punished.

111.   Under the Religious Viewpoint Antidiscrimination Act, Arkansas public schools are prohibited from discriminating against students' expressions of religious viewpoints, even if other students are offended by that religious expression.  Ark. Code Ann. 6-10-137.  A.F. is thus protected against adverse action

43

by her school when she expresses religious viewpoints regarding sex and gender, including using sex-consistent titles and pronouns when addressing and referring to other students.

112.   If the Final Rule takes effect, A.F.'s school will be required to investigate and respond to instances of what the Final Rule defines as "sex-based" harassment.  This includes the use of sex-consistent pronouns that offend another student, as measured from that other student's point of view. *See supra* ¶¶ 69-70 . A.F. will thus face potential investigation and sanctions by her school when she continues to refer to students using pronouns consistent with the student's sex, refuses to affirm that other students' professed gender identity determines whether they are in fact male or female, or even discusses her religious views regarding sex and gender in a manner that another student is offended by.

113.   If the Final Rule takes effect, A.F.'s school will face liability under Title IX if it does not allow male students into previously female-designated bathrooms, locker rooms, and shower areas.  Currently, Arkansas law prevents A.F.'s school from allowing males into these female-only spaces or allowing male students to share a room with female students on overnight trips.  This gives A.F. and other girls the assurance and comfort of knowing that males will not be allowed into these sensitive spaces when they are using the restroom, changing clothes, and showering.  The Final Rule will eviscerate that sense of safety and instead subject

A.F. and others to the deeply distressing and embarrassing reality that male students may be present while they are changing clothes or showering. This puts girls like A.F. to the choice of accepting the presence of males in these female-designated spaces or ceasing using school bathrooms, locker rooms, and showers altogether.

114. A.F. has played in organized sports from a young age and currently plays on her school basketball team. Athletics have played an important role in A.F.'s life and her development as a young person. Participating in school sports has helped her build a strong work ethic, kept her body health, taught her how to set goals and achieve them, and taught her how to communicate well with others. Competing in sports has boosted A.F.'s self-confidence and helped to build leadership skills. She anticipates continuing to compete in athletics on school teams in the years to come.

115. Arkansas law currently prevents males from competing in female-designated sports teams. This means that A.F. competes against only female teammates for athletic opportunities such as starting positions and playing time. When A.F.'s basketball team competes against teams from other Arkansas schools, they compete only against other female students.

116. Despite the Final Rule purporting to reserve the issue of athletics for a different rulemaking, the Final Rule clearly prevents funding recipients from enforcing blanket policies restricting males from competing in female-designated

sports teams and competitions. *See supra* ¶¶ 97-98. If the Final Rule takes effect, A.F. and other girls will be forced to compete alongside and against male athletes.

117.   Males indisputably have physiological advantages over females when it comes to athletics. It is unfair to require girls such as A.F. to compete in sports such as basketball against male athletes. A.F.'s ability to compete in school sports would be diminished if she were forced to compete with males for starting positions or playing time during games. She and other girls risk being displaced from school athletics by physiologically advantaged males if the Final Rule goes into effect.

118.   A.F. and other girls are at a greater risk of injury when competing against males due to the physiological advantages in size and strength that males have over females. These risks are not speculative. Girls suffer knee and ankle injuries playing basketball, and the risks of injuries only increase if girls are forced to play alongside and against male students.

## CLAIMS FOR RELIEF

## CLAIM I

**Violation of APA, 5 U.S.C. 706(2)(A), (C)**
**The Rule Exceeds Statutory Authority and Is Not in Accordance with Law**

119.    Plaintiffs repeat and incorporate by reference the preceding allegations.

120.    The Department is a federal agency within the meaning of the APA.

121.    The Final Rule is a final agency action within the meaning of 5 U.S.C. 704, because it was published in the Federal Register following notice-and-comment.  89 Fed. Reg. 33,474 (Apr. 29, 2024).  Plaintiff States lack another adequate remedy to challenge the Final Rule in court, and no rule requires that the States appeal to a superior agency authority prior to seeking judicial review.  5 U.S.C. 704.

122.    The APA requires courts to set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. 706(2)(A), (C); *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) ("Vacatur is the normal remedy under the APA, which provides that a reviewing court 'shall . . . set aside' unlawful agency action." (quoting 5 U.S.C. 706(2)).

*Contrary to Title IX*

123.   The Department's redefinition of sex discrimination is unlawful because it contravenes Title IX's text.  Courts must interpret a statute's "words consistent with their ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up).  The Final Rule relies on the Supreme Court's decision in *Bostock* to recast Title IX and justify imposing standards, definitions, and requirements that conflict with Title IX's text. Indeed, the Final Rule does so despite *Bostock*'s express reservation that it was not addressing the meaning of sex discrimination outside of Title VII and differences between Title VII and Title IX that require different treatment.

124.   The text of Title IX allows recipients of federal funds to distinguish between males and females in situations that the Final Rule prohibits.

125.   Title IX's prohibition of discrimination "on the basis of sex" refers only to biological sex and does not include protections based on sexual orientation or gender identity.  By rewriting the statute to cover sexual orientation and gender identity, the Department has exceeded its authority under the APA.

126.   The use of "sex" in Title IX is not ambiguous and clearly refers to the male/female binary of biological sex.  But even if it were an ambiguous term, the Department's definition is not entitled to any deference because its reading falls outside of the range of reasonable interpretations of the statutory text.  Indeed, it

purports to resolve a policy issue of major political significance without clear congressional authority. *See West Virginia v. EPA*, 597 U.S. 697, 721-25 (2022).

*Contrary to Religious Freedom Restoration Act*

127.   The Religious Freedom Restoration Act of 1993 provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. 2000bb-1(a). "If the Government substantially burdens a person's exercise of religion, under the Act that person is entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014). RFRA applies to any "department or agency" of the United States, including the Department of Education. 42 U.S.C. 2000bb–2(1).

128.   To the extent that the Final Rule's interpretation of Title IX would require students like A.F. to speak or use titles or pronouns in a manner that violates their religious beliefs, that would violate RFRA. The Department has no compelling interest in requiring such speech, and the Department's construction of "sex-based" harassment is not the least restrictive means of furthering that interest.

129.   The Final Rule's interpretation of Title IX is contrary to the statutory text, the Department's own regulations, and RFRA.   The Department's interpretation of Title IX is thus owed no deference and exceeds the agency's authority to implement Title IX.  The Final Rule should therefore be enjoined and ultimately "set aside" on this basis.  5 U.S.C. 706(2).

**CLAIM II**
**Violation of U.S. Constitution and 5 U.S.C. 706(2)(B)**
**The Rule Is Contrary to the U.S. Constitution**

130.   Plaintiffs repeat and incorporate by reference the preceding allegations.

131.   The APA requires courts to set aside and vacate agency action that is "contrary to constitutional right, power, privilege, or immunity."   5 U.S.C. 706(2)(B)

132.   The Final Rule is "contrary to [a] constitutional right [or] power," 5 U.S.C. 706(2)(B), in at least three ways.

*Spending Clause*

133.   First, it violates the Spending Clause.  Congress enacted Title IX pursuant to its powers under the Spending Clause.  *Davis*, 526 U.S. at 640 ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause[.]").  If Congress intends to impose a condition on the grant of federal funding under Title IX, it must do so with "a clear voice,"

50

"unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

134. The use of the word "sex" in Title IX did not put educational institutions and programs on notice that by accepting funding from the federal government for educational services and activities, they are prohibited from providing separate bathrooms or other facilities for the two sexes. *See Adams*, 57 F.4th at 816. That is clear not only from historical practice but from Defendants' longstanding interpretation of Title IX and its implementing regulations, which "include provisions that presuppose sex as a binary classification." 85 Fed. Reg. at 30,178.

135. The Final Rule is also unconstitutionally coercive because it leaves Plaintiff States with "no real option but to acquiesce" to the Department's interpretation, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78, 580-82 (2012) (opinion of Roberts, C.J., joined by Breyer & Kagan, JJ.).

136. The Final Rule impermissibly conditions federal funding on States' and school recipients' taking unconstitutional actions against faculty and students for engaging in protected expression. *See South Dakota v. Dole*, 483 U.S. 203, 210-11 (1987).

137. Finally, extending Title IX's protections to individuals based on gender identity alone is not related, as it must be, to the statute's purpose of remedying past

discrimination against women and promoting equal opportunity for women in education.  *See South Dakota*, 483 U.S. at 207-08.

*Nondelegation & Major Questions Doctrine*

138.   The Final Rule also violates the nondelegation doctrine to the extent the Department asserts authority to define new "discriminatory practices" that violate Title IX exclusively "through [its] regulations," 89 Fed. Reg. at 33,517, 33,560.  That sort of agency lawmaking transgresses "the Constitution's rule vesting federal legislative power in Congress," not agencies acting by "pen-and-phone regulations."  *West Virginia*, 597 U.S. at 737, 753 (Gorsuch, J., concurring).

139.   Under that doctrine, an agency action involving a matter of "vast economic and political significance" will stand only if the agency can identify "exceedingly clear language" authorizing its actions.  *Alabama Assn. of Realtors v. Dept. of Health and Human Services*, 594 U.S. 758, 764 (2021).  This doctrine rests on the premise "that Congress intends to make major policy decisions itself, not leave those decisions to agencies."  *West Virginia*, 597 U.S. at 723 (cleaned up).

140.   The Final Rule has both vast economic and vast political significance. The Final Rule affects hundreds of billions of dollars, and the substantive question involved has been at the forefront of American discussion for at least the last decade. There is no clear congressional authorization for the Secretary to redefine "sex"

away from the understood biological dimorphic definition.  This is a decision that Congress would have intended to keep for itself.

*First Amendment*

141.  To the extent the Final Rule requires students like A.F. and school employees to use pronouns contingent on a student's professed gender identity rather the student's sex, the Final Rule would violate the First Amendment.  *Cf. Davis*, 526 U.S. at 642-43, 650 (recognizing that a school's Title IX liability extends to sexual harassment of a student by teachers and peers).  The First Amendment protects the rights of individuals to decline to use pronouns inconsistent with sex.  *See Beard*, 97 F.4th at 1117 (holding that the Constitution does not require government officials to use "preferred gender pronouns" "in part because the speaker has a [First Amendment] right" to "the misuse of a pronoun").

142.  The Final Rule's expansive definition of "hostile environment harassment" creates additional First Amendment problems.  89 Fed. Reg. at 33,493, 33,884.  The Rule defines sex-based harassment to include harassment based on characteristics extending far beyond sex, including various "sex characteristics" and "gender identity."  *Id.* at 33,756, 33,886 (34 C.F.R. 106.02, .10).  This broad framework inhibits First Amendment rights by chilling, or risking liability over, students' expression on deeply held views regarding significant moral and political issues.

143.   For these reasons, the Final Rule is unconstitutional and should be declared unlawful, "set aside," and vacated.  5 U.S.C. 706(2).

**CLAIM III**
**Violation of APA, 5 U.S.C. 706(2)(A)**
**The Rule Is Arbitrary and Capricious**

144.   Plaintiffs repeat and incorporate by reference the preceding allegations.

145.   Federal law prohibits agency actions, findings, and conclusions that are "arbitrary, capricious," or "an abuse of discretion."  5 U.S.C. 706(2)(A).

146.   Agency actions are arbitrary and capricious when they "entirely fail to consider an important aspect of the problem or offer an explanation for its decision that runs counter to the evidence before it."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (cleaned up) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

147.   In promulgating the Final Rule over commenters' wide-ranging opposition and in the face of decades of contrary agency practice, the Department acted arbitrarily and capriciously.

148.   The Department fails to offer a reasoned explanation for the Final Rule's departure from the historic understanding—including within previous Title IX regulations—of Title IX's prohibition on "sex" discrimination.  To the extent the Department merely relies on *Bostock* for its changed interpretation, that was

54

unreasonable given that the decision itself disclaimed any application to other sex-related provisions in federal law. *Bostock* cannot excuse the inconsistency between the Department's longstanding view that enforcing sex-separation in spaces like bathrooms, locker rooms, and shower facilities is not sex discrimination, on the one hand, and its new rule deeming such policies actionable Title IX discrimination, on the other.

149.   The Department failed to adequately "consider and respond to significant comments received during the period for public comment" on the Final Rule. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Commenters raised a raft of concerns about the constitutional defects and compliance challenges attending the Final Rule's approach.  In response, the Final Rule offers only a "handful of conclusory sentences" and unexplained inconsistencies. *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), vacated as moot, 142 S. Ct. 1665 (Mem.) (2022).  But "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not the hallmark of reasoned decisionmaking." *Gresham*, 950 F.3d at 103.

150.   The Department also "entirely fail[s] to consider [certain] important aspect[s] of the problem" or address relevant evidence that "runs counter" to its cost-benefit determination. *State Farm*, 463 U.S. at 43.  The Department ignored practical concerns about funding recipients lacking any way to authenticate a

person's professed gender identity and failed to address commenters' concerns that the Final Rule will endanger privacy and safety interests. The Department fails to consider evidence of the biological differences between men and women that have long justified sex-separated facilities, certain sex-separated classes, and sex-separated sports. And the Department downplays the grave compliance challenges with structuring school operations based on internal notions of gender identity that are subjective and subject to change.

151. The Department's failure to consider these important aspects of the regulatory problem renders the Final Rule arbitrary and capricious under the APA and warrants enjoining, declaring unlawful, and setting aside the Final Rule. 5 U.S.C. 706(2).

## CLAIM IV
### Relief Under the Declaratory Judgment Act, 28 U.S.C. 2201 and 5 U.S.C. 706
### Claim for Declaratory Judgment

152. Plaintiffs repeat and incorporate by reference the preceding allegations.

153. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. 2201(a).

154. This case presents an actual controversy. The Final Rule operates on Plaintiff States directly as recipients of Title IX funds. Enforcement of the Final

Rule threatens to force recipients of Title IX funds to choose between violating State Plaintiffs' laws and longstanding policies or losing billions of dollars of Title IX funding.

155.   This controversy arises in this Court's jurisdiction, as it relates to questions of federal law.  Venue is proper, as Plaintiff the State of Missouri resides in this District.  28 U.S.C. 1391(e).

156.   Through this Complaint, the Plaintiffs have filed an appropriate pleading to have their rights declared.  The Court can resolve this controversy by declaring that Title IX does not authorize the Department to condition receipt of Title IX funds on using gender identity, rather than sex, as the rubric for student participation in covered educational programs.

## PRAYER FOR RELIEF

An actual controversy exists between the parties that entitles the Plaintiffs to declaratory and injunctive relief.  Plaintiffs request that this Court:

a) Enter a stay of the Final Rule's effective date under 5 U.S.C. 705 and a preliminary injunction enjoining Defendants, and any other agency or employee of the United States, from enforcing or implementing the portions of the Final Rule that violate Title IX, the APA, and the federal Constitution;

b) Enter a judgment declaring, pursuant to 28 U.S.C. 2201 and 5 U.S.C. 706, that (i) the Final Rule's interpretation of Title IX is unlawful; (ii) the Final Rule is arbitrary and capricious; (iii) the Plaintiff States, their political subdivisions, and their resident institutions may continue receiving Title IX funding notwithstanding any failure to adhere to the Final Rule's unlawful requirements; and (iv) the Final Rule's requirements may not be enforced against A.F. and other similarly situated individuals.

c) Set aside and vacate the Final Rule on the basis that it violates Title IX, the APA, and the federal Constitution, pursuant to 5 U.S.C. 706;

d) Enter a stay of the Final Rule's effective date under 5 U.S.C. 705 and a preliminary injunction enjoining Defendants, and any other agency or employee of the United States, from enforcing or implementing the

58

portions of the Final Rule that violate Title IX, the APA, and the federal Constitution;

e) Enter a judgment declaring, pursuant to 28 U.S.C. 2201 and 5 U.S.C. 706, that (i) the Final Rule's interpretation of Title IX is unlawful; (ii) the Final Rule is arbitrary and capricious; (iii) the Plaintiff States, their political subdivisions, and their resident institutions may continue receiving Title IX funding notwithstanding any failure to adhere to the Final Rule's unlawful requirements; and (iv) the Final Rule's requirements may not be enforced against A.F. and other similarly situated individuals.

f) Set aside and vacate the Final Rule on the basis that it violates Title IX, the APA, and the federal Constitution, pursuant to 5 U.S.C. 706.

g) Award attorneys' fees, costs, and other expenses of this action to Plaintiff A.F. under any applicable federal statute, including 28 U.S.C. 2412.

Dated:  May 7, 2024                          Respectfully submitted,


TIM GRIFFIN                                  ANDREW BAILEY
Arkansas Attorney General                    Missouri Attorney General

*/s/ Nicholas J. Bronni*                      */s/ Joshua M. Divine*
Nicholas J. Bronni                           Joshua M. Divine
  Solicitor General                            Solicitor General
Dylan L. Jacobs                              Missouri Attorney General's Office
  Deputy Solicitor General                   Post Office Box 899
Office of the Arkansas Attorney General      Jefferson City, MO 65102
323 Center Street, Suite 200                 Tel. (573) 751-1800
Little Rock, AR  72201                        Fax. (573) 751-0774
Telephone: (501) 682-2007                    josh.divine@ago.mo.gov
Fax: (501) 683-2520
nicholas.bronni@arkansasag.gov               *Counsel for Plaintiff State of Missouri*
dylan.jacobs@arkansasag.gov


*Counsel for Plaintiff State of Arkansas*

BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
Eric H. Wessan
Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
eric.wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

MICHAEL T. HILGERS
Nebraska Attorney General

*/s/ Lincoln J. Korell*
*Lincoln J. Korell
Assistant Solicitor General
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*\*Motion for admission forthcoming*

*Counsel for Plaintiff State of
Nebraska*

DREW H. WRIGLEY
North Dakota Attorney General

*/s/ Katie L. Carpenter*
*Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney
General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov

*\*Motion for admission forthcoming*

*Counsel for Plaintiff State of North
Dakota*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles D. McGuigan*
*Charles D. McGuigan
Deputy Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us

*\*Motion for admission forthcoming*

*Counsel for Plaintiff State of South
Dakota*

61

*s/ Brad L. Blake*

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
rrouleau@ADFlegal.org

Natalie D. Thompson**
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

Brad L. Blake
Missouri Bar No. 38340
Fellows & Blake, L.C.
13421 Manchester Road, Suite 105
St. Louis, MO 63131
(314) 725-1600
(314) 725-1609 Fax
bblake@fellowsblakelaw.com

*Counsel for Plaintiff A.F.*

*Motion for pro hac vice admission forthcoming*

**Motion for pro hac vice forthcoming, practice supervised by
 one or more D.C. Bar members while D.C. Bar
 application is pending.*