# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## ST. LOUIS DIVISION

| | |
|---|---|
| THE STATE OF ARKANSAS; THE STATE OF MISSOURI; THE STATE OF IOWA; THE STATE OF NEBRASKA; THE STATE OF NORTH DAKOTA; THE STATE OF SOUTH DAKOTA; A.F., a minor, by Sara Ford, her mother, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education; CATHERINE E. LHAMON, in her official capacity as Assistant Secretary for Civil Rights at the United States Department of Education; RANDOLPH WILLS, in his official capacity as Deputy Assistant Secretary for Enforcement at the United States Department of Education, <br><br> *Defendants*. | Case No.: 4:24-cv-636 |

## BRIEF IN SUPPORT OF MOTION FOR A 5 U.S.C. 705 STAY AND PRELIMINARY INJUNCTION

# Table of Contents

Introduction ...................................................................................................................1

Background ....................................................................................................................2

    A.    Title IX's text, structure, and history................................................... 2

    B.    Early regulations implementing Title IX.............................................. 3

    C.    The Obama administration's inroads into gender identity regulation. ........................ 4

    D.    The Trump administration's rescission of gender-identity guidance and 2020 regulations on sexual harassment and grievance procedures. .......................... 6

    E.    The Supreme Court's decision in *Bostock*.......................................... 8

    F.    The Biden administration's 2021 interpretation of "sex" in Title IX. ...................... 10

    G.    2022 proposed Title IX rule.............................................................. 11

    H.    2023 proposed Title IX rule relating to athletics. ................................. 14

    I.    The Final Rule is adopted in substantially the same form as the proposed rule........ 15

Legal Standard .............................................................................................................18

Argument .....................................................................................................................19

    I.    Plaintiffs are likely to succeed on the merits. .......................................... 19

    A.    The Final Rule exceeds the Department's statutory authority. ................... 19

        1.    The Final Rule unlawfully reinterprets "sex" discrimination to mean "gender identity" discrimination. .................................................. 19

        2.    The Final Rule unlawfully broadens its definition of "harassment.".................. 26

        3.    The Final Rule violates the Spending Clause ....................................... 29

    B.    The Final Rule is arbitrary and capricious.............................................. 31

        1.    The Final Rule's redefinition of "sex" discrimination is arbitrary and capricious. 31

        2.    The Final Rule's broadening of "harassment" is arbitrary and capricious. ........... 36

    II.    Plaintiffs face irreparable harm absent preliminary relief. ............................ 38

    A.    Irreparable harms to Plaintiff States. ...................................................... 38

    B.    Irreparable harms to A.F. ....................................................................... 42

    III.    The balance of equities and public interest factors weigh in Plaintiffs' favor. ............... 47

Conclusion ..................................................................................................................48

## INTRODUCTION

Since 1972 Title IX has protected women and girls from discrimination "on the basis of sex" in educational programs and activities.  But last month, the Department of Education issued a rule radically reinterpreting that half-century-old statute and rolling back those protections.  *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (attached as Exhibit A).  That rule takes effect August 1, 2024.

The challenged rule runs afoul of the law in at least two ways.  First, it requires States, schools, and universities to ignore biological sex in favor of self-professed "gender identity" when it comes to bathrooms, locker rooms, athletics, and even speech.  Second, it expands the definition of sex-based harassment in contravention of controlling Supreme Court precedent.

The rule cannot survive review under the Administrative Procedure Act.  It is illegal on its face, exceeding both the Department's statutory authority and constitutional limitations.  It is also arbitrary and capricious.  During the rulemaking process the Department steamrolled over valid concerns raised by commenters, rushing through a rule that defies logic, common sense, and the Department's own regulations.

If allowed to take effect, that rule will gut the very athletic opportunities that Title IX was designed to provide; destroy the privacy protections women and girls currently enjoy in restrooms, locker rooms, shower facilities, and overnight accommodations; preempt numerous State laws; silence and threaten with investigation any student, faculty member, or administrator who doesn't share the Department's view of sex; and deny federal funding to any school or university that doesn't adhere to those views.  To prevent those harms, Plaintiffs ask the Court to

postpone the rule's effective date and enjoin Defendants from enforcing it while this
lawsuit proceeds.

**BACKGROUND**

A.   Title IX's text, structure, and history.

Title IX was enacted in 1972 and states: "No person in the United States shall, on the
basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to
discrimination under any education program or activity receiving Federal financial assistance."
20 U.S.C. 1681(a).  At the time of Title IX's enactment (and in the half-century since) "sex" was
understood to mean biological sex—either male or female.  Sex is male or female—which "is an
immutable characteristic determined" prior to "birth." *Frontiero v. Richardson*, 411 U.S. 677,
686 (1973) (plurality op.).  The plain meaning of Title IX's text confirms this reading.  As the en
banc Eleventh Circuit recognized, "[r]eputable dictionary definitions of 'sex' from the time of
Title IX's enactment [in 1972] show that when Congress prohibited discrimination on the basis
of 'sex' in education, it meant biological sex, *i.e.*, discrimination between males and females."
*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc).
*See* Compl. ¶ 25.

The structure of Title IX further underscores that "sex" means "sex"—not gender identity
or any other distinct concept.  Title IX expressly states that it does not "prohibit any educational
institution . . . from maintaining separate living facilities for the different sexes."  20 U.S.C.
1686.  That provision only makes sense if "sex" refers to the male-female binary and the
associated physiological differences.  And Title IX's text is replete with further examples of
"sex" being referred to as a binary.  *See* Compl. ¶ 28.  Further underscoring that understanding is
Title IX's explicit exclusion of certain sex-selective organizations.  *See, e.g.*, *id.* 20 U.S.C.

1681(a)(6) (excluding membership practices of college fraternities and sororities or to those of sex-segregated voluntary service organizations); *id.* 1681(a)(7) (excluding Boys and Girls State and Boys and Girls Nation).

Title IX's treatment of sex as a male-female binary reflects the ordinary understanding of "sex" when the statute was passed.  After all, "[t]he phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications."  Ryan T. Anderson & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do* 9, The Heritage Found. (2017), https://perma.cc/VG5N-ZAYE.

B.    Early regulations implementing Title IX.

The Department of Education's predecessor agency first issued regulations implementing Title IX in 1975.  *See* 34 C.F.R. pt. 106.  These regulations treated sex as a binary, referring multiple times to "one sex," versus "the other sex," using the phrase "both sexes," and referencing "boys and girls" and "male and female teams."  *See, e.g.*, 34 C.F.R. 106.33, 106.34(a)(3), 106.36(c), 106.37(a)(3), 106.41(c), 106.51(a)(4), 106.58(a), 106.60(b), 106.61; *see also* 34 C.F.R. pt. 86 (1975).  Consistent with Title IX's structure, the regulations also preserved certain sex-separated spaces, including housing, restrooms, locker room, and shower facilities, sexual-education classes, and choruses.  *See* Compl. ¶ 32.

The original regulations likewise approved of sex separation in athletics in certain circumstances.  The regulations prohibited discrimination "on the basis of sex" in "interscholastic, intercollegiate, club or intramural athletics" but allowed a recipient to sponsor "separate teams for members of each sex" when team selection is "based upon competitive skill" or the sport is a "contact sport."  34 C.F.R. 106.41(a)-(b).  The regulations further recognized that sex differentiation in athletics does not necessarily constitute sex discrimination; in fact, the

failure to differentiate can amount to sex discrimination.  The rules required "equal athletic opportunity for members of both sexes," including in the distribution of athletic scholarships and the provision of facilities, equipment, and services, but provided that "aggregate expenditures for members of each sex" and "expenditures for male and female teams" need not necessarily be equal to comply with Title IX.  *Id.* 106.41(c); *see also id.* 106.37(c).

The Department thereafter consistently interpreted "sex" as a binary male/female classification over the next decades.  For example, in 1997 guidance clarifying that Title IX covers same-sex sexual harassment, the Department stated, "both male and female students are protected from sexual harassment . . . even if the harasser and the person being harassed are members of the same sex."  *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034, 12,039 (Mar. 13, 1997).  That same guidance stated that "Title IX does not prohibit discrimination on the basis of sexual orientation," because—as the Department then correctly recognized—"sex" refers to the status of being male or female, not that of having a heterosexual or homosexual orientation or a person's "gender identity."  *Id.*; *see also id.* at 12,036.

C.      The Obama administration's inroads into gender-identity regulation.

In stark contrast to that long-established reading, in 2014, President Obama's Department of Education suddenly attempted to radically redefine sex and recast Title IX as a regulation about gender identity, rather than sex.  It did so first via a "Dear Colleague" letter asserting—for the first time—that "Title IX's sex discrimination prohibition extends to claims of discrimination" based solely on "gender identity."  U.S. Dep't of Educ., Off. for Civ. Rts., Questions and Answers on Title IX and Sexual Violence, at 5 (Apr. 29, 2014) (rescinded in 2017), https://perma.cc/Y7BD-XHFU.

4

Then, in 2016, President Obama's Department went still further, issuing guidance claiming that Title IX "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status."  U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Title IX and Transgender Students, at 1 (May 13, 2016) (rescinded in 2017) ("2016 Guidance"), https://perma.cc/G5VG-ZNV9.  The 2016 Guidance claimed that failing to "treat students consistent with their gender identity" would constitute sex discrimination, even where a student's claimed gender identity differed from their sex.  *Id.* at 3.  And it suggested funding recipients were required to compel their faculty and staff to "use pronouns and names consistent with a transgender student's gender identity" and must permit access to previously sex-separated restrooms, locker rooms, shower facilities, housing, and sports based solely on a student's proclaimed gender identity.  *Id*. at 3-4.

The Obama administration's foray into gender-identity-based Title IX regulations was swiftly enjoined by the United States District Court for the Northern District of Texas, which concluded the 2016 Guidance was likely contrary to law.  *See Texas v. United States*, 201 F. Supp. 3d 810, 816 n.4, 836 (N.D. Tex. 2016), clarified by No. 7:16-cv-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016).  The Department subsequently withdrew its unlawful gender-identity guidance, *see infra* at ¶ 39, and that lawsuit was voluntarily dismissed.  *See* Pls.' Notice of Voluntary Dismissal, *Texas v. United States*, No. 7:16-cv-00054-O (N.D. Tex. Mar. 3, 2017), ECF No. 128.

The Obama administration's unlawful gender-identity guidance also spurred litigation in the United States District Court for the Eastern District of Virginia.  A transgender-identifying high-school student relied on that guidance in arguing that a school policy requiring students to use the bathroom associated with their sex, rather than their self-expressed gender identity,

violated Title IX.  The Fourth Circuit held that the Obama administration's guidance was entitled to *Auer* deference, *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016), *vacated and remanded*, 580 U.S. 1168 (2017), and the district court entered an injunction against the school board on remand requiring it to allow the plaintiff to use the bathroom associated with the plaintiff's self-professed gender identity, *G.G. v. Gloucester Cnty. Sch. Bd.*, No. 4:15CV54, 2016 WL 3581852, at *1 (E.D. Va. June 23, 2016), *vacated*, 853 F.3d 729 (4th Cir. 2017), *as amended* (Apr. 18, 2017).  The Supreme Court stayed the injunction, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 579 U.S. 961 (2016), and subsequently granted certiorari to consider the validity of the Title IX guidance, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 580 U.S. 951 (2016).  After the Department withdrew its unlawful Title IX guidance, the Supreme Court vacated the Fourth Circuit's decision and remanded for further proceedings. *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 580 U.S. 1168 (2017).

D.   <u>The Trump administration's rescission of gender-identity guidance and 2020 regulations on sexual harassment and grievance procedures.</u>

The Trump administration withdrew the Department's unlawful gender-identity guidance in February 2017, returning to the pre-2014 understanding that Title IX's prohibition on sex-based discrimination means "sex," not gender identity.  U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Gender Identity Guidance (Feb. 22, 2017), https://perma.cc/H6E3-YBEZ.  And in 2020, the Department further amended its regulations to clarify the definition of "sexual harassment" for purposes of Title IX enforcement.  *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ("2020 Rule").

The Department grounded its 2020 harassment guidance on the Supreme Court's decision in *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999).  There, the

6

Supreme Court held actionable Title IX harassment is limited to conduct that is "so severe, pervasive, *and* objectively offensive that it *denies* its victims . . . equal access to education" where "the recipient exercises substantial control over both the harasser and the context."  *Id.* at 645, 652 (emphases added).  This standard excludes both "a single instance of one-on-one peer harassment" (even if "sufficiently severe") and harassment that has only negative effects like "a mere 'decline in grades.'"  *Id.* at 652-53.  And under that standard, a funding recipient can only be held liable if it has "actual knowledge" of sexual harassment and is "deliberately indifferent" to it.  *Id*. at 650.  Moreover, particularly relevant here, in articulating that standard, *Davis* rejected the argument that the laxer standard governing Title VII harassment claims (which merely requires "severe" *or* "pervasive" conduct) ought to apply, because of the "practical realities of responding to student behavior."  *Id.* at 651-53 (distinguishing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (emphasis added)).  Those practical differences, the Court stressed, included "legal constraints on [schools'] disciplinary authority" under the First Amendment, *id.* at 649.

The Department's 2020 rulemaking incorporated the Supreme Court's *Davis* standard verbatim.  85 Fed. Reg. at 30,036.  The Department recognized that broader definitions of harassment "infringed on constitutionally protected speech" and led "'many potential speakers to conclude that it is better to stay silent.'"  *Id.* at 30,164-65 & nn.738-39.  Adopting the *Davis* standard, the Department concluded, "ensures that speech . . . is not peremptorily chilled or restricted" because it applies only when harassment rises to the level of "serious *conduct* unprotected by the First Amendment."  *Id.* at 30,151-52 (emphasis added).  The Department explained that this standard was appropriate in the education context because it would capture "serious situations" while accounting for the fact that "younger students are still learning social

skills and older students benefit from robust exchange of ideas, opinions, and beliefs." *Id.* at 30,143.  And the Department explained that that "narrowly tailored" definition of hostile-environment harassment was necessary to ensure that Title IX is applied "in a manner consistent with respect for First Amendment rights, and principles of free speech and academic freedom, in education programs and activities." *Id.* at 30,142.

      E.    The Supreme Court's decision in *Bostock*.

A month after the Department issued its 2020 Rule, the Supreme Court decided *Bostock v. Clayton County*, 590 U.S. 644 (2020).  *Bostock* held that Title VII's prohibition on sex discrimination bars an employer from firing an employee based on sexual orientation or transgender status.  *Id.* at 651-52.  In reaching that conclusion, *Bostock* interpreted Title VII's language prohibiting discrimination "because of" sex as a but-for causation standard, meaning that "[s]o long as the plaintiff's sex was one but-for cause of" an adverse employment action Title VII's coverage is triggered.  *Id.* at 656, 659.  And it concluded that "sex plays an unmistakable and impermissible role in [a] discharge decision" based on sexual orientation or transgender status.  *Id.* at 660.  That is because an employer who fires a male employee "for no reason other than the fact he is attracted to men . . . discriminates against him for traits or actions it tolerates in his female colleague"; similarly, an employer who fires a male who adopts a transgender identity as a female "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.*

As relevant here, however, *Bostock* assumed that "sex" as used in Title VII in 1964 referred "only to the biological distinctions between male and female." *Id.* at 655.  And it expressly declined to "prejudge" whether its decision would "sweep beyond Title VII" to other statutes such as Title IX, or whether enforcing "sex-segregated bathrooms, locker rooms, and

dress codes" would constitute discrimination under Title VII.  *Id.* at 681.  Finally, the Court did

not consider what Title IX's different language—"on the basis of sex"—means in the context of

discrimination.

Following *Bostock*, some lower courts sought to expand the scope of other statutory sex-

based provisions, including Title IX.  *See, e.g.*, *Adams ex rel. Kasper v. Sch. Bd. of St. Johns*

*Cnty.*, 968 F.3d 1286, 1305 (11th Cir. 2020), *rev'd on reh'g en banc*, 57 F.4th 791 (holding, prior

to the Eleventh Circuit holding the opposite on rehearing en banc, that "Title IX, like Title VII,

prohibits discrimination against a person because he is transgender, because this constitutes

discrimination based on sex"); *see also Brandt ex rel. Brandt v. Rutledge*, No. 21-2875, 2022

WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing)

(explaining that "there is reason to be skeptical that" the Equal Protection Clause's "protections

reach" as far as Title VII, given that "their text is not similar in any way").

The Department's Office of the General Counsel disagreed with the view of those few

lower courts that *Bostock*'s reasoning applied to Title IX.  Instead, it stated in a 2021

memorandum that the "Department's longstanding construction of the term 'sex' in Title IX [is]

biological sex, male or female."  Reed D. Rubinstein, Memorandum for Kimberly M. Richey,

Acting Assistant Secretary of the Office for Civil Rights, re: *Bostock v. Clayton Cty.*, 140 S. Ct.

1731 (2020) (Jan. 8, 2021), https://perma.cc/Q9YC-Q4Y2.  Moreover, "sex" as "biological sex"

is "the only construction consistent with the ordinary public meaning of 'sex' at the time of Title

IX's enactment."  *Id.* at 1-4.  Finally, the memorandum determined that giving "sex" its ordinary

meaning not only permits but requires a Title IX recipient providing "separate toilet, locker

room, and shower facilities" or "separate athletic teams" to regulate entry based on sex, rather

than gender identity.  *Id.* at 7, 9.

9

F.    <u>The Biden administration's 2021 interpretation of "sex" in Title IX.</u>

Soon after taking office, the Biden administration reversed that established, reasoned understanding.  President Biden issued an executive order declaring that *Bostock* applied across all federal law, arguing that "[u]nder *Bostock*'s reasoning, laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 et seq.), . . .  along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary."  Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021).  Every federal agency was directed to review its existing regulations and develop a plan to align them with the executive order.  *Id.* at 7,024.

Following that directive, in June 2021, the Department published guidance "interpret[ing] Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity."  *Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021) ("2021 Guidance").

In that guidance, the Department interpreted the phrase "on the basis of sex" in Title IX as having the same meaning as the phrase "because of . . . sex" in Title VII.  *Id.* at 32,638-39.  It claimed that this interpretation "is most consistent with the purpose of Title IX"—"ensur[ing] equal opportunity and . . . protect[ing] individuals from the harms of sex discrimination."  *Id*. at 32,639.  This was swiftly followed by other guidance documents explaining that the Department planned to "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance

10

from the Department."  Suzanne B. Goldberg, Dear Educator letter on Confronting Anti-LGBTQI+ Harassment in Schools, at 2 (June 23, 2021), https://perma.cc/A759-WKR9.

Like the 2016 Guidance, the 2021 Guidance was quickly enjoined.  *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022).  That injunction prevented the Department from enforcing the 2021 Guidance as to the 20-State plaintiff coalition.  That court concluded that it was likely the Biden administration acted unlawfully by "creat[ing] new rights and obligations" without complying with the APA's notice-and-comment requirements.  *Id.* at 838.  The court identified two reasons why the 2021 Guidance "plausibly 'adopt[s] a new position inconsistent with . . . [the Department's] existing regulations." *Id.* at 839.  First, "Title IX does allow for sex-separation in certain circumstances," but "the Department's guidance . . . appears to suggest such conduct will be investigated as unlawful discrimination." *Id.*  Second, the guidance "creates rights for students and obligations for regulated entities not to discriminate based on sexual orientation or gender identity that appear nowhere in *Bostock*, Title IX, or its implementing regulations." *Id.*  That injunction remains in effect today.

G.    2022 proposed Title IX rule.

In July 2022, the Department proposed amendments to its Title IX regulations that incorporated its previous guidance documents' atextual reading of Title IX.  *Notice of Proposed Rulemaking re: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390 (proposed July 12, 2022) (to be codified at 34 C.F.R. pt. 106).

The proposed rule defined sex discrimination under Title IX to "include[] discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id.* at 41,571 (to be codified at 34 C.F.R. 106.10).  The

proposed rule stated that, even where Title IX authorizes "different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, unless otherwise permitted by Title IX or this part." *Id.* (to be codified at 34 C.F.R. 106.31(a)(2)).  The Department further explained that "subject[ing] a person to more than de minimis harm on the basis of sex" would include "[a]dopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity." *Id.*

The proposed rule required a recipient to "take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects." *Id.* at 41,572 (to be codified at 34 C.F.R. 106.41(a)).  It also sought to "make clear" that its Title IX regulations "would preempt" "any State or local law" conflicting with them. *Id.* at 41,404; *see also id.* at 41,569 (to be codified at 34 C.F.R. 106.6(b)).

This new definition of sex discrimination also affected the revised definition of harassment.  Previous Title IX regulations targeted "sexual harassment," which included (in relevant part) "unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." *Id.* at 41,410.  The proposed rule broadened Title IX's coverage to "sex-based harassment," defined to include "unwelcome sex-based conduct." *Id.*  This expansion targeted "all forms of sex-based harassment, as opposed to only sexual harassment," including harassment based on sexual orientation or gender identity. *Id.*  The proposed rule also dropped the 2020 Rule's adoption of the *Davis* standard for actionable sexual harassment. *Id.* at 41,568-69.

12

This rule purported to decline to address athletics, citing "a longstanding congressional view that athletics presents unique considerations," *id.* at 41,537-38, and instead stated that the Department planned to address those issues in a separate rule.

A 20-state coalition, including many of the Plaintiff States, filed comments opposing the proposed rule. *See* Ex. B. The States argued that interpreting "sex" to mean "gender identity" contravenes Title IX's text, structure, and purpose, as well as longstanding Department regulations and practice. *Id.* at 2-5. The States also argued that the proposed rule would exceed Congress's Spending Clause authority; run afoul of the First Amendment by requiring colleges to compel speech; and potentially violate parental rights by forcing a school to accommodate a child's expressed gender identity without parental consent. *Id.* at 6-7.

The States further explained that the Department's proposed rule failed to address important policy considerations. *Id.* at 8-13. For example, the States explained that the Department had failed to consider the difficulty of even determining each student's gender identity in order to administer the proposed rule, given that gender identity is defined as a completely internal sense of self, which can change. *Id.* at 8-9. The proposed rule also did not adequately address safety concerns related to the effective elimination of sex-separated spaces such as locker rooms, restrooms, and dormitories. *Id.* at 9-11. The States pointed out the potential for voyeurism, harassment, and even violent crime due to allowing males into previously female-only spaces. *Id.* These concerns are most poignant in spaces frequented by vulnerable children. Finally, the proposed rule failed to account for the harms incurred by female students, the primary intended beneficiaries of Title IX, from allowing males to participate in sex-separated activities as females simply by claiming a different gender identity. *Id.* at 11-13.

H.     2023 proposed Title IX rule relating to athletics.

The next year, the Biden administration proposed another rule related to Title IX, this time addressing how its new interpretation of sex would be applied to athletics.  *See* 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) (to be codified at 34 C.F.R. pt. 106).  The proposed rule provided that:

> If a recipient adopts or applies sex-related criteria that would limit or deny a student's eligibility to participate on a male or female team consistent with their gender identity, such criteria must, for each sport, level of competition, and grade or education level: (i) Be substantially related to the achievement of an important educational objective; and (ii) Minimize harms to students whose opportunity to participate on a male or female team consistent with their gender identity would be limited or denied.

*Id.* at 22,891 (to be codified at 34 C.F.R. 106.41).  The Department offered two examples of "important educational objective[s]" that may qualify under the rule: "ensuring fairness in competition and prevention of sports-related injury." *Id.* at 22,872.  But the Department cautioned that even these objectives would not pass muster unless they were "substantially related to ensuring fairness in competition in [a] particular sport at the applicable level of competition and grade or educational level." *Id.* at 22,873.  Indeed, the Department stressed that even criteria that were "substantially related" to achieving an "important governmental objective" would violate the proposed sports rule if the funding recipient "c[ould] reasonably adopt or apply alternative criteria that would be a less harmful means of achieving the recipient's important educational objective." *Id.* at 22,877.  The Department admitted that "few, if any, sex-related eligibility criteria" would be able to surmount this high hurdle for elementary and middle school students. *Id.* at 22,860, 22,875.  Such criteria at the high school level would only be "more likely" to satisfy the proposed rule. *Id*. at 22,875.

14

Arkansas, along with eighteen other States, submitted comments raising several concerns with the proposed athletics rule.  First, as Arkansas explained, the Department was placing an unlawful premium on affirming the professed gender identities of students, over and above real harms to female athletes which would predictably occur due to physical differences between boys and girls.  *See* Ark. Comment Letter at 2-6 (May 15, 2023), https://perma.cc/GB2A-CQKK.  Second, Arkansas explained that the athletics proposal is "self-contradictory and utterly un-administrable" because it requires the use of self-identified gender identity to assess athletic performance in a case-by-case assessment with no clear standards or methodology.  *Id.* at 6-7.  Indeed, the murkiness of the standard is apparently a design feature of the proposed rule, placing a thumb on the scale in favor of deferring to a student's claimed gender identity in all cases.  *Id.*  Finally, Arkansas pointed out that the proposed athletics rule misinterpreted both Title IX and the Constitution.  *Id.* at 8-12.  Many other commenters presented similar concerns.  Alliance Defending Freedom (counsel for Plaintiff A.F.) argued, for example, that the major-questions doctrine and the "federalism clear-notice canon" indicate the Department lacked authority for the proposed athletics rule.  ADF Athletics Comment Letter at 6-8 (May 15, 2023), https://perma.cc/W846-9EMS.

I.      <u>The Final Rule is adopted in substantially the same form as the proposed rule.</u>

On April 29, 2024, the Department published the Final Rule.  *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024).  The Final Rule dramatically and unlawfully reshapes Title IX in two primary ways.  First, it redefines what constitutes sex discrimination.  Second, it broadens the definition of prohibited "harassment."

*Redefining sex discrimination*.  The Final Rule redefines Title IX's prohibition on sex discrimination to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  *Id.* (to be codified at 34 C.F.R. 106.10).  The Final Rule purports to preempt all "State or local laws or other requirements" that conflict with its terms, *id.* at 33,885, and it applies to any school "program or activity" regardless of whether the activity occurs within the school—or even within the United States.  *Id.* at 33,886 (to be codified at 34 C.F.R. 106.11).

In setting out how this new definition of sex discrimination must be implemented, the Department begins by instructing that schools are permitted to maintain certain sex-segregated programs, activities, and facilities.  *Id.* at 33,814.  But the Department then says that schools cannot enforce these sex-based distinctions in a way that "causes . . . more than de minimis harm."  *Id.* at 33,814, 33,816 (citing amended 34 C.F.R. 106.31(a)).  And the Final Rule says that it necessarily inflicts more than de minimis harm—and thus violates Title IX—to prohibit any "'person'" from "'participating in . . . education program[s and] activit[ies] consistent with [the person's] gender identity,'" except as "otherwise permitted by Title IX or [the Title IX regulations]."  *Id.* at 33,816, 33,819-20 (quoting amended 34 C.F.R. 106.31(a)).

The Final Rule thus threatens to withhold federal funding from schools that do not allow students access to "restrooms and locker rooms" based on their purported gender identity or that have "appearance codes (including dress and grooming codes)" rooted in biological sex.  *See, e.g.*, 89 Fed. Reg. at 33,816.  Indeed, under the Final Rule, a funding recipient would violate Title IX's nondiscrimination prohibition by denying a transgender-identifying student access to a bathroom or locker room of the opposite sex.  *See, e.g.*, *id.* at 33,818.

Additionally, the Final Rule states that it inflicts "more than de minimis harm" on students to even inquire into or seek confirmation of a student's gender identity.  *Id.* at 33,819. In other words, a school cannot require documentary evidence of diagnosed gender dysphoria or another gender-based condition to permit participation in or use of a sex-separate activity or facility.  *Id.*  A funding recipient thus violates the Final Rule's interpretation of sex discrimination if it even tries to verify the access of those using facilities like an elementary or secondary school girls' bathroom or locker room.  *Id.* at 33,818-19.

*Broadening the definition of harassment*.  The Final Rule follows through on the proposed rule's approach to lower the standard for sexual harassment.  The Final Rule jettisons the 2020 Rule's interpretation that had incorporated the Supreme Court's standard in *Davis*.

Indeed, the Final Rule deviates from *Davis* in several key ways.  *First*, it rejects *Davis*'s "severe *and* pervasive" test in favor of the Title VII "severe *or* pervasive" test that *Davis* had rejected for claims under Title IX.   89 Fed. Reg. at 33,884 (Proposed 106.2).  Thus, unlike under *Davis* and the Department's previous guidance, a "single serious" instance of unwelcome speech, or a pattern of non-severe incidents, can constitute prohibited harassment.  *Id.  Second*, the Final Rule rejects *Davis*'s requirement that to be actionable harassment must "*den[y]* the victim[] . . . access to the educational opportunities or benefits provided by the school," 526 U.S. at 650 (emphasis added), and imposes liability whenever conduct merely "*limits*" a person's ability to participate in, or benefit from, a program or activity, 89 Fed. Reg. at 33,884 (Proposed 106.2). Hence, the new rule would deem a broad array of impacts harassment—like "a mere 'decline in grades,'" a choice to skip class, or a decision not to attend a campus activity, 526 U.S. at 652— that the *Davis* standard would not.  *See* 89 Fed. Reg. at 33,511 ("[A] complainant must demonstrate *some impact* on their ability to participate or benefit from the education program or

17

activity, but the definition does not specify any particular limits or denials." (emphasis added)).
*Third*, the Final Rule rejects the deliberate-indifference standard for liability and imposes
liability whenever recipients fail to "promptly and effectively end" any harassment.  *See id.* at
33,889 (Proposed 106.44(f)(1)).

Additionally, the Final Rule also expands the definition of harassment to cover conduct
that is "subjectively and objectively" offensive measured from "the complainant's position."  *Id.*
at 33,510.  Thus, under the Final Rule, whether referring to a transgender-identifying male using
male pronouns instead of female pronouns is "subjectively and objectively offensive" must be
measured from the transgender-identifying male's point of view.

The Final Rule is set to take effect on August 1, 2024, prior to the beginning of the next
school year.  *Id.* at 33,474.

## LEGAL STANDARD

Plaintiffs seek a stay of the Final Rule's effective date under 5 U.S.C. 705, as well as a
preliminary injunction under Federal Rule of Civil Procedure 65(c).  Both aim to "preserve status
or rights" pending judicial review, 5 U.S.C. 705, and require an assessment of whether (1) a
plaintiff is "likely to succeed on the merits"; (2) the plaintiff is "likely to suffer irreparable harm
in the absence of preliminary relief"; (3) the "balance of equities tip[s] in [the plaintiff's] favor";
and (4) an injunction is "in the public interest."  *Jones v. Jegley*, 947 F.3d 1100, 1104-05 (8th
Cir. 2020) (citation omitted); *see Corning Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 562
F. Supp. 279, 280-81 (E.D. Ark. 1983) (same for Section 705).  Where the balance of the equities
"favors the movant," relief is warranted so long as a "substantial question" on the merits is
involved.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

**ARGUMENT**

This Court should postpone the Final Rule's effective date and preliminarily enjoin Defendants from enforcing it.  All the federal government's previous attempts to inject gender identity and sexual orientation into Title IX's prohibition on sex discrimination have been enjoined.  The Final Rule is every bit as unlawful as these previous attempts, and Plaintiffs will suffer irreparable harm absent action by this Court.

**I.      Plaintiffs are likely to succeed on the merits.**

      A.      <u>The Final Rule exceeds the Department's statutory authority.</u>

The APA requires courts to set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. 706(2)(A), (C); *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) ("Vacatur is the normal remedy under the APA, which provides that a reviewing court 'shall . . . set aside' unlawful agency action." (quoting 5 U.S.C. 706(2)).  Plaintiffs are likely to show that Defendants exceeded their authority, contravening Title IX's text and structure, in enacting the Final Rule.

           1.      The Final Rule unlawfully reinterprets "sex" discrimination to mean "gender identity" discrimination.

Title IX prohibits discrimination "on the basis of sex" by federal funding recipients.  20 U.S.C. 1681(a).  The term "sex" in that provision means biological sex, and that's how everyone understood that term in 1972.  And consistent with that meaning, since 1972, everyone has understood Title IX's prohibition on sex discrimination as a rule against discriminating based on biological sex.  The Final Rule, however, rejects that long-established meaning and instead reinterprets "sex" to mean "gender identity."  But that term was virtually unknown in 1972 and no one would have understood sex to mean one's self-professed gender identity.  So by

expanding the definition of sex to include gender identity (and sexual orientation), the Final Rule effectively rewrote a "clear statutory term[]." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). That exceeded the Department's legal authority, and as a result, Plaintiffs are likely to prevail on the merits of their claim that the Final Rule was unlawful.

It's a basic principle of statutory construction that when construing a statute, the Court's "job is to interpret the words consistent with their 'ordinary meaning' . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States,* 444 U.S. 37, 42 (1979)). That means "look[ing] to dictionary definitions for help in discerning a word's ordinary meaning," *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020), and reading the word in context, "not in isolation," *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). Here, interpreting the term "sex" as used in Title IX is straightforward.

To start, as the en banc Eleventh Circuit recognized, "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment [in 1972] show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, *i.e.*, discrimination between males and females." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc); *accord Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632-33 (4th Cir. 2020) (Niemeyer, J., dissenting) (collecting definitions); *see also, e.g.*, *Sex*, *Webster's Third New International Dictionary* 2081 (1966) ("one of the two divisions of organic esp. human beings respectively designated male or female"); *Sex, Webster's New World Dictionary* (1972) ("[E]ither of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions."); *Sex*, *American Heritage Dictionary* (1969) ("a. The property or quality by which organisms are classified according to

20

their reproduction functions. b. Either of two divisions, designated *male* and *female*, of this classification.").  After all, "[t]he phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications."  Ryan T. Anderson & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do* 9, The Heritage Found. (2017).  Thus, there's no genuine dispute about what "sex" meant in 1972 and the Department exceeded its statutory authority in adopting a radically different meaning of "sex."

Moreover, Title IX's structure confirms this reading.  *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (noting the "cardinal rule" of reading the statute "as a whole").  Other provisions of the statute indicate that "sex" means biological sex and refers to the binary division of male and female.  *See* 20 U.S.C. 1681(a)(2) (referring to "one sex" and "both sexes"); 1681(a)(8) (referring to "father-son or mother-daughter activities," "one sex," and "the other sex").  And underscoring that sex doesn't mean sexual orientation or gender identity, Title IX treats those terms differently—not as coterminous with (or part of) a person's "sex" but as a separate "status."  *See id.* 1689(a)(6) (directing that a sexual-violence task force be established and "develop recommendations on . . . inclusive approaches to supporting survivors, which include consideration of . . . lesbian, gay, bisexual, or transgender (commonly referred to as 'LGBT') status").

Indeed, adopting the Final Rule's definition of "sex" in Section 1681 of Title IX would render other provisions of Title IX meaningless.  Despite the Final Rule's trying to exempt sex-specific facilities like dormitories, the facilities exemption still uses the word sex.  So by redefining that term in Title IX, the Final Rule necessarily redefines it in 1681.  And if a recipient must treat a male who claims a female gender identity as a female, then that male must

21

be allowed to live in women's dormitories, which would render meaningless Title IX's provision allowing for sex-specific living facilities.  *See Adams*, 57 F.4th at 813 (discussing section 1686).  After all, it would make no sense for the statute to specifically allow these spaces to be designated by one characteristic (sex) but require a funding recipient to sort students into these spaces by a different characteristic (gender identity).  *See D.H. by A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 835 (M.D. Tenn. 2022) ("Any argument that the statute merely allows for the existence of separate restrooms, but does not allow schools to limit access to the restroom to the sex for which it is designated is untenable and appears to contradict the very purpose of allowing separate facilities.").  Interposing "gender identity" into sex discrimination cannot be squared with the presumption that "sex" means "the same thing throughout [the] statute."  *Brown v. Gardner*, 513 U.S. 115, 118 (1994).  There is no indication that Congress was speaking in different terms when it used "sex" in sections 1681 and 1686.

The Department's historical regulations further underscore the validity of its previous longstanding interpretation of sex as biological sex.  *See, e.g.*, 40 Fed. Reg. 24, 128, 24,132 (June 4, 1975) ("either sex"); *id.* at 24,135 ("male and female"); *id.* (referring to "one sex" and "the opposite sex"); 34 C.F.R. 106.33 (referring to "one sex" and "the other sex"); *id.* 106.41(c) (referring to "both sexes" and "male and female teams").  These contemporaneous regulations can be "powerful evidence" of the "original public meaning" of Title IX.  *Kisor v. Wilkie*, 588 U.S. 558, 594 (2019) (Gorsuch, J., concurring in the judgment) (emphasis omitted).  And the Supreme Court has noted that the congressional-review process in place at the time of the 1975

regulations, which permit sex-specific spaces, provides strong support that those regulations

"accurately reflect congressional intent."[1] *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984).

That's why the Final Rule doesn't even really attempt to claim that the ordinary meaning

of "sex" includes gender identity, but instead claims that its reinterpretation of the statute is

justified by the Supreme Court's decision in *Bostock*. 89 Fed. Reg. at 33,804-07. But *Bostock*

cannot save the Department's atextual rule because Title VII and Title IX have different statutory

language. Title VII prohibits employment discrimination "because of such individual's . . .

sex[]," 42 U.S.C. 2000e-2(a), and Title IX prohibits education discrimination "on the basis of

sex," 20 U.S.C. 1681(a). *Bostock* held that the "because of" language in Title VII imposed a

sweeping but-for causation requirement—under which discrimination based on gender identity

and sexual orientation constitutes sex discrimination. *Bostock*, 590 U.S. at 656. By contrast,

Title IX lacks that causal language. *See Basis*, *Black's Law Dictionary* (11th ed. 2019) ("A

fundamental principle; an underlying fact or condition; a foundation or starting point."); *Neese v.

Becerra*, 640 F. Supp. 3d 668, 680 (N.D. Tex. 2022) ("Because Title IX prohibits 'on the basis of

sex,' the Court cannot reflexively adopt Bostock's but-for causation analysis."). As a result,

courts have been skeptical that *Bostock*'s conception of discrimination "because of sex" applies

to Title IX claims. *See Eknes-Tucker v. Gov'r of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023)

(holding that *Bostock* has "minimal relevance" outside the Title VII context); *L.W. ex rel.*

*Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (explaining that *Bostock*'s "reasoning

applies only to Title VII, as *Bostock* itself and many subsequent cases make clear"); *see also*

---

[1] The Department's predecessor agency was required to submit the 1975 rules to Congress for review. 40 Fed. Reg. 24,128. After six days of hearings on whether the rulemaking was "consistent with the law" and congressional intent, Congress allowed the regulations to take effect. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531-32 (1982).

*Brandt ex rel. Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing) (explaining that "there is reason to be skeptical that" the Equal Protection Clause's "protections reach" as far as Title VII, given that "their text is not similar in any way").

That distinction also makes sense given the contexts in which Title VII and Title IX operate.  Title VII is an employment statute and its broad and sweeping "message is" that "[an] individual employee's sex" or "homosexuality or transgender status is not relevant to employment decisions."  *Bostock*, 590 U.S. at 681.  But that's not Title IX's message.  Instead, Title IX explicitly recognizes that sex differences *are* relevant to decisions about athletics, bathrooms, locker rooms, and living facilities.  *See, e.g.*, *Adams*, 57 F.4th at 811-17.  And that's why the Department is ultimately forced to acknowledge that under Title IX schools "have a legitimate interest in protecting all students' safety and privacy."  89 Fed. Reg. at 33,820.

Those interests, moreover, are rooted in anatomical differences between males and females—not gender identity.  *See Adams*, 57 F.4th at 805 (explaining that "people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating") (cleaned up).  Title IX reflects that fact, providing that bathrooms, locker rooms, and other facilities and programs are to be separated by sex—no matter how one identifies.  And while the *Bostock* Court reasoned that males and females are similarly situated under Title VII for the purpose of employment decisions, given the real biological differences between the sexes (that Title IX recognizes), it understandably did not "purport to address bathrooms, locker rooms, or anything else of the kind."  *Bostock*, 590 U.S. at 681.  *Bostock*'s narrow decision about employment has nothing at all to say about Title IX's application to educational programs and facilities.  *Chalenor v. Univ.*

24

*of N. Dakota*, 291 F.3d 1042, 1047 (8th Cir. 2002) ("[T]he gender make-up of athletic participation is certainly relevant to a determination of whether a school is in compliance with Title IX."). The Department's reliance on *Bostock* thus falls flat and isn't a basis for rewriting Title IX's general prohibition on sex discrimination.

Further, to the extent there were any textual uncertainty as to the Department's authority to issue the Final Rule (and there is not), the major-questions doctrine forecloses any interpretation in the Department's favor. The Final Rule decides major questions, such as such as whether to force States, schools, administrators, teachers, and students to treat a person's self-professed, unverifiable, potentially changing "gender identity" on par with, or as a replacement for biological sex. Those questions must be decided by "Congress itself" or, at the very least, by "an agency acting pursuant to a clear delegation from that representative body." *West Virginia v. EPA*, 597 U.S. 697, 735 (2022).

The Final Rule falls neatly within the Supreme Court's major-questions doctrine. First, the Rule has enormous social and political significance. *See id.* at 721. How to address and treat people claiming a gender identity that differs from their biological sex has prompted state legislation in numerous areas, and the proposed rule here garnered over 240,000 comments. 89 Fed. Reg. at 33,477. Second, the Rule has significant economic consequences because it threatens millions of dollars of funding for State educational programs. *See* Compl. ¶¶ 84-89.

. Third, the Final Rule is "novel" and "transformative," and Congress "has consistently rejected proposals" to expand Title IX to prohibit discrimination based on sexual orientation and gender identity. *West Virginia*, 597 U.S. at 716, 724, 731-32; *Neese v. Becerra*, 2022 WL 1265925, at *13 (N.D. Tex. Apr. 26, 2022) ("Legislators tried to amend Title IX to include 'sexual orientation' and 'gender identity' on multiple occasions, but those attempts failed."); *see*

*also, e.g.*, Equality Act, H.R. 5, 117 Cong. 9(2) (2021); Title IX Take Responsibility Act of 2021, H.R. 5396, 117 Cong. (2021).  Fourth, the Rule intrudes on education, which is an area "where States historically have been sovereign," *United States v. Lopez*, 514 U.S. 549, 564 (1995), implicating not only the major questions doctrine, but also the federalism canon, *see West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring).

All told, the Department cannot point to any statutory authority supporting its dramatic rewrite of Title IX, let alone the clear authority required to weigh in on the major questions the Final Rule attempts to answer.  The Final Rule's re-definition of "sex" discrimination is illegal on its face and should be preliminarily enjoined while the Court considers whether it must be set aside.  Such a ruling would merely maintain the status quo that has existed since Title IX's enactment in 1972 based on the universal understanding that "sex" means biological sex, not gender identity.

> ## 2.     The Final Rule unlawfully broadens its definition of "harassment."

The Department further exceeded its statutory authority in adopting an expansive definition of prohibited sexual "harassment."  It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Util. Air Regul. Grp.*, 573 U.S. at 328.

The Final Rule's redefinition of harassment runs afoul of that principle in two major ways.  First, *Davis* authoritatively defined when a funding recipient may be liable for harassment under Title IX and the Department has no authority to substitute its own standard.  The Department recognizes as much, attempting to downplay its refusal to abide by *Davis* on the grounds that, while its standard is not identical to *Davis*, it is "sufficiently closely aligned" with it.  89 Fed. Reg. at 33,501.  For support it cites to the Eighth Circuit's decision in *Rowles v.*

26

*Curators of University of Missouri*, where the court stated that a university's "severe or pervasive" definition of harassment "tracks" *Davis*'s "severe and pervasive" standard and did not pose a First Amendment problem. 983 F.3d 345, 356 (8th Cir. 2020). But critically, that case involved a graduate student working as a teaching assistant. A lower harassment standard may pose fewer First Amendment concerns in the context of a university regulating the speech of its employees, like a teaching assistant. *See, e.g.*, *Keefe v. Adams*, 840 F.3d 523, 529-33 (8th Cir. 2016). But the Department never addresses that distinction.

Moreover, the Eighth Circuit reasoned in *Rowles* that the university's standard there was—on the whole—functionally equivalent to *Davis*. Yet the Final Rule rejects any such claim here, arguing that, "The Department's final definition is not identical to *Davis* . . . because the Department . . . believes a broader standard is appropriate." 89 Fed. Reg. at 33,498. Indeed, the Department makes no argument that its use of "limits" instead of "denies" and its abandonment of *Davis*'s deliberate-indifference standard are consistent with the university policy that the Eighth Circuit approved in *Rowles*. Thus, *Rowles* does not help the Department.

Additionally, the Department hardly attempts to justify its rejection of *Davis*, arguing simply that Davis was about private lawsuits whereas the Final Rule applies to "administrative enforcement." 89 Fed. Reg. at 33,560. But that supposed distinction falls flat because *Davis* interpreted Title IX's text, and that text doesn't distinguish between private lawsuits and administrative proceedings. *See Davis*, 526 U.S. at 650 (test based on what Title IX "makes clear"). Nor for that matter does it matter that, as the Department claims, that it's the Department's "long-held view"—outside of the 2020 regulations—that different standards ought to apply depending on the context. 89 Fed. Reg. at 33,499. Rather, what matters is whether the Department's approach is consistent with the statute. *See CS Wind Viet. Co. v. United States*,

27

832 F.3d 1367, 1377 (Fed. Cir. 2016) (explaining that an "agency's statement of what it normally does or has done before is not, by itself, an explanation of why its [practice] comports with the statute") (cleaned up).  And the statutory text is the same—regardless of the context. Indeed, Title IX is not "a chameleon" whose "meaning [is] subject to change depending on the presence or absence of constitutional concerns in each individual case."  *Clark v. Martinez*, 543 U.S. 371, 382 (2005).  And the constitutional concerns undergirding the Supreme Court's adoption of *Davis*—rather than a broader standard like that used in Title VII—are present in both the private and administrative contexts.  The Supreme Court has said what the statute means, and the Department cannot override it.

Second, the Final Rule's harassment definition runs afoul of the First Amendment by unconstitutionally chilling student speech.  Courts reviewing similar harassment policies deviating from the Supreme Court's standard in *Davis* have found likely First Amendment violations.  For example, the Eleventh Circuit considered a university's definition of "Hostile Environment Harassment" as "[d]iscriminatory harassment that is so severe *or* pervasive that it unreasonably interferes with, *limits*, deprives, or alters the terms or conditions of education . . . or participation in a university program or activity . . . when viewed from both a subjective and objective perspective."  *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114-15 (11th Cir. 2022).  The court held that this policy was "almost certainly unconstitutionally overbroad" and "an impermissible content- and viewpoint-based speech restriction."  *Id.* at 1125.  Other courts agree.  *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir. 2020) (similar non-*Davis*-compliant harassment policy objectively chilled protected speech); *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480, 482 & n.6 (S.D. Tex. 2022) ("Speech First will likely succeed on

the merits because the original [harassment] policy does not comport with the standard adopted by the Supreme Court" in *Davis*).

Combined with the Final Rule's redefining of "sex" to include gender identity and sexual orientation, the Department's deviation from *Davis* has staggering implications for speech rights. For example, failure to abide by a student's insistence on biologically inaccurate pronouns would likely constitute harassment under the Final Rule since it could have some negative impact and, under that rule, that's sufficient.  *See* 89 Fed. Reg. at 33,816, 33,819-20 (explaining that gender-identity discrimination inherently inflicts more than de minimis harm under the Final Rule's approach).  Yet such a policy would compel speech in violation of individuals' moral and religious beliefs.  *See Beard v. Falkenrath*, 97 F.4th 1109, 1117 (8th Cir. 2024) (holding that the Constitution does not require government officials to use "preferred gender pronouns" "in part because the speaker has a [First Amendment] right" to even "the misuse of a pronoun"); *Meriwether v. Hartop*, 992 F.3d 492, 498-500 (6th Cir. 2021).  Taken to its logical conclusion, the Final Rule's deviation from *Davis* will require funding recipients to quash student speech in violation of the First Amendment.

The Department had no authority to shirk the Supreme Court's construction of Title IX harassment and require funding recipients to violate the First Amendment.  The Court should preliminarily enjoin its attempt to do so.

3.    The Final Rule violates the Spending Clause.

The APA requires courts to set aside and vacate agency action that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. 706(2)(B).  The Final Rule violates the limitations of the Spending Clause, and so would Title IX itself if the Final Rule were a valid interpretation of it.  Title IX was passed under Congress's Spending Clause

authority.  *Davis*, 526 U.S. at 640.  That "power is of course not unlimited, but is instead subject to several general restrictions."  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  These restrictions include requirements that: (1) conditions must be "unambiguous[]" so States can "exercise their choice knowingly, cognizant of the consequences of their participation"; (2) conditions must be related to the "federal interest in the project"; (3) spending must not "induce the States to engage in activities that would themselves be unconstitutional"; and (4) spending must not "be so coercive as to pass the point at which 'pressure turns into compulsion.'"  *Id.* at 207-11.  Each requirement is "equally important" and must be "equally" satisfied for a spending condition to be constitutional.  *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023).

The conditions imposed by the Final Rule fail these requirements.  First, the Final Rule's conditions are not "unambiguously" clear.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Plaintiff States did not "voluntarily and knowingly" agree to investigate and punish speech; rely on self-professed gender identity instead of biological sex to administer educational programs; abolish sex-specific bathrooms, locker rooms, rooming assignments, and sports; or violate staff and students' constitutional rights in exchange for federal funds under Title IX.  *Id. See Adams*, 57 F.4th at 816 ("The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable.").  Second, the Final Rule's conditions run counter to the federal interest in Title IX enforcement—promoting equal opportunities to both sexes—because it will deprive women of educational opportunities.  S*ee id.* at 819-21.  Third, the Rule will impermissibly induce recipients "to engage in activities that would themselves be unconstitutional," *Dole*, 483 U.S. at 210, including infringing on free speech and free exercise.

Fourth and finally, the "threatened loss" of a significant percentage of Plaintiffs' education funding "is economic dragooning that leaves the States with no real option but to acquiesce." *NFIB v. Sebelius*, 567 U.S. 519, 582 (2012).

Title IX's mandate of providing equal educational opportunities for women—and its conditioning of federal funds on compliance with that mandate—was crystal clear in 1972.  But in continuing to accept federal funding for the next five decades, States did not sign up for the confusion of the Final Rule's gender-identity mandate.

B.      The Final Rule is arbitrary and capricious.

Federal law prohibits agency actions, findings, and conclusions that are "arbitrary, capricious," or "an abuse of discretion."  5 U.S.C. 706(2)(A).  Agency actions are arbitrary and capricious when they "entirely fail to consider an important aspect of the problem or offer an explanation for its decision that runs counter to the evidence before it."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (cleaned up) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).

1.      The Final Rule's redefinition of "sex" is arbitrary and capricious.

For the reasons explained above, the Department lacked authority to rewrite Title IX to import gender identity and sexual orientation into the statute's prohibition of sex discrimination. But even if the Department plausibly had such authority, its attempt to exercise it here was arbitrary and capricious for numerous reasons.

**Meaning of sex.**  To start, the Department failed to offer "reasoned explanation" for departing from its longstanding view on the meaning of "sex" in Title IX.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[A] lack of reasoned explication for a

regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law."). In the proposed rule, the Department claimed that it "does not have a 'long-standing construction' of the term 'sex' in Title IX to mean 'biological sex.'" 87 Fed. Reg. at 41,537. That statement was directly contradicted by the Department's 2020 regulations, which noted that "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification." 85 Fed. Reg. at 30,178; *see F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."). So faced with that fact, the Department ultimately abandoned any such claim and instead argued that its sudden about-face was justified by *Bostock*.

But the Final Rule's reliance on *Bostock* for its departure from the Department's precedent was arbitrary. As explained above, *supra* pp. 23-24, the Department couldn't simply apply *Bostock*'s but-for-causation analysis to Title IX because Title VII and Title IX differ in both text and structure. Indeed, *Bostock* itself disclaimed any attempt to "address[] bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681. Yet the Final Rule fails to meaningfully address either those textual differences or that express disclaimer—despite numerous courts concluding *Bostock* is limited to Title VII. *See Eknes-Tucker*, 80 F.4th at 1229 (holding that *Bostock* has "minimal relevance" outside the Title VII context); *L.W.*, 83 F.4th at 484 (explaining that *Bostock*'s "reasoning applies only to Title VII, as *Bostock* itself and many subsequent cases make clear"); *Neese*, 640 F. Supp. 3d at 676. Rather than engage with those decisions, the Final Rule merely makes "conclusory statements" noting its disagreement with courts' contrary conclusions. *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024); *see* 89 Fed. Reg. at 33,805-06.

Moreover, the Department failed to address the practical considerations of importing gender-identity discrimination into Title IX's framework for binary sex-based discrimination. For example, under the Final Rule, a recipient violates Title IX "when it denies a transgender student access to a sex-separate facility or activity consistent with that student's gender identity." 89 Fed. Reg. at 33,818.  But "[g]ender identity" is not a "'discrete'" category but "can describe 'a huge variety of gender identities and expressions.'"  *L.W.*, 83 F.4th at 487.  WPATH, one of the sources upon which the Department relies and cites as a "well-established medical organizatio[n]," 89 Fed. Reg. at 33,819 & n.90, claims that a person can be "more than one gender identity simultaneously or at different times," "not have a gender identity or have a neutral gender identity," "have gender identities that encompass or blend elements of other genders," or "have a gender that changes over time."  *Standards of Care for the Health of Transgender and Gender Diverse People*, S80, World Prof. Ass'n Transgender Health (8th ed. 2022).  How is a funding recipient to deal with a student who identifies as "nonbinary"?

The Final Rule's test would mean that a funding recipient violates Title IX if it refuses to build a gender-neutral bathroom to accommodate such students because failing to do so would always constitute "more than de minimis harm."  89 Fed. Reg. at 33,818.  But the Department said it was declining "to require that recipients provide gender-neutral or single-occupancy facilities because such facilities," recognizing that "would likely carry significant cost implications and it would be appropriate to seek public comment on this issue before making any such changes."  *Id.* at 33,820.  The Final Rule offers no coherent way to reconcile these contradictory statements, to say nothing of more exotic gender identities.  The Department's failure to address the issues created by its rulemaking was arbitrary and capricious.

Further, the Final Rule's treatment of sex and gender identity failed to adequately consider other important aspects of the problem.  The Department was put on notice by commenters that its proposed rule would undermine funding recipients' "legitimate interest[s]" in protecting students' privacy and safety, but the Department simply stated it "disagree[s]" the Final Rule would undermine that interest.  89 Fed. Reg. at 33,820.  The Final Rule will allow any male—including "other community members" who are not even students—to claim a female gender identity to use the girls' restrooms, locker rooms, and shower areas.  *Id*. at 33,816.  Commenters pointed out the risks posted by allowing males into these spaces, but Department hand waved away "evidence that transgender students pose a safety risk" in girls-only spaces—stating, once again, that it simply "does not agree."  *Id* at 33,820.  But "bare acknowledgement" of concerns and "conclusory statements" are "no substitute for reasoned consideration." *Louisiana v. DOE*, 90 F.4th 461, 473 (5th Cir. 2024).  The Final Rule unreasonably dismissed commenters' safety and privacy concerns and made no efforts to mitigate those concerns.

Exacerbating that problem, the Final Rule provides funding recipients with no mechanism to authenticate the sincerity of a claimed gender identity.  Funding recipients have a duty to protect their students from harassment and sexual predators, including male students who would claim a female gender identity to enter female-designated spaces for nefarious purposes.  But a recipient could be guilty of sex-based harassment were it to try and verify a student's claimed gender identity.  *See* 89 Fed. Reg. at 33,818-19.  The Final Rule arbitrarily leaves recipients no path except to accept a person's self-expressed gender identity, despite the significant safety and privacy concerns at stake.

Finally, the Final Rule's treatment of sex and gender identity is so internally inconsistent that it cannot be the product of "reasoned decisionmaking" and a "logical and rational" process.

*Michigan v. EPA*, 576 U.S. 743, 750 (2015).  For example, the Department fails to reasonably explain treating like circumstances differently.  It declines to apply its gender-identity mandate to "living facilities" by pointing to the statutory exceptions in section 1681.  *See* 89 Fed. Reg. at 33,3816.  But it applies that mandate to "toilet, locker room, and shower facilities" despite the Department's regulations, which permit those facilities to be separate by sex and which the Final Rule did not rescind.  *See* 34 C.F.R. 106.33.  The Final Rule makes no attempt to reconcile these disparate statutory and regulatory requirements into a coherent whole.  Nor could they.  The privacy and safety interests requiring sex-separated bathrooms and showers are just as significant as those requiring sex-separated living facilities.  The Department's approach nonsensically assumes that Congress cared only about the latter.

**Athletics.**  The Final Rule's treatment of athletics raises almost as many questions as it answers and is likewise arbitrary and capricious.  Instead of directly considering how the Final Rule's redefinition of sex discrimination affects athletics, the Department attempted to wave those consequences away and defer them to a future rulemaking.  It pointed to regulations left on the books that expressly allow for sex-separate sports to support this claim.  89 Fed. Reg. at 33,817-18, 33,839.  But, as explained above, the Department left similar regulations allowing for sex-separated bathrooms and locker rooms on the books, *see* 34 C.F.R. 106.33, yet still applied its gender-identity mandate to those locations.  Thus, for instance, while the Department left regulations for sex-separated locker rooms on the books, it mandated that boys identifying as girls be permitted—just like biological girls—to access locker rooms designated as girls-only facilities.  And while the Department fails to explicitly explain whether it intended a similar result in sports competition, there's no real dispute that's exactly what the Biden administration intended.  *See* Br. for the United States as Amicus Curiae, at 27-28, *B.P.J. by Jackson v. W. Va.*

35

*State Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir.)[2] (arguing that "categorical bans" which "exclude[] transgender students from participating on athletic teams consistent with their gender identity . . . violate the general nondiscrimination mandate in [Title IX] and the regulations") (citing 34 C.F.R. 106.41(a)).  But the Final Rule deliberately attempts to leave that fact unsaid, creating unnecessary confusion and subjecting funding recipients to liability based on state laws—while never attempting to reconcile Title IX's text, structure, or history with a rule that bases athletics participation on gender identity rather than biological sex.

> 2.     The Final Rule's broadening of "harassment" is arbitrary and capricious.

The Department also failed to reasonably address important considerations regarding its expansive redefinition of sexual harassment.

First, the Department fails to provide a reasoned explanation for departing from the Supreme Court's standard for sexual harassment in *Davis*.  *See supra* pp. 26-29 (explaining why that departure is contrary to law).  Even if the Department's approach did not run afoul of *Davis*, having two different Title IX harassment standards—depending on whether the statute is being enforced by a private lawsuit or via administrative action by the Department—makes no practical sense.  A funding recipient must have a single sexual harassment policy by which it abides.  If a funding recipient can be held liable for harassment in a broader set of circumstances under the Final Rule than under *Davis*, the recipient will logically tailor its policy to the Final Rule's standard.  The Department fails to address its rendering of *Davis* as a dead letter through rulemaking.

---

[2] *Available at* https://www.justice.gov/d9/case-documents/attachments/2023/04/03/b.p.j._v._west_va_state_bd_of_educ._nos._23-1078_23-1130_4th_cir._04.03.23.pdf

The Final Rule is also arbitrary and capricious because it failed to reasonably address comments about "misgendering" as sexual harassment. The proposed rule garnered dueling commentary concerning when "misgendering" might constitute sexual harassment under Title IX. *See* 89 Fed. Reg. at 33,516 (noting the Department's recent resolution letter finding that a school district violated Title IX when it failed to effectively respond to misgendering of a student"); *id.* (comment urging the Department to more unequivocally state that "misgendering is a form of sex-based harassment that can create a hostile environment"). Commenters also noted that the proposed rule seemed to approvingly reference Obama administration guidance that stated that misgendering is harassment. *Id.*

The Department attempted to duck these issues in the Final Rule by claiming that pronoun usage and misgendering are "fact-specific," while opining that "a stray remark, such as a misuse of language, would not constitute harassment under this standard." *Id.* Of course, that fails to address the significant First Amendment concerns posed by forcing individuals to use biologically inaccurate pronouns under threat of a Title IX investigation. That failure is especially unreasonable in light of the Department's simultaneous redefining of sex discrimination to include gender-identity discrimination. The Department does not have "free license to . . . duc[k] the hard questions" or "bury its head in the sand." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023). Rather, the APA requires that it explain whether it is returning to the Obama-era view that "misgendering" constitutes sex-based harassment under Title IX. Its failure to at least give funding recipients that clarity is arbitrary and capricious, especially when recipients are already beginning to have to litigate these issues. *See, e.g.*, *PDE v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666-69 (8th Cir. 2023).

## II.   Plaintiffs face irreparable harm absent preliminary relief.

Absent a stay of the Final Rule prior to its August 1, 2024, effective date, Plaintiffs will face immediate and irreparable harm.

### A.   Irreparable harms to Plaintiff States.

The Final Rule derogates Plaintiff States' sovereign interests in enforcing their duly enacted laws. *See Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022) (describing this power as "[p]aramount among the States' retained sovereign powers"). The Final Rule preempts "any State or local law" conflicting with its provisions. 89 Fed. Reg. 41,404; see also *id.* at 41,569 (to be codified at 34 C.F.R. 106.6(b)). Plaintiff States' "inability to enforce [their] duly enacted" laws "inflicts irreparable harm on the State[s]." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) ("Prohibiting the State from enforcing a statute . . . would irreparably harm the State."). Numerous of Plaintiff States' duly enacted laws will be preempted if the Final Rule is allowed to take effect.

**Athletics**. Arkansas, Missouri, Iowa, South Dakota, and North Dakota have each enacted laws protecting women's and girls' athletics, all of which would be preempted by the Final Rule. *See* Ark. Code Ann. 6-1-107(c); Mo. Rev. Stat. 163.048(3); Iowa Code 261I.1–.2; N.D.C.C. 15-10.6-01–03; S.D.C.L. 13-67-1. All of these laws require sports teams and competitions to be designated as (1) for females; (2) for males; or (3) coeducational. Those classifications are based on biological sex, not gender identity. And each law *categorically* bars male students from participating in female-designated athletic teams or competitions, even if those males claim a female gender identity.

Though the Final Rule is deliberately cagy about how it applies to sports and athletics, at a minimum, it is clear that the Final Rule preempts state laws—like those in the Plaintiffs States—that categorically exclude male students from participation in female-designated sports, irrespective of the students' professed gender identity. So whatever gloss the Department plans to put on athletics in a future rulemaking, Plaintiff States' athletics laws clearly conflict with the Final Rule's gender-identity mandate and cannot be enforced as written if the Final Rule is allowed to take effect.

**Names and pronouns**. Arkansas, Iowa, and North Dakota have enacted laws regulating name and pronoun usage by government employees.

Arkansas's Given Name Act was enacted to protect the freedom of speech and expression of school faculty and students, and to protect the rights of parents. The Act provides that school employees and students shall not be sanctioned for declining to address a person by (1) a "[n]ame other than the name listed on the person's birth certificate," or (2) a "[p]ronoun or title that is inconsistent with the person's biological sex." Ark. Code Ann. 6-1-108(d)(2). Under the Religious Viewpoint Antidiscrimination Act, Arkansas public schools are also prohibited from discriminating against students' expressions of religious viewpoints, even if other students are offended by that religious expression. Ark. Code Ann. 6-10-137. North Dakota law similarly provides that "a government entity may not adopt a policy requiring or prohibiting" "[a]n employee's use of an individual's preferred pronoun when addressing or mentioning the individual in work-related communications." N.D.C.C. 14-02.4-15.2(1).

Arkansas and Iowa also protect parents' rights. Arkansas law prohibits a school employee from addressing a student with (1) a "[p]ronoun or title that is inconsistent" with the student's "biological sex"; or (2) a "[n]ame other than the name listed on the . . . [student's] birth

39

certificate" or a derivative of that name, unless the school employee "has the written permission" of the student's parent.  Ark. Code Ann. 6-1-108(d)(1).  Iowa law requires that any accommodation request by a student for a name or pronoun that differs from that on the student's birth certificate be disclosed to the student's parent or guardian.  *See* Iowa Code 279.78.3.

The Final Rule conflicts with these provisions by treating them as unlawful sex discrimination and imposing a mandate to use pronouns based on a person's gender identity instead of biological sex.  *See* 89 Fed. Reg. at 33,886.  The Plaintiff States cannot enforce their laws regulating name and pronoun use in school settings without being subject to liability under the Final Rule, including through private enforcement through Section 1983 suits.

**Bathrooms, locker rooms, showers, and overnight trips**.  Plaintiff States have likewise enacted regulations mandating that sensitive areas such as bathrooms and locker rooms be separated by biological sex, rather than gender identity.  *See* Ark. Code Ann. 6-21-120(b)(1) (requiring that multiple occupancy restrooms be designated for the "exclusive use by the male sex" or the "exclusive use by the female sex"); Iowa Code 280.33(2) (requiring "a multiple occupancy restroom or changing area to be designated only for and use by persons of the same sex" and prohibiting an individual from entering one of those areas "that does not correspond with the person's sex"); Neb. Rev. Stat. 79-2,124 (allowing school districts to "maintain[] separate toilet facilities, locker rooms, or living facilities for the different sexes"); *see also* Neb. Exec. Order. No. 23-16 (Aug. 30, 2023) (clarifying that "sex" is to be construed as biological sex rather than gender identity); N.D.C.C. 15-10-68(1) (requiring dormitory restrooms and showers to be designated "exclusively for males or exclusively for females" based on biological sex).

Arkansas law also provides that public schools sponsoring or supervising an overnight trip involving students must ensure that students only share sleeping quarters with those of the same sex.  Ark. Code Ann. 6-10-137(a).

The Final Rule would preempt all these laws, treating them as unlawful sex discrimination and by requiring federal funding recipients to change their policies to separate bathrooms, locker rooms, showers, changing facilities, and overnight room assignments based on gender identity instead of biological sex to remain in compliance with the Rule.  *See* 89 Fed. Reg. at 33,886.

Relatedly, Plaintiff States are facing the irreparable harm of "substantial pressure to change their state laws," *Tennessee*, 615 F. Supp. 3d at 841.  The Final Rule forces them into making a lose-lose choice: (1) lose a significant amount of federal funding or (2) comply with the Final Rule by revising state laws, policies, and practices and by violating the constitutional rights of students, parents, and employees.  Because these intangible harms—the "invasions of state sovereignty and coerced compliance"—likely cannot be quantified or "monetarily redressed," they too constitute irreparable harm that merits preliminary relief.  *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022); *see Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *9 (5th Cir. Feb. 17, 2022) (per curiam) (recognizing a "coercive choice" can "impose[] a distinct and irreparable harm" beyond "other tangible and remediable losses"); *Texas v. Yellen*, No. 2:21-CV-079-Z, 2022 WL 989733, at *5 (N.D. Tex. Mar. 4, 2022) (concluding plaintiffs were injured "by being put in the position of having to choose between being injured by the loss of a substantial amount of federal funds or the invasion of their constitutional authority to tax").

In sum, the Final Rule puts States and their political subdivisions to the Hobson's choice of enforcing their duly enacted laws, risking the loss of billions in federal funding to educational institutions, or accepting the Department's unlawful gender-identity mandate.  *See* Compl. ¶¶ 84-89.

      B.     <u>Irreparable harms to A.F.</u>

 A.F. is a 15-year-old girl residing in Jonesboro, Arkansas.  A.F. Decl., Ex. C, ¶ 1.  She attends a public high school in Arkansas that is a recipient of federal funds and is therefore subject to Title IX.  *Id.* ¶ 2.  If the Final Rule is allowed to go into effect, it will erase existing legal protections for female students and subject her to irreparable harms in numerous aspects of her school life.

*Protected expression*.  If the Final Rule goes into effect, A.F. may be forced to choose between following her religious beliefs or facing sanction from school officials.  *Id.* ¶ 39.  She believes as a Christian "that God created everyone to be either male or female," and "that people cannot . . . change their sex."  *Id.* ¶ 40.  She does not use pronouns or titles inconsistent with a person's sex and denies that a person's belief that they are male or female, or desire to be a male or female, makes them male or female.  *Id.* ¶ 41.  She "do[es] not want to be forced to lie about what [she] know[s] is true and to violate [her] religious beliefs."  *Id.*

A.F. also expresses her views about gender identity at school with her classmates and coaches by, for example, explaining that men who identify as women are in fact men and should not be allowed to compete in women's sports.  *Id.* ¶¶ 42-44.  But come August 1, A.F. fears she "will be punished for expressing [these] views" at her school and will be less vocal and more hesitant to speak these views to avoid punishment until she knows she can do so without being punished.  *Id.* ¶¶ 45, 46.

Under the Religious Viewpoint Antidiscrimination Act, Arkansas public schools are prohibited from discriminating against students' expressions of religious viewpoints, even if other students are offended by that religious expression.  Ark. Code Ann. 6-10-139.  A.F. is thus protected against adverse action by her school when she expresses religious viewpoints regarding sex and gender, including using sex-consistent titles and pronouns when addressing and referring to other students.

If the Final Rule takes effect, A.F.'s school will be required to investigate and respond to instances of what the Final Rule defines as "sex-based" harassment.  This includes the use of sex-consistent pronouns that offend another student, as measured from that other student's point of view.  *See supra* pp. 17-18.  A.F. will thus face potential investigation and sanctions by her school when she continues to refer to students using pronouns consistent with the student's sex, refuses to affirm that other students' professed gender identity determines whether they are in fact male or female, or even discusses her religious views regarding sex and gender in a manner that another student is offended by.

The Final Rule will thus directly harm A.F. by forcing her to self-censor protected speech, as well as protected religious expression, in violation of the First Amendment.  That harm is irreparable.  *See, e.g.*, *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (noting that a loss of First Amendment rights satisfies the irreparable-harm requirement).

*Privacy interests*.  If the Final Rule takes effect, A.F.'s school will face liability under Title IX if it does not allow male students into previously female-designated bathrooms, locker rooms, and shower areas.

43

A.F. uses the female-designated restrooms at her school and feels safe knowing that boys are not allowed to use the girls' restroom.  A.F. Dec. ¶¶ 47-48.  She does not want to use the restroom with a male, even if that male considers himself to be a female.  *Id.* ¶ 48.  If male students were allowed to use the female restrooms at her school, she would do her best to avoid any women's restroom that a male could access.  *Id.*

She also uses the school locker room to change clothes for games.  *Id.* ¶ 49.  At her school, the locker room is mainly an open area where girls on sports teams change clothes in front of their lockers.  Sometimes they must share a locker.  *Id.*  She and her teammates can see each other as they change clothes to prepare for games.  *Id.*  Like many girls, she desires privacy from the opposite sex while changing clothes.  *Id.*  If she were forced to share a locker room and change clothes in front of a male, or be present in the locker room while a male is changing clothes near her, she would suffer deep distress and embarrassment.  *Id.*  She would be forced to change in a different room or area to protect her privacy.  *Id.*

A.F. would not shower in her locker room with a male nearby.  *Id.* ¶ 50.  Like many girls, she desires privacy from the opposite sex while showering.  She feels safe and comfortable knowing that boys are not allowed in the girls' locker room and shower area.  *Id.*  It would cause her to feel extremely unsafe, anxious, and embarrassed to shower in the girls' locker room if males were allowed to be present in there.  *Id.*  To avoid this situation, she would instead seek out a safe place to shower that males could not access.  *See id.* ¶ 48.

A.F. travels on overnight trips with her sports teams during the school year and for overnight sports camps over the summer.  *Id.* ¶ 51.  She often must travel to different cities and stay multiple nights to play against other teams.  *Id.*  Travel increases if her team makes the playoffs.  This past year, her school volleyball and basketball teams made it through the playoffs

44

and to the state championships.  *Id.*  This required travel and overnight stays of about one week

for each team championship.  *Id.*  She desires privacy from the opposite sex while sleeping,

changing clothes, and showering during overnight trips.  *Id.* ¶ 52.  She would feel deeply

uncomfortable if she were forced to share a room with a male during an overnight trip.  *Id.*

Currently, Arkansas law prevents A.F.'s school from allowing males into these female-

only spaces or allowing male students to share a room with female students on overnight trips.

*See supra* pp. 40-41.  This gives A.F. and other girls the assurance and comfort of knowing that

males will not be allowed into these sensitive spaces when they are using the restroom, changing

clothes, and showering.  The Final Rule will eviscerate that sense of safety and instead subject

A.F. and others to the deeply distressing and embarrassing reality that male students may be

present while they are changing clothes or showering.  This puts girls like A.F. to the choice of

accepting the presence of males in these female-designated spaces or ceasing using school

bathrooms, locker rooms, and showers altogether.  Those harms cannot be compensated

monetarily or undone by a final judgment; the Court must take action now to prevent them.  *See*

*McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir. 1984) (holding that a violation of privacy

constitutes an irreparable harm*); Meyer v. Portfolio Recovery Assocs.*, *LLC*, 707 F.3d 1036, 1044

(9th Cir. 2012) (finding that violation of privacy shows irreparable harm).

*Athletics*.  A.F. has played in organized sports from a young age and currently plays on

her school basketball team.  A.F. Decl. ¶¶ 6-9.  Athletics have played an important role in A.F.'s

life and her development as a young person.  *Id.* ¶ 21.  Participating in school sports has helped

her build a strong work ethic, kept her body healthy, taught her how to set goals and achieve

them, and taught her how to communicate well with others.  *Id.*  Competing in sports has boosted

A.F.'s self-confidence and helped to build leadership skills.  *Id.*  She anticipates continuing to compete in athletics on school teams in the years to come.  *See id.* ¶ 14.

However, A.F.'s athletic opportunities would be severely diminished if she were required to compete against or alongside male students.  Males have inherent physical advantages over females, especially in a sport like basketball where height, size, and upper body strength are advantages.  *Id.* ¶ 24.  A.F. also worries about the increased potential for injury if she were forced to play against male students.  *Id.* ¶¶ 25, 29, 30.

Arkansas law currently prevents males from competing in female-designated sports teams.  *See supra* pp. 38. This means that A.F. competes against only female teammates for athletic opportunities such as starting positions and playing time.  When A.F.'s basketball team competes against teams from other Arkansas schools, they compete only against other female students.

Despite the Final Rule's purporting to reserve the issue of athletics for a different rulemaking, the Final Rule clearly prevents funding recipients from enforcing blanket policies restricting males from competing in female-designated sports teams and competitions.  *See supra* ¶¶ 97-98.  If the Final Rule takes effect, A.F. and other girls will be forced to compete alongside and against male athletes, eviscerating the athletic opportunities Title IX was intended to provide.  *See Washington v. Ind. High Sch. Athletic Ass'n*, 181 F.3d 840, 853 (7th Cir. 1999) (holding that loss of school athletic opportunities can constitute irreparable harm); *accord Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1102 (S.D. Iowa 2020); *Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499, 510 n.79 (M.D. Pa. 2022) (collecting cases).

**III.     The balance of equities and public interest factors weigh in Plaintiffs' favor.**

The Eighth Circuit has held that "the remaining factors of injury to other parties and the public's interest generally warrant lesser consideration than those of likelihood of success and irreparable harm." *Org. for Black Struggle*, 978 F.3d at 609.  Still, they favor Plaintiffs.  No other parties will be harmed by maintaining the status quo while Plaintiffs litigate the legality of the Final Rule.  *See Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) ("[T]he maintenance of the status quo is an important consideration in granting a stay." (quotation omitted)).  And the public interest is vindicated when the rule of law is upheld.  *See Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020) (noting that the "precedent it would set to allow an executive branch official to negate the duly-enacted . . . laws of a state . . . is toxic to the concept[] of the rule of law"); *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (noting that "there is generally no public interest in the perpetuation of unlawful agency action") (cleaned up).  The Department has no valid interest in enforcing its unlawful rule while this litigation proceeds, and the Final Rule should therefore be enjoined or stayed.

## CONCLUSION

For the foregoing reasons, the Court should postpone the effective date of the Final Rule and grant a preliminary injunction against its enforcement.

Dated:  May 21, 2024                              Respectfully submitted,


TIM GRIFFIN                                       ANDREW BAILEY
Arkansas Attorney General                         Missouri Attorney General

*/s/ Nicholas J. Bronni*                           */s/ Joshua M. Divine*
Nicholas J. Bronni                                Joshua M. Divine
  Solicitor General                                 Solicitor General
Dylan L. Jacobs                                   Missouri Attorney General's Office
 Deputy Solicitor General                         Post Office Box 899
Office of the Arkansas Attorney General           Jefferson City, MO 65102
323 Center Street, Suite 200                      Tel. (573) 751-1800
Little Rock, AR  72201                            Fax. (573) 751-0774
Telephone: (501) 682-2007                         josh.divine@ago.mo.gov
Fax: (501) 683-2520
nicholas.bronni@arkansasag.gov                    *Counsel for Plaintiff State of Missouri*
dylan.jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

48

BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
Eric H. Wessan
Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
eric.wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

MICHAEL T. HILGERS
Nebraska Attorney General

*/s/ Lincoln J. Korell*
Lincoln J. Korell
Assistant Solicitor General
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

DREW H. WRIGLEY
North Dakota Attorney General

*/s/ Katie L. Carpenter*
*Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov

*Application *for admission pending*

*Counsel for Plaintiff State of North
Dakota*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles D. McGuigan*
Charles D. McGuigan
Deputy Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us

*Counsel for Plaintiff State of South Dakota*

                                          _s/ Brad L. Blake_____

Jonathan A. Scruggs*                      Brad L. Blake
Arizona Bar No. 030505                    Missouri Bar No. 38340
Henry W. Frampton, IV*                    Fellows & Blake, L.C.
South Carolina Bar No. 75314              13421 Manchester Road, Suite 105
**Alliance Defending Freedom**            St. Louis, MO 63131
15100 N. 90th Street                      (314) 725-1600
Scottsdale, Arizona 85260                 (314) 725-1609 Fax
(480) 444-0020                            bblake@fellowsblakelaw.com
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
rrouleau@ADFlegal.org

Natalie D. Thompson**
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org


                    *Counsel for Plaintiff A.F.*

*Admitted pro hac vice*

**Admitted pro hac vice, practice supervised by*
*one or more D.C. Bar members while D.C. Bar*
*application is pending.*