**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

|  |  |
|---|---|
| STATE OF ARKANSAS, et al., | No. 2:24-cv-636-RWS |
| *Plaintiffs*, |  |
| v. | **ORAL ARGUMENT REQUESTED PURUSANT TO LCvR 4.02** |
| MIGUEL CARDONA, *in his official capacity as Secretary of Education*, et al., |  |
| *Defendants*. |  |

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR A § 705 STAY AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

PROCEDURAL HISTORY .................................................................................. 5

LEGAL STANDARD .......................................................................................... 5

ARGUMENT ...................................................................................................... 5

I.  Plaintiffs Are Unlikely To Succeed on the Merits. ........................................... 5

  A.  The Final Rule's Recognition that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text. ............................... 5

  B.  The Final Rule's Limitations on Sex Separation Are Lawful and Properly Account for Congressional Direction. ................................. 11

    1.  Section 106.31(a)(2) Is Consistent with the Statutory Text and Longstanding Regulations. ....................................... 11

    2.  Plaintiffs Do Not Show that the Department's Consideration of § 106.31(a)(2) Was Unreasonable. ......................................... 14

  C.  The Rule Does Not Violate the Major Questions Doctrine. .................................. 17

  D.  The Final Rule's Definition of Hostile Environment Sex-Based Harassment Is Consistent with the Department's Statutory Authority, the APA, and the Requirements of the First Amendment. ......................................... 18

    1.  The Definition of Hostile Environment Sex-Based Harassment Is Not Contrary to Law Because Davis Does Not Define the Scope of the Department's Enforcement Authority. .................................... 19

    2.  The Definition of Hostile Environment Sex-Based Harassment Does Not Abridge Protected Speech in Violation of the First Amendment. ................................................... 21

    3.  The Definition of Hostile Environment Sex-Based Harassment in the Final Rule is Not Arbitrary and Capricious. ........................................ 25

  E.  The Final Rule's Delineation of the Scope of Title IX's Unambiguous Prohibition on Sex Discrimination Poses No Spending Clause Issue. ................. 26

II.  Plaintiffs Have Not Established Irreparable Harm. ......................................... 29

III.  The Equities and Public Interest Weigh Against Preliminary Relief. .............................. 31

i

IV.     Any Relief Afforded by the Court Should Be Limited in Accordance with the
        Administrative Procedure Act and Equitable Principles. ................................................. 32

CONCLUSION ...................................................................................................................... 34

# TABLE OF AUTHORITIES

## CASES

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville,*
  75 F.4th 760 (7th Cir. 2023) ........................................................................ 7

*Adams ex rel. Kasper v. School Board of St. John's County,*
  57 F.4th 791 (11th Cir. 2022) ....................................................................... 8

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) .................................................................................... 22

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ....................................................................... 32

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................................... 19

*Ayotte v. Planned Parenthood of N. New England,*
  546 U.S. 320 (2006) .................................................................................... 34

*B & D Land & Livestock Co. v. Conner,*
  534 F. Supp. 2d 891 (N.D. Iowa 2008) ......................................................... 5

*Benning v. Georgia,*
  391 F.3d 1299 (11th Cir. 2004) ................................................................... 27

*Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N.*
  *Lines v. CSX Transp., Inc.,*
  522 F.3d 1190 (11th Cir. 2008) ................................................................... 21

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ............................................................................. *passim*

*Califano v. Aznavorian,*
  439 U.S. 170 (1978) .................................................................................... 13

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) .................................................................................... 32

*Cannon v. Univ. of Chi.,*
  441 U.S. 677 (1979) .................................................................................... 31

*Copeland v. Ga. Dep't of Corrs.,*
  97 F.4th 766 (11th Cir. 2024) ..................................................................... 26

*Cornish v. Dudas,*
  540 F. Supp. 2d 61 (D.D.C. 2008) .............................................................. 31

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ................................................................ 5

*Davis v. Monroe County Board of Education*,
  526 U.S. 629 (1999) ................................................................... *passim*

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ................................................................... 14

*DHS v. New York*,
  140 S. Ct. 599 (2020) ................................................................. 33

*Eknes-Tucker v. Governor of Alabama*,
  80 F.4th 1205 (11th Cir. 2023) ...................................................... 8

*Equity in Athletics, Inc. v. Dep't of Educ.*,
  675 F. Supp. 2d 660 (W.D. Va. 2009), *aff'd*, 633 F.3d 91 (4th Cir. 2011) ............ 28

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .................................................................. 20

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) .................................................................. 17

*Florida v. Dep't of Health & Hum. Servs.*,
  19 F.4th 1271 (11th Cir. 2021) ...................................................... 29

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
  503 U.S. 60 (1992) .................................................................... 7

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) .................................................................. 24

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998) .............................................................. 19, 20

*Gen. Motors Corp. v. Harry Brown's, LLC*,
  563 F.3d 312 (8th Cir. 2009) ........................................................ 32

*Grabowski v. Ariz. Bd. of Regents*,
  69 F.4th 1110 (9th Cir. 2023) ........................................................ 7

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ........................ 7, 12

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009) ................................................................... 7

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ................................................................................ 18, 25

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
  452 U.S. 264 (1981) ................................................................................ 29

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ................................................................................ 3, 28

*L.W. ex rel. Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) ................................................................ 9

*Maryland v. King*,
  567 U.S. 1301 (2012) .............................................................................. 30

*Meritor Sav. Bank, FSB v. Vinson*,
  477 U.S. 57 (1986) .................................................................................. 7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983) .................................................................................. 14

*Muldrow v. City of St. Louis*,
  601 U.S.---, 144 S. Ct. 967 (2024) ...................................................... 11, 12

*Munaf v. Geren*,
  553 U.S. 674 (2008) ................................................................................ 5

*Neese v. Becerra*,
  640 F. Supp. 3d 668 (N.D. Tex. 2022), *appeal filed*,
  No. 23-10078 (5th Cir. Jan. 25, 2023) ................................................ 9, 10

*NetChoice, L.L.C. v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) .................................................................. 22, 23

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ................................................................................ 28

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................ 31

*Novus Franchising, Inc. v. Dawson*,
  725 F.3d 885 (8th Cir. 2013) ................................................................ 30

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ................................................................................ 31

*Rodgers v. Bryant*,
  942 F.3d 451 (8th Cir. 2019) ................................................................ 32

v

*Rowles v. Curators of University of Missouri*,
  983 F.3d 345 (8th Cir. 2020) ........................................................................ 24

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*,
  696 F.3d 771 (8th Cir. 2012) ........................................................................ 31

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) .......................................................................................... 7

*Sampson v. Murray*,
  415 U.S. 61 (1974) ........................................................................................ 33

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ................................................................................ 26, 28

*Speech First, Inc. v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) ................................................................ 23, 24

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ...................................................................................... 24

*U.S. Telecom Ass'n v. FCC*,
  855 F.3d 381 (D.C. Cir. 2017) ...................................................................... 18

*United States v. Salerno*,
  481 U.S. 739 (1987) ...................................................................................... 22

*United States v. Texas*,
  599 U.S. 670 (2023) ................................................................................ 32, 33

*Virginia v. Hicks*,
  539 U.S. 113 (2003) ................................................................................ 22, 23

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ...................................................................................... 22

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ................................................................................ 17, 18

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ...................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................. 5, 29, 31

*Wolfe v. Fayetteville, Ark. Sch. Dist.*,
  648 F.3d 860 (8th Cir. 2011) .......................................................................... 7

**STATUTES**

5 U.S.C. § 705 .................................................................................................................. 5

20 U.S.C. § 1681 .......................................................................................................... *passim*

20 U.S.C. §§ 1681–1682 ............................................................................................... 13

20 U.S.C. § 1682 .............................................................................................. 1, 2, 30, 31

20 U.S.C. § 1683 ............................................................................................................ 30

20 U.S.C. § 1686 ........................................................................................................ 2, 13

42 U.S.C. § 2000e-2 .................................................................................................. 4, 6, 7

**REGULATIONS**

34 C.F.R. § 106.2 ......................................................................................................... 23

34 C.F.R. § 106.10 ..................................................................................................... 6, 10

34 C.F.R. § 106.31 ........................................................................................ 11, 13, 15, 21

34 C.F.R. § 106.33 ........................................................................................................ 12

34 C.F.R. § 106.41 ........................................................................................................ 17

1997 Sexual Harassment Guidance,
  62 Fed. Reg. 12,034 (Mar. 13, 1997) ....................................................................... 20

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
  Federal Financial Assistance,
  85 Fed. Reg. 30,026 (May 19, 2020) .......................................................................... 3

Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex,
  Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021,
  86 Fed. Reg. 13,803 (Mar. 8, 2021) ........................................................................... 4

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
  Federal Financial Assistance,
  87 Fed. Reg. 41,390 (proposed July 12, 2022) ........................................................... 4

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
  Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female
  Athletic Teams,
  88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) ...................................................... 4, 16

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
    Federal Financial Assistance,
    89 Fed. Reg. 33,474 (Apr. 29, 2024) .................................................................................. *passim*

**OTHER AUTHORITIES**

Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. (1946) ............................ 33

## INTRODUCTION

Title IX prohibits recipients of federal funds from discriminating on the basis of sex in their education programs or activities. 20 U.S.C. § 1681(a). The Department of Education (Department) is charged with issuing rules effectuating Title IX. *Id.* § 1682. On April 29, 2024, the Department issued a rule titled Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the Final Rule or Rule).

Among other things, the Final Rule clarifies that "discrimination on the basis of sex" includes "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 89 Fed. Reg. at 33,886, and that the definition of hostile environment sex-based harassment includes "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* at 33,884.

Plaintiffs' challenges to the Rule fail on every proffered ground. The Department's interpretation of discrimination "on the basis of sex" straightforwardly applies the Supreme Court's reasoning in *Bostock v. Clayton County*, 590 U.S. 644 (2020). *Bostock* concluded that Title VII's prohibition against sex discrimination encompasses discrimination on the basis of gender identity "because it is impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex." *Id.* at 660. That same reasoning applies to the nearly identical text prohibiting discrimination on the basis of sex in Title IX.

The Final Rule also appropriately recognizes distinctions between contexts in which Congress has specified exceptions to Title IX's prohibition on sex discrimination, and other contexts—such as restrooms—in which it has not. Consistent with Supreme Court precedent, the

1

Rule explains that outside those statutorily-mandated exceptions, separate or different treatment based on sex constitutes unlawful discrimination under Title IX only if it causes more than de minimis harm.

The Rule's definition of sex-based harassment is consistent with Title IX and the Department's enforcement authority. The Department used a similar standard in its enforcement of Title IX for decades prior to regulatory changes made in 2020 and continues to use a similar standard in its enforcement of Title VI of the Civil Rights Act of 1964 (prohibiting discrimination on the basis of race, color, and national origin including shared ancestry and ethnic characteristics) and Section 504 of the Rehabilitation Act (prohibiting discrimination on the basis of disability). 89 Fed. Reg. at 33,642. And courts and the Equal Employment Opportunity Commission (EEOC) have used a similar standard to identify harassment under Title VII's analogous provisions for decades. Under these circumstances, Plaintiffs fail to show that the Rule's definition of sex-based harassment conflicts with any governing legal precedent, conflicts with the First Amendment, or is otherwise arbitrary or capricious.

Plaintiffs are unlikely to succeed on their other claims as well. Plaintiffs fail to show that the Final Rule requires an interpretation of Title IX that would violate the Spending Clause or that the Rule implicates the major questions doctrine.

In addition to Plaintiffs' lack of a likelihood of success on the merits, Plaintiffs also have not met their high burden to satisfy the other requirements for a stay or preliminary injunction. Plaintiffs' alleged harms are largely speculative and cannot establish irreparable injury justifying preliminary relief. Moreover, the public interest and balance of equities weigh against granting Plaintiffs' motion, as enjoining the Rule would substantially harm the federal government's interest in preventing discrimination in federally funded educational programs and activities.

Accordingly, the Court should deny Plaintiffs' motion.

## BACKGROUND

Title IX's nondiscrimination mandate states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There are only a small number of "specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *see* 20 U.S.C. § 1681(a)(1)-(9) (listing educational institutions, organizations, or programs that are exempt or partly exempt from Title IX's prohibition on sex discrimination); *id.* § 1686 (permitting maintenance of sex-separate living facilities).

Title IX directs the Department to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." *Id.* § 1682. Title IX also sets forth an administrative enforcement scheme, which requires the Department to obtain voluntary compliance from (or, failing that, terminate or refuse to grant or continue the federal funds of) a recipient that fails to comply with the statute or the Department's implementing regulations, through a variety of means. *Id.*

Over the years, the Department has promulgated regulations effectuating Title IX, including in 2020, when it specified how recipients of federal funds must respond to allegations of sexual harassment. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) [hereinafter 2020 Amendments].

One month after publication of the 2020 Amendments, the Supreme Court held that discrimination on the basis of gender identity is necessarily discrimination "because of . . . sex" in

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). *See Bostock*, 590 U.S. at 660. Following *Bostock*, President Biden directed the Department of Education to review the 2020 Amendments and existing agency guidance "for consistency with governing law." Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021, § 2, 86 Fed. Reg. 13,803 (Mar. 8, 2021).

After a considerable public engagement process, in July 2022 the Department issued a Notice of Proposed Rulemaking (NPRM). *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (proposed July 12, 2022). Following extensive review of more than 240,000 public comments, the Department published the Final Rule, which goes into effect on August 1, 2024. *See* 89 Fed. Reg. at 33,476.[1]

As relevant to this case, the Final Rule (1) describes the scope of prohibited sex discrimination under Title IX; (2) explains the limits of permissible different or separate treatment on the basis of sex under Title IX; and (3) clarifies the definition of sex-based harassment under Title IX.

## PROCEDURAL HISTORY

Plaintiffs are six states and one individual—A.F., a minor resident of Arkansas. Plaintiffs filed their complaint on May 7, 2024. ECF No. 1. Plaintiffs moved for a § 705 stay and preliminary injunction on May 22, 2024. Pls.' Mem., ECF No. 12.

---

[1] In April 2023, the Department issued a separate notice of proposed rulemaking regarding the athletics regulations, which has not yet been finalized. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023). As the Department has explained, "[u]ntil that rule is finalized and issued, the current regulations on athletics continue to apply," 89 Fed. Reg. at 33,817.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In determining whether a preliminary injunction is warranted, the Court considers four factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Section 705 of the Administrative Procedure Act permits a court to stay agency action pending judicial review. 5 U.S.C. § 705. A plaintiff must make the same showing for a preliminary injunction as for a § 705 stay. *See B & D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d. 891, 905 (N.D. Iowa 2008).

**ARGUMENT**

**I.   Plaintiffs Are Unlikely To Succeed on the Merits.**

   **A.   The Final Rule's Recognition that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text.**

Title IX states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Final Rule recognizes that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). As the Department explained, "discrimination on each of those bases is sex discrimination because each necessarily

5

involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" *Id.* at 33,802 (quoting *Bostock*, 590 U.S. at 655); *see generally* 89 Fed. Reg. at 33,801–10 (explaining the bases for § 106.10 and *Bostock*'s application)

Plaintiffs argue that the Department's interpretation of Title IX is contrary to statute and is arbitrary and capricious. *See* Pls.' Mem. 19–25, 31–35. In fact, the Department faithfully interpreted the statutory text in light of *Bostock*, which interpreted Title VII's provision making it unlawful, in relevant part, "for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex." 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Supreme Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656–57 (citation omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660, 661 (emphasis omitted). If, for example, an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female," but "retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. "[T]he individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* That is so even if "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

*Bostock*'s reasoning applies with equal force to Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. § 1681(a), which employs a causation standard no more stringent

than Title VII's "because of . . . sex" language, 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has long used the phrase "on the basis of" interchangeably with Title VII's "because of" language when discussing Title VII's causation standard, including in *Bostock* itself. *See* 590 U.S. at 650 ("[I]n Title VII, Congress outlawed discrimination in the workplace on the basis of . . . sex."); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (explaining statutory phrase, "based on" has the same meaning as the phrase "because of" (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64 & n.14 (2007))). Courts—including the Eighth Circuit—consistently rely on interpretations of Title VII's prohibition against discrimination "because of . . . sex" to interpret Title IX's textually similar provision. *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)); *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 866 (8th Cir. 2011) (observing that Title VII's "because of" and Title IX's "on the basis of" language "are treated interchangeably"). And as to the specific question at hand, several courts have already held that there is no difference between the two statutes that would permit a different result. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). Title IX no more permits a school to bar a student from band practice on the basis of the student being transgender than Title VII permits an employer to fire an employee because the employee is transgender.

Plaintiffs rely on out-of-circuit opinions to argue that *Bostock*'s reasoning does not apply to Title IX. *See* Pls.' Mem. 23–24, 32–33. But none of these cases provides grounds to conclude that *Bostock*'s analysis of Title VII's prohibition of discrimination "because of" sex is inapplicable to Title IX's nearly identical prohibition.

7

*Adams ex rel. Kasper v. School Board of St. John's County* did not interpret the scope of discrimination "on the basis of sex" addressed in § 106.10, but rather whether a particular school district policy preventing a transgender boy from using the boys' restroom violated Title IX. 57 F.4th 791, 799 (11th Cir. 2022). But the Final Rule's provision setting forth the scope of sex discrimination (§ 106.10) does not address restrooms, *see* 89 Fed. Reg. at 33,886. Rather, the only portion of the Final Rule that has implications for sex-separate restrooms is the provision to be codified at § 106.31(a)(2). *See infra* Part I.B.1. Nothing in *Adams* contradicts the Final Rule's clarification in § 106.10 that discrimination based on gender identity necessarily constitutes discrimination "on the basis of sex" under Section 1681 of Title IX, read in light of *Bostock. See Adams*, 57 F.4th at 808-09 (recognizing that "*Bostock* held that 'discrimination based on . . . transgender status necessarily entails discrimination based on sex'" and maintaining that this "statement is not in question in this appeal" (citation omitted)).

*Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), a due process and equal protection case is inapposite for similar reasons. *Eknes-Tucker* did not concern whether Title VII's prohibition on discrimination "because of" sex is materially distinguishable from Title IX's prohibition on discrimination "on the basis of" sex. Rather, the court declined to rely on *Bostock*'s analysis of but-for causation under Title VII in interpreting the Equal Protection Clause, emphasizing that the latter is a constitutional provision not a statutory protection, and that the Equal Protection Clause does not contain comparable language to Title VII. *See id.* at 1228-29 ("Because *Bostock* therefore concerned a different law (with materially different language) and a different factual context, it bears minimal relevance to the instant case.").

*L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), also did not interpret Title IX. In reversing the preliminary injunction of a state law prohibiting health care providers from

performing gender-affirming surgeries and administering hormones or puberty blockers to transgender minors, the court considered whether the law would receive heightened review under the Equal Protection Clause. *Id.* at 479-86. The court observed that *Bostock* "does not alter" its conclusion about whether the law should receive increased scrutiny, and suggested in dicta that *Bostock*'s reasoning applied only to Title VII. *Id.* at 484-85 (emphasis omitted). But contrary to Plaintiffs' assertion, Pls.' Mem. 14, this dicta—divorced from any analysis of Title IX's materially indistinguishable text—cannot overcome the textual analysis in *Bostock* itself. *See Bostock*, 590 U.S. at 654-55, 664-65.

Finally, *Neese v. Becerra* arose in a different context from this case—that is, a challenge by two physicians to a notice that the Department of Health and Human Services would interpret a prohibition of sex discrimination in Section 1557 of the Affordable Care Act to include discrimination on the basis of sexual orientation and gender identity. 640 F. Supp. 3d 668, 673 (N.D. Tex. 2022), *appeal filed*, No. 23-10078 (5th Cir. Jan. 25, 2023). The *Neese* physicians expressly conceded that *Bostock*'s reasoning applies to Title IX and Section 1557. *See* Resp. to Defs.' Mot. for Summ. J. & Reply Br. in Supp. of Pls.' Mot. for Summ. J. at 7, *Neese v. Becerra*, No. 2:21-cv-00163-Z (N.D. Tex. Sept. 16, 2022), ECF No. 62 ("The plaintiffs have acknowledged from the outset that the holding of *Bostock* applies to Title IX and section 1557."). The Court disregarded plaintiffs' concession and, without the benefit of the Final Rule's analysis, concluded that *Bostock*'s reasoning does not extend to Title IX because "Title IX presumes sexual dimorphism" and because Title IX refers to discrimination "on the basis of" sex rather than "because of" sex. *See* 640 F. Supp. 3d at 676–84. But, as noted above, the Rule, like *Bostock*, explains that discrimination based on gender identity is necessarily a form of discrimination on the basis of sex, even if sex is assumed to be binary—that is, even if "sexual dimorphism" is presumed.

89 Fed. Reg. at 33,802, 33,804–05, 33,807. And in focusing on Title IX's use of the phrase "on the basis" of sex, the Court in *Neese* failed to acknowledge that *Bostock* used "on the basis" and "because of" interchangeably. *See, e.g.*, *Bostock*, 590 U.S. at 650, 654, 662, 666.

Plaintiffs rely on *Adams* and various other sources for the proposition that Title IX prohibits discrimination based on only "biological sex." *See* Pls.' Mem. 20–21. But *Bostock* likewise "proceed[ed] on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female." 590 U.S. at 655. Thus, per *Bostock*, regardless of how one defines "sex," "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660; *see also id.* at 660–61 (explaining "transgender status [is] inextricably bound up with sex"). The Rule faithfully follows Bostock's reasoning. *See* 89 Fed. Reg. at 33,802, 33,804–05, 33,807.

As set forth above, the Department properly applied *Bostock*'s straightforward textual analysis in interpreting the plain language of Title IX's nondiscrimination mandate. Plaintiffs thus are unlikely to succeed on the merits of their claims that the interpretation of sex discrimination to be codified at 34 C.F.R. § 106.10 is inconsistent with Title IX or arbitrary and capricious.[2]

### B.    The Final Rule's Limitations on Sex Separation Are Lawful and Properly Account for Congressional Direction.

The Final Rule's adherence to the limited scope of Title IX's exceptions to the statute's

---

[2] A district court in another circuit recently declared unlawful the Department's interpretation, in certain guidance documents predating the Final Rule and "any future agency guidance documents," that the anti-discrimination provisions of Title IX do not include sexual orientation or gender identity. Mem. Op. & Order at 102, *Texas v. Cardona*, No. 4:23-cv-00604-O (N.D. Tex. June 11, 2024), ECF No. 37. In reaching that decision, the court endorsed much of the faulty reasoning and misunderstanding of *Bostock* underpinning Plaintiffs' claims here. *See generally id.* at 78–85. Regardless, the declaratory relief granted in the guidance documents case does not purport to extend to the Final Rule, and the court made clear that its parallel injunctive relief likewise does not apply to the Final Rule. *See id.* at 102, 108.

general prohibition on sex discrimination follows naturally from Title IX's text and is not arbitrary or capricious. Plaintiffs take issue with the Final Rule's provision that, with limited exceptions, a recipient may not carry out otherwise permissible different or separate treatment on the basis of sex in a manner that prevents a person from participating in an education program or activity consistent with the person's gender identity. *See* 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). Plaintiffs assert that this provision is contrary to statute and unreasonable. Pls.' Mem. 21–22, 32–36. These arguments fail.

1. Section 106.31(a)(2) Is Consistent with the Statutory Text and Longstanding Regulations.

The Department's regulations have long specified that separate or different treatment on the basis of sex is generally prohibited under Title IX because such treatment is presumptively discriminatory. 89 Fed. Reg. at 33,814 (citing NPRM, 87 Fed. Reg. at 41,534; 34 C.F.R. § 106.31(b)(4), (7)). The regulations have also long recognized limited contexts in which sex separation or differentiation is allowed. *Id.* The provision to be codified at 34 C.F.R. § 106.31(a)(2) explains how recipients may carry out such separate or different treatment without running afoul of the statute's nondiscrimination mandate. In short, the Rule provides, consistent with Supreme Court precedent, that—except in circumstances where Congress provided otherwise—Title IX prohibits "distinctions or differences in treatment [on the basis of sex] that injure protected individuals." *Id.* at 33,814 (brackets in original) (quoting *Bostock*, 590 U.S. at 681); *see Muldrow v. City of St. Louis*, 601 U.S.---, 144 S. Ct. 967, 974 (2024) ("The words 'discriminate against,' we have explained, refer to 'differences in treatment that injure' employees." (quoting *Bostock*, 590 U.S. at 681)).

As compelled by that natural reading of the statutory text, which prohibits "discrimination," 20 U.S.C. § 1681(a), the Department explained that, except in limited contexts

explained below, a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury (i.e., more than de minimis harm). 89 Fed. Reg. at 33,814. The Department has long recognized that sex "separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" because separation of such facilities by sex generally imposes no more than de minimis harm on students. *Id.* at 33,818; *see generally* 34 C.F.R. § 106.33. But consistent with federal court decisions and guidelines published by respected medical organizations, the Department explained that sex separation that prevents a person from participating in an education program or activity consistent with their gender identity *does* cause more than de minimis harm— a conclusion that Plaintiffs do not dispute. *See* 89 Fed. Reg. at 33,816 (citing *Grimm*, 972 F.3d at 617–18; *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045-46 (7th Cir. 2017)); *id.* at 33,819 n.90 (citing guidelines published by medical organizations). Because preventing a student from using sex-separate restrooms or participating in single-sex classes consistent with their gender identity causes more than de minimis harm on the basis of sex, *id.* at 33,814, it is prohibited by Title IX.

At the same time, the Department recognized that Congress specified a few limited contexts in which different or separate treatment based on sex is permitted, without regard to the degree of harm such sex separation might cause. *Id.* at 33,819; *see, e.g.*, 20 U.S.C. § 1681(a)(6) (membership practices of certain social fraternities or sororities); *id.* § 1681(a)(4) (institutions focused on military training); *id.* § 1686 (educational institution's maintenance of "separate living facilities for the different sexes").

Plaintiffs are incorrect that the Final Rule's attention to the distinction between regulations that mirror an express statutory exception (as listed at § 106.31(a)(2)) and those that address sex

separation in other contexts not specifically exempted by Congress is somehow contradictory. *See, e.g.*, Pls.' Mem. 21–22, 34–35. To the contrary, as explained by the Department, this distinction follows directly from the statute itself. *See* 89 Fed. Reg. at 33,814, 33,819. The Final Rule "clearly effectuates this basic congressional decision." *Califano v. Aznavorian*, 439 U.S. 170, 178 (1978). Although Congress did not except restrooms and locker rooms from the general prohibition on sex discrimination, the Department reasonably determined that sex separation in such contexts can be consistent with Title IX, but only to the extent that any sex-based harm imposed as a result of that separation is de minimis (i.e., not discriminatory). 89 Fed. Reg. at 33,816; *see id.* at 33,821 (explaining that the statutory living facilities "carve-out" in 20 U.S.C. § 1686 is inapplicable to "other aspects of a recipient's education program or activity for which Title IX permits different treatment or separation on the basis of sex, such as bathrooms, locker rooms, or shower facilities," and noting that the latter are "regulations that the Department adopted under different statutory authority [20 U.S.C. §§ 1681–1682], and which have long been addressed separately from 'living facilities'").

Thus, contrary to Plaintiffs' argument, Pls.' Mem. 21–22, the de minimis harm provision at § 106.31(a)(2) follows directly from the text and structure of Title IX. It explains how Title IX's prohibition of discrimination—which is premised on a concept of harm—places limitations on the sex-based separate or different treatment permitted in certain contexts by Department regulations. That is, in these contexts, separate or different treatment on the basis of sex is permitted to the extent it does not cause more than de minimis harm.

### 2. Plaintiffs Do Not Show that the Department's Consideration of § 106.31(a)(2) Was Unreasonable.

Plaintiffs argue that the Rule's de minimis harm standard is arbitrary and capricious because (1) the Department allegedly failed to offer a reasoned explanation for the Rule's

application of the standard in the context of sex-separate activities and facilities; and (2) because the Rule does not encompass athletics. Plaintiffs' contentions that the Department's consideration of § 106.31(a)(2) was arbitrary and capricious lack merit. Review under the arbitrary and capricious standard is "deferential." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019). The question for the Court is whether the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983). The Department clearly met that standard here with respect to each of Plaintiffs' concerns. The Final Rule's adherence to the limited scope of Title IX's exceptions to the statute's general prohibition on sex discrimination follows naturally from the operative text and is not arbitrary or capricious.

*First*, Plaintiffs are wrong to argue that, in promulgating § 106.31(a)(2), the Department "failed to adequately consider other important aspects of the problem," Pls.' Mem. 34. The Department thoroughly considered and addressed commenters' concerns, including reported concerns regarding safety, privacy, and compliance. The Department "strongly agrees that recipients have a legitimate interest in protecting all students' safety and privacy," and explained that, under § 106.31(a)(2), "a recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity." 89 Fed. Reg. at 33,820; *see also id.* ("nothing in Title IX or the final regulations prevents a recipient from offering single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason"). The Department reasonably concluded, however, that there is no "evidence that transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." *Id.* Nor have Plaintiffs

14

identified any evidence contradicting that conclusion. As the Final Rule notes, federal courts have rejected "unsubstantiated and generalized concerns that transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." 89 Fed. Reg. at 33,820 (citing cases).

The Department also addressed concerns regarding compliance, including "questions about how a recipient should determine a person's gender identity for purposes of § 106.31(a)(2)." *Id.* at 33,819. Contrary to Plaintiffs' characterization, the Rule does not bar recipients from "verify[ing] a student's claimed gender identity," Pls.' Mem. 34; rather, the Rule acknowledges that "many recipients rely on . . . written confirmation . . . by the student or student's parent, counselor, coach, or teacher." 89 Fed. Reg. at 33,819. The Rule merely explains that recipients may not "requir[e] a student to submit to invasive medical inquiries or *burdensome* documentation requirements" because doing so "imposes more than de minimis harm." *Id.* (emphasis added). Plaintiffs do not meaningfully dispute that conclusion, and the Rule's recognition that some compliance mechanisms are unduly invasive or burdensome does not render the Rule arbitrary and capricious.

To the extent that Plaintiffs argue that the Rule fails to adequately address how § 106.31(a)(2) applies to nonbinary individuals, Pls.' Mem. 33, they are incorrect. The Department explained that "[f]or nonbinary students, a recipient may, for example, coordinate with the student, and the student's parent or guardian as appropriate, to determine how to best provide the student with safe and nondiscriminatory access to facilities, as required by Title IX." 89 Fed. Reg. at 33,818. Plaintiffs identify no way in which this explanation is unreasonable.

*Second*, the Department's decision to address athletics through a separate rulemaking and to specify that the de minimis harm rule in § 106.31(a)(2) does not apply to sex-separate athletic teams that a recipient offers under § 106.41(b), *see id.* at 33,816, does not lend support to Plaintiffs'

contention that the Rule is unreasonable. Plaintiffs' challenges to § 106.31(a)(2) at points appear to assume that this provision has implications for sex-separate athletic teams. *See* Pls.' Mem. 35–36. To the contrary, § 106.31(a)(2) expressly does *not* apply to the criteria recipients use to determine students' eligibility to participate on male and female athletic teams. 89 Fed. Reg. at 33,816–17 ("Consistent with the longstanding athletics regulations, § 106.31(a)(2) does not apply to permissible sex separation of athletic teams."). Indeed, the Department revised the proposed regulation to identify the specific contexts in which § 106.31(a)(2) does not apply, including with respect to § 106.41(b). *Id*. In April 2023, the Department issued a separate notice of proposed rulemaking regarding the athletics regulations, which will be finalized in a separate rulemaking. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023). As the Department has explained, "[u]ntil that rule is finalized and issued, the current regulations on athletics continue to apply." 89 Fed. Reg. at 33,817. In other words, the Rule makes explicit that it in no way alters the status quo regarding eligibility for sex-separate athletic teams.

Moreover, the Department's decision to address athletics through a separate rulemaking is consistent with the fact that Congress recognized by statute that athletics is a special context. *Id.*; *see* Education Amendments of 1974, section 844. And the Department's athletics regulations have always tracked Congress's determination that the unique circumstances of athletics merit a different approach, "governed by an overarching nondiscrimination mandate and obligation to provide equal athletic opportunities for students regardless of sex." 89 Fed. Reg. at 33,816 (citing 34 C.F.R. § 106.41(a), (c)). This approach allows individual students to be excluded, in certain circumstances, from a particular male or female team based on their sex, even when doing so

16

imposes more than de minimis harm on the excluded student. *Id.* at 33,817. Contrary to Plaintiffs' suggestions, Pls.' Mem. 35–361, the Rule thoroughly and logically explains why the de minimis harm standard in § 106.31(a)(2) does not apply to the athletics regulations, and why this is consistent with the Department's longstanding approach to athletics. 89 Fed. Reg. at 33,816–19.

In sum, the Final Rule's application of the de minimis harm standard in § 106.31(a)(2) is supported and logical, and, in promulgating this provision, the Department neither failed to consider an important aspect of the problem nor ignored relevant evidence. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (noting that judicial review under arbitrary-and-capricious standard is "deferential" and "simply ensures that the agency has acted within a zone of reasonableness").

### C.      The Rule Does Not Violate the Major Questions Doctrine.

Contrary to Plaintiffs' assertions, §§ 106.10 and 106.31(a)(2) of the Rule do not implicate the major questions doctrine. *See* Pls.' Mem. 25–26. That doctrine is reserved for only "extraordinary" cases, "in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up). This is not such a case. With respect to § 106.10, the Department does not contend that Congress gave it the authority to decide as a matter of policy whether Title IX prohibits discrimination based on gender identity. Instead, like the Supreme Court in *Bostock*, the Department in this provision merely interpreted the unambiguous text of the statute. *See supra,* Part I.A. Thus, it reflects "policy decisions" made by "Congress . . . itself." *West Virginia*, 597 U.S. at 723 (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017)). To the extent Plaintiffs' argument addresses the Rule's implications for sex-separate spaces under § 106.31(a)(2), the major questions doctrine is likewise inapplicable. As explained above,

§ 106.31(a)(2) effectuates Congress's decision in Title IX to generally prohibit sex-based discrimination where it subjects a person to more than de minimis harm. *See* Part I.B *supra*.

### D. The Final Rule's Definition of Hostile Environment Sex-Based Harassment Is Consistent with the Department's Statutory Authority, the APA, and the Requirements of the First Amendment.

The Final Rule defines hostile environment sex-based harassment, in relevant part, as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884. The definition in the Final Rule is consistent with "relevant judicial precedent, . . . with congressional intent and the Department's longstanding interpretation of Title IX and resulting enforcement practice prior to the 2020 amendments." *Id.* at 33,490. In addition, this language "closely tracks longstanding case law defining sexual harassment," *id.* at 33,494 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)), and aligns with the definition used by the EEOC. *Id.* at 33,516.

Plaintiffs nevertheless argue that the Final Rule's harassment definition is unlawful because (1) the definition is inconsistent with the definition in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), Pls.' Mem. 26-29; and (2) the Rule abridges protected speech in violation of the First Amendment. These arguments are incorrect.

### 1. The Definition of Hostile Environment Sex-Based Harassment Is Not Contrary to Law Because *Davis* Does Not Define the Scope of the Department's Enforcement Authority.

Plaintiffs' reliance on *Davis* is misplaced because *Davis* addressed the standard that a plaintiff must meet to bring a private action for damages, 526 U.S. at 650; it did not limit the Department's enforcement authority. 89 Fed. Reg. at 33,499. The Supreme Court's articulation of the scope of the private cause of action in Title IX focused on the fact that this cause of action is

implied, rather than an express creation of Congress. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). Explaining that "[t]he requirement that recipients receive adequate notice of Title IX's proscriptions . . . bears on the proper definition of 'discrimination' in the context of a private damages action," *Davis* thus held that "funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 649-50. The Supreme Court's baseline presumption that "implied causes of action are disfavored," *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009), provides an additional reason the Court may have been hesitant to craft a broad standard in *Davis*.

Plaintiffs fail to explain why the *Davis* standard must apply in the distinct context of administrative enforcement and cite no authority for this proposition. In the administrative enforcement context, unlike private suits, Title IX and its implementing regulations require the Department to provide notice to recipients before taking enforcement actions. Thus, *Davis*'s analysis of when to allow recovery of damages on theories of *respondeat superior* and constructive notice is not controlling. Indeed, after observing that Congress "entrusted" Federal agencies to "promulgate rules, regulations, and orders to enforce the objectives" of Title IX, 526 U.S. at 638, *Davis* repeatedly and approvingly cited the Department's then-recently published guidance regarding sexual harassment, *see id.* at 647-48, 651 (citing 1997 Sexual Harassment Guidance, 62 Fed. Reg. 12,034 (Mar. 13, 1997)). That guidance stated that schools could be found to violate Title IX if the relevant harassment "was sufficiently severe, persistent, or pervasive to create a hostile environment." 1997 Sexual Harassment Guidance, 62 Fed. Reg. at 12,040.

The *Davis* Court did not suggest that the Department's enforcement standard had to exactly

mirror that case's holding. And more generally, both *Gebser* and *Davis* contemplated that the standard for private suits would be *different* than the standard for the Department's enforcement efforts. *See Davis*, 526 U.S. at 639 ("[W]e are asked to do more than define the scope of the behavior that Title IX proscribes. We must determine whether [the facts] can support a private suit for money damages."); *Gebser*, 524 U.S. at 284 ("Because the private right of action under Title IX is judicially implied, we have a measure of latitude to shape a sensible remedial scheme . . ."); *see also* 85 Fed. Reg. at 30,033 (2020 Amendments) ("Neither *Gebser* nor *Davis* opined as to what the appropriate conditions (e.g., definition of sexual harassment, actual knowledge) and liability standard (e.g., deliberate indifference) must or should be for the Department's administrative enforcement.").

Plaintiffs also complain that the Rule differs from the 2020 Amendments, which adopted the *Davis* standard. Pls.' Mem. 17, 27, 32. But in 2020, the Department merely explained that it preferred the *Davis* standard, not that the *Davis* standard was the only possibility or somehow compelled by law. *See* 85 Fed. Reg. at 30,036 ("The Department chooses to return to the premise expressed [in earlier guidance]"). When an agency changes policy, an agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one," but only that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, the Department has done precisely that.

Similarly, Plaintiffs are incorrect to argue that the Final Rule's harassment definition improperly covers conduct that "limits" a person's ability to participate in an activity because that element of the definition differs from the holding in *Davis*. Pls.' Mem. 27. As the Department explained, including conduct that "limits or denies" participation is compelled by the text of Title

20

IX. "If Title IX only covered exclusion from participation or denial of access, there would have been no reason for Congress to add 'be denied the benefits of,'" because "be excluded from" would have supplied the necessary standard. 89 Fed. Reg. at 33,511. Since 1975, Title IX regulations have prohibited recipients from, on the basis of sex, "limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity." 34 C.F.R. § 106.31(b)(7). The "limits or denies" standard in the Final Rule gives effect to every word in the statute without rendering any words redundant or superfluous. *See, e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1195 (11th Cir. 2008) (noting "the rules of statutory construction require courts to give meaning to every word and clause in a statute" and that courts must similarly avoid surplusage).

### 2. The Definition of Hostile Environment Sex-Based Harassment Does Not Abridge Protected Speech in Violation of the First Amendment.

Plaintiffs allege the Rule's definition of hostile environment sex-based harassment infringes on protected speech in violation of the First Amendment. This assertion is incorrect. By its plain terms, the Final Rule does no such thing. "Nothing in the Final [Rule] limits any rights that would otherwise be protected by the First Amendment," Final Rule, 89 Fed. Reg. at 33,505, and "nothing in the regulations requires or authorizes a recipient to violate anyone's First Amendment rights." *Id*. at 33,516. In the event discipline is meted out, that too must be consistent with Due Process principles and the First Amendment. *Id*. at 33,500-01. And the Department clearly stated that "a stray remark, such as a misuse of language, would not constitute harassment under [the applicable] standard." *Id.* at 33,516.

Plaintiffs incorrectly argue that the application of the Rule's definition of sex-based harassment to discrimination based on gender identity violates the First Amendment. On the contrary, similar harassment standards have existed in many contexts—for example, in Title IX

and Title VII—over a long period of time without raising serious First Amendment issues. Just as it has been possible for schools and the Department—over decades of enforcement—to address discriminatory harassment on other bases, while still respecting First Amendment rights and religious views, so too will schools and the Department be able to address harassment based on gender identity without infringing on First Amendment rights.

As a threshold matter, Plaintiffs assert a pre-enforcement facial challenge to the Rule, but do not even try to show that the Rule is "unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Although in the First Amendment context "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021), courts "have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the 'strong medicine' of overbreadth invalidation," *Virginia v. Hicks*, 539 U.S. 113, 119-20 (2003) (internal citations omitted); *see also NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 450 (5th Cir. 2022) (citing *Hicks*, 539 U.S. at 119). Plaintiffs cannot satisfy this standard.

Indeed, Plaintiffs cite no case in which a court has held unconstitutional a definition of harassment analogous to the hostile environment sex-based harassment definition to be codified at 34 C.F.R. § 106.2. This definition is narrow: it "only prohibit[s] conduct that meets all the elements" set forth in the definition and whether harassment has occurred is evaluated based on "the totality of the circumstances . . . to ensure that no element or relevant factual consideration is ignored." 89 Fed. Reg. at 33,506. When evaluated against the "plainly legitimate sweep" of

preventing sex-based harassment, the Rule in no way reaches such a substantial proportion of protected speech to justify "the strong medicine' of overbreadth invalidation," *Hicks*, 539 U.S. at 119-20, 122. At bottom, Plaintiffs' First Amendment arguments boil down to "speculat[ion] about the most extreme hypothetical applications" of the Rule, *NetChoice*, 49 F.4th at 451-52, but "[s]uch whataboutisms further exemplify why it's inappropriate to hold the [Rule] facially unconstitutional in a pre-enforcement posture." *Id.*

Plaintiffs suggest that only the *Davis* standard respects principles of free speech. *See* Pls.' Mem. 28-29. But the *Davis* court had no concerns about the interaction of its holding on First Amendment rights and gave no indication that the definition of actionable harassment it adopted was driven by First Amendment considerations. In fact, the majority discusses the issue only to correct a misunderstanding by the dissent. *See Davis*, 526 U.S. at 652. In the cases Plaintiffs cite, the courts of appeal found First Amendment violations not because a standard other than *Davis* was applied, but for entirely separate reasons.

For example, Plaintiffs rely (Pls.' Mem. 28) on *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), but as the Final Rule explains, this case is inapposite. 89 Fed. Reg. at 33,505. At issue in *Speech First* was a policy that, among other things, prohibited "a wide range of 'verbal, physical, electronic, and other' expression concerning any of (depending on how you count) some 25 or so characteristics," and "reache[d] not only a student's own speech, but also her conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's speech." 32 F.4th at 1125. In contrast to the Final Rule, "[t]he policy, in short, [was] staggeringly broad," *id.*, and it was not "tailored to harms that have long been covered by hostile environment laws," 89 Fed. Reg. at 33,505 (discussing *Speech First*, 32 F.4th 1110). Plaintiffs provide no basis for their contention that, despite the clear differences in definitions, the Final Rule is in tension with *Speech First*.

23

Plaintiffs complain that the Final Rule is inconsistent with in-circuit caselaw set forth in *Rowles v. Curators of University of Missouri*, 983 F.3d 345 (8th Cir. 2020). *See* 89 Fed. Reg. at 33,494; Pls.' Mem. 26-27. As the Department explained, the *Rowles* court "rejected the plaintiff's vagueness challenge, explaining the policy 'provided adequate notice of what conduct is prohibited' and used language with 'common usage and understanding.'" 89 Fed. Reg. at 33,494 (quoting *Rowles*, 983 F.3d at 356, 358) (internal alterations omitted). Plaintiffs argue *Rowles* is inapposite because a "lower harassment standard may pose fewer First Amendment concerns in the context of a university regulating the speech of its employees, like a teaching assistant." Pls.' Mem. 27. In fact, the Supreme Court has repeatedly concluded that this "lower standard" does indeed apply when a university regulates "the speech of its employees" such as professors and teachers. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 419-20 (2006) (although public employees may speak on matters "of public concern," employers may also limit speech where "necessary . . . operate efficiently and effectively"). This is also true of students in public schools, whose speech is similarly more regulated than that of the general public. *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). Plaintiffs therefore cannot distinguish *Rowles* by arguing the standard applied in that case is different from the standard that applies to teachers and students regulated by the Final Rule.

The Rule also raises no overbreadth concerns. The definition "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits" a person's ability to participate in the recipient's education program or activity. 89 Fed. Reg. at 33,503. The Supreme Court has upheld Title VII's application to speech under a similar standard "without acknowledging any First Amendment concern." *Id.* at 33,505 (citing *Harris*, 510 U.S. at 23).

24

Plaintiffs are accordingly unlikely to succeed on their claim that the Rule's definition of hostile environment sex-based harassment violates First Amendment rights.

3.  The Definition of Hostile Environment Sex-Based Harassment in the Final Rule is Not Arbitrary and Capricious.

Plaintiffs allege the Final Rule's definition of hostile environment sex-based harassment is arbitrary and capricious for three reasons: (1) it allegedly contravenes the *Davis* standard; (2) it allegedly infringes on protected speech in violation of the First Amendment; and (3) the Department allegedly failed to address comments about misgendering. Each assertion is incorrect, particularly under the deferential arbitrary-and-capricious standard. *See supra*, Part I.B.2,

*First*, Plaintiffs are wrong to argue that the Department failed to adequately address *Davis.* Pls.' Mem. 36. As discussed above, the Department expressly considered *Davis.* As the Department explained in the Final Rule, the Department's enforcement authority is not limited to conduct that itself gives rise to private damages liability. 89 Fed. Reg. at 33,490. *See supra* Part I.D.1.

*Second*, Plaintiffs' argument that the Final Rule failed to adequately consider First Amendment concerns raised by commentors is refuted by the record. The Department extensively considered First Amendment concerns, and documented that consideration in the preamble to the Final Rule, which is more than adequate to meet the arbitrary and capricious review standard because it shows that the Department considered the relevant questions in its analysis. *See* 89 Fed. Reg. at 33,492-97, 33,500-11, 33,514-16, 33,542, 33,559, 33,570-71, 33,616, 33,810, 33,828, 33,838.

*Third*, Plaintiffs are wrong to suggest that the Department failed to address comments about misgendering. *Contra* Pls.' Mem. 37. The Rule acknowledged commenters' assertions that, under some circumstances, misgendering can be one form of sex-based harassment, but notes that

"whether verbal conduct constitutes sex-based harassment is necessarily fact-specific," and in all instances must satisfy all the elements of hostile environment sex-based harassment to violate Title IX. 89 Fed. Reg. at 33,516; *see, e.g.*, *Copeland v. Ga. Dep't of Corrs.*, 97 F.4th 766, 778 (11th Cir. 2024) (holding in the Title VII context that frequent misgendering can evidence a hostile environment). Plaintiffs complain this definition is arbitrary and capricious and risks chilling protected speech, but the Rule addresses this, as well. "While the final regulations do not purport to identify all of the circumstances that could constitute sex-based harassment under Title IX, a stray remark, such as a misuse of language, would not constitute harassment under this standard." 89 Fed. Reg. at 33,516. And whether any conduct is "severe or pervasive" is necessarily a fact-specific inquiry. *Id.* at 33,507. Accordingly, Plaintiffs have not shown that the Rule's definition of sex-based harassment is arbitrary, capricious, or in excess of statutory authority.

### E.    The Final Rule's Delineation of the Scope of Title IX's Unambiguous Prohibition on Sex Discrimination Poses No Spending Clause Issue.

Plaintiffs are also incorrect in contending that the Final Rule violates the Spending Clause. *See* Pls.' Mem. 29–31. The Spending Clause grants Congress broad power to achieve its policy aims through conditioned offers of funding, so long as those conditions are, *inter alia*, (1) "unambiguous[]," (2) not unduly coercive, (3) relate "to the federal interest" in the project, and (4) consistent with "other constitutional provisions." *South Dakota v. Dole*, 483 U.S. 203, 207–08, 211 (1987). The focus of a Spending Clause inquiry is typically on a *statute*, not an implementing regulation, because the Spending Clause limits *Congress's* authority to condition federal funds. Title IX has long been held to be consistent with the Spending Clause. *Davis*, 526 U.S. at 640. Here, however, Plaintiffs argue that if the Rule effectuates Title IX, then the Rule's alleged infirmities would render it or Title IX invalid under the Spending Clause. Pls.' Mem. 29–31. This theory largely restates Plaintiffs' other merits arguments, and is wrong.

26

*First*, there is no issue of ambiguity in Title IX's provisions. The requirement of unambiguity requires that Congress "make the existence of the condition itself" "explicitly obvious," not that Congress list all ways in which a recipient could fail to comply. *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (citation omitted). Indeed, "so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Id.* at 1306.

Here, this standard is met because the relevant provision in the Final Rule merely delineates the scope of Title IX's unambiguous prohibition on sex discrimination, based on the plain meaning of the statutory language. *See* 89 Fed. Reg. at 33,802. Title IX unambiguously prohibits any form of sex-based discrimination not specifically excepted by statute. *See* 20 U.S.C. § 1681(a) ("No person . . . shall, on the basis of sex, be excluded from . . . ."). Because it is "impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex," *Bostock*, 590 U.S. at 660, Title IX's prohibition on sex-based discrimination necessarily includes discrimination because of gender identity. Plaintiffs in essence argue that certain obligations imposed by the Rule are not ones they expected, Pls.' Mem. 30, but Plaintiffs were on notice that they were barred from discriminating based on sex, and "the fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock*, 590 U.S. at 674 (cleaned up); *see also id.* at 688 (Alito, J., dissenting) ("According to the Court, the text is unambiguous."). Indeed, in 2005, the Supreme Court rejected an analogous argument that Title IX did not cover retaliation because it was not specifically mentioned in the statute, concluding that specific forms of discrimination not mentioned in the statute—such as retaliation—were nonetheless discrimination. *Jackson*, 544 U.S. at 175; *see also id.* ("Because

27

Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered.").

*Second*, Plaintiffs devote one sentence to arguing the Rule is unduly coercive, Pls.' Mem. 31, but their explanation is inadequate. A statute may be unconstitutionally coercive if it "pass[es] the point at which 'pressure turns into compulsion,'" *NFIB v. Sebelius*, 567 U.S. 519, 580 (2012) (quoting *Dole*, 483 U.S. at 211), but generally a state is expected to simply decline the offer of funds, *id.* at 579 (Roberts, C.J.). Plaintiffs here make no effort to meet this high bar. Plaintiffs' brief does not explain what amount of funding they believe is at risk because of the Rule, nor do Plaintiffs present any declarations supporting this claim. Nor do Plaintiffs attempt to place the amount of funding at issue in the context of their overall budgets or the Supreme Court's case law. *Cf. Dole*, 483 U.S. at 211. Particularly in the context of this facial challenge, Plaintiffs cannot show that they have been unduly coerced. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660, 674 (W.D. Va. 2009) (holding that Title IX and certain implementing regulations did not violate the Spending Clause because of the enforcement process and that there are penalties "less drastic than the withholding of federal funding"), *aff'd*, 633 F.3d 91 (4th Cir. 2011).

Plaintiffs' remaining Spending Clause theories—that the Rule is contrary to federal interests and is otherwise unconstitutional—restate their other merits arguments. For the same reasons that the Rule is consistent with Title IX and the First Amendment, there also is no Spending Clause violation on these bases.

## II. Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs also fail to establish the imminent irreparable harm needed to justify a preliminary injunction. A plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a

possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*.

Plaintiffs argue that the Rule imposes irreparable harms on Plaintiff States because it conflicts with Plaintiff States' laws and policies. Specifically, Plaintiffs argue that the Rule will conflict with Plaintiff States' laws regarding "[a]thletics," Pls.' Mem. 38; "[n]ames and pronouns," *id.* at 39; and "[b]athrooms, locker rooms, showers, and overnight trips," *id.* at 40. As an initial matter, as explained above, any alleged injuries stemming from sex-separate athletic teams do not flow from the Rule, nor could they because the Rule does not address sex-separate athletic teams, *see supra*, p.4 n.1; Part I.B.2. Any purported harm stemming from those allegations is misplaced in this lawsuit. But in any event, regardless of whether the Plaintiff States' laws or policies conflict with the Final Rule, "it is black-letter law that the federal government does not 'invade[ ]' areas of state sovereignty 'simply because it exercises its authority' in a way that preempts conflicting state laws." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981)). "Indeed, to conclude otherwise would mean that a state would suffer irreparable injury from all federal laws with preemptive effect." *Id.* at 1292. Accordingly, it is the federal government, not Plaintiff States, that faces significant irreparable harm, if it is prevented from administrating the Rule. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (reasoning that if the Government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

Relatedly, Plaintiffs claim that Plaintiff States face "coerced compliance" because the Rule will force them to comply or "lose a significant amount of federal funding." Pls.' Mem. 41. But

Plaintiffs fail to identify how any such injury is realistic, let alone "imminen[t]." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). Indeed, even if an administrative enforcement action were to occur once the Rule goes into effect, Plaintiffs could at that time raise challenges to any administrative enforcement proceedings, which would necessarily precede any termination of funds. 20 U.S.C. § 1682. Moreover, any adverse administrative determination would be subject to judicial review. *Id.* § 1683.

Next, Plaintiffs claim that the Rule will cause irreparable harm to A.F. by infringing on her right to free expression, Pls.' Mem. 43, violating her privacy interest, *id.* at 43–44, and undermining her athletics opportunities, *id.* at 45–46. Plaintiffs, however, fail to show how any of these alleged harms to A.F. are "certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc.*, 725 F.3d at 895. Indeed, Plaintiffs' allegations are based on a series of speculative and conclusory statements by A.F. *See, e.g.*, A.F. Decl. ¶ 45, ECF No. 9-3 (speculating that she "will be punished for expressing my views on women's sports and gender identity and for speaking consistent with my views"); *id.* ¶ 52 (speculating that at some unidentified point she will have to "stay in the same room and sleep in the same room on these trips with a boy").[3] As the Eighth Circuit has clearly expressed, "[s]peculative harm" or a "possibility of irreparable harm" is not enough. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012). Here, at most, Plaintiffs have alleged a mere possibility of the future harm to A.F. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy." *Winter*, 555 U.S. at 22.

---

[3] As explained above, the Rule does not address athletics, *see supra*, Part I.B.2; so, any purported future harm to A.F. with regards to her athletic opportunities is especially misplaced and could not flow from the challenged Rule.

**III.    The Equities and Public Interest Weigh Against Preliminary Relief.**

The balance of equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these combined factors strongly counsel against issuing the requested preliminary relief. The Final Rule implements the Department's authority to enforce the statutory objectives of Title IX. *See* 20 U.S.C. § 1682. "There is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). The public interest favors allowing the Department to fulfill these responsibilities.

Moreover, Title IX mandates that "[n]o person" be subjected to sex discrimination in any education program or activity. Granting preliminary relief would significantly harm the Government's interests in preventing such discrimination. Sex discrimination in educational environments has devastating consequences, including the effects of harassment based on sexual orientation and gender identity. *See, e.g.*, 89 Fed. Reg. at 33,478-80 (summarizing personal stories submitted by commenters). The Final Rule therefore effectuates Title IX's important goals of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Needless to say, preventing sex discrimination is in the public interest. *Roberts v. U.S. Jaycees,* 468 U.S. 609, 623-24 (1984). Conversely, Plaintiffs have failed to show they face significant imminent and irreparable harm. *See supra* Part I.

In sum, the balance of the equities and the public interest weigh in favor of denying the requests for a preliminary injunction, and the Court may deny the motion on this basis alone. *See Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009).

IV. **Any Relief Afforded by the Court Should Be Limited in Accordance with the Administrative Procedure Act and Equitable Principles.**

While Defendants dispute that any relief is necessary for the reasons explained above, any relief afforded must be appropriately limited.

The Court should not issue preliminary relief that extends beyond Plaintiffs or beyond portions of the Rule as to which the Court has found that Plaintiffs have established a likelihood of success. Here, if any preliminary relief were appropriate, it should be limited to the plaintiff-States (which would provide complete relief to A.F., who is a resident of Arkansas and attends school in Arkansas, A.F. Decl. ¶¶ 1-2), and to certain portions of the Rule. One reason for this is that the better understanding of the APA is that it does not authorize any specific remedies, including vacatur—remedies are addressed in § 703 of the APA, which says nothing about "set aside" but refers to the existing forms of relief. *Cf. United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring in the judgment).

But in any event, relief should be limited by traditional equitable principles, including that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *cf.*, *Rodgers v. Bryant*, 942 F.3d 451, 467 (8th Cir. 2019) (Stras, J. concurring in part) (explaining the need for careful consideration before granting broad injunctions). "At a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government." *Arizona v. Biden*, 40 F.4th 375, 395-96 (6th Cir. 2022) (Sutton, C.J., concurring).

Alternatively, Plaintiffs seek a § 705 stay, presumably as an interim measure. But a § 705 stay would raise all the same problems as a nationwide injunction if it applied universally to parties not before the Court. *See DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J.,

32

concurring in the grant of stay). Furthermore, like other APA provisions, § 705 "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Plaintiffs do not identify, and the Government has not found, any pre-APA practice of district courts granting universal stays of agency regulations. Consistent with that backdrop, Congress contemplated that any relief under § 705 "would normally, if not always, be limited to the parties," Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. at 277 (1946). And even if § 705 did authorize universal preliminary relief, such an "extraordinary remedy" that applied to non-parties should at minimum "demand truly extraordinary circumstances to justify it." *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring in the judgment).

Finally, the Final Rule is severable. *See* 89 Fed. Reg. at 33,848 ("[R]emov[ing] any 'doubt that it would have adopted the remaining provisions of the Final Rule' without any of the other provisions, should any of them be deemed unlawful."). The Rule promulgates numerous regulatory provisions running approximately 14 single-spaced pages. *See id.* at 33,882–96. Plaintiffs have challenged only a small fraction of these provisions; and for some, Plaintiffs challenge only certain applications. If the Court grants preliminary relief as to any portion of the Rule, the remainder of the Rule should still be permitted to go into effect, as intended, on August 1, 2024.[4] As the Supreme Court explained, courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force, . . . or . . . sever its problematic portions while leaving the

---

[4] On June 13, 2024, the U.S. District Court for the Western District of Louisiana issued a decision in which it preliminarily enjoined the Department from enforcing the Rule in the plaintiff States (Louisiana, Idaho, Mississippi, and Montana). *See* Mem. Ruling at 39–40, *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-cv-00563 (W.D. La. June 13, 2024), ECF No. 53. The *Louisiana* court's reasoning was faulty in numerous respects, and one such error was the court's failure to even address the issue of severability.

remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a § 705 stay and preliminary injunction.

Dated: June 14, 2024                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        EMILY B. NESTLER
                                        Assistant Branch Director

                                        */s/ Hannah M. Solomon-Strauss*
                                        ELIZABETH TULIS
                                        REBECCA KOPPLIN
                                        BENJAMIN TAKEMOTO
                                        HANNAH SOLOMON-STRAUSS
                                        PARDIS GHEIBI
                                        Trial Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        P.O. Box No. 883, Ben Franklin Station
                                        Washington, DC 20044
                                        Phone: 202-616-8198
                                        Fax: (202) 616-8470
                                        E-mail: Hannah.M.Solomon-Strauss@usdoj.gov

                                        *Counsel for Defendants*

## REQUEST FOR ORAL ARGUMENT

Given the complex and consequential nature of the issues presented by Plaintiffs' Motion for a Preliminary Injunction, pursuant to Local Rule 4.02(B), Defendants request a hearing on Plaintiffs' Motion.

                                        */s/ Hannah M. Solomon-Strauss*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2024, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ Hannah M. Solomon-Strauss*