# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# ST. LOUIS DIVISION

| | |
|---|---|
| THE STATE OF ARKANSAS; THE STATE OF MISSOURI; THE STATE OF IOWA; THE STATE OF NEBRASKA; THE STATE OF NORTH DAKOTA; THE STATE OF SOUTH DAKOTA; A.F., a minor, by Sara Ford, her mother,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education; CATHERINE E. LHAMON, in her official capacity as Assistant Secretary for Civil Rights at the United States Department of Education; RANDOLPH WILLS, in his official capacity as Deputy Assistant Secretary for Enforcement at the United States Department of Education,<br><br>*Defendants*. | Case No.: 4:24-cv-636 |

**REPLY IN SUPPORT OF MOTION FOR A 5 U.S.C. 705 STAY AND PRELIMINARY INJUNCTION**

**Table of Contents**

Introduction ...................................................................................................................1

Argument......................................................................................................................2

    I.    Plaintiffs are likely to succeed on the merits. ...............................................2

        A.    The Final Rule exceeds the Department's statutory authority....................2

            1.    The Final Rule unlawfully reinterprets "sex" discrimination to mean "gender identity" discrimination.................................................................2

            2.    The Final Rule unlawfully broadens its definition of "harassment" in violation of Title IX and the First Amendment. ..........................................7

            3.    The Final Rule violates the Spending Clause. .........................................9

        B.    The Final Rule is arbitrary and capricious. ...............................................10

            1.    The Final Rule's redefinition of "sex" is arbitrary and capricious.......10

            2.    The Final Rule's broadening of "harassment" is arbitrary and capricious. ..................................................................................................13

    II.    The remaining factors support preliminary relief.......................................13

        A.    Irreparable harms to Plaintiff States and A.F............................................13

        B.    The balance of equities and public interest factors weigh in Plaintiffs' favor. ..................................................................................................................15

    III.    Defendants' arguments for limited relief are meritless..............................15

Conclusion .................................................................................................................15

# INTRODUCTION

Like the Final Rule itself, the Department's defense of that rule makes a mockery of Title IX.  It replaces Title IX's long-understood prohibition on sex discrimination with a gender-identity regime that cannot be reconciled with Title IX's plain meaning, nor its purpose of providing equal educational opportunities for women.  Defendants claim that this gender-identity mandate has been required by Title IX's text since its passage in 1972.  But far from being a faithful application of Title IX, the Final Rule takes away the very educational opportunities the statute was intended to provide by forcing women and girls to share their previously safe spaces with males.  Further, the Final Rule's definition of sex-based harassment imposes a heckler's veto on anyone who does not share the Department's views on sex and gender, trampling upon their First Amendment rights.  And it is so internally inconsistent that the Department failed to even offer a reasoned explanation for its decisionmaking.

Since this case began, two other district courts have enjoined the Final Rule.  Both held that rule likely exceeded the Department's authority, is likely arbitrary and capricious, and will irreparably harm States and individuals unless enjoined.  *Tennessee v. Cardona*, No. 2:24-cv-00072-DCR-CJS, 2024 WL 3019146 (E.D. Ky. June 17, 2024); *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024).  Both courts also soundly rejected the exact same arguments that the Department offers here.  This Court should follow suit and enjoin the Final Rule prior to its August 1, 2024, effective date.

# ARGUMENT

I. **Plaintiffs are likely to succeed on the merits.**

    A. <u>The Final Rule exceeds the Department's statutory authority.</u>

        1. The Final Rule unlawfully reinterprets "sex" discrimination to mean "gender identity" discrimination.

As originally understood, Title IX's prohibition of discrimination on the basis of sex "meant biological sex, *i.e.*, discrimination between males and females." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc). This follows from the ordinary meaning of the word "sex" as understood in 1972. *See* Pls.' Br. 20 (collecting contemporary dictionary definitions of "sex" as binary); *Tennessee*, 2024 WL 3019146, at *9 (same); *Louisiana*, 2024 WL 2978786, at *11 (same). It also accords with Title IX's structure, which references "sex" in binary terms. *See* 20 U.S.C. 1681(a)(2) (referring to "one sex" and "both sexes"); 1681(a)(8) (referring to "father-son or mother-daughter activities," "one sex," and "the other sex"). The statute lists sexual orientation and gender identity as a "status" separate from one's sex, so those terms cannot be synonymous. *See id.* 1689(a)(6) ("lesbian, gay, bisexual, or transgender (commonly referred to as 'LGBT') status").

Title IX's prohibition on sex discrimination does not—and has never been understood to—prohibit all sex distinctions. Indeed, the statute expressly states it doesn't "prohibit any educational institution . . . from maintaining separate living facilities for the different sexes." 20 U.S.C. 1686; *see also id.* 1681(a)(6), (7) (allowing sex-restricted membership in fraternities, sororities, Boys/Girls State, and Boys/Girls Nation). The Department's regulations further confirm that the statute doesn't prohibit "separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. 106.33, or "separate [sports] teams for members of each sex," *id.* 106.41(b). Recipients have operated under this commonsense understanding of Title IX for decades.

The Final Rule trades that decades-long understanding for one that is irreconcilable with Title IX's text and purpose, the Department's history of enforcement, and common sense. Under the Final Rule, sex separation violates Title IX when it excludes a transgender-identifying person along with the other members of his or her sex from opposite-sex spaces—even where the Department's longstanding regulations would allow it (such as in showers)—unless the statute specifically provides otherwise (such as in living facilities). Defs.' Br. 11. Thus, a funding recipient need not allow a transgender-identifying male to share a dorm-room hall with a female, but it must allow him to share her shower area. *See Tennessee*, 2024 WL 3019146, at *12.

Defendants don't try to justify their interpretation of sex discrimination using the original understanding of Title IX's text or its purpose of providing equal educational opportunities to women. Given Title IX's specific allowance for sex separation, that's unsurprising. Instead, they hang their hat entirely on the Supreme Court's decision in *Bostock v. Clayton County, Georgia*, which held that employment discrimination based on sexual orientation or transgender status is necessarily discrimination "because of sex" under Title VII. 590 U.S. 644, 658 (2020). But the Final Rule turns even *Bostock*'s logic on its head by declaring that enforcing sex separation amounts to gender-identity discrimination where it requires a transgender-identifying individual to be treated the same as other members of his or her sex. Thus, while Title IX has for decades uncontroversially allowed recipients to exclude males from women's showers without being understood to discriminate on the basis of sex, the Final Rule deems such a policy to be gender-identity discrimination (and thus prohibited sex discrimination) when applied to males who identify as transgender. If that sounds like nonsense, it's because it is.

*Bostock does not apply.* Two district courts have considered Defendants' *Bostock*-based justification, and both rejected Defendants' near-verbatim arguments. This Court should follow

3

suit.  To start, both courts correctly recognized that "sex" in Title IX's antidiscrimination provision refers to biological sex, rather than gender identity.  *Tennessee*, 2024 WL 3019146, at *12 ("Title IX's text, coupled with the legislative history . . ., leaves little doubt that Title IX's drafters meant 'male' and 'female' when they wrote 'on the basis of sex.'"); *Louisiana*, 2024 WL 2978786, at *12 ("[T]he term 'sex discrimination' only included discrimination against biological males and females at the time of enactment.").  Defendants' response variously assumes (*e.g.*, at 9) that sex is binary, but fails to grapple with its implications in the Title IX context.

Both district courts correctly rejected incorporating *Bostock*'s gloss on sex discrimination under Title VII into Title IX, given the different contexts in which those statutes operate.  *Bostock*'s conception of sex discrimination hinges on its determination that an employee's "sex" or "homosexuality or transgender status is not relevant to employment decisions."  *Bostock*, 590 U.S. at 660.  But "Title IX's purpose [is] to protect biological women from discrimination in education."  *Louisiana*, 2024 WL 2978786, at *12; *see Tennessee*, 2024 WL 3019146, at *12 ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." (quoting *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004)).  Sex-based distinctions can thus be highly relevant to Title IX's guarantee of equal educational opportunities for women.  Indeed, "ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities." *Tennessee*, 2024 WL 3019146, at *35.

"Enacting the changes in the Final Rule would subvert the original purpose of Title IX." *Louisiana*, 2024 WL 2978786, at *12; *Tennessee*, 2024 WL 3019146, at *13 (similarly holding that the Department's *Bostock*-inspired standard "undercut[s] that purpose").  Allowing the Final Rule to go into effect would "wreak[] havoc on Title IX and produce[] results that Congress

4

could not have intended." *Id.* at \*12. "For example," a recipient "may separate students [by sex] for purposes of fraternities and sororities, but not for purposes of utilizing bathrooms." *Id.* "Likewise, recipients may require children to participate in the Boy Scouts or Girl Scouts consistent with the student's biological sex but may not require the same for sex education or physical education classes." *Id*. But there's no serious argument that Congress was more concerned about males' being allowed into women's social clubs than girls' showers.

Defendants attempt to explain away these puzzling results by implying that Section 1681's general language prohibiting discrimination on the basis of sex would, standing alone, prohibit *all* those instances of sex separation. But Sections 1681(a)(1)-(9) and 1686, they say, "specified a few limited contexts in which different or separate treatment based on sex is permitted, without regard to the degree of harm such sex separation might cause." Defs.' Br. 12.[1] Thus, they continue, anything not specifically carved out by the text (such as bathrooms) is fair game for the Final Rule's gender-identity-driven approach to sex discrimination.

The problem for the Department's argument is that, while the items listed in Section 1681(a)(1)-(9) are termed as exceptions to the statute's prohibition on sex discrimination, Section 1686 is not. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (noting the "specific, narrow exceptions to [Title IX's] broad prohibition," and citing to Section 1681 but not Section 1686). Rather, that section says that "nothing contained [in Title 20] shall be construed to prohibit any [funding recipient] from maintaining separate living facilities for the different sexes." 20 U.S.C. 1686. That language is not a narrow carve-out from a general prohibition but

---

[1] Contrary to Defendants' allegations (at 12), Plaintiffs do not concede that it causes "more than de minimis harm" to treat individuals consistent with their biological sex. Plaintiff States have enacted numerous laws requiring just that to prevent harm—especially to women and girls—caused by abandoning regulations recognizing biological distinctions. *See* Pls.' Br. at 33-35.

5

is instead an instruction on how that prohibition (and the statute as a whole) must be interpreted. And it makes clear Congress's intent that sex separation in contexts where biological differences matter—such as living facilities, bathrooms, locker rooms, and athletics—is not discrimination under Title IX.  *See Tennessee*, 2024 WL 3019146, at *12-13.  Common sense is in accord.

Defendants attempt to buttress their textual argument by pointing to longstanding regulations, which address living facilities separately from bathrooms, locker rooms, and showers, implying that the Department has long treated those areas as distinct under the statutory framework. Defs.' Br. 13.  But those regulations only further undercut Defendants' position.  The 1975 housing and bathroom regulations—still codified at 34 C.F.R. 106.32 and 106.33, respectively—are functionally identical in wording.  They were proposed together, adopted together, approved by Congress together, and use the same "may provide separate [facilities] on the basis of sex" language. *Id*.  Thus, from earliest inception the Department has recognized that Title IX does not prohibit sex separation where biological differences give rise to privacy and safety concerns, regardless of whether those areas are specifically listed in Section 1686.  The Final Rule thus exceeds the Department's authority by eschewing that understanding and expanding Title IX's prohibition on sex discrimination beyond what Congress intended.

*The Final Rule applies to sports*. While Defendants say the Final Rule does not apply to sports, they do not deny that 34 C.F.R. 106.41(a) anti-discrimination provision does.  Defendants don't dispute the Final Rule's gender-identity mandate applies there.  And while Section 106.41(b)'s separate-teams provision is exempted from the de-minimis-harm standard, Section 106.41(a)'s antidiscrimination provision is not.  This means that excluding a male who identifies as female from a women's sports team now violates Section 106.41(a) by discriminating on the basis of gender identity and causing more than de minimis harm.  In fact, that's what Defendants

6

told the Fourth Circuit about existing law. *See* Pls.' Br. 29-30. Defendants cannot explain why the current sports regulation requires admitting men into women's sports but the Final Rule somehow doesn't, when the new rule simply redefined the old regulation to explicitly include gender identity. The Final Rule cannot help but affect sports by globally importing gender identity into Title IX and by failing to universally exempt sports from all these regulations.

*The Final Rule decides major questions*. If it were debatable whether the Final Rule exceeds the Department's authority, the major-questions doctrine settles the issue. Defendants don't dispute the Final Rule's enormous social and political significance. Nor did the *Louisiana* and *Tennessee* courts have any trouble concluding that the Final Rule meets that doctrine's requirements. *Louisiana*, 2024 WL 2978786, at *13 (concluding the Final Rule "is an issue of vast economic significance" and "is also one of vast political significance"); *accord Tennessee*, 2024 WL 3019146, at *14. Rather, Defendants maintain that the major-questions doctrine is inapplicable because Title IX itself unambiguously requires its gender-identity-based approach to sex discrimination. Defs.' Br. 17. As explained, that isn't true. "[T]he changes implemented under the Final Rule represent a novel expansion of the Department's power under Title IX." *Tennessee*, 2024 WL 3019146, at *14.

> 2. The Final Rule unlawfully broadens its definition of "harassment" in violation of Title IX and the First Amendment.

*Title IX.* The Final Rule exceeds the Department's authority by adopting a more expansive definition of "harassment" than *Davis ex. Rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). Defendants don't dispute that the Final Rule is broader than *Davis*. Defs. Br. at 18-19. But they claim that having two harassment standards—depending on who sues—is statutorily permissible. *Id.* at 19-20. But *Davis*'s liability standard didn't rest on who the plaintiff happened to be; it rested on what Title IX's text "makes clear." *Davis*, 526

7

U.S. at 650; *see Louisiana*, 2024 WL 2978786, at *13 (the "'harassment standard' created by the Final Rule is obviously contrary to Title IX").

*First Amendment.* The Final Rule unconstitutionally chills protected expression and even compels speech. Defendants don't disclaim that rule will force students, teachers, and staff to abide by a student's insistence on biologically inaccurate pronouns. Defs.' Br. 21-24. Nor do Defendants contest that—under binding Eighth Circuit precedent—a speaker can't be compelled to use biologically inaccurate pronouns. *See Beard v. Falkenrath*, 97 F.4th 1109, 1117 (8th Cir. 2024) (holding a "speaker has a [First Amendment] right" to even "the misuse of a pronoun").

Instead, Defendants generally rely on the Title IX regulations' statement that recipients aren't required to "[r]estrict any rights that would otherwise be protected from government action by the First Amendment." 34 C.F.R. 106.6(d)(1); *see also* 89 Fed. Reg. 33,474, 33,505 (Apr. 29, 2024). And they repeatedly fall back on claiming that it's speculative whether the Final Rule will ultimately violate anyone's First Amendment rights.[2] Defs.' Br. 22. But the Final Rule is clear: "So long as the offended individuals complain with sufficient vigor, the refusal to abide by preferred pronouns can be deemed harassment and exposes a recipient of Federal funds to liability under Title IX." *Tennessee*, 2024 WL 3019146, at *22; *see also id.* at *21-22 (reviewing DOJ amicus brief arguing that even a facially neutral approach of refusing to use honorifics such as "Mr." and "Ms." altogether can "create[] a risk of Title IX liability" where "students correctly recognize" the decision is "motivated by an aversion to referring to transgender students by names and pronouns that accord[] with their gender identity" (quotations omitted)).

---

[2] Defendants also cite cases articulating the standard for overbreadth challenges. Defs.' Br. 22. But Defendants cite no authority holding that an agency rule must be unlawful in all its applications before it may be set aside under the APA.

8

Indeed, the *Tennessee* court had no trouble concluding that the Final Rule's harassment standard is nothing "less than a tacit endorsement of a content-based heckler's veto." *Id.* at 22.

    3.  The Final Rule violates the Spending Clause.

The Final Rule also violates the Spending Clause. *Tennessee*, 2024 WL 3019146, at *15 (concluding likely violates the Spending clause); *Louisiana*, 2024 WL 2978786, at *16 (same). As Plaintiffs explained, the Final Rule (1) imposes conditions that are not "unambiguously clear" from the statute, such as punishing speech, relying on self-professed gender identity to administer educational programs, and abolishing sex-separated facilities and athletics; (2) conflicts with Title IX's goal of providing educational opportunities to women; (3) impermissibly induces recipients to engage in unconstitutional behavior; and (4) coerces States through the loss of a significant percentage of their educational funding. Pls.' Br. at 29-30.

Defendants claim there's no ambiguity problem because the Final Rule's requirements are "based on the plain meaning of the statutory language" viewed through the lens of *Bostock*. Defs.' Br. 27. But "Title IX's language provides no indication that an institution's receipt of federal funds is conditioned on any sort of mandate concerning gender identity." *Tennessee*, 2024 WL 3019146, at *15. Defendants' reliance on *Jackson* is misplaced. There, the Court read broadly the categories of sex discrimination covered by Title IX and concluded retaliation fell within the statute. 544 U.S. at 175. But the Final Rule reinterprets what constitutes sex discrimination in the first place. And no one in 1972 thought that prohibiting sex discrimination in Title IX would require recipients to allow males to use women's showers if they identify as female.

Defendants surprisingly resist the notion that the Final Rule is coercive enough to compel compliance, suggesting that "generally a state is expected to simply decline the offer of funds." Defs.' Br. 28. That's nonsense. Defendants cannot dispute that Plaintiff States rely on billions

9

of dollars in education funding to operate their public-school systems and that losing those funds would cripple Plaintiff States. *See* Compl. ¶¶ 84-89 (citing the Department's published funding figures). They instead chiefly claim that any funding loss is ultimately speculative. Defs.' Br. 28. But the relevant legal question isn't whether the Department will ultimately cut funding; it's whether the "threatened loss" of funding is coercive enough that a State has no option "but to acquiesce" to the requirement. *NFIB v. Sebelius*, 567 U.S. 519, 582 (2012) (plurality op.). And that's clearly the case here.

      B.      <u>The Final Rule is arbitrary and capricious.</u>

           1.      The Final Rule's redefinition of "sex" is arbitrary and capricious.

The Final Rule's definition of sex discrimination is also arbitrary and capricious. *Tennessee*, 2024 WL 3019146, at *36 (concluding that "the Final Rule is arbitrary and capricious"); *Louisiana*, 2024 WL 2978786, at *17-19 (same). The Department's decision to abandon its decades-long understanding of the meaning of sex was arbitrary for numerous reasons, Pls.' Br. at 31-35, and Defendants' responses fall short.

To start, the Final Rule does "not adequately account[] for the potential risks posed to students and faculty safety that were raised by states, educators, and parents during the" comment period. *Tennessee*, 2024 WL 3019146, at *34. Nor did it consider the fact that "[m]any of these students are minors." *Louisiana*, 2024 WL 2978786, at *18. Instead, the Final Rule—and Defendants' response—simply handwaves away those concerns.

Indeed, Defendants deny that students have *any* privacy interest in shielding their bodies from the opposite sex (at least if those students claim a transgender identity). And parroting the Final Rule, they simply declare—without analysis, evidence, or any attempt to grapple with comments "identifying numerous instances of males attacking females in public restrooms that were

10

designated for females only" (*Tennessee*, 2024 WL 3019146, at *35)—that transgender-identifying students pose *no* safety risk to other students in single-sex spaces.  Defs.' Br. 14.  That approach not only violates basic principles of administrative law requiring the agency to engage in reasoned decisionmaking, it blinks reality.  *See Louisiana*, 2024 WL 2978786, at *19 ("[B]y allowing biological men who identify as a female into locker rooms, showers, and bathrooms, biological females risk invasion of privacy, embarrassment, and sexual assault."); *Tennessee*, 2024 WL 3019146, at *35 (noting that this is "so obvious" and "the Department . . . declined to provide any credible empirical analysis" otherwise).  And that alone means Plaintiffs' claims are likely to succeed.

Moreover, to the extent Defendants attempt to address those shortcomings, their efforts fall flat.  For instance, the Defendants asserts privacy and safety concerns are a nonissue because "a recipient can make and enforce rules" protecting privacy and safety.  Defs.' Br. 14.  But that assertion rings hollow because Defendants refuse to say what those rules can be aside from "offering single-occupancy facilities" to students who don't wish to share a restroom or shower with a person of the opposite sex.  *Id.* (quoting 89 Fed. Reg. at 33,820).  Thus, put differently, Defendants' only solution for minor girls—like Plaintiff A.F.—who are uncomfortable sharing a bathroom, shower, or changing area with a male, is to force them to use the restroom or change somewhere other than the space designated for girls.  That defies common sense.

Next, Defendants' response as to how a recipient can verify a person's transgender identity fares no better.  While the Department may "acknowledge[]" that some recipients rely on "written confirmation" from another person of a student's claimed gender identity, it fails to tell recipients whether or when it violates the Final Rule to do so.  Defs.' Br. 15.  Defendants don't even give even a single example of "documentation" that a school could require as proof that

11

wouldn't be "burdensome" under the Final Rule. *Id.* Indeed, though the rule itself mentions "an amended birth certificate or evidence of medical treatment," it doesn't explain what may be required if a student has not amended his or her birth certificate or undergone any medical treatments. 89 Fed. Reg. at 33,819. Ultimately, the Final Rule leaves recipients no viable option other than relying on the student's say-so. That is arbitrary. *Louisiana*, 2024 WL 2978786, at *19 ("Allowing a biological male student to change to a female by simply declaring it, requiring no documentation of the change, and allowing the student to shower with cisgender females in the girls' locker room goes beyond the scope of arbitrary and capricious.").

The Final Rule and Defendants' response likewise fail to address how recipients must account for individuals who identify as nonbinary. Pls.' Br. at 32. Indeed, Defendants offer no actual response. They merely parrot the Final Rule's statement that recipients "may, for example coordinate with the student, and the student's parent . . . to determine how to best provide the student with safe and nondiscriminatory access to facilities . . . ." Defs.' Br. 15 (quoting 89 Fed. Reg. at 33,818). But the Final Rule doesn't say what constitutes "nondiscriminatory access to facilities" under its gender-identity requirement. Nor does Defendants' response.

Lastly, the fact that under the Final Rule "not only a recipient's students, but virtually anyone who enters a public school, would be entitled to use the facilities consistent with that person's purported gender identity," *Tennessee*, 2024 WL 3019146, at *15, amplifies those problems. And the Final Rule's failure to grapple with the safety and privacy concerns of requiring recipients to permit adult males to use the same facilities as minor girls—including Plaintiff A.F.—demonstrates the Department failed to consider the consequences of its rule.

12

2. The Final Rule's broadening of "harassment" is arbitrary and capricious.

The Department also failed to reasonably address its broadening of the definition of harassment. Contrary to Defendants' claim, it is arbitrary for the Final Rule to depart from *Davis* and subject recipients to two differing standards for liability, effectively overriding *Davis* by providing a lower bar for enforcement actions. The Department failed to adequately consider the First Amendment issues. Pronoun usage is but one salient example. Defendants admit that whether a person's usage of pronouns constitutes harassment is a "fact-specific inquiry" that depends on how "severe or pervasive" the complained of speech is. Defs.' Br. 26 (quotations omitted). But Defendants have no answer as to whether a person's wholesale and ongoing refusal to use inaccurate pronouns to a transgender-identifying person meets that standard. Indeed, how could they given that the answer turns in part on the listener's subjective feeling of offense? It was arbitrary for the Department to address these kinds of First Amendment concerns by concocting a standard under which a person cannot know whether their speech is prohibited until they have already spoken. *See Tennessee*, 2024 WL 3019146, at *26 ("Not only did the Department fail to meaningfully address these First Amendment concerns, *but it also intentionally opted to leave the vague terms undefined*." (emphasis in original)).

**II.     The remaining factors support preliminary relief.**

    A.     <u>Irreparable harms to Plaintiff States and A.F.</u>

Absent injunctive relief before the Final Rule's August 1 effective date, Plaintiffs will suffer irreparable harm. First, each Plaintiff State has laws that will be preempted by the Final Rule. *See* Pls.' Br. at 38-40; s*ee Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) ("Prohibiting the State from enforcing a statute . . . would irreparably harm the State."). Defendants don't dispute (save for their meritless arguments concerning athletics) that the Final

13

Rule preempts these laws. Defs.' Br. 29. Instead, Defendants cite an inapposite Eleventh Circuit decision for the notion that preemption doesn't injure a State. *Id.* (citing *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271 (11th Cir. 2021). But *Florida* merely held that, where the federal agency "had the authority to issue the interim rule," Florida was not injured by its law being preempted. *Id.* at 1292. Here, the Department lacked the authority to issue the Final Rule. Preemption by an invalid regulation undoubtedly causes irreparable injury to Plaintiff States. *Louisiana*, 2024 WL 2978786, at *19 ("The State Plaintiffs have also shown irreparable harm in violation of First Amendment rights, preemption of state laws, loss of Title IX federal funds, pressure to change their laws, and invasion of state sovereignty."); *Tennessee*, 2024 WL 3019146, at *41 (finding irreparable harm where "the Final Rule conflicts with the plaintiff-States' own duly enacted laws"). So does the threatened loss of education funding. *See Louisiana*, 2024 WL 2978786, at *20; *Tennessee*, 2024 WL 3019146, at *39-41.

      A.F.—and students like her across the country—similarly faces irreparable harm. As explained above, the Final Rule both compels and prohibits speech in violation of the First Amendment. Defendants don't disclaim that A.F. could be subject to sanction under the Final Rule for expressing her beliefs regarding biological sex and her refusal to use pronouns or titles inconsistent with a person's sex. *See* A.F. Decl. ¶ 40-41. And a loss of First Amendment rights, even for a moment, constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976)). Further, A.F. will be irreparably harmed if she is forced to share a locker room, restroom, or shower with a male student. A.F. Decl. ¶¶ 47-51. Defendants don't dispute the irreparable nature of her harm; rather, they claim that whether it'll occur is speculative. Defs.' Br. 30. But Defendants can't both claim that the intended effect of the Department's rulemaking is speculative and that it's imperative to enforce the Final Rule so that its intended effect become reality. *Id.* at 31-32.

14

B.  The balance of equities and public interest factors weigh in Plaintiffs' favor.

The Eighth Circuit has held that "the remaining factors of injury to other parties and the public's interest generally warrant lesser consideration than those of likelihood of success and irreparable harm." *Org. for Black Struggle*, 978 F.3d at 609.  The Department has no valid interest in enforcing its unlawful rule while this litigation proceeds.

### III.  Defendants' arguments for limited relief are meritless.

Defendants' arguments for geographically cabined relief ignore circuit precedent holding that "'the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.'" *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (quoting *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019)).  This is especially appropriate in the APA context, where vacatur of a rule "for everyone" is the normal remedy. *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (K.B. Jackson, J.) (citation omitted).

Defendants' severability arguments are unpersuasive.  For one, the Final Rule's "impermissible definition of 'discrimination on the basis of sex' . . . permeates the remaining regulations." *Tennessee*, 2024 WL 3019146, at *43.  And attempting to "excise" the portions of the regulations that reference "sex discrimination or sexual harassment" would raise separation-of-powers concerns, as "rulemaking is exclusively within the purview of the Executive Branch." *Id*; *see also Louisiana*, 2024 WL 2978786, at *21 (enjoining the rule in its entirety).

## CONCLUSION

For the foregoing reasons, the Court should postpone the effective date of the Final Rule and grant a preliminary injunction against its enforcement.

Dated:  June 21, 2024                                    Respectfully submitted,

| | |
|---|---|
| TIM GRIFFIN<br>Arkansas Attorney General | ANDREW BAILEY<br>Missouri Attorney General |
| */s/ Nicholas J. Bronni*<br>Nicholas J. Bronni<br> Solicitor General<br>Dylan L. Jacobs<br> Deputy Solicitor General<br>Office of the Arkansas Attorney General<br>323 Center Street, Suite 200<br>Little Rock, AR  72201<br>Telephone: (501) 682-2007<br>Fax: (501) 683-2520<br>nicholas.bronni@arkansasag.gov<br>dylan.jacobs@arkansasag.gov<br><br>*Counsel for Plaintiff State of Arkansas* | */s/ Joshua M. Divine*<br>Joshua M. Divine<br> Solicitor General<br>Missouri Attorney General's Office<br>Post Office Box 899<br>Jefferson City, MO 65102<br>Tel. (573) 751-1800<br>Fax. (573) 751-0774<br>josh.divine@ago.mo.gov<br><br>*Counsel for Plaintiff State of Missouri* |

BRENNA BIRD
Iowa Attorney General

/s/ *Eric H. Wessan*
Eric H. Wessan
Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
eric.wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

MICHAEL T. HILGERS
Nebraska Attorney General

/s/ *Lincoln J. Korell*
Lincoln J. Korell
Assistant Solicitor General
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

DREW H. WRIGLEY
North Dakota Attorney General

/s/ *Katie L. Carpenter*
\*Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov

\*Application *for admission pending*

*Counsel for Plaintiff State of North Dakota*

MARTY J. JACKLEY
South Dakota Attorney General

/s/ *Charles D. McGuigan*
Charles D. McGuigan
Deputy Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us

*Counsel for Plaintiff State of South Dakota*

17

| | |
|---|---|
| Jonathan A. Scruggs*<br>Arizona Bar No. 030505<br>Henry W. Frampton, IV*<br>South Carolina Bar No. 75314<br>**Alliance Defending Freedom**<br>15100 N. 90th Street<br>Scottsdale, Arizona 85260<br>(480) 444-0020<br>(480) 444-0028 Fax<br>jscruggs@ADFlegal.org<br>hframpton@ADFlegal.org<br><br>Rachel A. Rouleau*<br>Virginia Bar No. 97783<br>**Alliance Defending Freedom**<br>44180 Riverside Parkway<br>Lansdowne, Virginia 20176<br>(571) 707-2119<br>(571) 707-4790 Fax<br>rrouleau@ADFlegal.org<br><br>Natalie D. Thompson**<br>TX Bar No. 24088529<br>**Alliance Defending Freedom**<br>440 First Street NW, Suite 600<br>Washington, DC 20001<br>(202) 393-8690<br>(202) 347-3622 Fax<br>nthompson@ADFlegal.org | *s/ Brad L. Blake*<br>Brad L. Blake<br>Missouri Bar No. 38340<br>Fellows & Blake, L.C.<br>13421 Manchester Road, Suite 105<br>St. Louis, MO 63131<br>(314) 725-1600<br>(314) 725-1609 Fax<br>bblake@fellowsblakelaw.com |

*Counsel for Plaintiff A.F.*

*\*Admitted pro hac vice*

*\*\*Admitted pro hac vice, practice supervised by one or more D.C. Bar members while D.C. Bar application is pending.*

18