**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
ST. LOUIS DIVISION**

| | |
|---|---|
| THE STATE OF ARKANSAS; THE STATE OF MISSOURI; THE STATE OF IOWA; THE STATE OF NEBRASKA; THE STATE OF NORTH DAKOTA; THE STATE OF SOUTH DAKOTA; A.F., a minor, by Sara Ford, her mother, | Case No. 4:24-cv-636-RWS |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education; CATHERINE E. LHAMON, in her official capacity as Assistant Secretary for Civil Rights at the United States Department of Education; RANDOLPH WILLS, in his official capacity as Deputy Assistant Secretary for Enforcement at the United States Department of Education, | |
| Defendants. | |

**<u>BRIEF OF *AMICUS CURIAE* NWLC IN OPPOSITION TO PLAINTIFFS' MOTION FOR A 5 U.S.C. 705 STAY AND PRELIMINARY INJUNCTION</u>**

## **FEDERAL RULE OF CIVIL PROCEDURE 7.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel for National

Women's Law Center certify that:

1.  National Women's Law Center has no parent corporation, and

2.  No corporation owns any stock in National Women's Law Center.


<u>/s/ *Denise Lieberman*</u>
Denise Lieberman

# TABLE OF CONTENTS

**FEDERAL RULE OF CIVIL PROCEDURE 7.1 DISCLOSURE STATEMENT** ................ i

**TABLE OF AUTHORITIES** ................................................................................... iii

**STATEMENT OF INTEREST OF** *AMICUS CURIAE* ......................................... 1

**INTRODUCTION** ..................................................................................................... 1

**ARGUMENT** ............................................................................................................. 4

      I.    Policies That Allow Transgender Students to Use Facilities that Align with their Gender Identity Do Not Harm Cisgender Girls or Women ................................... 4

          A. Research confirms that transgender-inclusive locker and restroom policies do not harm other students. ................................................................................. 4

          B. Courts have concluded that transgender-inclusive locker and restroom policies do not harm other students. ............................................................. 6

      II.   Transgender Students are Harmed When Excluded From School Facilities that Align With their Gender Identity. ....................................................................... 12

      III.  The Harm to Transgender Students Face Outweighs Any Harm to Plaintiffs. ..... 14

**CONCLUSION** ......................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) ............................. 9

*Adams ex rel. Kasper v. Sch. Bd. of St. John's Cnty.*, 57 F.4th 791 (11th Cir. 2022) .................. 11

*Bostock v. Clayton County,* 590 U.S. 644 (2020) .......................................................... 1

*C.M.B. by Burch v. Odessa R-VII Sch. Dist. Bd. of Educ.*, No. 17-01075-CV-W-GAF, 2019 WL 13298894 (W.D. Mo. Mar. 21, 2019) ........................................................ 7

*Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981 (8th Cir. 2002) ................................. 6

*Dawson v. H&H Elec. Inc.*, No. 4:14CV00583 SWW, 2015 WL 5437101 (E.D. Ark. Sept. 15, 2015) ............................................................................... 6

*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518  (3rd Cir. 2018), *reh'g en banc denied*, 897 F.3d 515 (3d Cir. 2018) ........................................................... 8, 12, 13, 15

*Gloucester Cnty. Sch. Bd. v. G.G.,* 580 U.S. 1168 (2017) ........................................... 6

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020). ....................................................................... 7, 8, 9, 12

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ......................................... 10

*Louisiana v. U.S. Dep't of Educ.*, 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024) ............................................................................ 10, 11

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011 (8th Cir. 2023) ................................................................... 15

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) ........................................... 10

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998) ......................................... 11

*Parents for Priv. v. Barr*, 949 F.3d 1210 (9th Cir. 2020) ......................................... 8, 9

*Parents for Priv. v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075 (D. Or. 2018), *aff'd sub nom. Parents for Priv.*, 949 F.3d 1210 ................................................... 8

*Rumble v. Fairview Health Servs.*, No. 14-cv-2037 (SRN/FLN), 2015 WL 1197415 (D. Minn. Mar. 16, 2015) ........................................................................ 6

*Tennessee v. Cardona*, No. CV 2:24-072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024) ..............................................................................................................10, 11

*Watkins Inc. v. Lewis*, 346 F.3d 841 (8th Cir. 2003) .................................................. 14

*Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. Of Educ.*, 858 F.3d 1034 (7th Cir. 2017) .... 8, 9, 12, 15

*Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860 (8th Cir. 2011) ..................................... 7

**Statutes**

20 U.S.C. § 1681 ...................................................................................................... 1, 4

**Other Authorities**

118 Cong. Rec. 5111 (1972) ......................................................................................... 10

Am. Med. Ass'n & GLMA, *Transgender individuals' access to public facilities* (2018), https://www.ama-assn.org/system/files/2019-03/transgender-public-facilities-issue-brief.pdf. ................................................................................................................................5

Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. and Soc. Pol'y 70 (July 23, 2018), https://escholarship.org/content/qt4rs4n6h0/qt4rs4n6h0_noSplash_8740e92d7f24b6c89dbd4b d4d27fbbcb.pdf ..................................................................................................... 4, 5

Christopher Wiggins, *Cis Woman Mistaken as Transgender Records Being Berated in Bathroom*, The Advocate (updated May 26, 2023), https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-transgender-records-being-berated-bathroom ............................................. 14

Gabriel R. Murchison et al., *School Restroom/Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8849575/. .................................................. 13

Jody L. Herman et al., The Williams Inst., UCLA Sch. of L., *Suicide Thoughts and Attempts Among Transgender Adults: Findings from the 2015 U.S. Transgender Survey* (Sept. 2019), https://williamsinstitute.law.ucla.edu/wpcontent/uploads/Suicidality-Transgender-Sep-2019.pdf. ............................................................................................................... 14

Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65 (2013) ..... 12

Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2020), https://www.glsen.org/sites/default/files/2020-10/NSCS-2019-Full-Report_0.pdf ..... 12, 13, 14

Julie Moreau, *No link between trans-inclusive policies and bathroom safety, study finds,* NBC News (Sept. 19, 2018), https://www.nbcnews.com/feature/nbc-out/no-link-between-trans-inclusive-policies-bathroom-safety-study-finds-n911106 ........................................................ 4

Kiara Alfonseca, *Transgender student alleges assault after using bathroom, family calls for charges*, ABC News (June 7, 2024), https://abcnews.go.com/US/transgender-student-assaulted-after-bathroom-family-calls-charges/story?id=110927216 ...................................... 13

Lou Chibbaro Jr., *Predictions of trans bathroom harassment unfounded*, Washington Blade (March 31, 2016), https://www.washingtonblade.com/2016/03/31/predictions-of-trans-bathroom-harassment-unfounded/. ........................................................................ 5

Melanie Springer Mock, *I'm a Woman Who Got Kicked Out of Women's Bathrooms*, Christianity Today Int'l (June 7, 2016), https://www.christianitytoday.com/women/2016/june-web-only/im-woman-who-got-kicked-out-of-womens-bathrooms.html .......................................... 14

Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth & School Facilities* (2017), https://www.glsen.org/sites/default/files/2019-11/Separation_and_Stigma_2017.pdf ....................................................................................... 3

Nat'l Task Force to End Sexual and Domestic Violence Against Women, *National Consensus Statement of Anti-Sexual Assault and Domestic Violence Organizations in Support of Full and Equal Access for the Transgender Community* (updated Apr. 29, 2016), https://endsexualviolence.org/wp-content/uploads/2017/09/STATEMENT-OF-ANTI-SEXUAL-ASSAULT-AND-DOMESTIC-VIOLENCE-ORGANIZATIONS-IN-SUPPORT-OF-EQUAL-ACCESS-FOR-THE-TRANSGENDER-COMMUNITY.pdf ............................ 6

Ryan Thoreson, *Shut Out: Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools*, Hum. Rts. Watch (Sept. 14, 2016), www.hrw.org/report/2016/09/15/shut-out/restrictions-bathroom-and-locker-room-access-transgender-youth-us .................................................................................................. 5, 12

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey*, https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ..................................................................................................................... 12

Susan Etta Keller, *Gender-Inclusive Bathrooms: How Pandemic-Inspired Design Imperatives and the Reasoning of Recent Federal Court Decisions Make Rejecting Sex-Separated Facilities More Possible*, 23 Geo. J. Gender & L. 35 (2021), https://www.law.georgetown.edu/gender-journal/wp-content/uploads/sites/20/2022/03/Gender-Inclusive-Bathrooms.pdf........................................ 6

**Rules and Regulations**

34 C.F.R. § 106.44(f)(1) ............................................................................................................... 5

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024)................................................... 1, 2

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

This brief is filed by *amicus curiae* National Women's Law Center (NWLC), a nonprofit legal organization dedicated to the advancement and protection of women's legal rights and the right of all to be free from sex discrimination. Since 1972, NWLC has worked to secure equal opportunity in education for women and girls through enforcement of Title IX, the Constitution, and other laws. NWLC has led briefs in numerous cases affirming that protections against sex discrimination include protections for LGBTQI+ students. NWLC is also committed to ensuring all women and girls, including transgender women and girls, are protected from sexual violence.

## INTRODUCTION

Congress passed Title IX over 50 years ago to address sex discrimination that prevented women and girls from securing equal educational opportunity. Title IX is clear: "No person" should be subject to sex discrimination in an education program or activity. 20 U.S.C. § 1681. Title IX requires educational environments be free of sexual harassment and limiting sex stereotypes.

The Department of Education (the "Department") promulgated the final rule at issue here, to "fulfill Title IX's protection for students, teachers, and other employees in federally funded elementary schools and secondary schools and postsecondary institutions against all forms of sex discrimination, including sex-based harassment and sexual violence." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474, 33476 (Apr. 29, 2024) (hereinafter the "Rule"). Specifically, the Rule clarifies the scope of prohibited discrimination under Title IX. The Rule aligns with numerous federal court decisions regarding the scope of "sex" discrimination, including in the Eighth Circuit, and as affirmed by the Supreme Court in *Bostock v. Clayton County,* 590 U.S. 644 (2020). Given this consensus that discrimination on the basis of sex necessarily includes discrimination on the basis

of sexual orientation and gender identity, the Rule requires schools to treat "students consistent with their gender identity." Thus, schools are to permit transgender students to use school facilities, such as locker rooms and bathrooms, consistent with their gender identity. 89 Fed. Reg. at 33820.

In developing the Rule, the Department carefully evaluated a range of views related to "Participation Consistent With Gender Identity," *Id.* at 33817-18. These included allegations that nondiscrimination policies would violate some students' privacy or safety interests. *See id.* at 33818. The Department addressed the comments in depth, including discussion of research and relevant case law. *Id.* at 33818-21. The Department also correctly concluded, that "[T]he mere presence of a transgender person in a single-sex space" does not compromise "anyone's legitimate privacy interest" and that the presence of transgender students does not pose a safety risk to cisgender students. *Id.* at 33820.

Additionally, the Department identified nondiscriminatory measures available to address any safety and privacy concerns, even though there was no evidence that violence would increase if facilities were open to transgender students. *Id.* First, the Department highlighted that harming someone at school is already illegal and related protections exist for all students. Second, the Department noted that recipients could offer "single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason." *Id.*

The Department also considered many experts' views including from medical organizations, and reviewed prior legal decisions that similarly concluded, that transgender students can face serious harms when excluded from facilities that align with their gender identity. *Id.* at 33819. Finally, the Department considered comments submitted by experts regarding sexual violence prevention, such as *amicus curiae*, that urged the Department to confirm that transgender students should not be excluded from school facilities based on their gender identity.

Despite this thorough record, Plaintiffs challenge the Rule and erroneously argue it infringes on the privacy and safety interests of students. They primarily do this through Plaintiff A.F, who "desires privacy from the opposite sex" while changing clothes, showering, and using the restroom.[1] Pls.' Br. in Supp. of Mot. for a 5 U.S.C. 705 Stay and Prelim. Inj. at 44, ECF No. 12. But the only evidence Plaintiffs offer is A.F.'s declaration, which lacks facts or evidence concerning how A.F.'s privacy or safety is threatened by the Rule. *See* Decl. of A.F. in Supp. of Pls.' Mot. for Stay and Prelim. Inj. at 9, ECF No. 9-3.

Plaintiffs' vilification of transgender students is wrong, belied by the facts, and dangerous. *No* credible evidence supports allegations that transgender students' use of restrooms consistent with their affirmed gender injures *any* student.[2] Instead, research shows denying transgender students access to restrooms aligned with their gender increases their risk to a range of harms including sexual violence.

Plaintiffs' arguments are also unsupported by law. An overwhelming majority of courts have concluded policies that permit transgender students to use facilities that align with their gender identity do not harm other students, and multiple circuit courts have found that a school's refusal to adopt transgender-inclusive policies violate Title IX. The two recent district court decisions enjoining the Rule failed to give due weight to existing precedent and research and

---

[1] Plaintiffs also argue that these concerns will extend to "living facilities" because the Rule is contradictory in its treatment of these facilities. Pls.' Br. at 21-22. But as Defendants explain, "the Rule's attention to "living facilities" "follows directly from the statute itself," and the Rule "follows directly from the text and structure of Title IX." Defs.' Br. at 12-13, ECF No. 18.

[2] Hundreds of school districts have adopted non-discrimination policies that allow transgender students to use restrooms aligned with their gender identity while maintaining the "privacy and safety of all students." *See* Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth & School Facilities* 4-5 (2017), https://www.glsen.org/sites/default/files/2019-11/Separation_and_Stigma_2017.pdf.

instead credited generalized allegations of harm. Plaintiffs' trans-exclusionary position would create harms to transgender students as detailed herein.

Weighing these documented harms to transgender students against the unsupported allegations from Plaintiffs that the Rule poses harm to cisgender students, the balance of equities and the public interest weigh heavily in favor of Defendants. Plaintiffs wrongfully ask this Court to rescind Title's IX broad promise to protect all persons from sex discrimination. *See* 20 U.S.C. 1681(a). *Amicus curiae* urge this Court to deny Plaintiffs' request for a preliminary injunction.

## ARGUMENT

I.     **Policies That Allow Transgender Students to Use Facilities that Align with Their Gender Identity Do Not Harm Cisgender Girls or Women.**

    A.  *Research confirms that transgender-inclusive locker and restroom policies do not harm other students.*

Policies permitting transgender individuals to use locker and restrooms aligning with their gender identity do not harm others. Plaintiffs fail to identify any evidence that shows otherwise. Plaintiffs' arguments constitute baseless fears that serve to harm transgender people, as detailed in Section II.

As studies confirm, "fears of increased safety and privacy violations" because of nondiscrimination laws regarding bathrooms and locker rooms "are not empirically grounded."[3] Indeed, any criminal incidents relating to privacy or safety in these facilities are "exceedingly rare."[4] Results from a 2018 study revealed "the passage of such nondiscrimination laws is not

---

[3] Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. and Soc. Pol'y 70, 81 (July 23, 2018), https://escholarship.org/content/qt4rs4n6h0/qt4rs4n6h0_noSplash_8740e92d7f24b6c89dbd4bd4d27fbbcb.pdf; *see also* Julie Moreau, *No link between trans-inclusive policies and bathroom safety, study finds,* NBC News (Sept. 19, 2018), https://www.nbcnews.com/feature/nbc-out/no-link-between-trans-inclusive-policies-bathroom-safety-study-finds-n911106.

[4] Hasenbush et al., *supra* note 3, at 79.

related to the number or frequency of criminal incidents in such public spaces."[5] Law enforcement officials in cities and states with nondiscrimination policies that protect transgender individuals agree: "[T]hey could not identify a single case in which a transgender person ha[d] been charged with assaulting or harassing women in a public bathroom."[6] A report from Human Rights Watch also found no evidence that transgender students' use of restroom or locker room facilities "correspond[ing] to their gender identity puts other students at risk."[7] Moreover, assertions that inclusive restroom policies make it more likely that cisgender men will enter women's restrooms for criminal purposes lack merit.[8]

Title IX and its corresponding regulations already require schools to maintain safe educational environments and respond promptly and effectively to sexual harassment including assault. The recent Title IX Rule clarifies that this includes investigations of reports of sexual harassment, taking other steps to end harassment, preventing its recurrence, and remedying its effects. 34 C.F.R. § 106.44(f)(1). Notably, experts who are advocates for survivors of sexual assault, like NWLC, routinely support transgender-inclusive locker and restroom policies; that is because Plaintiffs' claims that others are harmed by such policies are false.[9]

---

[5] *Id.* at 81.

[6] Lou Chibbaro Jr., *Predictions of trans bathroom harassment unfounded*, Washington Blade (March 31, 2016), https://www.washingtonblade.com/2016/03/31/predictions-of-trans-bathroom-harassment-unfounded/.

[7] Ryan Thoreson, *Shut Out: Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools*, Hum. Rts. Watch (Sept. 14, 2016), www.hrw.org/report/2016/09/15/shut-out/restrictions-bathroom-and-locker-room-access-transgender-youth-us.

[8] For example, the American Medical Association's conclusion that social transition can be medically necessary points to studies that show there is no evidence to support claims from Plaintiffs and others that these laws provide sexual predators new opportunities to engage in sexual violence. Am. Med. Ass'n & GLMA, *Transgender individuals' access to public facilities* (2018), https://www.ama-assn.org/system/files/2019-03/transgender-public-facilities-issue-brief.pdf.

[9] Nat'l Task Force to End Sexual and Domestic Violence Against Women, *National Consensus Statement of Anti-Sexual Assault and Domestic Violence Organizations in Support of Full and*

B. *Courts have concluded that transgender-inclusive locker and restroom policies do not harm other students.*

Federal courts have rejected claims, under Title VII and Title IX, that "the mere presence of transgender students [i]s invasive and harmful."[10] Indeed, the Eighth Circuit has addressed this question in the context of transgender people in schools using facilities that align with their gender identity, under an analogous civil rights statute, Title VII. In *Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981 (8th Cir. 2002), a school district permitted a transgender female teacher to use the women's faculty bathroom. The transgender teacher engaged in no "inappropriate conduct" and was merely present in the women's restroom. *Id.* at 984. The Court rejected plaintiff's argument that reasonable women "could [] find their working environment is abusive or hostile when they must share bathroom facilities" with a transgender woman." *Id.*

Following *Cruzan*, courts within the Eighth Circuit have repeatedly affirmed that transgender people are protected by federal civil rights laws. *See, e.g., Dawson v. H&H Elec. Inc.*, No. 4:14CV00583 SWW, 2015 WL 5437101, at *3 (E.D. Ark. Sept. 15, 2015) (explaining plaintiff, a transgender woman, had pled sufficient facts to state a claim that the defendant discriminated against her because of her sex in violation of Title VII); *Rumble v. Fairview Health Servs.*, No. 14-cv-2037 (SRN/FLN), 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015) ("Because

---

*Equal Access for the Transgender Community* (updated Apr. 29, 2016), https://endsexualviolence.org/wp-content/uploads/2017/09/STATEMENT-OF-ANTI-SEXUAL-ASSAULT-AND-DOMESTIC-VIOLENCE-ORGANIZATIONS-IN-SUPPORT-OF-EQUAL-ACCESS-FOR-THE-TRANSGENDER-COMMUNITY.pdf.

[10] Susan Etta Keller, *Gender-Inclusive Bathrooms: How Pandemic-Inspired Design Imperatives and the Reasoning of Recent Federal Court Decisions Make Rejecting Sex-Separated Facilities More Possible*, 23 Geo. J. Gender & L. 35, 50 (2021), https://www.law.georgetown.edu/gender-journal/wp-content/uploads/sites/20/2022/03/Gender-Inclusive-Bathrooms.pdf. These claims echo the unfounded fears historically used to justify discrimination against other groups; courts have rejected similar arguments in the context of racial segregation. *See, e.g.*, Br. of NAACP Legal Defense & Educational Fund, Inc. and Asian American Legal Defense & Education Fund as *Amici Curiae* in Supp. of Resp't at 4, *Gloucester Cnty. Sch. Bd. v. G.G.,* 580 U.S. 1168 (2017).

the term 'transgender' describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping.").[11] This approach is well settled in the Eighth Circuit and affirmed by the Supreme Court in *Bostock*. Thus, protections against sex discrimination also provide protections against discrimination based on sexual orientation and gender identity. These precedents govern here given that the Circuit has understood that Title IX is informed by Title VII. *See Wolfe v. Fayetteville*, *Arkansas Sch. Dist*., 648 F.3d 860, 866 (8th Cir. 2011). Indeed, the Western District of Missouri previously held the Eighth Circuit would likely "interpret the phrase 'on the basis of sex' in Title IX as encompassing a transgender person's sex-stereotyping claim, following the analysis of Title VII. *C.M.B. by Burch v. Odessa R-VII Sch. Dist. Bd. of Educ*., No. 17-01075-CV-W-GAF, 2019 WL 13298894, at *6 (W.D. Mo. Mar. 21, 2019).

The facts in *Cruzan* are analogous to the ones presented here. The presence of a transgender woman in a women's restroom does not create a hostile work environment under Title VII; similarly, permitting transgender students to use restrooms consistent with their gender also does not create a hostile environment in an educational program or activity. Other federal courts of appeal's determination that *Bostock's* interpretation of Title VII guides an "evaluation of claims under Title IX" further support this conclusion. *Grimm v. Gloucester Cnty. Sch. Bd*., 972 F.3d 586, 616 (4th Cir. 2020), as amended (Aug. 28, 2020).[12]

Before *Bostock*, federal courts of appeal had also concluded transgender-inclusive policies do not create harms for others. For example, the Ninth Circuit concluded "the use of facilities for their intended purpose, without more, does not constitute an act of harassment simply because a

---

[11] These decisions were all issued *before* the Supreme Court's decision in *Bostock,* which only made precedent in this area more clear.

[12] *See also* Defs.' Br. at 7 (citing additional case law).

person is transgender." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1229 (9th Cir. 2020). "[H]igh school students do not have a fundamental privacy right to not share school restrooms, lockers, and showers with transgender students whose biological sex is different than theirs." *Parents for Priv. v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1099 (D. Or. 2018), *aff'd sub nom. Parents for Priv.*, 949 F.3d 1210.

In *Doe v. Boyertown Area School District,* the Third Circuit similarly was "unpersuaded . . . that the appellants' asserted privacy interest requires protection from the risk of encountering students in a bathroom or locker room whom appellants identify as being members of the opposite sex." 897 F.3d 518, 531 (3rd Cir. 2018), *reh'g en banc denied*, 897 F.3d 515 (3d Cir. 2018). Rejecting arguments that an inclusive policy violated cisgender students' rights, the court determined "the presence of transgender students in the locker and restrooms is no more offensive to constitutional or [state] law privacy interests than the presence of the other students who are not transgender. Nor does their presence infringe on the plaintiffs' rights under Title IX." *Id.* at 521.

The Fourth Circuit has likewise struck down a policy restricting a transgender boy's use of the boys' restroom as a violation of Title IX, determining the policy has no relation to protecting students' privacy interests. *Grimm*, 972 F.3d at 613-14. Although the Fourth Circuit acknowledged students maintain privacy interests, it stressed the "bodily privacy of cisgender boys using the boys['] restrooms did not increase" when Gavin Grimm, who was a transgender boy, was prohibited from entering. *Id*. at 614. The policy ignored how transgender students use restrooms aligning with their gender identity: "'by entering a stall and closing the door.'" *Id*. at 613 (quoting *Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. Of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017)).

Additionally, the Seventh Circuit has *twice* rejected policies barring transgender students from using bathrooms aligning with their gender identity on grounds the policies violated Title IX.

*A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023) (concluding Wisconsin school district's need to protect cisgender students' privacy by denying a transgender student access to a restroom correlating to his gender amounted to "sheer conjecture and abstraction") (internal citation omitted), *cert. denied*, 144 S. Ct. 683 (2024); *Whitaker*, 858 F.3d at 1052 (determining a transgender-exclusive policy "does nothing to protect the privacy rights of each individual students . . . who share similar anatomy," and noting the transgender plaintiff had "used the boys' bathroom . . . without incident or complaint from another student.").

Plaintiffs' asserted concerns also consistently fail to consider available mitigating measures or ones already in place. For example, restroom stalls enable all students to use facilities discreetly to protect their privacy. *A.C.*, 75 F.4th at 773 (observing a students' presence behind the door of a restroom stall does not threaten student privacy). Schools can also install other privacy strips and screens. *See, e.g.*, *Grimm*, 972 F.3d at 614. And cisgender students may use available single-occupancy facilities, as stated in the Department's Rule. *See, e.g., Parents for Priv.*, 949 F.3d at 1225 (holding alleged right to privacy failed to account for "alternative options and privacy protections" for those who did not want to share a facility with a transgender student, even if alternatives "appear[ed] inferior or less convenient").

Despite the overwhelming majority of federal courts finding that transgender-inclusive policies are not harmful to others, and are legally allowed or required under our nation's civil rights laws, and despite the applicability of precedent from the Supreme Court interpreting the scope of sex discrimination protections under a closely analogous statute, the Rule has been the subject of numerous legal challenges. In recent days, two district courts in other circuits (the Western District of Louisiana and the Eastern District of Kentucky) have preliminarily enjoined this Rule as to those states. *Louisiana v. U.S. Dep't of Educ.*, 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June

13, 2024); *Tennessee v. Cardona*, No. CV 2: 24-072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024). Both decisions are incorrect under this substantial body of precedent detailed above—specifically including applicable Eighth Circuit and Supreme Court precedent. Additionally, the two courts preliminarily enjoining the Rule are out of sync with the broad sweeping mission of Title IX. These opinions are largely premised on the idea Title IX is a narrow statute enacted solely to protect "biological women." *See Louisiana*, 2024 WL 2978786, at *3; *Tennessee*, 2024 WL 3019146 at *6. But such a reading of Title IX misreads its text and intent. In fact, the statute, which uses expansive language, has the broad purpose of eradicating all forms of invidious sex discrimination in educational programs. The Supreme Court has consistently recognized Title IX's breadth and the need to interpret it expansively to effectuate its purpose. More than 30 years ago, in *North Haven Board of Education v. Bell*, the Court recognized that, to "give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language." 456 U.S. 512, 521 (1982) (quotation omitted); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Congress gave the statute a broad reach.").

In introducing Title IX, Senator Birch Bayh, its principal sponsor, articulated that the "impact of this amendment" was meant to be "far-reaching," 118 Cong. Rec. 5111, 5808 (1972), as it was "designed to root out, as thoroughly as possible at the present time, the social evil of sex discrimination in education." *Id*. at 5804. And Congress was concerned with eradicating pernicious sex stereotyping. In introducing Title IX, Senator Bayh expressly recognized sex discrimination in education is based on "stereotyped notions," like that of "women as pretty things who go to college to find a husband, . . . marry, have children, and never work again." *Id*. Title IX was therefore necessary to "change [these] operating assumptions" and to combat the "vicious and reinforcing pattern of discrimination" based on these "myths." *Id.*

Although the two courts enjoining the Rule state that the original legislative intent was to safeguard cisgender female students, *Louisiana,* 2024 WL 2978786 at *4-7; *Tennessee,* 2024 WL 3019146 at *2-8, the Supreme Court has advised that "statutory prohibitions often go beyond the principal evil [that prompted their enactment] to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998). As Justice Scalia wrote for a unanimous Court, even though "[m]ale-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII," Title VII's broad language extended to that "reasonably comparable evil[]." *Id.* Here, discrimination against transgender students is like the sex discrimination (including sex stereotyping) specifically discussed by Congress at the time of Title IX's passage—and thus is covered by the statute's sweeping language.

These opinions also incorrectly conclude that the Rule harms the privacy and safety of other students, even though the opinions point to no evidence in support. *See Louisiana*, 2024 WL 2978786 at *35; *Tennessee,* 2024 WL 3019146 at *73.[13] That is because they cannot. As set out above, *supra* Section I.A., the social science data confirms there are no actual harms to others present. Nor does either opinion consider the significant physical and emotional harms transgender students experience when barred from using school facilities that align with their gender identity.[14]

---

[13] The two opinions also rely heavily on *Adams ex rel. Kasper v. Sch. Bd. of St. John's Cnty.*, 57 F.4th 791 (11th Cir. 2022), a case that, as the Rule notes, is an outlier as compared to the body of cases provided above. As Defendants set forth in their brief, *Adams* should not govern here, and *amicus curiae* joins those arguments for all the reasons provided above. *See* Defs. Br. at 8.

[14] Defendants also thoroughly considered and addressed commenters' concerns on these issues. *See* Defs. Br. at 14. The opinion in *Tennessee* is wrong in concluding otherwise. *See* 2024 WL 3019146 at *72.

## II.    Transgender Students Are Harmed When Excluded From School Facilities that Align With Their Gender Identity.

Transgender students suffer significant harms when barred from using school facilities that align with their gender identity. These harms can have long-lasting impacts on students' health and educational outcomes. Because of transgender students' heightened risk of experiencing sex-based discrimination, the Department's changes to the Title IX Rule are critical for three reasons.

*First*, a majority of transgender students report having avoided school facilities because of safety concerns. One survey of K-12 students shows 82.1% of transgender students avoid using the restroom and 69.1% of transgender students avoid using the locker room at school, because they felt unsafe or uncomfortable.[15] Research suggests many transgender students excluded from the restrooms matching their gender identity avoid urinating all together while they are at school, leading to serious health risks including kidney damage and urinary tract infections.[16] Many transgender students avoid drinking or eating throughout the school day to avoid bathroom use.[17]

*Second*, forcing transgender people to use bathrooms corresponding to their sex assigned at birth "put[s] them at risk of physical, verbal, or sexual assault from other students or adults."[18]For

---

[15] Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, 97 (2020), https://www.glsen.org/sites/default/files/2020-10/NSCS-2019-Full-Report_0.pdf.

[16] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 224-30 (Dec. 2016) ("2015 Survey"), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf (citing Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65, 75 (2013)). *See also Grimm*, 972 F.3d at 593 (transgender student plaintiff developed urinary tract infections due to bathroom avoidance).

[17] *See, e.g., Doe*, 897 F.3d at 523 (forcing transgender students to use restrooms that do not match their gender identity causes students to "avoid going to the bathroom by fasting, dehydrating, or otherwise forcing themselves not to use the restroom throughout the day"); *Whitaker*, 858 F.3d at 1041 (transgender student denied restroom access "restricted his water intake to ensure that he did not have to utilize the restroom at school"); 2015 Survey, *supra* note 16, at 229 (nearly 32% of transgender adult responders avoided eating or drinking to avoid using the restroom).

[18] Thoreson, *supra* note 7.

example, cisgender boys broke 17-year-old nonbinary student Cobalt Sovereign's jaw after school administrators forced Cobalt to use the boys' restroom.[19]  The assault occurred after a *cisgender* boy violated Cobalt's privacy and peered over Cobalt's stall while they were using the facility.

Transgender students who face locker or restroom restrictions are significantly more likely to experience sexual assault than transgender students whose facility use is not restricted.[20] One study showed that the prevalence of sexual assault of transgender and nonbinary U.S. adolescents was 25.9%, which was substantially higher than rates of 15% for cisgender high school girls and 4% for cisgender boys.[21] However, transgender and nonbinary youth subject to locker or restroom restrictions experienced an even higher prevalence of sexual assault at 36 percent.[22]

*Third*, policies precluding transgender students from using restrooms and locker rooms aligning with their gender identity also causes psychological harm. "When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening." *Doe*, 897 F.3d at 529. The pervasive discrimination that too many transgender students experience at school often results in adverse mental health outcomes for those students. LGBTQI+ students who encounter hostility and discrimination in K-12 educational settings—such as verbal harassment, physical attacks, or sexual assault—report higher levels of depression and lower levels of self-esteem than students who have not experienced victimization.[23]  More severe

---

[19] Kiara Alfonseca, *Transgender student alleges assault after using bathroom, family calls for charges*, ABC News (June 7, 2024), https://abcnews.go.com/US/transgender-student-assaulted-after-bathroom-family-calls-charges/story?id=110927216.
[20] Gabriel R. Murchison et al., *School Restroom/Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8849575/.
[21] *Id.* at 7.
[22] *Id.* at 6.
[23] Kosciw, *supra* note 15, at 52-54.

experiences of victimization *are* tied to higher levels of depression and lower self-esteem.[24] The consequences of discrimination can be catastrophic: transgender students who encounter violence or verbal harassment have a "higher prevalence of lifetime and past-year suicide thoughts and attempts" than respondents who did not have such experiences.[25]

Notably, cisgender girls who do not conform to specific standards of femininity are likewise harmed by anti-transgender locker and restroom policies, as such policies invoke enforcement of sex-based stereotypes to determine who is a "real" woman or girl. Examples of gender-nonconforming women who are harassed or ejected from women's restrooms, an experience that is both humiliating and harmful, are numerous.[26] Enjoining the Rule also makes some cisgender women and girls more susceptible to serious emotional or physical harm in school facilities.

### III.   The Harm Transgender Students Face Outweighs Any Harm to Plaintiffs.

For the reasons outlined above, Plaintiffs have not met their burden and so this Court should deny the request for a preliminary injunction. Specifically, plaintiffs seeking a preliminary injunction must show—not merely allege—irreparable harm. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."). Plaintiffs must also show that their harm outweighs harm to the opposing party and the public interest.  *See Morehouse Enters., LLC v. Bureau of*

---

[24] *Id.*

[25] Jody L. Herman et al., The Williams Inst., UCLA Sch. of L., *Suicide Thoughts and Attempts Among Transgender Adults: Findings from the 2015 U.S. Transgender Survey* 22 (Sept. 2019), https://williamsinstitute.law.ucla.edu/wpcontent/uploads/Suicidality-Transgender-Sep-2019.pdf.

[26] Christopher Wiggins, *Cis Woman Mistaken as Transgender Records Being Berated in Bathroom*, The Advocate (updated May 26, 2023), https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-transgender-records-being-berated-bathroom; Melanie Springer Mock, *I'm a Woman Who Got Kicked Out of Women's Bathrooms*, Christianity Today Int'l (June 7, 2016), https://www.christianitytoday.com/women/2016/june-web-only/im-woman-who-got-kicked-out-of-womens-bathrooms.html.

*Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023) (recognizing third and fourth factors merge when government is opposing the injunction).

Here, Plaintiffs have not and cannot meet their burden. The Rule will not infringe on other students' privacy or safety interests and Plaintiffs provide no evidence to the contrary. Hypothetical concerns that lack any basis in fact are not enough to justify discrimination.  These interests are speculative and not grounded in fact, and they fail to *show* how students' safety and privacy would be at risk by allowing students to use facilities that align with their gender identity. The mere presence of transgender students using the facilities corresponding to their gender identities is not harassment, and certainly not severe, pervasive, or objectively offensive to others. *See Doe*, 897 F.3d at 523-24 (finding that "the level of stress that cisgender students may experience" and "the plight of transgender students who are not allowed to use facilities consistent with their gender identities" are "simply not analogous"); *Whitaker*, 858 F.3d at 1053 (holding that "the School District's privacy arguments are insufficient to establish an exceedingly persuasive justification for the classification").

The lack of evidence provided by Plaintiffs regarding harms to others stands in sharp contrast to the severe and well-documented psychological, social, and emotional harms transgender students face when excluded from restrooms and locker rooms that align with their gender identity. Enjoining the Rule —even temporarily—risks causing significant harm to transgender students. The equities favor denying Plaintiffs' request to enjoin the Rule. *See, e.g.*, *Whitaker*, 858 F.3d at 1054 (finding balance of equities favored transgender student).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a 5 U.S.C. 705 Stay and Preliminary Injunction.

Dated: June 21, 2024                      Respectfully submitted,

                                          /s/ *Denise Lieberman*
                                          Denise Lieberman, MBE# 47013
                                          6047 Waterman Blvd.
                                          St. Louis, MO 63112
                                          (314) 780-1833
                                          denise@movpc.org

                                          Maddy Gitomer*
                                          Kaitlyn Golden*
                                          Sunu Chandy*
                                          DEMOCRACY FORWARD
                                            FOUNDATION
                                          P.O. Box 34553
                                          Washington, D.C. 20043
                                          Tel: (202) 448-9090
                                          mgitomer@democracyforward.org
                                          kgolden@democracyforward.org
                                          schandy@democracyforward.org

                                          Anya Marino*
                                          Shiwali Patel*
                                          Emily Martin*
                                          NATIONAL WOMEN'S
                                            LAW CENTER
                                          1350 I Street NW, Suite 700
                                          Washington, DC 20005
                                          Amarino@nwlc.org
                                          Spatel@nwlc.org
                                          Emartin@nwlc.org

                                          *Motion for admission *Pro Hac Vice*
                                          forthcoming


                                          *Counsel for* Amicus Curiae

16