# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# ST. LOUIS DIVISION

STATE OF ARKANSAS *et al.*,

                 Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF
EDUCATION *et al.*,

                 Defendants.

Case No. 4:24-cv-636
Judge Rodney W. Sippel

**BRIEF OF AMICI CURIAE CALIFORNIA, NEW JERSEY, PENNSYLVANIA, COLORADO, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A 5 U.S.C. § 705 STAY AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................1

INTERESTS OF AMICI CURIAE ............................1

ARGUMENT..............................................2

    I.      AMICI STATES' EXPERIENCE CONFIRMS THAT
           THE FINAL RULE WILL YIELD BROAD BENEFITS
           WITHOUT COMPROMISING STUDENT PRIVACY
           OR SAFETY, OR IMPOSING SIGNIFICANT COSTS. .........2

          A.     The Final Rule's Benefits Will Not Compromise
                 Student Privacy or Safety.............................3

          B.     The Final Rule Will Foster Positive Health
                 Outcomes for LGBTQ Students. ...................7

    II.     THE FINAL RULE DEFINES "SEX-BASED
           HARASSMENT" IN A WAY THAT EFFECTUATES
           TITLE IX WITHOUT BURDENING OR SURPRISING
           THE STATES..........................................9

    III.    THE FINAL RULE DOES NOT VIOLATE THE
           SPENDING CLAUSE. .......................................12

CONCLUSION ........................................13

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bostock v. Clayton County*
590 U.S. 644 (2020)................................................................1, 13

*Brown v. Bd. of Educ.*
347 U.S. 483 (1954)...................................................................4, 7

*Davis v. Monroe Cnty. Bd. of Educ.*
526 U.S. 629 (1999).................................................................9, 10

*Doe v. Miami Univ.*
882 F.3d 579 (6th Cir. 2018).......................................................11

*Feminist Majority Found. v. Hurley*
911 F.3d 674 (4th Cir. 2018)..........................................................9

*Fennell v. Marion Indep. Sch. Dist.*
804 F.3d 398 (5th Cir. 2015)..........................................................9

*Franklin v. Gwinnett Cnty. Pub. Schs.*
503 U.S. 60 (1992).......................................................................11

*Gebser v. Lago Vista Indep. Sch. Dist.*
524 U.S. 274 (1998)....................................................................10

*Grimm v. Gloucester Cnty. Sch. Bd.*
972 F.3d 586 (4th Cir. 2020)........................................................13

*J.A.W. v. Evansville Vanderburgh Sch. Corp.*
396 F. Supp. 3d 833 (S.D. In. 2019).............................................13

*Jackson v. Birmingham Bd. of Educ.*
544 U.S. 167 (2005).......................................................................1

*Mahanoy Area Sch. Dist. v. B.L.*
594 U.S. 180 (2021)...................................................................2, 3

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Meritor Sav. Bank, FSB v. Vinson*
    477 U.S. 57 (1986) ................................................................. 11

*Olmstead v. L.C. ex rel. Zimring*
    527 U.S. 581 (1999) ................................................................. 1

*Roberts v. U.S. Jaycees*
    468 U.S. 609 (1984) ................................................................. 6

*Tennessee v. U.S. Dep't of Agric.*
    665 F. Supp. 3d 880 (E.D. Tenn. 2023) ................................. 13

*Tovar v. Essentia Health*
    342 F. Supp. 3d 947 (D. Minn. 2018) ..................................... 13

**FEDERAL STATUTES**

20 U.S.C.
    § 1681 ............................................................................ 1, 9
    § 1682 ............................................................................... 10
    § 1686 ................................................................................. 7

**FEDERAL REGULATORY MATERIALS**

*Nondiscrimination on the Basis of Sex in Education Programs*
    *or Activities Receiving Federal Financial Assistance,* 85
    Fed. Reg. 30,026 (May 19, 2020) ........................................... 11

*Nondiscrimination on the Basis of Sex in Education Programs*
    *or Activities Receiving Federal Financial Assistance,* 89
    Fed. Reg. 33,474 (Apr. 29, 2024) .......................................... 1, 9

*Racial Incidents and Harassment Against Students at*
    *Educational Institutions; Investigative Guidance,* 59 Fed.
    Reg. 11,448 (Mar. 10, 1994) ................................................. 10

## TABLE OF AUTHORITIES
### (continued)

**Page**

Russlyn Ali, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) ................................................................................... 10

*Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties,* 62 Fed. Reg. 12,034 (Mar. 13, 1997) ................................................... 10, 12

U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017, rescinded Aug. 2020) ........................................ 10

U.S. Dep't of Educ., *Q&A on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017) ........................... 10

U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001) .................................. 10

STATE STATUTES AND REGULATORY MATERIALS

Assemb. B. 1266, 2013-2014 Sess. (Cal. 2013) ........................... 3

Iowa Code
§ 216.2(10) ............................................................ 12
§ 216.7 ................................................................ 12
§ 216.8 ................................................................ 12
§ 216.9 ................................................................ 12

N.H. Rev. Stat. Ann.
§ 354-A:2(XIV-e) ...................................................... 12
§ 354-A:6 ............................................................. 12
§ 354-A:16 ............................................................ 12
§ 354-A:27 ............................................................ 12

# TABLE OF AUTHORITIES
## (continued)

Page

OTHER AUTHORITIES

Affirming & Inclusive Schs. Task Force, *Strengthening Inclusion in Illinois Schools* (2020).............................................6

Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappa (Sept. 1, 2016) ......................................................................................5

Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Tex. Trib. (June 14, 2016).......................................................3

Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence,* 6 Fronteirs Socio. 1 (Mar. 31, 2021) .........................................5

Br. Of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. Of Resp't, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 137 S. Ct. 1239 (2017), 2017 WL 930055 ...................4, 5

Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities (2014) ....................................................6

Colo. Ass'n of Sch. Bds. et al., Guidance for Educators Working with Transgender and Gender Nonconforming Students (n.d.)............................................................................6

Conn. Safe Sch. Coal., Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws (2012) ....................................................6

Ctrs. For Disease Control, *Youth Risk Behavior Survey: Data Summary & Trends Report 2011-2021* (2023) .......................11

D.C. Pub. Schs., Transgender and Gender-Nonconforming Policy Guidance (2015) ..............................................................6

# TABLE OF AUTHORITIES
## (continued)

Page

Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* (2009) ...................................................................8

Human Rts. Campaign Found, *2023 LGBTQ+ Youth Report* (2023) ...................................................................7

Ill. Dep't of Hum. Rts., Non-Regulatory Guidance: Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act (2021).........................................................6

Ill. State Bd. of Educ., Non-Regulatory Guidance: Supporting Transgender, Nonbinary and Gender Nonconforming Students (2020) .........................................................6

Interim Other Sexual Misconduct Policy, Harvard Univ. (Aug. 26, 2022)...............................................................11

Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools,* 24 Contemp. Sch. Psych. 3 (Aug. 2020)...........................................................11

Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2016) ..............................................................4, 8

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022)..............................................3, 4, 7

Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223 (Mar. 2016) ..............................................4, 8

## TABLE OF AUTHORITIES
### (continued)

Page

Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97 (Feb. 17, 2019) ..................................................4, 7

Mass. Dep't of Elementary & Secondary Educ., Guidance for Massachusetts Public Schools: Creating a Safe and Supportive School Environment (Oct. 28, 2021) ..........................................................6

Md. State Dep't of Educ., Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination (2015) ....................6

Mich. Dep't of Educ., State Board of Education Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students (2016) ........................................................6

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rept. 67 (2019) ........................................8

Minn. Dep't of Educ., A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students (2017) ............................................6

Movement Advancement Project, *Local Nondiscrimination Ordinances* ..................................................................12

Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* (Apr. 2017) ................................................12

N.J. State Dep't of Educ., Transgender Student Guidance for School Districts (2018) ..........................................................6

## TABLE OF AUTHORITIES
### (continued)

**Page**

N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices (June 2023) ..................................................................................6

Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive Schools* (May 30, 2023) ..............................................5

Or. Dep't of Educ., Supporting Gender Expansive Students: Guidance for Schools (2023) ..................................................................6

R.I. Dep't of Educ., Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students (2016) ......................6

Stephen Russell et al., *Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health (2018) ..................................................................................9

Sandy E. James et al., Nat'l Ctr. For Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* (Dec. 2016) ...................7, 8

*Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 3-4 (2017) ..................................................................................7

Sexual and Gender-Based Harassment Policy, Harvard Univ. (Feb. 10, 2017) ..........................................................................11

Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* (Wash. Off. of Superintendent of Pub. Instruction 2012) ..........................................................5

Toomey et al., *Gender-Affirming Policies Support Transgender and Gender Diverse Youth's Health,* Soc'y for Rsch. In Child Dev. (Jan. 27, 2022) ..................................................13

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* (2023)................................................3, 8

*The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces*, The Trevor Project (Dec. 2020)..................................9

University of Southern Mississippi, *Title IX: Learn More: Types of Sexual Harassment* .................................................................11

Vt. Agency of Educ., Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students (2017)..........................................................................................6

World Professional Association for Transgender Health, *Standards of Care fo the Health of Transgender and Gender Diverse People*, Version 8, Int'l J. of Transgender Health (Sept. 2022) ...........................................................................................8

ix

**INTRODUCTION**

In defining sex discrimination to include discrimination based on sexual orientation or gender identity, the U.S. Department of Education's ("ED") new final rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Final Rule"), is consistent with the plain text of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, Supreme Court precedent, decisions in at least eight circuits, and congressional intent.

Title IX broadly prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005) (emphasizing "repeated holdings construing 'discrimination' under Title IX broadly"). The Supreme Court, and many circuit courts, interpret Title IX in light of Title VII. *E.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) (citing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992)). Thus, given "the straightforward application of legal terms with plain and settled meanings," a prohibition on sex discrimination also covers discrimination based on being lesbian, gay, bisexual, transgender, or queer ("LGBTQ"). *Bostock v. Clayton County,* 590 U.S. 644, 6662 (2020).

Because the Final Rule comports with Title IX and the U.S. Constitution, and better enables states to advance their compelling interests in preventing harassment and discrimination and protecting students from harm, Amici Curiae States ("Amici States") submit this brief in support of ED's opposition to Plaintiffs' motion for a 5 U.S.C. § 705 stay and preliminary injunction.

**INTERESTS OF AMICI CURIAE**

Amici States have compelling governmental interests in the robust enforcement of Title IX to ensure that our schools operate in a manner that is free from sex discrimination. As sovereign jurisdictions charged with enforcing state antidiscrimination laws and shaping school policies that

foster a safe and supportive environment for all students, Amici States take the implementation of Title IX regulations seriously. Sex discrimination and harassment based on sexual orientation or gender identity, and sex stereotypes imposed on LGBTQ individuals, cause direct economic, physical, and emotional harms to students. To prevent these tangible injuries, Amici States have adopted laws and policies that combat sex discrimination against students on the basis that they appear, act, and identify as a sex different from their sex assigned at birth, or that they are attracted to someone of the same sex.

As Amici States' experience demonstrates, preventing sex-based discrimination, protecting against sexual harassment, and ensuring equal access to educational opportunities for all students confer wide societal benefits without imposing substantial costs on schools, or compromising student privacy or safety. The same is true under the Final Rule, which includes explicit protections for LGBTQ students and rectifies the harm caused to our schools and communities through ED's prior rule ("2020 Rule"). The 2020 Rule undermined Title IX's nondiscrimination mandate by arbitrarily narrowing the scope of Title IX's sexual harassment protections.

Amici States submit this brief to demonstrate, through sovereign states' unique experience, how discrimination and exclusion on the basis of sex can cause direct economic, physical, and emotional harms to students, their communities, their states, and society as a whole, and that the balance of equities and public interest cut against the extraordinary relief Plaintiffs seek. Amici States encourage the Final Rule's prompt and full implementation nationwide.

## ARGUMENT

I.  **AMICI STATES' EXPERIENCE CONFIRMS THAT THE FINAL RULE WILL YIELD BROAD BENEFITS WITHOUT COMPROMISING STUDENT PRIVACY OR SAFETY, OR IMPOSING SIGNIFICANT COSTS.**

States' responsibility to provide public education encompasses a concomitant duty to protect students from harm. *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 189-90 (2021) (noting states

have duty to protect students from harm); *id.* at 201 (Alito, J., concurring). The Final Rule will promote states' efforts to protect students from harms of all kinds—in part by clarifying that Title IX protections against sex discrimination include protections for LGBTQ students—and will provide broad, significant benefits to LGBTQ students nationwide, without compromising student privacy or safety, and without imposing substantial costs to our schools.

### A.    The Final Rule's Benefits Will Not Compromise Student Privacy or Safety.

Amici States' experience demonstrates that policies allowing transgender students to use bathrooms and locker rooms consistent with their gender identity significantly benefit those students without risking student privacy or safety. For example, allowing students to use bathrooms consistent with their gender identity helps safeguard against harms common to transgender students, such as students forgoing drinking or eating during the school day to avoid using the restroom for fear of exclusion, reprimand, or bullying.[1]

By contrast, subjecting LGBTQ students to such discrimination and harassment, including by barring transgender students from bathroom and locker rooms consistent with their gender identity, results in those students feeling less connected to their schools and fellow students, and exacerbates harms to their education.[2] For example, one 2021 survey showed that LGBTQ students who experienced discrimination in their schools were almost three times as likely (43.3% versus

---

[1] *See* Assemb. B. 1266, 2013-2014 Sess. (Cal. 2013); Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Tex. Trib. (June 14, 2016), https://tinyurl.com/mtpescst. *See also* The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* 5 (2023), https://tinyurl.com/mvbmabrw [hereinafter Trevor Project 2023] (noting that approximately half of transgender and nonbinary youth reported in 2023 having seriously considered suicide in the past twelve months).

[2] Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xix, 36 (2022), https://tinyurl.com/2aabcfe4 [hereinafter Kosciw 2021].

16.4%) to have missed school because they felt unsafe or uncomfortable.[3] LGBTQ students subjected to discriminatory policies and practices also had lower grade point averages, lower levels of educational achievement and aspiration, lower self-esteem, and higher levels of depression than other students who had not encountered such discrimination.[4]

While discriminatory environments that cause fear and anxiety weaken a child's cognitive capacity and disrupt effective learning, safe and supportive school environments allow students to develop positive relationships, regulate their emotions and behavior, and maintain their physical, psychological, and academic well-being.[5] Accordingly, transgender students, when allowed to use school bathroom and locker room facilities consistent with their gender identity, experience better mental health outcomes that are more comparable to their cisgender peers.[6] Providing equal access to facilities that align with one's gender identity—in accordance with the Final Rule—promotes these positive outcomes and helps reduce the harms that LGBTQ students face. This, in turn, benefits society as a whole, since equal education better prepares students to contribute to society, both culturally and economically. *Cf. Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

---

[3] *Id.* at 36.

[4] *Id.* at 35-36, 41-45; Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xviii-xix, 41-45, 48-49 (2016), https://tinyurl.com/5av274d3 [hereinafter Kosciw 2015].

[5] *See* Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97-98, 102 (Feb. 17, 2019) [hereinafter Darling-Hammond], https://tinyurl.com/5f97nkbx.

[6] *See* Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223, at 5-7 (Mar. 2016), [hereinafter Olson] https://tinyurl.com/47fuas7h; Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. of Resp't [hereinafter Br. of Amici Curiae Sch. Adm'rs] at 4, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 137 S. Ct. 1239 (2017) (No. 16-273), 2017 WL 930055.

Amici States' experience also demonstrates that allowing transgender students access to facilities that correspond with their gender identity does not result in increased privacy or safety concerns in public schools, or specific instances of transgender students harassing others when using restrooms or locker rooms consistent with their gender identity.[7] The documented experience of school administrators in thirty-one states and the District of Columbia demonstrates that sex-based protections for gender identity in bathroom- and locker room-use policies result in no public safety or privacy risks, nor is there evidence that cisgender students pose as transgender to gain improper restroom access.[8]

The Final Rule affords ample flexibility for our schools to implement policies to address privacy concerns, and Amici States have already increased privacy options for all students in a cost-effective manner without singling out any one student. For example, in Washington, where districts must allow students to use the restroom or locker room consistent with their gender identity, schools must provide any student "who has a need or desire for increased privacy, regardless of the underlying reason," with "access to an alternative restroom (e.g., staff restroom, health office restroom)," "a reasonable alternative changing area, such as the use of a private area (e.g., a nearby restroom stall with a door), or a separate changing schedule."[9] At least twelve other states and the District of Columbia offer comparable guidance to ensure that school districts can

---

[7] *See* Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappa (Sept. 1, 2016), https://tinyurl.com/224mzep4; Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1, 8 (Mar. 31, 2021), https://tinyurl.com/2s2ucz9t.

[8] *See* Br. of Amici Curiae Sch. Adm'rs at 14-16; Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive Schools* (May 30, 2023), https://tinyurl.com/yv397h94.

[9] *See* Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* 30-31 (Wash. Off. of Superintendent of Pub. Instruction 2012), https://tinyurl.com/yk26eb96.

comply with nondiscrimination policies and privacy concerns.[10] Solutions range from offering privacy curtains to separate restroom and changing rooms to all who desire them, none of which require costly construction or remodeling.

Maintaining sex-separated spaces while allowing transgender students to use restrooms and locker rooms that align with their gender identity results in positive educational and health outcomes for students, and promotes Amici States' compelling interest in "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984). Ensuring equal access to facilities that align with gender identity is therefore not only consistent with Title IX's provision

---

[10] **California**: Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities 2 (2014). **Colorado**: Colo. Ass'n of Sch. Bds. et al., Guidance for Educators Working with Transgender and Gender Nonconforming Students 4-5 (n.d.). **Connecticut**: Conn. Safe Sch. Coal., Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws 9-10 (2012). **Illinois**: Ill. Dep't of Hum. Rts., Non-Regulatory Guidance: Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act 6-7 (2021); Ill. State Bd. of Educ., Non-Regulatory Guidance: Supporting Transgender, Nonbinary and Gender Nonconforming Students 10-11 (2020); Affirming & Inclusive Schs. Task Force, *Strengthening Inclusion in Illinois Schools* 19-21 (2020). **Maryland**: Md. State Dep't of Educ., Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination 13-14 (2015). **Massachusetts**: Mass. Dep't of Elementary & Secondary Educ., Guidance for Massachusetts Public Schools: Creating a Safe and Supportive School Environment (Oct. 28, 2021). **Michigan**: Mich. Dep't of Educ., State Board of Education Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students 5-6 (2016). **Minnesota**: Minn. Dep't of Educ., A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students 10 (2017). **New Jersey**: N.J. State Dep't of Educ., Transgender Student Guidance for School Districts 7 (2018). **New York**: N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices 22-24 (June 2023). **Oregon**: Or. Dep't of Educ., Supporting Gender Expansive Students: Guidance for Schools 24-26 (2023). **Rhode Island**: R.I. Dep't of Educ., Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students 8-9 (2016). **Vermont**: Vt. Agency of Educ., Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students 6, 8 (2017). **District of Columbia**: D.C. Pub. Schs., Transgender and Gender-Nonconforming Policy Guidance 9 (2015).

for sex-separated facilities, 20 U.S.C. § 1686, but also with the constitutional guarantee that education be "made available to *all* on equal terms," *Brown*, 347 U.S. at 493 (emphasis added).

**B.     The Final Rule Will Foster Positive Health Outcomes for LGBTQ Students.**

Amici States' experience counsels that LGBTQ students suffer concrete harms when they are denied Title IX's protection against discrimination and severe or pervasive harassment in schools—including a greater risk of mental health issues and worse educational outcomes. Indeed, neuroscience research and developmental studies indicate that a child's social, emotional, and academic development is closely related to their educational environment,[11] and negative effects of discrimination and harassment can impede a child's cognitive development, disrupt the learning process, and endanger psychological well-being.

In a recent study, almost 90% of LGBTQ students reported hearing homophobic slurs from their peers, while more than 68% reported feeling unsafe in schools due to their gender identity, gender expression, or sexual orientation.[12] In a 2022 survey of LGBTQ teenagers, 56.9% of LGBTQ youth reported being verbally or physically harassed at least once in the past thirty days.[13] Of students known or perceived to be transgender, 77% reported negative experiences at school, including harassment and physical assault.[14] And as many as 75% of transgender students surveyed in 2017 felt unsafe at school as a result of their gender identity or gender expression.[15]

---

[11] Darling-Hammond et al., *supra* note 5, at 97-98.

[12] Kosciw 2021, *supra* note 2, at xv-xvi, 83, 93.

[13] Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023), https://tinyurl.com/2zrnav26.

[14] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 132-34 (Dec. 2016), https://tinyurl.com/46fkp2th.

[15] *Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 3-4 (2017), https://tinyurl.com/ukvkv8tf.

As a group, transgender students are up to five times more likely than cisgender students to report being bullied at school, threatened or injured with a weapon at school, and being sexually assaulted.[16] Another 2022 survey found that 64% of transgender and nonbinary youth reported being discriminated against because of their gender identity.[17] In the largest survey of transgender people to date, 17% of respondents reported that they left K-12 school because of the mistreatment they suffered as a result of their gender expression.[18] And a 2009 study found that 40% of students who experienced frequent verbal harassment because of their gender expression did not plan to continue on to college.[19]

By contrast, LGBTQ students who are supported by school staff are less likely to feel unsafe, miss school, or say they may not graduate high school because of their sexual orientation or gender expression, and they are more likely to have higher GPAs and feel a greater sense of belonging to their school community.[20] When transgender youth do not suffer severe discrimination and have their gender identity affirmed, their mental health outcomes mirror those of their cisgender peers: they experience reduced suicidal ideation, fewer suicide attempts, and enhanced well-being and functioning.[21]

---

[16] Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 69 (2019), https://tinyurl.com/5bpxzvfy.

[17] Trevor Project 2023, *supra* note 1, at 16.

[18] James et al., *supra* note 14, at 135.

[19] Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* 25-27 (2009), https://tinyurl.com/3bpt9py5.

[20] Kosciw 2015, *supra* note 4, at xx-xxi.

[21] Olson, *supra,* note 6 at 5-7; *see also* World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, Int'l J. of Transgender Health S107 (Sept. 2022), https://tinyurl.com/y86j5jnp; Stephen Russell et

## II.    THE FINAL RULE DEFINES "SEX-BASED HARASSMENT" IN A WAY THAT EFFECTUATES TITLE IX WITHOUT BURDENING OR SURPRISING THE STATES.

The Final Rule's definition of sex-based harassment as conduct that "is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity," 89 Fed. Reg. at 33,884, comports with the text and intent of Title IX and better enables stakeholders to prohibit harassment and redress hostile environments. In Amici States' experience, sex-based harassment need not be severe *and* pervasive to create tangible injury to a student's education. For example, a teacher's repeated inappropriate sexual comments and intrusions of personal space may not be "severe," but could be so pervasive that a student feels unsafe and avoids classes, and is effectively excluded from education. *See, e.g.*, *Feminist Majority Found. v. Hurley,* 911 F.3d 674, 680-82, 687-89, 693 (4th Cir. 2018) (finding a series of harassing social media posts sent over campus wireless network could support Title IX harassment claim); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (noting that "offensive remarks made every few months over three years" raised genuine dispute regarding Title VII hostile environment).

By covering severe *or* pervasive forms of harassment, the Final Rule also effectuates the breadth of 20 U.S.C. § 1681(a), and advances Congress' objectives, because "the scope of the behavior that Title IX proscribes" is not limited to "severe, pervasive, and objectively offensive" conduct. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639, 652 (1999). Congress established an administrative scheme authorizing ED "to give effect to" the goals of Title IX.

---

al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health 503 (2018), https://tinyurl.com/465z8reh; *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces*, The Trevor Project (Dec. 2020), https://tinyurl.com/2c2p7zkf.

9

*Davis*, 526 U.S. at 638-39; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-81 (1998); 20 U.S.C. § 1682.[22] Consistent with that congressional design, the Final Rule protects students from both severe incidents of harassment, as well as a series of lesser, unwelcome incidents that become pervasive.

Amici States' experience also teaches that no sovereign jurisdiction should be burdened or surprised by the Final Rule's return to the "severe or pervasive" standard. For more than thirty years, ED defined harassment as conduct that was "sufficiently severe, pervasive or persistent" to *interfere with, limit, or adversely affect*, rather than *deny*, a student's ability to participate in or benefit from an education program or activity, and consistently applied this definition to address harassment under Title IX and Title VI.[23] Amici States have long understood that this definition applies to their schools, and the Final Rule correctly returns to ED's longstanding definition and

---

[22] Plaintiffs mistakenly rely on *Davis* to argue that harassment must be "severe *and* pervasive." Pls.' Br. Supp. Mot. Stay & Prelim. Inj. 17, 26-28, ECF No. 12. But *Davis* makes clear that its rule applies only to private damages claims, 526 U.S. at 652; *see also Gebser*, 524 U.S. at 283-84, 287, and does not otherwise limit ED's regulatory authority, *see Gebser*, 524 U.S. at 292.

[23] *See, e.g.*, Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994); *Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties*, 62 Fed. Reg. 12,034, 12,038 (Mar. 13, 1997) [hereinafter 1997 Guidance] ("[S]exual harassment must be sufficiently severe, persistent, or pervasive that it adversely affects a student's education . . . ."); U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001), at v, 6 (noting that harassment must "deny or limit" student's education, and single "sufficiently severe" incident of sexual harassment can create hostile environment); Russlyn Ali, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) ("The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment . . . ."); U.S. Dep't of Educ., *Q&A on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017) (same); U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017, rescinded Aug. 2020) (applying "severe, persistent, or pervasive" and "deny or limit" standards).

provides appropriate baseline protections against sexual harassment in our schools.[24] *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (protecting employees, including student employees, from sexual harassment that is "severe or pervasive"); *Franklin*, 503 U.S. at 75 (concluding that sexual harassment constitutes discrimination under Title IX); *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) (applying "severe or pervasive" standard to Title IX harassment).

Finally, in Amici States' experience, a definition of sexual harassment that encompasses both severe and pervasive forms of harassment is essential to ensure the safety and sense of belonging that students need in order to learn and thrive. Students who experience safe and supportive school climates see improvements in academic achievement and healthy development, and such schools are more effective at preventing violence and retaining teachers.[25] (*See also supra*, at pp. 3-9.) On the other hand, ED itself estimated that the 2020 Rule's narrow interpretation of Title IX's protections would reduce investigations of sexual harassment by 50% in K-12 schools,[26] even though research shows that sexual harassment and assault occur at alarming rates

---

[24] For example, Harvard University's 2017-2020 sexual harassment policy defined a hostile environment as one that "can be created by persistent or pervasive conduct or by a single severe episode. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment." Sexual and Gender-Based Harassment Policy, Harvard Univ. 2-3 (Feb. 10, 2017), https://tinyurl.com/m272ckyy. Even after the 2020 Rule, Harvard continued to use a "severe, persistent, or pervasive" standard to protect students. Interim Other Sexual Misconduct Policy, Harvard Univ. 1-2 (Aug. 26, 2022), https://tinyurl.com/muzzhxhs. Similarly, the University of Southern Mississippi's current sexual misconduct policy includes examples of conduct that is pervasive but not necessarily severe, such as repeated inappropriate sexual comments. *See* University of Southern Mississippi, *Title IX: Learn More: Types of Sexual Harassment*, https://tinyurl.com/bdzszfx3 (last visited June 19, 2024).

[25] *See, e.g.*, Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemp. Sch. Psych. 3 (Aug. 2020); Darling-Hammond et al., *supra* note 5, at 97-98; *see also* Ctrs. for Disease Control, *Youth Risk Behavior Survey: Data Summary & Trends Report 2011-2021* 72 (2023), https://tinyurl.com/2p6w6yrv.

[26] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,* 85 Fed. Reg. 30,026, 30,551-52, 30,565-68 (May 19, 2020).

and are severely underreported. For example, more than 20% of girls between the ages of fourteen and eighteen have been kissed or touched without their consent, but no more than 3% reported the incidents to police or school administrators.[27] The Final Rule's definition of sexual harassment reasonably protects students from severe or pervasive harassment and its devastating impacts on students' physical, emotional, and academic well-being.[28]

## III.    THE FINAL RULE DOES NOT VIOLATE THE SPENDING CLAUSE.

Plaintiffs also allege that the Final Rule violates the Spending Clause's clear-statement rule. Pls.' Br. Supp. Mot. Stay & Prelim. Inj. 29-31, ECF No. 12. This argument runs contrary to Amici States' actual experience. The Final Rule does not require any state to establish any new programs; it just clarifies that established programs must protect LGBTQ students from sex discrimination, using the Title IX framework that funding recipients already have in place. Many Amici States and other jurisdictions have already implemented these and similar protections,[29] and incurred *de minimis* costs in doing so, while conferring significant benefits to students.[30] Moreover, many

---

[27] Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* 1-2 (Apr. 2017), https://tinyurl.com/u53eawk2.

[28] 1997 Guidance, 62 Fed. Reg. at 12,034 ("[S]exual harassment can interfere with a student's academic performance and emotional and physical well-being, and . . . preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn.").

[29] At least twenty-three states and the District of Columbia, and at least 374 municipalities, already provide express protection against discrimination for LGBTQ people in a variety of areas. *See, e.g.*, Iowa Code § 216.2(10) (definition); *id.* § 216.7 (public accommodations); *id.* § 216.8 (housing); *id.* § 216.9 (education); N.H. Rev. Stat. Ann. § 354-A:2(XIV-e) (definition); *id.* § 354-A:6 (employment); *id.* § 354-A:16 (public accommodations); *id.* § 354-A:27 (education); Movement Advancement Project, *Local Nondiscrimination Ordinances*, https://tinyurl.com/59p55bap (current as of Jan. 1, 2023).

[30] School-based gender-affirming policies are linked to dramatic decreases in depression, anxiety, and suicidal ideation among transgender and nonbinary students. *See* Toomey et al.,

courts have held that discrimination based on LGBTQ identity is sufficiently ascertainable from Title IX's prohibition against sex discrimination, such that the clear-statement rule is satisfied. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 n.18 (4th Cir. 2020); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 842 (S.D. In. 2019).[31] And every state is already required to prohibit discrimination against LGBTQ people for all employees, including student employees, in its schools under Title VII. *See Bostock*, 590 U.S. at 659-62.

The Final Rule does not transgress the constitutional limitations on conditions imposed on federal spending. It requires funding recipients to do only what it has always required: to refrain from discriminating against students on the basis of sex, and to remedy any discrimination that arises. No state should be surprised at the need to perform this longstanding duty.

## CONCLUSION

This Court should deny Plaintiffs' motion for emergency and preliminary relief.

---

*Gender-Affirming Policies Support Transgender and Gender Diverse Youth's Health*, Soc'y for Rsch. in Child Dev. (Jan. 27, 2022), https://tinyurl.com/ms6eubb7.

[31] *See also Tennessee v. U.S. Dep't of Agric.*, 665 F. Supp. 3d 880, 916 (E.D. Tenn. 2023) (concluding statute prohibiting sex discrimination for SNAP and SNAP-Ed funding recipients "unambiguous[ly]" prohibited gender identity discrimination, "and always has"); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018) (holding that "plain language" of Patient Protection and Affordable Care Act "incorporates Title IX and its prohibition on sex discrimination," putting healthcare providers "on notice that [the statute's] nondiscrimination requirements encompassed gender-identity discrimination").

Dated: June 21, 2024                          Respectfully submitted,

**ROB BONTA**                                 **MATTHEW J. PLATKIN**
*Attorney General*                            *Attorney General*
*State of California*                          *State of New Jersey*

*/s/ Edward Nugent*                            */s/ Jessica L. Palmer*
EDWARD NUGENT                                 JESSICA L. PALMER
CHRISTINA RIEHL                               ANDREW H. YANG
Deputy Attorneys General                      AMANDA I. MOREJÓN
LAURA L. FAER                                 GIANCARLO G. PICCININI
Supervising Deputy Attorney General           LAUREN E. VAN DRIESEN
California Attorney General's Office           Deputy Attorneys General
455 Golden Gate Ave., Suite 11000             New Jersey Attorney General's Office
San Francisco, CA 94102-7004                  25 Market Street
(415) 510-4400                                Trenton, NJ 08625
Edward.Nugent@doj.ca.gov                      (609) 376-3377
                                              Jessica.Palmer@law.njoag.gov

*Attorneys for Amicus Curiae State of California*

                                              *Attorneys for Amicus Curiae State of New Jersey*

**MICHELLE HENRY**
*Attorney General*
*Commonwealth of Pennsylvania*

*/s/ Lisa E. Eisenberg*
LISA E. EISENBERG
Deputy Attorney General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(215) 560-2980
leisenberg@attorneygeneral.gov

*Attorney for Amicus Curiae Commonwealth of Pennsylvania*

*[additional counsel listed on subsequent page]*

14

## ADDITIONAL COUNSEL

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street N.W.
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, Hawai'i, 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, Vermont 05609-1001

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

15