# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# ST. LOUIS DIVISION

The State of Arkansas; The State of Missouri; The State of Iowa; The State of Nebraska; The State of North Dakota; The State of South Dakota; A.F., a minor, by Sara Ford, her mother,

     *Plaintiffs*,

v.

United States Department of Education; Miguel Cardona, in his official capacity as Secretary of the United States Department of Education; Catherine E. Lhamon, in her official capacity as Assistant Secretary for Civil Rights at the United States Department of Education; Randolph Wills, in his official capacity as Deputy Assistant Secretary for Enforcement at the United States Department of Education,

     *Defendants*.

Case No.: 4:24-cv-636

**SUPPLEMENTAL BRIEF ON PLAINTIFFS' STANDING**

**Table of Contents**

Argument.................................................................................................................1
   I.    Plaintiffs have demonstrated an injury-in-fact. .............................................1
      A.   Plaintiff States are injured by the Final Rule. ..........................................1
         1.   Plaintiff States have sovereign injuries..................................................1
         2.   Plaintiff States face injuries as regulated parties. .................................5
      B.   A.F. is injured by the Final Rule. ...........................................................10
      C.   Plaintiffs' injuries are sufficiently imminent. .........................................13
   II.   Plaintiffs have established both traceability and redressability...................14
Conclusion ...........................................................................................................16

The Final Rule would preempt the laws of the Plaintiff States and directly regulates their instrumentalities.  It would also require Plaintiff A.F. to adhere to a speech code and share locker rooms, bathrooms, and showers with males who identify as female.  Only preliminary relief before the Final Rule's August 1 effective date can prevent those injuries.

**ARGUMENT**

To establish standing, a plaintiff must demonstrate (1) an injury in fact; (2) that the injury is fairly traceable to the defendant's action; and (3) that the injury will be redressed by a favorable decision.  See *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52, n.2 (2006).  Plaintiffs are injured by the new mandates imposed by the Final Rule, and a favorable decision from this Court enjoining the Final Rule from taking effect will redress those injuries.  That satisfies Article III, as every court to consider a State-led challenge to the Biden administration's gender-identity Title IX policies (both its guidance and the Final Rule) has held.

**I.      Plaintiffs have demonstrated an injury-in-fact.**

A.      <u>Plaintiff States are injured by the Final Rule.</u>

Plaintiff States are injured by the Final Rule in two critical ways.  First, it impairs their sovereignty by preempting Plaintiff States' duly enacted laws.  Second, it directly regulates the Plaintiff States and imposes obligations on them.

1.      Plaintiff States have sovereign injuries.

Plaintiff States suffer injuries as sovereigns due to the inability to fully enforce their duly enacted laws.  "[A] State clearly has a legitimate interest in the continued enforceability of its own statutes." *Maine v. Taylor*, 477 U.S. 131, 137 (1986); s*ee also Alfred L. Snapp & Son, Inc.*

1

*v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982) (recognizing a State's "sovereign interest[]" in "creat[ing] and enforc[ing] a legal code"). And a long line of precedent confirms that States may seek injunctive relief in federal court to protect that interest. *See, e.g., Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (allowing Massachusetts to seek relief under the APA to "protect[] its quasi-sovereign interests"); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (explaining that "[f]ederal regulatory action that preempts state law creates a sufficient injury-in-fact to satisfy" Article III).

The Final Rule aims to preempt all "State or local laws or other requirements" that conflict with its terms. 89 Fed. Reg. at 33,885. As explained in previous briefing (and largely uncontested by Defendants), numerous statutes of Plaintiff States will become unenforceable on account of the Final Rule, on pain of losing billions of dollars in federal funds. To summarize, the Final Rule's redefinition of "sex-based harassment" will require funding recipients to police the speech of their students, imposing a requirement that students use whatever pronoun a transgender-identifying student wishes to be referred by regardless of whether that's consistent with his or her sex. *See* 89 Fed. Reg. at 33,510-11. The Final Rule thus preempts: (1) Arkansas's Given Name Act, which (A) prohibits school officials from addressing students with an incorrect pronoun without the written permission of the student's parent or guardian, and (B) protects school officials and students from adverse action for failing to address a person with a inaccurate pronoun, Ark. Code Ann. 6-1-108(d)(2); (2) Arkansas's Religious Viewpoint Antidiscrimination Act, which protects students expressing religious viewpoints, including the use of correct pronouns, from discrimination, Ark. Code Ann. 6-10-139; (3) North Dakota's law prohibiting government entities from requiring their employees to use inaccurate pronouns, N.D.C.C. 14-

02.4-15.2(1); and (4) Iowa's law requiring school officials to inform a student's parents or guardians if the student requests to be addressed using an inaccurate pronoun, Iowa Code 279.78.3.

Next, the Final Rule aims to preempt state laws separating intimate spaces based on biology. The Final Rule does not modify the text of 34 C.F.R. 106.33, which allows "separate toilet, locker room, and shower facilities on the basis of sex." But the Final Rule's de-minimis-harm standard prohibits funding recipients from "prevent[ing] a person from participating in an education program or activity consistent with the person's [claimed] gender identity," even in otherwise sex-separated facilities such as bathrooms or showers. 34 C.F.R. 106.31(a)(2); 89 Fed. Reg. 33,816, 33,819-20. Consequently, if a male identifies as a female, a funding recipient must allow him to use the women's restroom, locker room, or shower area. The Final Rule thereby preempts: (1) Arkansas law requiring school restrooms, locker rooms, changing rooms, and shower rooms to be designated for use based on biological sex, Ark. Code Ann. 6-21-120(b)(1); (2) Arkansas law requiring schools ensure that during overnight trips students do not share sleeping quarters with members of the opposite sex, Ark. Code Ann. 6-10-137(a); (3) Iowa law requiring school restrooms, locker rooms, changing areas, and shower rooms to be designated for use based on a person's biological sex, Iowa Code 280.33.2; (4) Nebraska's Equal Opportunity in Education Act, which allows schools to provide separate restrooms and locker rooms based on sex, Neb. Rev. Stat. 79-2,124; and (5) North Dakota's law requiring that school restrooms and showers be designated for use based on sex, N.D.C.C. 15-10-68(1); *see also* Pls.' PI Br. at 40-41.

The Final Rule's anti-discrimination provision also aims to preempt state sports laws, though Defendants do at least attempt to deny this conflict. In 34 C.F.R. 106.10, the Final Rule universally redefines sex discrimination to include gender-identity discrimination, and that redefinition applies to 34 C.F.R. 106.41(a)'s athletics anti-discrimination provision. Nor does the

3

attempted sports carveout in new 34 C.F.R. 106.31(a)(2) mention the athletics anti-discrimination provision in 34 C.F.R. 106.41(a). So by its express terms ("Except as provided elsewhere in this part . . ."), the de-minimis-harm standard in § 106.31(a)(1) applies to the athletics anti-discrimination provision in 34 C.F.R. 106.41(a). And Defendants already insist that Title IX's general nondiscrimination rule requires that result. *See* Br. for the U.S. as Amicus Curiae in Supp. of Pl.-Appellant and Urging Reversal at 27, *B.P.J. ex. rel. Jackson v. W. Va. State Bd. of Educ.* (BPJ Amicus Brief), 98 F.4th 541 (4th Cir. 2024) (Nos. 23-1078, 23-1130), 2023 WL 2859726 (interpreting 34 C.F.R. 106.41(a) to require schools to admit males who identify as female into women's sports).

That means that even though a funding recipient might (under the text of the athletics provisions) validly distinguish between sexes, they may not—under the de-minimis-harm standard—"[a]dopt a policy or engag[e] in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity." 34 C.F.R. 106.31(a)(2). Thus, where recipients separates teams or competitors based on sex, practically speaking, the Final Rule requires they do so based on a student's professed gender identity. That would preempt: (1) Arkansas's Fairness in Women's Sports Act, Ark. Code Ann. 6-1-107(c); (2) Mo. Rev. Stat. 163.048(3); (3) Iowa Code 261I.1–.2; (4) N.D.C.C. 15-10.6-01–03; and (5) S.D.C.L. 13-67-1, all of which require sports teams and competitions to be designated as (1) for females; (2) for males; or (3) coeducational—based on biological sex, not gender identity—and which *categorically* bar male students from participating in female-designated athletic teams or competitions, even if those males claim a female gender identity.

The inability to enforce these laws injures Plaintiff States. Both courts that have addressed standing in a challenge to the Final Rule had little trouble concluding that the Final

4

Rule's preemption of conflicting state laws was a cognizable Article III injury. *See Tennessee v. Cardona*, No. CV 2: 24-072-DCR, 2024 WL 3019146, at *30 (E.D. Ky. June 17, 2024) (holding state plaintiffs had standing where "state officials would be forced to choose between enforcing their own laws, essentially protecting their independent quasi-sovereign and sovereign interests, or violating the Title IX gender identity mandate"); *State of Kansas v. United States Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *6 (D. Kan. July 2, 2024) (holding state plaintiffs demonstrated standing because the Department "seeks to regulate Title IX in a manner that is not compatible with their state laws"). The Sixth Circuit similarly held recently that a state coalition (which included all but one of Plaintiff States here) had standing to challenge the Biden administration's Title IX guidance due to that guidance's purported preemption of various states' laws. *State of Tennessee v. Dep't of Educ.*, No. 22-5807, 2024 WL 2984295, at *10 (6th Cir. June 14, 2024) ("[T]he sovereign injury here—a state's ability to enforce its laws, particularly over a traditional sovereign prerogative like education—is sufficient to confer standing."); *see also Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at *13 (N.D. Tex. June 11, 2024) (holding that Texas had standing to challenge the Title IX guidance because the guidance conflicted with a Texas law "that requires student athletes to compete according to their biological sex").

The injury to Plaintiff States' sovereignty from not being able to enforce their duly enacted laws—standing alone—is a sufficiently cognizable injury-in-fact.

2. Plaintiff States face injuries as regulated parties.

Plaintiff States also have standing to sue because their state instrumentalities—public universities and public schools—are injured by the Final Rule.

5

*Universities.* Seventy years ago, the Supreme Court held that the State of Arkansas could bring suit based on injuries to one of its state universities. *See Arkansas v. Texas*, 346 U. S. 368, 370 (1953). The Court recently reaffirmed that holding in *Biden v. Nebraska* and further clarified that, for purposes of Article III standing, a state "seek[s] to protect its *own* interests" when it sues to redress an injury suffered by a public instrumentality. 143 S. Ct. 2355, 2367 (2023). Here, Plaintiff States sue to redress injuries caused to them through the Final Rules' application to various classes of state instrumentalities. *See Kansas*, 2024 WL 3273285, at *7 ("Plaintiff States have standing due to the alleged injuries to their state universities.").

As in *Arkansas v. Texas*, all of Plaintiff States operate public universities. *See, e.g.*, Ark. Code Ann. 6-64-202 (establishing the University of Arkansas); Mo. Rev. Stat. 172.020 (University of Missouri); Iowa Code 262.7 (establishing the state board of regents to govern the University of Iowa); Neb. Rev. Stat. 86-101 *et seq* (establishing the University of Nebraska); N.D.C.C. 15-10-01.2 (establishing the "North Dakota university system"); S.D.C.L. 13-57-1 (establishing the University of South Dakota). All these state universities are federal funding recipients subject to Title IX. *See, e.g.*, *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 869 (8th Cir. 2020) (holding that the plaintiff demonstrated a "facially plausible claim against the University under Title IX"); *Doe v. Univ. of Missouri*, No. 19-CV-04229-NKL, 2022 WL 4043458, at *3 (W.D. Mo. Aug. 30, 2022); *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1090 (S.D. Iowa 2020); *Doe v. Bd. of Regents of Univ. of Nebraska*, No. 4:21CV3049, 2023 WL 2351687, at *4 (D. Neb. Mar. 3, 2023); *Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 790 (8th Cir. 2021); *Orr v. S. Dakota Bd. of Regents*, No. 1:19-CV-01023-CBK, 2023 WL 3484207, at *9 (D.S.D. May 16, 2023). Injuries suffered by these universities on account of the Final Rule are injuries suffered by Plaintiff States for purposes of Article III standing.

*Schools*.  Plaintiff States assert the injuries of the K-12 schools for which they are responsible and which will be subject to the Final Rule.  *See Tennessee*, 2024 WL 3019146 at *28-30 (holding that states demonstrated standing based on injuries to their public schools).  Several of Plaintiff States also operate public schools directly through state instrumentalities.  To name but one example, "[t]he Board of Trustees of the Arkansas School for the Blind and the Arkansas School for the Deaf . . . is charged with the management and control of the Arkansas School for the Blind and the Arkansas School for the Deaf."  Ark. Code Ann. 6-43-102.  The Board shares all the hallmarks of a state educational instrumentality identified by the Supreme Court in *Arkansas*.  It was "created by the Arkansas legislature, is governed by a Board of Trustees appointed by the Governor with consent of the Senate," and "must report all of its expenditures to the legislature."  *Arkansas*, 346 U.S. at 370; *see* Ark. Code Ann. 6-43-101(a) (establishing the Board); *id.* -101(b)(2) (appointment by Governor with advice and consent of the Senate); *id.* -223 (mandating biennial reports to the Arkansas General Assembly).   Further, "the State owns all the property used by the" Board.  *Arkansas*, 346 U.S. at 370; *see* Ark. Code Ann. 6-43-302 (providing that the Board "may take and hold in trust for the state to the use of the Arkansas School for the Deaf any lands conveyed or devised and any money or other personal property given or bequeathed, to be applied to the use and benefit of the school").  The Board is also "charged with the management and control of" both of those two "institutions of the State of Arkansas."  Ark. Code Ann. 25-17-202.  Finally, "a suit against the [Board] is a suit against the State." *Arkansas*, 346 U.S. at 370; *see Bd. of Trustees of Univ. of Arkansas v. Andrews*, 2018 Ark. 12, 5 (2018) (holding that suits against "an instrumentality of the State" is barred by sovereign immunity).  The other Plaintiff States likewise operate similar schools.  *See* Mo. Rev. Stat. 162.730(2) (Missouri School for the Deaf and Missouri School for the Blind); N.D.C.C. 25-06-01 (North Dakota

7

school for the blind); N.D.C.C. 25-07-01 (North Dakota school for the deaf); S.D.C.L. 13-61-1 (South Dakota School for the Blind and Visually Impaired). These schools are all federal funding recipients and will therefore be subject to the Final Rule. *See, e.g.*, *Doe ex rel. Doe v. Barger*, 193 F. Supp. 2d 1112, 1118 (E.D. Ark. 2002).

Moreover, Plaintiff States are each obligated by their state constitutions to provide K-12 education to their citizens. *See* Ark. Const., art. 14, sec. 1; Mo. Const., art. IX secs. 1(a); Neb. Const., art. VII, sec. 1; N.D. Const. Art. 8, sec. 6; S.D. Const., art. 8, sec. 1. *See Tennessee*, 2024 WL 3019146 at *28-30 (reviewing similar constitutional provisions). Arkansas, for example, has 1,058 public schools among 237 school districts. *See Arkansas K-12 Profile: 2023-2024*, Ark. Dep't of Educ., *available at* https://adedata.arkansas.gov/Ark12. Public school districts in Arkansas are political subdivisions of the state, created by the state to further Arkansas's public purpose in providing education to its citizens. Ark. Code Ann. 6-13-1505 (school districts created by order of the State Board of Education). The State Board of Education, along with the Arkansas General Assembly, "prescribe[] the "qualifications and duties" of school superintendents, Ark. Code Ann. 6-13-109(a), who serve as the "executive officer of a school district board of directors directing the affairs of the school district," *id.* -109(b). And, at times, the State may assume direct control of a school district. *See* Ark. Code Ann. 6-13-112. Like universities, school districts "serve[] a public purpose, acting as the State's agent in the educational field." *Nebraska*, 143 S. Ct. at 2367 (cleaned up). Plaintiffs States' public schools are likewise federal funding recipients (to the tune of billions of dollars) subject to Title IX. *See* Compl. ¶¶ 84-89. Injuries suffered by these public schools are thus injuries suffered by Plaintiff States for Article III standing purposes.

8

In sum, then, Plaintiff States suffer an injury-in-fact in two critical ways because they are regulated by the Final Rule. First, Plaintiff States—through their educational instrumentalities—are directly regulated by the Final Rule. "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) *see also Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 871 (8th Cir. 2013) (holding that where "a challenger is the subject of agency action, 'there is ordinarily little question that the action . . . has caused [it] injury.'" (quoting *Defs. Of Wildlife*, 504 U.S. at 561-62); *Corbett v. Transp. Sec. Admin.*, 19 F.4th 478, 483 (D.C. Cir. 2021) (standing of regulated parties "usually self-evident")). That is because parties "have a concrete interest . . . in avoiding regulatory obligations above and beyond those that can be statutorily imposed upon them." *Iowa League*, 711 F.3d at 871. Defendants cannot dispute that the Final Rule represents a staggering change in Title IX enforcement that will impose new obligations on Plaintiff States and their instrumentalities. As the *Kansas* court observed, "new duties are imposed under the Final Rule that were not required under the prior regulations. The States must now investigate allegations of sex discrimination based on gender identity discrimination. The States must comply with the requirement of new policies in accordance with the Final Rule and hire Title IX coordinators to make sure the policies are carried out." *Kansas*, 2024 WL 3273285, at *7. Plaintiff States have standing to seek redress for the injury of being illegally subjected to these additional regulatory burdens.

Second, Plaintiff States are injured by the prospect of losing billions of dollars in federal funding. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (future loss of federal funds sufficient to establish standing). Defendants don't dispute that failure to abide by the Final Rule can result in "the termination of or refusal to grant or to continue assistance," *i.e.*, federal

9

funding, to the recipient. 20 U.S.C. 1682. *See also Kansas*, 2024 WL 3273285 (holding that states demonstrated standing because they are "are threatened with a loss of federal funding if they fail to comply with the Final Rule"); *Tennessee*, 2024 WL 3019146 (holding that states demonstrated standing because they "would be forced to abandon enforcement of their own laws or risk the loss of federal funding because they operate education programs and activities that receive federal financial assistance within the meaning of Title IX through state level agencies and local subdivisions") (cleaned up); *State of Tennessee*, 2024 WL 2984295, at *6 (holding that the Title IX guidance's "threaten[ing of] the States' educational institutions with financial penalties, specifically the revocation of federal funds, if they don't comply with the policies . . . is an injury to the States as proprietors of their educational institutions and is sufficient to confer standing"). If "an identifiable trifle will suffice" for standing purposes, the billions of dollars Plaintiff States stand to lose due to the Final Rule easily chin the bar. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 988 (8th Cir. 2011).

    B.    <u>A.F. is injured by the Final Rule.</u>

As noted above, because Plaintiff States have standing, that should conclude the matter under Article III. *Kansas*, 2024 WL 3273285, at *6 n.3 (applying same logic to similar Title IX lawsuit). Here, A.F and the States seek the same relief. But A.F. is also independently injured by the Final Rule's evisceration of longstanding protections for women and girls and its imposition of the gender-identity mandate. She attends a public high school in Arkansas which is a recipient of federal funds. Should the Final Rule be allowed to take effect and its mandates forced upon school districts, A.F.'s school will be forced to abide by the Final Rule's gender-identity mandate.

10

As explained above and in Plaintiffs' preliminary-injunction briefing, the Final Rule both compels and prohibits speech in violation of the First Amendment.  Defendants don't disclaim that A.F. could be subject to sanction under the Final Rule for expressing her beliefs regarding biological sex and her refusal to use pronouns or titles inconsistent with a person's sex.  *See* A.F. Decl. ¶ 40-41. In fact, Defendants have elsewhere taken the position that teachers must use these inaccurate pronouns. *See Tennessee*, 2024 WL 3019146 at *20-22 (summarizing these positions). That logic imperils students too.  And A.F. suffers an injury whenever her First Amendment rights are curtailed.  *See Elrod v. Burns*, 427 U.S. 347, 373-74 (1976).  The Final Rule will do just that.  The court in *Kansas* had before it claims by a public-school student like A.F.  That student also attested to her religious view "that that there are two sexes, a person's sex cannot be changed, and that [she] believe[s] that [she] must use pronouns which align with a person's biological sex." *Kansas*, 2024 WL 3273285, at *7.  That court had no trouble concluding that she had standing to challenge the Final Rule due to her "fear[] that [she] would be subject to investigation and potential discipline for continuing to speak [her] views." *Id.*  The same is true here.

Further, A.F. will further suffer a cognizable injury if she is forced to share a locker room, restroom, or shower with a male student.  A.F. Decl. ¶¶ 47-51.  While an injury to A.F.'s interest in shielding her body from the opposite sex in sensitive places is intangible, the Supreme Court has held that "intangible injuries can nevertheless be concrete" for Article III purposes. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).  "[I]t is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341.  Applying *Spokeo*, the Eleventh Circuit has recognized standing may be based on an analogous injury to the "tort of intrusion upon seclusion," which creates liability for invasions of privacy that would be "highly

11

offensive to a reasonable person." *Salcedo v. Hanna*, 936 F.3d 1162, 1171 (11th Cir. 2019) (citing Restatement (Second) of Torts sec. 652B)); *see also Bassett v. Credit Bureau Servs., Inc.*, 60 F.4th 1132, 1136 (8th Cir. 2023) (recognizing injuries analogous to the torts of "[i]nfliction of emotional distress and intrusion upon seclusion"); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (upholding standing based on privacy and seclusion injury); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (same); *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017).  A Plaintiff suffers a cognizable injury where "where an intrusion on h[er] privacy is objectively serious and universally condemnable." *Salcedo*, 936 F.3d at 1171.  A 15-year-old girl being forced to share a sensitive area—here, a changing area, bathroom, or shower—with a male is a sufficiently serious invasion of historically understood privacy interests to satisfy Article III.

A.F. will also be injured by a loss of athletic opportunities if she is forced to play alongside and against males.  Federal courts have recognized, especially in the Title IX context, that the loss of athletic opportunities is a sufficiently cognizable injury for Article III standing.  *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000).  Males have inherent physical advantages over females, especially in a sport like basketball where height, size, and upper body strength are advantages.  *Id.* ¶ 24.  A.F. also worries about the increased potential for injury if she were forced to play against male students.  *Id.* ¶¶ 25, 29, 30.  Arkansas law currently prevents males from competing in female-designated sports teams.  *See* Ark. Code Ann. 6-1-107(c).  This means that A.F. competes against only female teammates for athletic opportunities such as starting positions and playing time.  When A.F.'s basketball team competes against teams from other Arkansas schools, they compete against other female students only.

12

As explained above, despite Defendants' protestations to the contrary, the Final Rule will prevent funding recipients from denying males a place on girls' sports teams.  If the Final Rule takes effect, A.F. and other girls will be forced to compete alongside and against male athletes, eviscerating the athletic opportunities Title IX was intended to provide.  That is a sufficiently cognizable injury to establish standing.

C. <u>Plaintiffs' injuries are sufficiently imminent.</u>

For a future injury to be sufficiently imminent, a plaintiff must demonstrate "'a credible threat' of enforcement."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (citation omitted).  A plaintiff bringing a pre-enforcement challenge "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'"  *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).  Defendants may claim that the injuries suffered by Plaintiffs are too speculative to establish standing.  Not so.

Defendants may claim that, although the Department has the ability to terminate federal funding for recipients who do not comply with the Final Rule, that it will choose not to do so. The Sixth Circuit recently considered (and rejected) a similar argument in the challenge to the Title IX guidance.  There, the government claimed that it would not enforce the guidance documents against the states, so they would not be injured.  *State of Tennessee*, 2024 WL 2984295, at *5 n.8.  The Sixth Circuit held that this was in essence "a voluntary cessation argument in disguise." *Id.*  And "Courts are rightly skeptical about taking a party at its word that it will not enforce something when enforcement is within its discretion." *Id.*  The district court in *Tennessee* similarly rejected an implication by Defendants that they have not previously terminated funding

13

due to a Title IX violation; it held that this was insufficient to defeat standing because "it is no guarantee that the Department will not do so in the future." *Tennessee v. Cardona*, No. CV 2:24-072-DCR, 2024 WL 3019146, at *41 (E.D. Ky. June 17, 2024). Indeed, courts "normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law." *State of Tennessee*, 2024 WL 2984295, at *5 n.8. That is especially true when billions of dollars of education funding are on the line.

Finally, any litigation position by Defendants that they don't intend to fully enforce the Final Rule is contradicted by the rule itself. 89 Fed. Reg. at 33,841 (noting the Department's "obligation[] to fully enforce Title IX's nondiscrimination mandate"); *see also Texas*, 2024 WL 2947022, at *13 (holding that "Texas faces a substantial risk of imminent enforcement" where "the Guidance Documents unambiguously state the Department's intent to 'fully enforce' its expanded interpretation of Title IX"). Plaintiffs have demonstrated harms that are imminent; indeed, they will begin as soon as the Final Rule becomes effective on August 1, absent preliminary relief from this Court.

**II.    Plaintiffs have established both traceability and redressability.**

The traceability and redressability elements "are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 54 (D.C. Cir. 2016). "For causation to exist, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Agred Found. v. U.S. Army Corps of Eng'rs*, 3 F.4th 1069, 1073 (8th Cir. 2021).

Defendants may argue that Plaintiffs' injuries are not traceable to the Final Rule, but merely to the Supreme Court's decision in *Bostock* and the Text of Title IX itself. *See* Defs.' PI Br. at 11-12; *State of Tennessee*, 2024 WL 2984295, at *6 n.10 (rejecting this argument in the

14

context of the Title IX guidance). That doesn't fly. For one, the Final Rule explicitly acknowledges changing the Department's standard for sexual harassment from the *Davis* standard to a more relaxed one. 89 Fed. Reg. at 33,510-11. And the Department cannot help but acknowledge that its de-minimis-harm standard forces funding recipients to allow individuals to use a bathroom, locker room, or shower facility consistent with his or her self-professed gender identity rather than his or her sex. Without that modification, the Department's regulations still allow sex-separated bathrooms, locker rooms, and showers. *See* 34 C.F.R. 106.33.

Finally, to the extent Defendants may argue that *Bostock* compels the Department's gender-identity-based rewrite of sex discrimination, its litigation decisions belie that assertion. Defendants have now sought partial stays pending appeal of the preliminary injunctions issued in both the *Tennessee* and *Louisiana* cases. And in each case, Defendants are asking the courts to reinstate the Final Rule's definition of sex discrimination—on an emergency basis so that they can enforce their rewrite of the law. *Tennessee v. Cardona*, No. 2:24-cv-00072-DCR-CJS, ECF No. 104 (E.D. Ky. June 24, 2024), *stay denied* in Order, ECF No. 117 (July 10, 2024); *State of Louisiana, et al. v. U.S. Dep't of Educ.*, et al., 3:24-cv-00563, ECF No. 59 (W.D. La. June 24, 2024).

In sum, there's no dispute that an injunction preventing the Final Rule from taking effect would redress Plaintiffs' injuries. Indeed, two federal court courts have already concluded as much, and this Court should follow suit.

## CONCLUSION

For the foregoing reasons, Plaintiffs have standing to challenge the Final Rule.

Dated:  July 12, 2024                                        Respectfully submitted,

| | |
|---|---|
| TIM GRIFFIN<br>Arkansas Attorney General | ANDREW BAILEY<br>Missouri Attorney General |
| */s/ Dylan L. Jacobs*<br>Nicholas J. Bronni<br> Solicitor General<br>Dylan L. Jacobs<br> Deputy Solicitor General<br>Office of the Arkansas Attorney General<br>323 Center Street, Suite 200<br>Little Rock, AR  72201<br>Telephone: (501) 682-2007<br>Fax: (501) 683-2520<br>nicholas.bronni@arkansasag.gov<br>dylan.jacobs@arkansasag.gov<br><br>*Counsel for Plaintiff State of Arkansas* | */s/ Joshua M. Divine*<br>Joshua M. Divine<br> Solicitor General<br>Missouri Attorney General's Office<br>Post Office Box 899<br>Jefferson City, MO 65102<br>Tel. (573) 751-1800<br>Fax. (573) 751-0774<br>josh.divine@ago.mo.gov<br><br>*Counsel for Plaintiff State of Missouri* |

16

| | |
|---|---|
| BRENNA BIRD<br>Iowa Attorney General<br><br>/s/ *Eric H. Wessan*<br>Eric H. Wessan<br>Solicitor General<br>Office of the Iowa Attorney General<br>1305 E. Walnut Street<br>Des Moines, Iowa 50319<br>(515) 281-5164<br>eric.wessan@ag.iowa.gov<br><br>*Counsel for Plaintiff State of Iowa* | MICHAEL T. HILGERS<br>Nebraska Attorney General<br><br>/s/ *Lincoln J. Korell*<br>Lincoln J. Korell<br>Assistant Solicitor General<br>Office of the Nebraska<br>Attorney General<br>2115 State Capitol<br>Lincoln, NE 68509<br>(402) 471-2682<br>lincoln.korell@nebraska.gov<br><br>*Counsel for Plaintiff State of Nebraska* |
| DREW H. WRIGLEY<br>North Dakota Attorney General<br><br>/s/ *Katie L. Carpenter*<br>Katie L. Carpenter<br>*Deputy Solicitor General*<br>North Dakota Office of the Attorney General<br>600 E. Boulevard Ave., Dept. 125<br>Bismarck, ND 58505<br>Telephone: (701) 328-2210<br>Email: katcarpenter@nd.gov<br><br>*Counsel for Plaintiff State of North Dakota* | MARTY J. JACKLEY<br>South Dakota Attorney General<br><br>/s/ *Charles D. McGuigan*<br>Charles D. McGuigan<br>Deputy Attorney General<br>Office of the Attorney General<br>1302 E. Hwy. 14, Suite 1<br>Pierre, SD 57501-8501<br>Telephone: (605) 773-3215<br>Facsimile: (605) 773-4106<br>charles.mcguigan@state.sd.us<br><br>*Counsel for Plaintiff State of South Dakota* |

17

| | |
|---|---|
| Jonathan A. Scruggs*<br>Arizona Bar No. 030505<br>Henry W. Frampton, IV*<br>South Carolina Bar No. 75314<br>**Alliance Defending Freedom**<br>15100 N. 90th Street<br>Scottsdale, Arizona 85260<br>(480) 444-0020<br>(480) 444-0028 Fax<br>jscruggs@ADFlegal.org<br>hframpton@ADFlegal.org<br><br>Rachel A. Rouleau*<br>Virginia Bar No. 97783<br>**Alliance Defending Freedom**<br>44180 Riverside Parkway<br>Lansdowne, Virginia 20176<br>(571) 707-2119<br>(571) 707-4790 Fax<br>rrouleau@ADFlegal.org<br><br>Natalie D. Thompson**<br>TX Bar No. 24088529<br>**Alliance Defending Freedom**<br>440 First Street NW, Suite 600<br>Washington, DC 20001<br>(202) 393-8690<br>(202) 347-3622 Fax<br>nthompson@ADFlegal.org | *s/ Brad L. Blake*<br>Brad L. Blake<br>Missouri Bar No. 38340<br>Fellows & Blake, L.C.<br>13421 Manchester Road, Suite 105<br>St. Louis, MO 63131<br>(314) 725-1600<br>(314) 725-1609 Fax<br>bblake@fellowsblakelaw.com |

*Counsel for Plaintiff A.F.*

*Admitted pro hac vice

**Admitted pro hac vice, practice supervised by one or more D.C. Bar members while D.C. Bar application is pending.

18