# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# ST. LOUIS DIVISION

| | |
|---|---|
| THE STATE OF ARKANSAS; THE STATE OF MISSOURI; THE STATE OF IOWA; THE STATE OF NEBRASKA; THE STATE OF NORTH DAKOTA; THE STATE OF SOUTH DAKOTA; A.F., a minor, by Sara Ford, her mother, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education; CATHERINE E. LHAMON, in her official capacity as Assistant Secretary for Civil Rights at the United States Department of Education; RANDOLPH WILLS, in his official capacity as Deputy Assistant Secretary for Enforcement at the United States Department of Education, <br><br> *Defendants*. | Case No.: 4:24-cv-636 |

## PROPOSED ORDER GRANTING PRELIMINARY RELIEF

This matter is before the Court on Plaintiffs' Motion for a 5 U.S.C. § 705 Stay and Preliminary Injunction. ECF No. 9.[1] Plaintiffs seek an injunction prohibiting the United States Department of Education's rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the "Final Rule"), from going into effect on August 1, 2024. The motion is ripe for decision and, for the reasons stated herein, Plaintiffs' motion is GRANTED.

---

[1] Where citations to the record contain page numbers, they use the pagination from the PACER header.

**FINDINGS OF FACT**

I.    **Background**

    A.    <u>Title IX</u>

Title IX was enacted in 1972 and states: "No person in the United States shall, on the ba-sis of sex, be excluded from participation in, be denied the benefits of, or be subjected to dis-crimination under any education program or activity receiving Federal financial assistance." 20 § U.S.C. 1681(a).  Section 1681 excepts certain institutions and activities from its antidiscrim-ination mandate, including religious organizations, military institutions, social fraternities, and institutions of undergraduate higher education that traditionally and continually only admitted students "of one sex."  *Id.*  Further, Section 1686 states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintain-ing separate living facilities for the different sexes."  20 U.S.C. § 1686.  Federal agencies that provide financial assistance to "any education program or activity" are authorized to effectuate Title IX by "issuing rules, regulations, or orders of general applicability."  20 U.S.C. § 1682. Agencies may effect compliance "by the termination of or refusal to grant or to continue assis-tance."  *Id.*

The Department of Education's predecessor agency first issued regulations implementing Title IX in 1975.  These included athletics regulations which required equal opportunities for "members of both sexes" to participate in athletics, 34 C.F.R. § 106.41(c), and regulations con-firming that funding recipients "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

Other Title IX's regulations particularly relevant occurred in 2020.  *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020).  Though the Supreme Court had long recognized sexual harassment as a form of discrimination under Title IX, the 2020 regulations were the first to address sexual harassment and include a definition of the term.  34 C.F.R. § 106.30.

B.     The Supreme Court's decision in *Bostock*

A month after the Department issued the 2020 rule, the Supreme Court decided *Bostock v. Clayton County*, 590 U.S. 644 (2020), holding that Title VII's prohibition on discrimination because of sex bars an employer from taking adverse employment action on account of sexual orientation or transgender status.  Following that decision, the Department did not import *Bostock*'s conception of sex discrimination into Title IX.  Instead, the Department's Office of General Counsel stated in a 2021 memorandum that the "Department's longstanding construction of the term 'sex' in Title IX [is] biological sex, male or female."  Reed D. Rubinstein, Memorandum for Kimberly M. Richey, Acting Assistant Secretary of the Office for Civil Rights, re: *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) (Jan. 8, 2021), https://perma.cc/Q9YC-Q4Y2.  Moreover, as the memorandum explained, "sex" as "biological sex" is "the only construction consistent with the ordinary public meaning of 'sex' at the time of Title IX's enactment."  *Id.* at 1-4.  Finally, the memorandum determined that giving "sex" its ordinary meaning not only permits but requires a Title IX recipient providing "separate toilet, locker room, and shower facilities" or "separate athletic teams" to regulate entry based on sex, rather than gender identity.  *Id.* at 9-10.

3

C.    <u>The Biden administration begins to incorporate *Bostock* into Title IX</u>

Soon after taking office, the Biden administration took another approach.  President Biden issued an executive order declaring that *Bostock* applied across all federal law, arguing that "[u]nder *Bostock*'s reasoning, laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 et seq.), . . .  along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021).  Every federal agency was directed to review its existing regulations and develop a plan to align them with the executive order.  *Id.* at 7,024.

Following that directive, in June 2021, the Department published guidance "interpret[ing] Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity." *Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*, 86 Fed. Reg. 32,637, 32,637 (June 22, 2021) ("2021 Guidance").  In that guidance, the Department interpreted the phrase "on the basis of sex" in Title IX as having the same meaning as the phrase "because of . . . sex" in Title VII.  *Id.* at 32,638-39.  It claimed that this interpretation "is most consistent with the purpose of Title IX"— "ensur[ing] equal opportunity and . . . protect[ing] individuals from the harms of sex discrimination."  *Id*. at 32,639.  This was swiftly followed by other guidance documents explaining that the Department planned to "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial

4

assistance from the Department." Suzanne B. Goldberg, Dear Educator letter on Confronting Anti-LGBTQI+ Harassment in Schools, at 2 (June 23, 2021), https://perma.cc/A759-WKR9.

That guidance was quickly enjoined. *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022), *aff'd*, 104 F.4th 577 (6th Cir. 2024). That injunction prevented the Department from enforcing the guidance as to the 20-State plaintiff coalition. The district court concluded that it was likely the Biden administration acted unlawfully by "creat[ing] new rights and obligations" without complying with the APA's notice-and-comment requirements. *Tennessee*, 615 F. Supp. 3d at 838. The guidance was eventually vacated and the Department permanently enjoined from enforcing it. *See Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at *51 (N.D. Tex. June 11, 2024).

    D.    <u>The Final Rule</u>

In July 2022, the Department proposed amendments to its Title IX regulations that incorporated its previous guidance documents' reading of Title IX. *Notice of Proposed Rulemaking re: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390 (proposed July 12, 2022) (to be codified at 34 C.F.R. pt. 106). The Department received over 240,000 comments on the proposed regulations.

On April 29, 2024, the Department published the Final Rule. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024). The Court summarizes the 423-page document only as necessary.

    1.    Definition of sex discrimination

The Final Rule redefines discrimination on the basis of sex to include "discrimination on the basis of . . . sexual orientation and gender identity." 89 Fed. Reg. at 33,886, ECF No. 9-1 at 413 (to be codified at 34 C.F.R. § 106.10). Title IX's antidiscrimination mandate covers "any

education program or activity receiving Federal financial assistance," which covers public K-12 schools and public universities across the country, in addition to many private schools and universities.  20 U.S.C. 1681(a).

The Final Rule leaves in place regulations allowing for sex-separate programs, activities, and facilities (including restrooms, showers, and locker rooms).  89 Fed. Reg. at 33,814, ECF No. 9-1 at 341.  But the Final Rule instructs recipients that a sex-separation policy cannot be carried out in a manner that "causes . . . more than de minimis harm."  *Id.* at 33,814, 33,816, ECF No. 9-1 at 341, 343 (citing amended 34 C.F.R. § 106.31(a)).  The Final Rule goes on to declare that a policy necessarily inflicts more than de minimis harm if it "prevents a person from participating in an education program or activity consistent with the person's gender identity."  *Id.* at 33,820 ECF No. 9-1 at 347 (quoting amended 34 C.F.R. § 106.31(a)).  The de-minimis-harm standard does not apply to sex-separation policies that are in accord with the exceptions to Title IX's sex-discrimination prohibition contained in 20 U.S.C. § 1681(a)(1)–(9), or to sex-separated living facilities, 20 U.S.C. § 1686.

In effect, the Final Rule requires funding recipients to allow students to use the restroom, locker room or shower area "consistent with that student's gender identity."  89 Fed. Reg. at 33,818, ECF No. 9-1 at 345.

The Final Rule does not define "gender identity."  But it describes the term as "an individual's sense of their gender, which may or may not be different from their sex assigned at birth."  89 Fed. Reg. at 33,809, ECF No. 9-1 at 336.  The Final Rule does not specify how a recipient should determine a student's gender identity.  But it declares that requiring a "student to submit to invasive medical inquiries or burdensome documentation requirements to participate in

6

a recipient's education program or activity consistent with their gender identity imposes more than de minimis harm" and thus would in itself be prohibited sex discrimination. *Id.*

### 2.    Definition of sex-based harassment

The Final Rule expands the definition of prohibited sexual harassment under Title IX to include "[h]ostile environment harassment," which it defines as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity."  89 Fed. Reg. at 33,884, ECF No. 9-1 at 411 (to be codified at 34 C.F.R. § 106.2).  Sex-based harassment includes harassment on the basis of sexual orientation or gender identity. *See id.*  The Final Rule also extends the definition of sex-based harassment to cover conduct that is "subjectively and objectively" offensive measured from "the complainant's position."  *Id.* at 33,510, ECF No. 9-1 at 37.

This standard is broader than that articulated by the Supreme Court in *Davis ex. rel. La-Shonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), in several respects. *First*, the Final Rule rejects *Davis*'s "severe *and* pervasive" test in favor of the Title VII "severe *or* pervasive" test that *Davis* had rejected for claims under Title IX.   89 Fed. Reg. at 33,884, ECF No. 9-1 at 411 (proposed § 106.2).  Thus, unlike under *Davis* and the Department's previous guidance, a "single serious" instance of unwelcome speech, or a pattern of non-severe incidents, can constitute prohibited harassment "even if [it is] not pervasive." *Id.* at 33,500, ECF No. 9-1 at 27.

*Second*, the Final Rule rejects *Davis*'s requirement that to be actionable harassment must "*deprive* the victim[] . . . access to the educational opportunities or benefits provided by the school," 526 U.S. at 650 (emphasis added), and imposes liability whenever conduct merely

"limits or denies a person's ability to participate in or benefit from the… program or activity." 89 Fed. Reg. at 33,884, ECF No. 9-1 at 411 (proposed § 106.2).  Hence, the new rule would deem a broad array of impacts harassment—like "a mere 'decline in grades,'" a choice to skip class, or a decision not to attend a campus activity, 526 U.S. at 652—that the *Davis* standard would not.  *See* 89 Fed. Reg. at 33,511, ECF No. 9-1 at 38 ("[A] complainant must demonstrate *some impact* on their ability to participate or benefit from the education program or activity, but the definition does not specify any particular limits or denials." (emphasis added)).

*Third*, the Final Rule rejects the deliberate-indifference standard for liability and imposes liability whenever recipients fail to "promptly and effectively end" any harassment.  *See id.* at 33,889, ECF No. 9-1 at 416 (proposed 106.44(f)(1)).

### 3. Conflict provision

The Final Rule amends Title IX's regulations to declare that a funding recipient's "obligation to comply with Title IX and" the Final Rule "is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or" the Final Rule.  89 Fed. Reg. at 33,885, ECF No. 9-1 at 412 (to be codified at 34 C.F.R. § 106.6(b)).  In other words, to the extent that any laws enacted by Plaintiff States conflict with the Final Rule, the Department intends to preempt those laws and that the Final Rule take precedence.

## II. Parties

### A. Plaintiffs

#### 1. Plaintiff States

Plaintiff the State of Arkansas is a sovereign State of the United States of America.  Tim Griffin is the Attorney General of Arkansas.  Tim Griffin is authorized to "maintain and defend

8

the interests of the state in matters before the United States Supreme Court and all other federal courts." Ark. Code Ann. § 25-16-703.  Compl. ¶ 1.

The State of Arkansas runs and oversees schools throughout the state that are subject to Title IX and will be subject to the Final Rule if it goes into effect.  The Arkansas General Assembly has a constitutional obligation to provide "a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education."  Ark. Const., art. 14, sec. 1.  The State of Arkansas is constitutionally charged with ensuring the adequacy of education provided by its 1,058 public schools among 237 school districts.[2]  Arkansas operates the Arkansas School for the Blind and the Arkansas School for the Deaf, both K-12 schools, through a legislatively created Board of Trustees.  Ark. Code Ann. § 6-43-102.  Arkansas also operates public universities.  *See, e.g.*, Ark. Code Ann. § 6-64-202 (establishing the University of Arkansas).  Arkansas and its local programs receive at least $1.4 billion from the Department and expect that number to increase in future years.  *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/statetables/index.html; *see also* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/statetables/index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

Plaintiff the State of Missouri is a sovereign State of the United States of America.  Andrew Bailey is the Attorney General of Missouri.  General Bailey is authorized to "institute, in the name and on behalf of the state, all civil suits and other proceedings at law or equity requisite

---

[2] Ark. Dep't of Educ., *Arkansas K-12 Profile: 2023-2024*, https://adedata.arkansas.gov/Ark12

or necessary to protect the rights and interests of the state."  Mo. Rev. Stat. § 27.060.  Compl. ¶ 2.

The Missouri General Assembly has a constitutional obligation "to establish and maintain free public schools for the gratuitous instruction of all persons in this state" and "to maintain the state university."  Mo. Const., art. IX §§ 1(a), 9(b). Missouri Operates the Missouri School for the Deaf and Missouri School for the Blind.  Mo. Rev. Stat. § 162.730(2). Missouri also operates public universities.  *See, e.g.*, Mo. Rev. Stat. § 172.020 (University of Missouri). Missouri and its local programs receive at least $3 billion from the Department and expect that number to increase in future years.  *See* U.S. Dep't of Educ., F*unds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/statetables/index.html; see also U.S. Dep't of Educ., Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ., https://www2.ed.gov/about/overview/budget/statetables/index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

Plaintiff the State of Iowa is a sovereign State of the United States of America.  Brenna Bird is the Attorney General of Iowa.  She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2.  Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.  Compl. ¶ 3.  Iowa operates public universities.  *See, e.g.*, Iowa Code § 262.7 (establishing the state board of regents to govern the University of Iowa). Iowa and its local programs receive at least $1.6 billion from the Department and expect that number to increase in future years.  *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/statetables/index.html; *see also* U.S. Dep't of

Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/statetables/index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

Plaintiff the State of Nebraska is a sovereign State of the United States of America. Michael T. Hilgers is the Attorney General of Nebraska. He is authorized to appear for the State in any civil matter in which the State has an interest. Neb. Rev. Stat. § 84-203. Compl. ¶ 4. The Nebraska Constitution charges the Nebraska Legislature with "provid[ing] for the free instruction in the common schools of [Nebraska] of all persons between the ages of five and twenty-one years." Neb. Const., art. VII, § 1. Nebraska also operates public universities. *See, e.g.*, Neb. Rev. Stat. § 86-101 *et seq.* (establishing the University of Nebraska). Nebraska and its local programs receive at least $1.07 billion from the Department and expect that number to increase in future years. *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/statetables/index.html; *see also* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/statetables/index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

Plaintiff the State of North Dakota is a sovereign State of the United States of America. North Dakota brings this suit through its Attorney General, Drew H. Wrigley, who has the authority to represent the State in federal court. N.D.C.C. § 54-12-01. Compl. ¶ 5.

The North Dakota Legislative Assembly has a constitutional obligation to "provide for a uniform system of free public schools throughout the state, beginning with the primary and extending through all grades up to and including schools of higher education," N.D. Const. art. 8, § 2. The North Dakota Constitution also bestows power on the North Dakota Board of Higher

Education to control and administer state higher education institutions. N.D. Const. art. 8, § 6. North Dakota operates the North Dakota School for the Blind and School for the Deaf. N.D.C.C. §§ 25-06-01, 25-07-01. North Dakota also operates public universities. *See, e.g.*, N.D.C.C. § 15-10-01.2 (establishing the "North Dakota university system"). North Dakota and its local pro-grams receive at least $446 million from the Department and expect that number to increase in future years. *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/statetables/in-dex.html; *see also* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/statetables/index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

Plaintiff the State of South Dakota is a sovereign State of the United States of America. Marty J. Jackley is the Attorney General of South Dakota. General Jackley is authorized "to ap-pear for the state and prosecute or defend, in any court or before any officer, any cause or matter, civil or criminal, in which the state may be a party or interested." S.D.C.L.1-1-1(2). Compl. ¶ 6.

The South Dakota Legislature has a constitutional duty "to establish and maintain a gen-eral and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportuni-ties of education." S.D. Const., art. 8, § 1. South Dakota operates the South Dakota School for the Blind and Visually Impaired. S.D.C.L. 13-61-1. South Dakota also operates public universi-ties. *See, e.g.*, S.D.C.L. 13-57-1 (establishing the University of South Dakota). South Dakota and its local programs receive at least $519 million from the Department and expect that number to increase in future years. *See* U.S. Dep't of Educ., *Funds for State Formula-Allocated and Se-lected Student Aid Programs*, by State, available at https://www2.ed.gov/about/overview/budget/

statetables/index.html; *see also* U.S. Dep't of Educ., *Fiscal Years 2023-2025 State Tables of the U.S. Dep't of Educ.*, https://www2.ed.gov/about/overview/budget/statetables/index.html (last updated Mar. 15, 2024) (noting the tables "do not reflect all department funds that a State receives").

   2.   A.F.

A.F. is a 15-year-old girl residing in Jonesboro, Arkansas.  A.F. Decl., ECF No. 9-3, ¶ 1.[3] She attends a public high school in Arkansas.  *Id.* ¶ 2.  A.F. is "a Christian" and "believe[s] that created everyone to be either male or female."  As a part of those religious beliefs, "[she] believe[s] that everyone should be treated with dignity and respect, that people cannot and should not attempt to change their sex, and that people should seek to live consistent with their sex."  *Id.* ¶ 40.  To follow her religious beliefs, A.F. will "only use pronouns of others consistent with their sex, not their gender identity," and "will not use pronouns that contradict a person's sex when referring to other students or teachers."  *Id.* ¶ 41.  A.F. expresses her views about gender identity at school with her classmates and coaches, including by expressing the view that men who identify as women are in fact men and should not be allowed to compete in women's sports.  *Id.* ¶¶ 42-44.

At A.F.'s school, currently "girls are expected to use the girls' restroom, and boys use the boys' restroom."  *Id.* ¶ 47.  Currently, "boys aren't allowed in the girls' locker room, restroom, and shower area" at A.F.'s school.  *Id.* ¶ 50.  A.F. uses the girls' restrooms and locker room, including the shower area in the locker room, at school.  *Id.* ¶¶ 47-49.  She desires privacy from the opposite sex while using the restroom, changing clothes in the locker room, and showering.  *Id.* ¶

---

[3] Defendants have not, at this stage of the litigation, contested the facts A.F. swears to in her declaration.

48. Sharing any of these areas with a male would "cause [her] serious distress and anxiety." *Id.* ¶ 50. A.F. would do her best to avoid changing clothes in a restroom or locker room if males were allowed in. *Id.* ¶ 48. A.F. sometimes participates in overnight school trips related to athletics. *Id.* ¶ 51. She does not wish to share a hotel room, where she must change clothes and shower, with a male when she is on one of these overnight trips. *Id.* ¶¶ 51-52. Doing so would make her "very uncomfortable." *Id.* ¶ 52.

A.F. has played in organized sports from a young age and currently plays on her school basketball team. *Id.* ¶¶ 6-9. Athletics have played an important role in A.F.'s life and her development as a young person. *Id.* ¶ 21. A.F. anticipates continuing to compete in athletics on school teams in her remaining years in high school. *Id.* ¶ 14. A.F. currently competes alongside and against only other female athletes. *Id.* ¶ 31. If A.F. were forced to compete against or alongside or against male students, her athletic opportunities would be diminished due to the inherent physical advantages males have over females, especially in a sport like basketball where height, size, and upper body strength are advantages. *Id.* ¶ 24. A.F. would also be more likely to get injured. *Id.* ¶¶ 25, 29, 30.

    B.   <u>Defendants</u>

Defendant U.S. Department of Education ("the Department") is a federal agency. It "is authorized and directed to effectuate" Title IX "by issuing rules, regulations, or orders of general applicability . . . consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682. Defendant Miguel Cardona is the U.S. Secretary of Education and is responsible for its administration, including implementing Title IX via rulemaking. 20 U.S.C. § 3474; 20 U.S.C. § 1682. He is sued in his official capacity. Defendant Catherine Lhamon is the Assistant Secretary for Civil Rights at the Department of Education. She is sued in her official capacity. Defendant

Randolph Wills is the Deputy Assistant Secretary for Enforcement at the Department of Education. He is sued in his official capacity.

## III.    Proceedings

The Final Rule is set to take effect on August 1, 2024. 89 Fed. Reg. at 33,474, ECF No. 9-1 at 1.

Plaintiffs filed suit on May 7, 2024, challenging the Final Rule on statutory and constitutional grounds. ECF No. 1. Plaintiffs moved for preliminary relief on May 21. ECF No. 9.

The Court notes that 26 States in total have challenged the Final Rule across seven lawsuits, including this one:

    a.  *Alabama v. Cardona*, No. 7:24-cv-533 (N.D. Ala.) (Alabama, Florida, Georgia, and South Carolina)

    b.  *Louisiana v. Cardona*, No. 3:24-cv-563 (W.D. La.) (Louisiana, Mississippi, Montana, and Idaho)

    c.  *Kansas v. United States Department of Education*, No. 5:24-cv-4041 (D. Kansas) (Kansas, Alaska, Utah, and Wyoming)

    d.  *Tennessee v. Cardona*, No. 2:24-cv-72 (E.D. Ky.) (Tennessee, Kentucky, Indiana, Ohio, West Virginia, and Virginia)

    e.  *Texas v. United States*, No. 2:24-cv-86 (N.D. Tex.) (Texas)

    f.  *Oklahoma v. Cardona*, No. 5:24-cv-461 (W.D. Okla.) (Oklahoma)

Four other courts have entered a preliminary injunction against the Final Rule in a State-led challenge. *See Texas v. United States*, No. 2:24-cv-86 (N.D. Tex. July 10, 2024); *Kansas v. U.S. Dep't of Educ.*, No. 5:24-cv-4041, 2024 WL 3273285 (D. Kan. July 2, 2024); *Tennessee v.*

*Cardona*, No. 2:24-cv-72, 2024 WL 3019146 (E.D. Ky. June 17, 2024); *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-CV-563, 2024 WL 2978786 (W.D. La. June 13, 2024).

The injunctions in the *Tennessee*, *Louisiana*, and *Texas* cases apply only within the states which are plaintiffs in each lawsuit. *Tennessee*, 2024 WL 3019146, at *44; *Louisiana*, 2024 WL 2978786, at *21. *The Kansas* injunction applies to three organizations with nationwide membership and could include funding recipients within Plaintiff States. *Kansas*, 2024 WL 3273285, at *22. However, the parties agree that a ruling from this Court remains necessary because "presumably there are many schools operated by [Plaintiff States] that will not be affected by the order in the Kansas case." ECF No. 41 at 8; *see also* ECF No. 39 at 6-7. Defendants represent that they "currently plan for the Final Rule to take effect on its August 1, 2024 effective date to the full extent permitted by court orders, including enforcement by the Department in the ordinary course." ECF No. 41 at 8. The Court agrees with the parties that the *Kansas* injunction does not obviate the need for the Court to rule on Plaintiffs' motion.

## CONCLUSIONS OF LAW

### I.    Standing

To establish standing, a plaintiff must demonstrate (1) an injury in fact; (2) that the injury is fairly traceable to the defendant's action; and (3) that the injury will be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must support allegations establishing standing "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52, n.2 (2006). Defendants do not challenge Plaintiffs' standing to challenge the Final Rule, but the Court nonetheless addresses the issue to assure itself of its

jurisdiction.  Having done that, the Court concludes that Plaintiff States and A.F. have standing to challenge the Final Rule.

     A.     <u>Injury in Fact</u>

  To start, the Court concludes that Plaintiffs meet the injury-in-fact requirement.

     1.     Plaintiff States

*Sovereign injuries*

Plaintiff States claim to suffer injuries as sovereigns due to their inability to enforce their duly enacted laws.  "[A] State clearly has a legitimate interest in the continued enforceability of its own statutes." *Maine v. Taylor*, 477 U.S. 131, 137 (1986); s*ee also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982) (recognizing a State's "sovereign interest[]" in "creat[ing] and enforc[ing] a legal code").  And a long line of precedent confirms that States may seek injunctive relief in federal court to protect that interest.  *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (allowing Massachusetts to seek relief under the APA to "protect[] its quasi-sovereign interests"); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (explaining that "[f]ederal regulatory action that preempts state law creates a sufficient injury-in-fact to satisfy" Article III).

Plaintiffs claim that the Final Rule aims to render unenforceable any laws that conflict with it.  The plain text of the rule supports that conclusion.  It states that a recipient's "obligation to comply with Title IX and" the Final Rule "is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or" the Final Rule.  89 Fed. Reg. at 33,885, ECF No. 9-1 at 412 (to be codified at 34 C.F.R. § 106.6(b)).  Defendants do not deny that the Final Rule is intended to displace any contrary state-law requirements.

The Court agrees with the decisions in *Kansas* and *Tennessee*, both of which held that

the Final Rule's preemption of conflicting state laws was a cognizable Article III injury.  *See Tennessee v. Cardona*, 2024 WL 3019146, at *30 (E.D. Ky. June 17, 2024) (holding state plaintiffs had standing where "state officials would be forced to choose between enforcing their own laws, essentially protecting their independent quasi-sovereign and sovereign interests, or violating the Title IX gender identity mandate"); *Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *6 (D. Kan. July 2, 2024) (holding state plaintiffs demonstrated standing because the Department "seeks to regulate Title IX in a manner that is not compatible with their state laws").  The Sixth Circuit similarly held recently that a state coalition (which included all but one of Plaintiff States here) had standing to challenge the Biden administration's Title IX guidance due to that guidance's purported preemption of various states' laws.  *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 2024 WL 2984295, at *10595 (6th Cir. 2024) ("[T]he sovereign injury here—a state's ability to enforce its laws, particularly over a traditional sovereign prerogative like education—is sufficient to confer standing."); *see also Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at *13 (N.D. Tex. June 11, 2024) (holding that Texas had standing to challenge the Title IX guidance because the guidance conflicted with a Texas law "that requires student athletes to compete according to their biological sex").

Thus, to the extent the Final Rule renders any law of Plaintiff States' unenforceable, that it is a sufficient sovereign injury to meet the injury-in-fact requirement.

*Sex-based harassment*

Plaintiffs claim that, under the Final Rule's expanded definition of sex-based harassment, if a student speaks to or about another student using pronouns that are inconsistent with that student's gender identity, the speaking student can be held liable for harassment.  Defendants do not

deny that this conduct can fall within the Final Rule's definition of harassment, but insist that whether any given speech does so is a "fact-specific inquiry." ECF No. 48 at 35.

Plaintiffs have pointed to state statutes that likely conflict with the Final Rule.  *See* Ark. Code Ann. § 6-1-108(d)(2); Ark. Code Ann. § 6-10-139; N.D.C.C. § 14-02.4-15.2(1); Iowa Code § 279.78.3.  For example, Arkansas law prohibits penalizing school officials or students who use pronouns that are inconsistent with a person's gender identity. Ark. Code Ann. § 6-1-108(d)(2). Defendants do not contest that the Final Rule would, in some instances, deem such conduct to be sex-based harassment that a recipient must investigate under Title IX.  Arkansas's law says school officials and students can never be punished for that conduct; the Final Rule says some-times they must.  The Court is satisfied at this stage of the proceedings that the Final Rule's defi-nition of sex-based harassment sufficiently conflicts with the laws of Plaintiff States so as to give rise to a sovereign injury.

*Sex-separated intimate spaces*

The Final Rule's definition of sex discrimination, in combination with the de-minimis-harm standard, requires funding recipients to allow students to use the restroom, locker room, or shower area consistent with the person's gender identity.  *See* 34 C.F.R. § 106.31(a)(2); 89 Fed. Reg. at 33,816, 33,819-20, ECF No. 9-1 at 343, 346-47.  Defendants do not contest this reading of the Final Rule.  ECF No. 18 at 21.

Plaintiffs point to multiple state laws that require sex-separate restrooms, changing areas, and showers and which do not provide exemptions for situations where a student's gender iden-tity differs from his or her sex.  *See* Ark. Code Ann. § 6-21-120(b); Ark. Code Ann. § 6-10-137(a); Iowa Code § 280.33.2; Neb. Rev. Stat. § 79-2,124; N.D.C.C. § 15-10-68.  Defendants do not contest that these laws are inconsistent with the Final Rule.  The Court is therefore satisfied

at this stage of the of the proceedings that the Final Rule's definition of sex discrimination, in combination with the de-minimis-harm standard, sufficiently conflicts with the laws of Plaintiff States to give rise to a sovereign injury.

*Athletics*

The parties dispute what effect, if any, the Final Rule will have on athletic participation. Plaintiffs claim that the Final Rule seeks to preempt state laws which mandate sex-separated sports teams. Defendants maintain that the Final Rule "does not encompass athletics." ECF No. 18 at 23. Defendants rely on to-be-codified § 106.31(a)(2), which provides that the de-minimis-harm standard does not apply to § 106.41(b), the regulation allowing sex-separated teams, thus seemingly allowing funding recipients to separate teams based on sex.

In 34 C.F.R. § 106.10, the Final Rule universally redefines sex discrimination to include gender-identity discrimination. That redefinition must apply to 34 C.F.R. § 106.41(a)'s athletics anti-discrimination provision, which provides that, "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.31(a)(2) exempts § 106.41(b), but it does not mention the athletics anti-discrimination provision in §106.41(a). So by its express terms, *see* § 106.31(a)(1) ("Except as provided elsewhere in this part . . ."), the de-minimis-harm standard would seem to apply to the athletics anti-discrimination provision in 34 C.F.R. § 106.41(a). If so, recipients must allow students to participate in athletic activities on a basis consistent with their gender identity, even in instances where teams or competitions are otherwise separated by sex. *Cf. Louisiana*, 2024 WL 2978786, at *14 (noting that, while there "exists a credible concern that the Final Rule may

20

allow biological males who identify as females to compete on female sports teams," "the effect of the Final Rule on sports is not certain").

Plaintiff States have enacted laws categorically barring males from competing on female-designated sports teams.  *See* Ark. Code Ann. § 6-1-107(c); (2) Mo. Rev. Stat. § 163.048(3); (3) Iowa Code § 261I.1–.2; (4) N.D.C.C. § 15-10.6-01–03; and (5) S.D.C.L. § 13-67-1.  These statutes do not provide an exemption for a male student who identifies as female.  Elsewhere, the federal government has taken the position that, under "Title IX and its regulations," states may not "impose a categorical ban on [biological boys'] participation on teams consistent with their [female] gender identity."  Br. for the U.S. as Amicus Curiae in Supp. of Pl.-Appellant and Urging Reversal at 27, *B.P.J. ex. rel. Jackson v. W. Va. State Bd. of Educ.* (BPJ Amicus Brief), 98 F.4th 541 (4th Cir. 2024) (Nos. 23-1078, 23-1130), 2023 WL 2859726, at *27-28.  Given Defendants' position that "Title IX's regulations must be read consistently with its core nondiscrimination mandate," *id.* at *27, and the fact that the Final Rule modifies that "core mandate" to include discrimination based on gender identity, 89 Fed. Reg. 33,886, ECF No. 9-1 at 413 (to be codified at 34 C.F.R. § 106.10), it is difficult to see how the Department could maintain that Plaintiff States remain free to enforce these laws notwithstanding the Final Rule.  Plaintiffs have demonstrated it is likely that the Department will enforce the Final Rule in a manner that does impact Plaintiff States' athletics laws.  The Court is therefore satisfied at this stage of the of the proceedings that the Final Rule sufficiently conflicts with Plaintiff States' sports laws to give rise to a sovereign injury.

*Injuries as regulated parties*

Plaintiff States are also injured because they—through their public instrumentalities—are regulated by the Final Rule.

*Universities*.  Seventy years ago, the Supreme Court held that the State of Arkansas could bring suit based on injuries to one of its state universities.  *See Arkansas v. Texas*, 346 U. S. 368, 370 (1953).  The Court recently reaffirmed that holding in *Biden v. Nebraska* and further clarified that, for purposes of Article III standing, a state "seek[s] to protect its *own* interests" when it sues to redress an injury suffered by a public instrumentality.  143 S. Ct. 2355, 2367 (2023).  Here, Plaintiff States all operate public universities which are subject to Title IX's requirements.  The Court thus agrees with the *Kansas* court's conclusion that "Plaintiff States have standing" to challenge the Final Rule "due to the alleged injuries to their state universities."  *Kansas*, 2024 WL 3273285, at *7.

*K-12 schools*.  Plaintiff States may also assert the injuries of their states' public schools, including both those they operate directly (such as the Arkansas School for the Blind) or those operated by political subdivisions.  *Tennessee*, 2024 WL 3019146, at *28-30 (holding that states demonstrated standing based on injuries to their public schools).  Plaintiff States are constitutionality obligated to provide public education to their citizens, and public schools are recipients of the billions of dollars of federal funding the Department provides to Plaintiff States.  Any regulatory obligations imposed on Plaintiff States' public schools by the Final Rule can be redressed by the Plaintiff States.

The Court concludes that Plaintiff States meet the injury-in-fact requirement in at least two respects because of injuries to their public instrumentalities.

First, Plaintiff States—through their educational instrumentalities—are directly regulated by the Final Rule.  "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements."  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024); *see also Iowa League of Cities v.*

22

*EPA.*, 711 F.3d 844, 871 (8th Cir. 2013) (holding that where "a challenger is the subject of agency action, 'there is ordinarily little question that the action . . . has caused [it] injury.'" (quoting *Defs. of Wildlife*, 504 U.S. at 561-62); *Corbett v. Transp. Sec. Admin.*, 19 F.4th 478, 483 (D.C. Cir. 2021) (standing of regulated parties "usually self-evident")).  That is because parties "have a concrete interest . . . in avoiding regulatory obligations above and beyond those that can be statutorily imposed upon them." *Iowa League*, 711 F.3d at 871.  As the *Kansas* court observed, "new duties are imposed under the Final Rule that were not required under the prior regulations," including "investigat[ing] allegations of sex discrimination based on gender identity discrimination. *Kansas*, 2024 WL 3273285, at *7.  Plaintiff States have standing to challenge those new duties.

Second, Plaintiff States are injured by the prospect of losing billions of dollars in federal funding.  *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (future loss of federal funds sufficient to establish standing).  Title IX provides that the Department may secure compliance with its regulations, including the Final Rule, through "the termination of or refusal to grant or to continue assistance," *i.e.*, federal funding, to the recipient.  20 U.S.C. § 1682.  Defendants have not disclaimed this power.  The threat of losing education funds due to noncompliance is a sufficient injury for Article III standing.  *See also Kansas*, 2024 WL 3273285, at *12 (holding that states demonstrated standing because they are "are threatened with hundreds of millions, or even billions, of dollars of  federal funding if they fail to comply with the Final Rule"); *Tennessee*, 2024 WL 3019146, at *28 (holding that states demonstrated standing because they "would be forced to abandon enforcement of their own laws or risk the loss of federal funding because they operate education programs and activities that receive federal financial assistance within the meaning of Title IX through state level agencies and local subdivisions") (cleaned up);

*Tennessee*, 2024 WL 2984295, at *6 (holding that the Title IX guidance's "threaten[ing of] the States' educational institutions with financial penalties, specifically the revocation of federal funds, if they don't comply with the policies . . . is an injury to the States as proprietors of their educational institutions and is sufficient to confer standing").

        2.    *A.F.*

Because Plaintiff States have standing, it is unnecessary for the Court to separately analyze A.F.'s standing. *Rumsfeld*, 547 U.S. at 52 n.2; *Kansas*, 2024 WL 3273285, at *6 n.3 (applying same logic to similar Title IX lawsuit). A.F. is injured by the Final Rule because she attends a public high school which, absent injunctive relief, will be obligated to follow the Final Rule or risk losing federal funding. Nevertheless, the Court analyzes A.F.'s injuries and concludes that she too, separately has standing.

*First Amendment*

As explained above, the Final Rule's expanded definition of sex-based harassment will require funding recipients to investigate and sanction students based on their gender-related speech. Defendants do not disclaim that the Final Rule will require funding recipients to police speech. As the *Tennessee* court summarized it: "So long as the offended individuals complain with sufficient vigor, the refusal to abide by preferred pronouns can be deemed harassment and exposes a recipient of Federal funds to liability under Title IX." *Tennessee*, 2024 WL 3019146, at *22.

A.F. has submitted declaration testimony explaining that she will "only use pronouns of others consistent with their sex, not their gender identity." ECF No. 9-3 at 7. In the past, she has spoken to her fellow students and teachers concerning her views of male athletes participating in female sports, including her view that "it's untrue to say male athletes are female just because

24

they identify as female and want to compete on girls' teams." *Id.*  Due to the Final Rule, she

fears that she "will be punished for expressing [her views] . . . and for speaking consistent with

[her] views" and "will be more hesitant to keep speaking" in the future.  *Id.* at 8.  The chill to

A.F.'s First Amendment rights is a cognizable injury-in-fact for Article III standing.  *See Elrod*

*v. Burns*, 427 U.S. 347, 373-74 (1976); *see also Kansas*, 2024 WL 3273285, at *7 (holding indi-

vidual plaintiff had standing to challenge the Final Rule due to her "fear[] that [she] would be

subject to investigation and potential discipline for continuing to speak [her] views").

>    *Privacy interests*

The Court concludes that A.F. has also sufficiently demonstrated that she will suffer a

cognizable Article III injury if she is forced to share a locker room, restroom, or shower area

with a male on account of the Final Rule.  While an injury to A.F.'s interest in shielding her body

from the opposite sex in sensitive places is intangible, the Supreme Court has held that "intangi-

ble injuries can nevertheless be concrete" for Article III purposes.  *Spokeo, Inc. v. Robins*, 578

U.S. 330, 340 (2016).  "[I]t is instructive to consider whether an alleged intangible harm has a

close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit

in English or American courts."  *Id.* at 341.  For example, applying *Spokeo*, the Eleventh Circuit

has recognized standing may be based on an analogous injury to the "tort of intrusion upon se-

clusion," which creates liability for invasions of privacy that would be "highly offensive to a rea-

sonable person."  *Salcedo v. Hanna*, 936 F.3d 1162, 1171 (11th Cir. 2019) (citing Restatement

(Second) of Torts § 652B)); *see also Bassett v. Credit Bureau Servs., Inc.*, 60 F.4th 1132, 1136

(8th Cir. 2023) (recognizing injuries analogous to the torts of "[i]nfliction of emotional distress

and intrusion upon seclusion"); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir.

2019) (upholding standing based on privacy and seclusion injury); *Van Patten v. Vertical Fitness*

*Grp.*, *LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (same); *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017).   A plaintiff suffers a cognizable injury where "where an intrusion on h[er] privacy is objectively serious and universally condemnable." *Salcedo*, 936 F.3d at 1171. The Court is satisfied that the Final Rule's forcing a 15-year-old girl to share a sensitive area— here, a changing area, bathroom, or shower—with a male is a sufficiently serious invasion of historically understood privacy interests to satisfy Article III.

*Athletics*

Courts have recognized, especially in the Title IX context, that that the loss of athletic opportunities is a sufficiently cognizable injury for Article III standing.  *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004); *Pederson v. La. State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000).  Plaintiffs claim that A.F. will be injured by a loss of athletic opportunities because the Final Rule could require her to play alongside and against male students, who have inherent physical advantages over her.  ECF No. 9-3 at 4  Defendants do not deny that A.F. would suffer a cognizable injury if she loses athletic opportunities due to being forced to play alongside and against male students.  Instead, Defendants maintain that the Final Rule does not change the current regime regarding sex-separated sports.  ECF No. 18 at 24, 25, 39 n.3.

For the reasons explained above, Plaintiffs have shown that the Department will likely enforce the Final Rule's antidiscrimination provision in a manner that impacts sex-separated athletics.  At this stage of the proceedings, that is sufficient to support A.F.'s standing to challenge the Final Rule.

3.    Sufficiently imminent injuries

For a future injury to be sufficiently imminent, a plaintiff must demonstrate "'a credible threat' of enforcement." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (citation omitted).  A plaintiff bringing a pre-enforcement challenge "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Defendants represent that they intend to enforce the Final Rule "to the full extent permitted by court orders, including enforcement by the Department in the ordinary course." ECF No. 41 at 8.  The Court is therefore satisfied that Plaintiffs' injuries are sufficiently imminent to satisfy Article III.

B.    Traceability and redressability

"For causation to exist, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Agred Found. v. U.S. Army Corps of Eng'rs*, 3 F.4th 1069, 1073 (8th Cir. 2021).  The traceability and redressability elements "are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 54 (D.C. Cir. 2016).

The Court is satisfied that Plaintiffs' injuries are sufficiently traceable to the Final Rule, and that an order prohibiting Defendants from enforcing the Final Rule would redress those injuries.  Plaintiffs' claimed injuries flow directly from the Final Rule's definitions of sex discrimination and sex-based harassment.  If the Final Rule is enjoined, Plaintiffs will be placed in the state they were in prior to the Final Rule's adoption.

27

\*      \*      \*

Accordingly, the Court is satisfied that Plaintiffs have standing to challenge the Final Rule.

## II.     Legal Standard

Plaintiffs seek a stay of the Final Rule's effective date under 5 U.S.C. § 705, as well as a preliminary injunction under Federal Rule of Civil Procedure 65(c).  Both aim to "preserve status or rights" pending judicial review, 5 U.S.C. § 705, and require an assessment of whether (1) a plaintiff is "likely to succeed on the merits"; (2) the plaintiff is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) the "balance of equities tip[s] in [the plaintiff's] favor"; and (4) an injunction is "in the public interest."  *Jones v. Jegley*, 947 F.3d 1100, 1104-05 (8th Cir. 2020) (citation omitted); *see Corning Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 562 F. Supp. 279, 280-81 (E.D. Ark. 1983) (same for Section 705).  While no single factor is determinative, *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019), the likelihood of success is the most significant, *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).  Where the balance of the equities "favors the movant," relief is warranted so long as a "substantial question" on the merits is involved.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

## III.    Likelihood of Success

Plaintiffs challenge the Final Rule as both unlawful and arbitrary and capricious under the APA.  For the reasons below, the Court concludes that Plaintiffs are likely to succeed on their claims.

A.     <u>The Final Rule is likely unlawful.</u>

The APA requires the Court to set aside agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 § U.S.C. 706(2)(A), (C). "Vacatur is the normal remedy under the APA, which provides that a reviewing court 'shall . . . set aside' unlawful agency action." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) (quoting 5 U.S.C. § 706(2)). Plaintiffs claim that in adopting the Final Rule, the Department exceeded its authority under Title IX. The Court concludes they are likely to succeed.

1.     Sex discrimination

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). What that text means is the crux of this lawsuit.

Plaintiffs argue, and Defendants do not ultimately dispute, that the word "sex" as understood when Title IX was enacted in 1972 refers to biological sex. *See, e.g.*, *Sex*, Webster's Third New International Dictionary 2081 (1966) ("one of the two divisions of organic esp. human beings respectively designated male or female"); *Sex*, Webster's New World Dictionary (1972) ("[E]ither of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions."); *Sex*, American Heritage Dictionary (1969) ("a. The property or quality by which organisms are classified according to their reproduction functions. b. Either of two divisions, designated *male* and *female*, of this classification."). Title IX itself references "sex" in binary terms. *See* 20 U.S.C. §§ 1681(a)(2) (referring

29

to "one sex" and "both sexes"); 1681(a)(8) (referring to "father-son or mother-daughter activities," "one sex," and "the other sex").

Title IX's use of "sex" in 1972 could have been understood to include sexual orientation or gender identity. Even in the text today, the statute lists sexual orientation and gender identity as a "status" separate from one's sex, so those terms cannot be synonymous. *See id.* § 1689(a)(6) ("lesbian, gay, bisexual, or transgender (commonly referred to as 'LGBT') status").

Nonetheless, under the Final Rule, "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886, ECF No. 9-1 at 413 (to be codified at 34 C.F.R. § 106.10). In the Department's view, "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" *Id.* at 33,802, ECF No. 9-1 at 329 (quoting *Bostock*, 590 U.S. at 655). The Department relies solely on extending the reasoning of the Supreme Court's decision in *Bostock* interpreting Title VII to the Title IX context.

*Bostock* held that Title VII's prohibition on sex discrimination bars an employer from firing an employee based on sexual orientation or transgender status. 590 U.S. at 651-52. In reaching that conclusion, *Bostock* interpreted Title VII's language prohibiting discrimination "because of" sex as a but-for causation standard, meaning that "[s]o long as the plaintiff's sex was one but-for cause of" an adverse employment action Title VII's coverage is triggered. *Id.* at 656, 659. And it concluded that "sex plays an unmistakable and impermissible role in [a] discharge decision" based on sexual orientation or transgender status. *Id.* at 660. That is because an employer who fires a male employee "for no reason other than the fact he is attracted to men . . .

discriminates against him for traits or actions it tolerates in his female colleague"; similarly, an employer who fires a male who adopts a transgender identity as a female "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.*

As relevant here, however, *Bostock* assumed that "sex" as used in Title VII in 1964 referred "only to the biological distinctions between male and female." *Id.* at 655.  And it expressly declined to "prejudge" whether its decision would "sweep beyond Title VII" to other statutes such as Title IX, or whether enforcing "sex-segregated bathrooms, locker rooms, and dress codes" would constitute discrimination under Title VII.  *Id.*  at 681.  Finally, the Court did not consider what Title IX's different language—"on the basis of sex"—means in the context of discrimination.

The Court is not persuaded that *Bostock* can be extended from Title VII to Title IX, given the different contexts in which those statutes operate.  *Bostock*'s conception of sex discrimination hinges on its determination that an employee's "sex" or "homosexuality or transgender status is not relevant to employment decisions."  *Bostock*, 590 U.S. at 660.  But "Title IX's purpose [is] to protect biological women from discrimination in education."  *Louisiana*, 2024 WL 2978786, at *12; *see Tennessee*, 2024 WL 3019146, at *12 ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." (quoting *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004)).

Title IX's prohibition on sex discrimination does not prohibit all sex distinctions.  Instead, it recognizes that at times sex distinctions are necessary to secure equal educational opportunities for women.  Indeed, the statute expressly states it doesn't "prohibit any educational institution . . . from maintaining separate living facilities for the different sexes."  20 U.S.C. § 1686;

31

*see also id.* § 1681(a)(6), (7) (excepting sex-restricted membership in fraternities, sororities, Boys/Girls State, and Boys/Girls Nation from the prohibition on sex discrimination).  The Department's longstanding regulations have understood Title IX to allow "separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33, and "separate [sports] teams for members of each sex," *id.* § 106.41(b).

The Final Rule's approach cannot be squared with Title IX.  Under the Final Rule, sex separation always violates Title IX when it excludes a transgender-identifying person along with the other members of his or her sex from opposite-sex spaces—even where the Department's longstanding regulations would allow it (such as in showers)—unless the statute specifically provides otherwise (such as in living facilities).  This interpretation creates nonsensical results.  For example, funding recipients can separate students by sex for purposes of membership in sororities and fraternities, 20 U.S.C. § 1681(a)(6), but not bathrooms.  *See Louisiana*, 2024 WL 2978786 (reaching similar conclusion).  That cannot be Congress's intended result in prohibiting discrimination on the basis of sex in educational settings.

Section 1686 is instructive for interpreting the statute as a whole.  *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (noting the "cardinal rule" of reading the statute "as a whole").  It provides that "nothing contained" in Title IX "shall be construed to prohibit" funding recipients "from maintaining separate living facilities for the different sexes."  20 U.S.C. § 1686.  Thus, sex-separated living facilities are not what Congress envisioned as being sex discrimination under the statute.  Yet under the Final Rule's logic, excluding male students who identify as female from female dormitories would constitute discrimination based on sex.  Defendants defend their logic by claiming Section 1686 is an example of a "limited context[] in which different or separate treatment based on sex is permitted, without regard to the degree of harm such sex

separation might cause." ECF No. 18 at 20. But Congress did not judge that sex-separated liv-ing facilities would cause any harm. On the contrary, Section 1686 evidences Congress's con-cern that women's equal educational opportunities would be harmed if funding recipients were prohibited from separating certain sensitive areas by sex. *See Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at *32 (N.D. Tex. June 11, 2024) ("This instruction is the authori-tative expression of Congress's view that separating the two sexes where personal privacy must be preserved is not the type of discrimination prohibited by the statute." (quotation omitted)).

In sum, the Court agrees with the Plaintiffs that Title IX's prohibition on discrimination on the basis of "sex" means biological sex only and does not include gender identity. Plaintiffs are therefore likely to succeed in challenging the Final Rule as exceeding the Department's au-thority. *See Kansas*, 2024 WL 3273285, at *11 (concluding Final Rule exceeds the Depart-ment's authority under Title IX); *Tennessee*, 2024 WL 3019146, at *13 (same); *Louisiana*, 2024 WL 2978786, at *15 (same).

*Major questions doctrine*

The Supreme Court has held that Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA.*, 573 U.S. 302, 324 (2014) (quotation omitted). That is because agencies "have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). The Court does not find it to be a close call that the Department's interpretation of Title IX is foreclosed by the statute's text. But even if that were not the case, the major-questions doc-trine would require the Court to rule against the Department because Congress did not clearly

give the Department authority in Section 1681(a) to prohibit discrimination based on characteristics other than sex, including gender identity.

Plaintiffs argue the major-questions doctrine applies to the Final Rule.  Defendants, for their part, argue the doctrine does not apply because Title IX unambiguously authorizes the Department's definition of sex discrimination.  But Defendants do not otherwise contest that the Final Rule meets the requirements for the major-questions doctrine to apply.  The Court agrees with Plaintiffs that those requirements are met here.

First, the Rule has enormous social and political significance.  *See West Virginia*, 597 U.S. at 721.  How to address and treat people claiming a gender identity that differs from their biological sex has prompted state legislation in numerous areas, and the proposed rule here garnered over 240,000 comments.  89 Fed. Reg. at 33,477, ECF No. 9-1 at 4.  Second, the Rule has significant economic consequences because it threatens millions of dollars of funding for State educational programs.  Third, the Final Rule is "novel" and "transformative," and Congress "has consistently rejected proposals" to expand Title IX to prohibit discrimination based on sexual orientation and gender identity.  *West Virginia*, 597 U.S. at 716, 724, 732; *Neese v. Becerra*, No. 2:21-cv-163, 2022 WL 1265925, at *13 (N.D. Tex. Apr. 26, 2022) ("Legislators tried to amend Title IX to include 'sexual orientation' and 'gender identity' on multiple occasions, but those attempts failed."); *see also, e.g.*, Equality Act, H.R. 5, 117 Cong. 9(2) (2021); Title IX Take Responsibility Act of 2021, H.R. 5396, 117 Cong. (2021).  Fourth, the Rule intrudes on education, which is an area "where States historically have been sovereign," *United States v. Lopez*, 514 U.S. 549, 564 (1995), implicating not only the major questions doctrine, but also the federalism canon, *see West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring).

34

The Court therefore concludes that major-questions doctrine apples.  Because Title IX does not clearly give the Department the authority to prohibit discrimination based on gender identity, the Department exceeded its authority in adopting the Final Rule.  *See Kansas*, 2024 WL 3273285, at *12 (concluding that the major-questions doctrine applies); *Tennessee*, 2024 WL 3019146, at *14 (same); *Louisiana*, 2024 WL 2978786, at *14 (same).

2.      Sex-based harassment

Plaintiffs claim that the Department exceeded its authority in adopting a harassment standard that is contrary to Supreme Court caselaw.  The Court agrees.

*Contrary to Title IX*

The Supreme Court has held that sexual harassment is prohibited sex discrimination under Title IX.  *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992).  In *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), the Supreme Court held actionable Title IX harassment is limited to conduct that is "so severe, pervasive, *and* objectively offensive that it *denies* its victims . . . equal access to education" where "the recipient exercises substantial control over both the harasser and the context."  *Id.* at 645, 652 (emphases added).  This standard excludes both "a single instance of one-on-one peer harassment" (even if "sufficiently severe") and harassment that has only negative effects like "a mere 'decline in grades.'"  *Id.* at 652-53.  Under that standard, a funding recipient can only be held liable if it has "actual knowledge" of sexual harassment and is "deliberately indifferent" to it.  *Id.* at 650.  The Department formally adopted that definition of sexual harassment in 2020.  *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).

The Final Rule instead defines sex-based harassment to include hostile environment harassment, *i.e.*, "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe *or* pervasive that it *limits or denies* a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,498, ECF No. 9-1 at 25 (to be codified at 24 C.F.R. § 106.2) (emphasis added). Additionally, the Final Rule also expands the definition of harassment to cover conduct that is "subjectively and objectively" offensive measured from "the complainant's position." *Id.* at 33,510, ECF No. 9-1 at 37.

Those standards are quite different.  Defendants do not deny this.  Indeed, "[t]he Department's final definition is not identical to *Davis* . . . because the Department . . . believes a broader standard is appropriate." 89 Fed. Reg. at 33,498, ECF No. 9-1 at 25.  The question is whether the Department had authority to adopt a standard for harassment that is broader than the one adopted by the Supreme Court.

The Court concludes that Plaintiffs are likely to succeed in showing that the Department exceeded its authority in eschewing the Supreme Court's *Davis* standard.  The Supreme Court has recently explained that "statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Loper Bright Enters. v. Raimondo*, No. 22-1219, 2024 WL 3208360, at *16 (U.S. June 28, 2024).  This forecloses Defendants' argument that Title IX's prohibition on sexual harassment as sex discrimination takes on a different meaning depending on who brings the enforcement action.  ECF No. 18 at 28-29.

*Violates the First Amendment*

Plaintiffs claim that the Final Rule's definition of sex-based harassment violates the First Amendment by compelling and restricting speech.  *See Riley v. Nat'l Fed'n of the Blind of N.C.,*

*Inc.*, 487 U.S. 781, 796 (1988) ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance."). Courts reviewing similar harassment policies deviating from the Supreme Court's standard in *Davis* have found likely First Amendment violations. For example, the Eleventh Circuit considered a university's definition of "Hostile Environment Harassment" as "[d]iscriminatory harassment that is so severe *or* pervasive that it unreasonably interferes with, *limits*, deprives, or alters the terms or conditions of education . . . or participation in a university program or activity . . . when viewed from both a subjective and objective perspective." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114-15 (11th Cir. 2022) (emphasis added). The court held that this policy was "almost certainly unconstitutionally overbroad" and "an impermissible content- and viewpoint-based speech restriction." *Id.* at 1125. Other courts agree. *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir. 2020) (similar non-*Davis*-compliant harassment policy objectively chilled protected speech); *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480, 482 & n.6 (S.D. Tex. 2022) ("Speech First will likely succeed on the merits because the original [harassment] policy does not comport with the standard adopted by the Supreme Court" in *Davis*).

The Final Rule's constitutional infirmities are starkest as applied to pronoun usage. For example, failure to abide by a student's insistence on use of certain pronouns would likely constitute harassment under the Final Rule since it could have some negative impact upon the student. *See* 89 Fed. Reg. at 33,816, 33,819-20, ECF No. 9-1 at 343, 346-47 (explaining that gender-identity discrimination inherently inflicts more than de minimis harm under the Final Rule's approach). Yet such a policy would compel speech in violation of individuals' moral and religious beliefs. *See Beard v. Falkenrath*, 97 F.4th 1109, 1117 (8th Cir. 2024) (holding that the

Constitution does not require government officials to use "preferred gender pronouns" "in part because the speaker has a [First Amendment] right" to even "the misuse of a pronoun"); *Meriwether v. Hartop*, 992 F.3d 492, 498-500 (6th Cir. 2021).  Taken to its logical conclusion, the Final Rule's deviation from *Davis* will require funding recipients to quash student speech in violation of the First Amendment.

Defendants generally rely on the Title IX regulations' statement that recipients are not required to "[r]estrict any rights that would otherwise be protected from government action by the First Amendment."  34 C.F.R. § 106.6(d)(1); *see also* 89 Fed. Reg. at 33,505, ECF No. 9-1 at 32.  But the Court agrees with the court in *Tennessee*: "So long as the offended individuals complain with sufficient vigor, the refusal to abide by preferred pronouns can be deemed harassment and exposes a recipient of Federal funds to liability under Title IX."  *Tennessee*, 2024 WL 3019146, at *22; *see also id.* at *21-22 (reviewing DOJ amicus brief arguing that even a facially neutral approach of refusing to use honorifics such as "Mr." and "Ms." altogether can "create[] a risk of Title IX liability" where "students correctly recognize" the decision is "motivated by an aversion to referring to transgender students by names and pronouns that accord[] with their gender identity" (quotations omitted)).

The Court thus agrees that Plaintiffs are likely to succeed in showing that the Final Rule violates the First Amendment.  *See Kansas*, 2024 WL 3273285, at *15 (concluding Final Rule likely violates the First Amendment); *Tennessee*, 2024 WL 3019146, at *27 (same); *Louisiana*, 2024 WL 2978786, at *13 (same).

3.    Spending Clause

Plaintiffs claim that the Final Rule violates the limitations of the Spending Clause, and so would Title IX itself if the Final Rule were a valid interpretation of it.  The Court agrees that the Final Rule likely violates the Spending Clause.

Title IX was passed under Congress's Spending Clause authority.  *Davis*, 526 U.S. at 640.  That "power is of course not unlimited, but is instead subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  These restrictions include requirements that: (1) conditions must be "unambiguous[]" so States can "exercise their choice knowingly, cognizant of the consequences of their participation"; (2) conditions must be related to the "federal interest in the project"; (3) spending must not "induce the States to engage in activities that would themselves be unconstitutional"; and (4) spending must not "be so coercive as to pass the point at which 'pressure turns into compulsion.'"  *Id*. at 207-11.  Each requirement is "equally important" and must be "equally" satisfied for a spending condition to be constitutional. *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023).

The conditions imposed by the Final Rule fail these requirements.  First, the Final Rule's conditions are not "unambiguously" clear from Title IX itself.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Indeed, if they were, it would not have taken the Department over fifty years to issue them in a rulemaking.  Plaintiff States did not "voluntarily and knowingly" agree to the upheaval caused by the Final Rule's expansion of the definition of sex discrimination.  *Id.  See Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816 (2022) ("The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable.").  Finally, the "threatened loss" of a significant percentage of Plaintiffs' education funding "is

economic dragooning that leaves the States with no real option but to acquiesce." *NFIB v. Sebelius*, 567 U.S. 519, 582 (2012).

The Court concludes that Plaintiffs are likely to succeed in showing the Final Rule violates the Spending Clause. *See Kansas*, 2024 WL 3273285, at *13 (concluding Final Rule likely violates the Spending Clause); *Louisiana*, 2024 WL 2978786, at *16 (same).

B.    Arbitrary and capricious

Federal law prohibits agency actions, findings, and conclusions that are "arbitrary, capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A). Agency actions are arbitrary and capricious when they "entirely fail to consider an important aspect of the problem or offer an explanation for its decision that runs counter to the evidence before it." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (cleaned up) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). The Court concludes that the Final Rule is likely arbitrary and capricious.

1.    Sex discrimination

Plaintiffs claim that the Department's decision to abandon its decades-long understanding of Title IX's prohibition on sex discrimination was arbitrary and capricious. The Court agrees.

The Department failed to offer a "reasoned explanation" for departing from its longstanding view on the meaning of "sex" in Title IX. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[A] lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law."). In the proposed rule, the Department claimed that it "does not have a 'long-standing construction' of the term 'sex' in Title IX to mean 'biological sex.'" 87 Fed. Reg. at 41,537. That statement was directly contradicted by the Department's 2020 regulations, which noted that "Title IX

40

and its implementing regulations include provisions that presuppose sex as a binary classification."  85 Fed. Reg. at 30,178; *see F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.").

The Final Rule's reliance on *Bostock* for its departure from the Department's precedent was arbitrary.  As explained above, *Bostock*'s but-for-causation analysis cannot be simply imported into to Title IX because Title VII and Title IX differ in both text and structure.  Rather than engage with contrary precedents, the Final Rule merely makes "conclusory statements" noting its disagreement with courts' contrary conclusions.  *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024); *see* 89 Fed. Reg. at 33,805-06, ECF No. 9-1 at 332.  That is insufficient.

The Court also concludes that the Department failed to address relevant factors.

First, the Department failed to address the practical considerations of importing gender-identity discrimination into Title IX's framework for binary sex-based discrimination.  For example, under the Final Rule, a recipient violates Title IX "when it denies a transgender student access to a sex-separate facility or activity consistent with that student's gender identity."  89 Fed. Reg. at 33,818, ECF No. 9-1 at 345.  But "Defendants failed to include any requirements for changing one's gender identity and did not include any guidance for addressing 'non-binary' students or students with other gender identities."  *Louisiana*, 2024 WL 2978786, at *17.  The Final Rule's test would mean that a funding recipient violates Title IX if it refuses to build a gender-neutral bathroom to accommodate such students because failing to do so would always constitute "more than de minimis harm."  89 Fed. Reg. at 33,818, ECF No. 9-1 at 345.  But the Department said it was declining "to require that recipients provide gender-neutral or single-occupancy

facilities because" it recognized such facilities "would likely carry significant cost implications and it would be appropriate to seek public comment on this issue before making any such changes."  *Id.* at 33,820, ECF No. 9-1 at 347.  The Final Rule offers no coherent way to reconcile these contradictory statements.

Second, the Court concludes that the Department failed to respond to concerns raised by commentors that the proposed rule would undermine funding recipients' "legitimate interest[s]" in protecting students' privacy and safety.  89 Fed. Reg. at 33,820, ECF No. 9-1 at 347.  Instead, the Department simply stated it "disagree[s]" that the Final Rule would undermine that interest. *Id* (ignoring "evidence that transgender students pose a safety risk" in girls-only spaces—stating, once again, that it simply "does not agree.").

Responding to that criticism, Defendants simply declare that students identifying as transgender pose *no* safety risk to other students in single-sex spaces.  ECF No. 18 at 23.  If that is the Department's only defense, the Court concludes that Plaintiffs are likely to overcome it. Indeed, "bare acknowledgement" of concerns and "conclusory statements" are "no substitute for reasoned consideration."  *Louisiana*, 90 F.4th at 473 ; *see Tennessee*, 2024 WL 3019146, at *35 (noting that this is "so obvious" and "the Department . . . declined to provide any credible empirical analysis" otherwise); *Louisiana*, 2024 WL 2978786, at *19 ("[B]y allowing biological men who identify as a female into locker rooms, showers, and bathrooms, biological females risk invasion of privacy, embarrassment, and sexual assault.").

The Final Rule also provides funding recipients with no mechanism to authenticate the sincerity of a claimed gender identity.  Funding recipients have a duty to protect their students from harassment and sexual predators, including male students who would claim a female gender identity to enter female-designated spaces for nefarious purposes.  But a recipient could be guilty

of sex-based harassment were it to try and verify a student's claimed gender identity.  *See* 89 Fed. Reg. at 33,818-19, ECF No. 9-1 at 345-46.  The Final Rule arbitrarily leaves recipients no path except to accept a person's self-expressed gender identity, despite the significant safety and privacy concerns at stake.

While the Department may "acknowledge[]" that some recipients rely on "written confirmation" from another person of a student's claimed gender identity, it fails to tell recipients whether or when it violates the Final Rule to do so.  ECF No. 18 at 24.  Defendants fail to give even a single example of "documentation" that a school could require as proof that wouldn't be "burdensome" under the Final Rule.  *Id*; *see Kansas*, 2024 WL 3273285, at *16 (the Department "does not explicitly authorize any policy to determine a student's gender identity apart from said student's own statement and, in fact, dissuades a recipient from any documentation requirements, which could include a letter from a parent or coach.").  Ultimately, the Final Rule leaves recipients no viable option other than relying on the student's say-so.  That is arbitrary.  *Louisiana*, 2024 WL 2978786, at *19 ("Allowing a biological male student to change to a female by simply declaring it, requiring no documentation of the change, and allowing the student to shower with cisgender females in the girls' locker room goes beyond the scope of arbitrary and capricious.").

Lastly, the Final Rule's treatment of sex and gender identity is so internally inconsistent that it cannot be the product of "reasoned decisionmaking" and a "logical and rational" process.  *Michigan v. EPA*, 576 U.S. 743, 750 (2015).  For example, the Department fails to reasonably explain treating like circumstances differently.  It declines to apply its gender-identity mandate to "living facilities" by pointing to the statutory exceptions in section 1681.  *See* 89 Fed. Reg. at 33,816, ECF No. 9-1 at 343.  But it applies that mandate to "toilet, locker room, and shower facilities" despite the Department's regulations, which permit those facilities to be separated by sex

43

and which the Final Rule did not rescind.  *See* 34 C.F.R. § 106.33.  The Final Rule makes no attempt to reconcile these disparate statutory and regulatory requirements into a coherent whole. Nor could they.  Instead, the Department simply claims that under Section 1686 it must allow sex-separated living facilities and therefore does not impose the de-minimis-harm standard there. But the privacy and safety interests requiring sex-separated bathrooms and showers are just as significant as those requiring sex-separated living facilities.  The Department's approach nonsensically assumes that Congress cared only about the latter.  The Court concludes that Plaintiffs are likely to succeed in showing that the Final Rule is arbitrary and capricious.

2.    Sex-based harassment

Department failed to reasonably address its broadening of the definition of harassment.

It is arbitrary for the Final Rule to depart from *Davis* and subject recipients to two differing standards for liability, effectively overriding *Davis* by providing a lower bar for enforcement actions.

The Department also failed to adequately consider the First Amendment issues.  Pronoun usage is but one salient example.  Defendants admit that whether a person's usage of pronouns constitutes harassment is a "fact-specific inquiry" that depends on how "severe or pervasive" the complained of speech is.  ECF No. 18 at 35 (quotations omitted).  But Defendants have no answer as to whether a person's wholesale and ongoing refusal to use certain pronouns to a transgender-identifying person meets that standard.  The Court concludes that it was likely arbitrary for the Department to address these kinds of First Amendment concerns by creating a standard under which a person cannot know whether their speech is prohibited until they have already spoken.  *See Tennessee*, 2024 WL 3019146, at *26 ("Not only did the Department fail to

44

meaningfully address these First Amendment concerns, *but it also intentionally opted to leave the vague terms undefined*." (emphasis in original)).

## IV.    Irreparable Harm

Having concluded that Plaintiffs are likely to succeed in their challenge to the Final Rule, the Court considers whether Plaintiffs will suffer irreparable harm absent an injunction prior to the Final Rule's August 1 effective date.  The Court concludes that they will.

The irreparable-harm analysis largely overlaps with the Court's standing analysis.  The Court has already concluded that the Final Rule, if allowed to take effect, would prevent enforcement of numerous laws of Plaintiff States.  That suffices to show irreparable harm.  *See Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) ("Prohibiting the State from enforcing a statute . . . would irreparably harm the State.").  While Defendants argue that preemption does not injure a State where the agency has authority to issue the rule, ECF No. 18 at 29, they do not dispute that—assuming the Department exceeded its authority in issuing the Final Rule—Plaintiff States are irreparably harmed by the inability to enforce their duly enacted laws.

A.F. likewise faces irreparable harm due to the Final Rule's violation of her First Amendment rights.  *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976).  She would also be irreparably harmed if she were forced by the Final Rule to share a locker room, restroom, or shower area with a male student.  Defendants do not dispute the irreparable nature of her harm; instead, they argue that the injury is speculative.  For the same reason that A.F.'s injuries are sufficiently imminent for purposes of standing, the Court disagrees that A.F.'s claimed harm is speculative.

Accordingly, Plaintiffs have established they will be irreparably harmed absent injunctive relief.

## V.      Public Interest and Balance of the Equities

The Eighth Circuit has held that "the remaining factors of injury to other parties and the public's interest generally warrant lesser consideration than those of likelihood of success and irreparable harm." *Org. for Black Struggle*, 978 F.3d at 609.  The Department has no valid interest in enforcing its unlawful rule while this litigation proceeds.

## VI.     Scope of Relief

Defendants argue that any preliminary relief should be limited to the portions of the Final Rule that Plaintiffs specifically challenge as unlawful or arbitrary and capricious.  Defendants do not cite any precedent holding that partial injunctive relief against an agency rulemaking can be warranted.  "Vacatur is the normal remedy under the APA, which provides that a reviewing court 'shall . . . set aside' unlawful agency action." *Long Island Power Auth.*, 27 F.4th at 717 (quoting 5 U.S.C. 706(2)).  If Plaintiffs succeed on the merits, the Final Rule will be vacated in its entirety.  Defendants do not explain why the Department should be allowed to enforce a rule that is due to be vacated after a final merits decision.

Defendants also rely on the Final Rule's severability provision to argue for piecemeal relief.  But, as the *Tennessee* court recognized, "[t]he severability clause has little impact on the Court's analysis because the impermissible definition of 'discrimination on the basis of sex' in 34 C.F.R. § 106.10 permeates the remaining regulations." *Tennessee*, 2024 WL 3019146, at *43. The Court will therefore enjoin the Final Rule in its entirety.

Defendants ask the Court to limit the reach of any injunction to Plaintiff States.  But Eighth Circuit precedent holds that "'the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.'" *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (quoting *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir.

46

2019)).  Given that the ultimate remedy at the end of the case, assuming Plaintiffs succeed, would be vacatur of the Final Rule itself, the Court declines to limit injunctive relief to the Plaintiff States.

# CONCLUSION

Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' Motion for a 5 U.S.C. § 705 Stay and Preliminary Injunction of the Final Rule, ECF No. 9, is GRANTED.

IT IS FURTHER ORDERED that Defendants, along with their secretaries, directors, administrators, and employees, are ENJOINED and RESTRAINED from implementing, enacting, enforcing, or taking any action in any manner to enforce the Final Rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024), which is scheduled to take effect on August 1, 2024.

IT IS FURTHER ORDERED that the Final Rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024), is HEREBY ENJOINED AND RESTRAINED from going into effect on August 1, 2024, pending further orders of the Court.

IT IS FURTHER ORDERED that no security is required to be posted by Plaintiffs under Federal Rule of Civil Procedure 65.

IT IS FURTHER ORDERED that this Order shall remain in effect pending the final resolution of this case, or until further orders from this Court, the United States Court of Appeals for the Eighth Circuit, or the Supreme Court of the United States.

Prepared by:


Dated:  July 12, 2024                    Respectfully submitted,


TIM GRIFFIN                              ANDREW BAILEY
Arkansas Attorney General                Missouri Attorney General

*/s/ Dylan L. Jacobs*                    */s/ Joshua M. Divine*
Nicholas J. Bronni                       Joshua M. Divine
  Solicitor General                        Solicitor General
Dylan L. Jacobs                          Missouri Attorney General's Office
  Deputy Solicitor General               Post Office Box 899
Office of the Arkansas Attorney General  Jefferson City, MO 65102
323 Center Street, Suite 200             Tel. (573) 751-1800
Little Rock, AR  72201                    Fax. (573) 751-0774
Telephone: (501) 682-2007                josh.divine@ago.mo.gov
Fax: (501) 683-2520
nicholas.bronni@arkansasag.gov           *Counsel for Plaintiff State of Missouri*
dylan.jacobs@arkansasag.gov


*Counsel for Plaintiff State of Arkansas*

BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
Eric H. Wessan
Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
eric.wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

MICHAEL T. HILGERS
Nebraska Attorney General

*/s/ Lincoln J. Korell*
Lincoln J. Korell
Assistant Solicitor General
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

DREW H. WRIGLEY
North Dakota Attorney General

/s/ *Katie L. Carpenter*
Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov

*Counsel for Plaintiff State of North Dakota*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles D. McGuigan*
Charles D. McGuigan
Deputy Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us

*Counsel for Plaintiff State of South Dakota*

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
rrouleau@ADFlegal.org

Natalie D. Thompson**
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

*s/ Brad L. Blake*
Brad L. Blake
Missouri Bar No. 38340
Fellows & Blake, L.C.
13421 Manchester Road, Suite 105
St. Louis, MO 63131
(314) 725-1600
(314) 725-1609 Fax
bblake@fellowsblakelaw.com

*Counsel for Plaintiff A.F.*

*Admitted pro hac vice

**Admitted pro hac vice, practice supervised by
one or more D.C. Bar members while D.C. Bar
application is pending.