## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

STATE OF ARKANSAS, et al.,

      *Plaintiffs*,

      v.

MIGUEL CARDONA, *in his official capacity as Secretary of Education*, et al.,

      *Defendants*.

No. 4:24-cv-636-RWS

## <u>DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

1.      Pursuant to the Court's order dated June 21, 2024 [ECF No. 19], Defendants respectfully submit the following proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

### I.      Statutory and Regulatory Background

2.      Title IX's nondiscrimination mandate states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There are a small number of "specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *see* 20 U.S.C. § 1681(a)(1)-(9) (listing educational institutions, organizations, or programs that are exempt or partly exempt from Title IX's prohibition on sex discrimination); *id.* § 1686 (permitting maintenance of sex-separate living facilities).

3.      Congress granted the Department the authority to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 20 U.S.C. § 1682. And Title IX sets forth an administrative enforcement scheme, which requires the Department to first seek to obtain voluntary compliance from a recipient that fails to comply with the statute or the Department's implementing regulations before taking steps to otherwise effectuate compliance through enforcement proceedings that could lead to fund termination or refusal to grant or continue funding, or by any other means authorized by law. *Id.*

4.      Over the years, the Department has promulgated regulations effectuating Title IX, *see* 34 C.F.R. part 106, including in 2020 when it specified how recipients of federal funds must respond to allegations of sexual harassment. *See* Nondiscrimination on the Basis of Sex in

1

Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) [hereinafter 2020 Amendments].

5.    One month after publication of the 2020 Amendments, the Supreme Court held that discrimination on the basis of gender identity is necessarily discrimination "because of . . . sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020).

6.    Following *Bostock*, President Biden directed the Department of Education to review the 2020 Amendments and existing agency guidance "for consistency with governing law." Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021, § 2, 86 Fed. Reg. 13,803 (Mar. 8, 2021).

7.    In July 2022, after a considerable public engagement process and "an extensive review of the 2020 amendments," Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474, 33,476 (Apr. 29, 2024) [hereinafter the Final Rule or Rule] [ECF No. 9-1 at 3], the Department issued a Notice of Proposed Rulemaking. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (proposed July 12, 2022) [hereinafter NPRM].

8.    Following issuance of the NPRM, the Department conducted an extensive review of more than 240,000 public comments and determined that amendments were necessary to "fully effectuate" Title IX's purpose of eliminating sex discrimination from education programs and activities. 89 Fed. Reg. at 33,476 [ECF No. 9-1 at 3].

9.    Accordingly, the Department published the Final Rule, which goes into effect on August 1, 2024. *See* 89 Fed. Reg. 33,474 [ECF No. 9-1].

**II.    The Final Rule**

10.    The Final Rule makes a variety of changes to Title IX's current regulations. *See generally id.* at 33,882-96 (regulatory changes) [ECF No. 9-1 at 409-23].

11.    Among other things, the Final Rule streamlines administrative requirements related to the appointment and responsibilities of Title IX coordinators, 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.8(a)-(b)) [ECF No. 9-1 at 412]; revises recipients' notice of nondiscrimination and record-keeping requirements, *id.* at 33,885-86 (to be codified at 34 C.F.R. § 106.8(c), (f)) [ECF No. 9-1 at 412-13]; ensures access to lactation spaces for students who are breastfeeding, *id.* at 33,887 (to be codified at 34 C.F.R. § 106.40(b)(3)(v)) [ECF No. 9-1 at 414]; and provides recipients additional flexibility in the development and implementation of procedures to responded to claims of sex-based harassment, *id.* at 33,888-95 (to be codified at 34 C.F.R. §§ 106.45, 106.46) [ECF No. 9-1 at 415-22].

12.    In addition, as relevant to this case, the Final Rule (1) describes the scope of prohibited sex discrimination under Title IX, 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10) [ECF No. 9-1 at 413]; (2) explains the limits of permissible different or separate treatment on the basis of sex under Title IX, *id.* at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)) [ECF No. 9-1 at 414]; and (3) clarifies the definition of sex-based harassment under Title IX, *id.* at 33,884 (to be codified at 34 C.F.R. § 106.2) [ECF No. 9-1 at 411].

13.    The Rule explains that its various provisions are "intended to operate independently of each other" and are severable. 89 Fed. Reg. at 33,848 [ECF No. 9-1 at 375]; *see id.* (discussing

3

the Rule's severability provisions to be codified at 34 C.F.R. §§ 106.16 and 106.48, and existing provisions at 34 C.F.R. §§ 106.62, 106.72, and 106.82).

14.     The first provision of the Rule at issue, § 106.10 ("Scope"), provides that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 [ECF No. 9-1 at 413].

15.     The Rule states that "discrimination on these bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female,' as the Supreme Court assumed in *Bostock*." 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655) [ECF No. 9-1 at 329]. The Rule explains that Title IX prohibits the discrimination described in § 106.10 because "it is impossible to discriminate against a person on the bases listed in § 106.10 without discriminating against [an] individual based, at least in part, on sex, even if 'sex' is understood only in terms of certain physiological sex characteristics." *Id.* at 33,807 [ECF No. 9-1 at 334].

16.     The second provision at issue, § 106.31(a)(2), provides:

In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations at §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

89 Fed. Reg. at 33,887 [ECF No. 9-1 at 414].

17.     The Rule explains that § 106.31(a)(2) applies the well-established principle that sex-based different treatment or separation is not prohibited "discrimination" unless it subjects a person to injury, or harm. 89 Fed. Reg. at 33,814 [ECF No. 9-1 at 341]. The Department "concluded that to provide an education program or activity that does not subject participants to sex discrimination, a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury—*i.e.*, more than de minimis harm—unless there is a statutory basis for allowing otherwise." *Id.* The Department further concluded that, consistent with the guidelines of well-established medical organizations, and the findings of various courts, "excluding students from sex-separate facilities and activities consistent with their gender identity can impose significant harm on those students' mental health and overall well-being." *Id.* at 33,819 [ECF No. 9-1 at 346]. Thus, the Department determined that "students experience sex-based harm when they are excluded from sex-separate facilities consistent with their gender identity," *id.* at 33,820 [ECF No. 9-1 at 347]; *see id.* at 33,818 [ECF No. 9-1 at 345].

18.     The third provision at issue is the definition of "hostile environment harassment" set forth in § 106.2. That provision defines "hostile environment harassment" as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." 89 Fed. Reg. at 33,884 [ECF No. 9-1 at 411]. It further specifies that "[w]hether a hostile environment has been created is a fact-specific inquiry that includes consideration of" several factors, including, among others, "[t]he degree to which the conduct affected the complainant's ability to access the recipient's program or activity," and "[t]he type, frequency, and duration of the conduct." *Id.* As explained in the Rule, the Department promulgated this definition because it determined that "the

definition of 'sexual harassment' in the 2020 amendments failed to fully effectuate Title IX's prohibition on sex discrimination," *id.* at 33,497 [ECF No. 9-1 at 24].

19.     The Final Rule makes explicit that it does not affect recipients' obligations under the Department's preexisting Title IX regulation concerning sex-separate athletic teams. *See* 89 Fed. Reg. at 33,816-17 [ECF No. 9-1 at 343-44]; 34 C.F.R. 106.41(b) (providing that "a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport"). Instead, the Department is currently considering a separate proposed rule that would address eligibility criteria for sex-separate athletic teams. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023). "Until that rule is finalized and issued, the current regulations on athletics continue to apply." 89 Fed. Reg. at 33,817 [ECF No. 9-1 at 344].

### III.    Plaintiffs' Claimed Interests, Amici States' Asserted Interests, and Other Interests.

*Plaintiffs' Interests*

20.     Plaintiffs are an individual Arkansas public high school student and six States. Compl. ¶¶ 1-8.

21.     High school student A.F. plays basketball and volleyball [ECF No. 9-3, ¶¶ 6-19], and "[s]ports has played an important part in [her] life." [ECF No. 9-3, ¶ 21]. A.F. believes it is "unfair" to allow "males who identify as girls to compete in girls' sports," [ECF No. 9-3, ¶ 23], and she does not want to play on sports teams with or against students whose gender identity does not match their sex assigned at birth. [ECF No. 9-3, ¶¶ 25-37].

22.     In the past, A.F. has expressed her views about gender identity and sex-separate

sports teams to her teammates and coaches. [ECF No. 9-3, ¶ 42]. In addition, A.F. is Christian and believes "that God created everyone to be either male or female," and A.F. "only use[s] pronouns of others consistent with their sex, not their gender identity." [ECF No. 9-3, ¶¶ 40-41]. A.F. wants to continue to express her views about gender identity in the future, but she fears that if the Final Rule goes into effect, "someone might get offended and complain to the school," and that the school would punish her for her speech. [ECF No. 9-3, ¶ 46].

23.    A.F. does not want to "use the restroom" or "change clothes in the locker room" "in front of" a transgender girl. [ECF No. 9-3, ¶ 48]. Nor does she want to shower in the locker room with a transgender girl nearby [ECF No. 9-3, ¶ 50], or sleep in the same room as a transgender girl on a school overnight trip [ECF No. 9-3, ¶ 52]. She explains that such experiences would cause her distress, embarrassment, anxiety, and discomfort. [ECF No. 9-3, ¶¶ 49, 50, 52].

24.    However, A.F. has not plausibly alleged that there are any transgender students at her school whom she is likely to encounter in a restroom or locker room, or with whom she could be assigned to share a room on a school overnight trip. [ECF No. 9-3, ¶¶ 47-52]. Nor does she allege or present evidence that there are students who have been offended by her use of pronouns or speech about gender identity, or that there are individuals whom she expects to complain of harassment due to her speech. [ECF No. 9-3, ¶¶ 38-46].

25.    State Plaintiffs' only claimed harm is that "the Final Rule derogates [their] sovereign interests in enforcing their duly enacted laws." [ECF No. 12 at 38].

26.    Several State Plaintiffs have laws that limit eligibility for sex-separate school athletics teams based on sex assigned at birth or "biological sex." *See* Ark. Code Ann. § 6-1-107(c); Mo. Rev. Stat. § 163.048(3); Iowa Code Ann. § 261i.1–.2; N.D. Cent. Code § 15-10.6-01–03; S.D. Codified Laws § 13-67-1.

27.     Arkansas, North Dakota, and Iowa have laws regulating name and pronoun usage by school employees and students. *See* Ark. Code Ann. § 6-1-108(d)(1), (d)(2); N.D. Cent. Code. § 14-02.4-15.2(1); Iowa Code Ann. § 279.78.3.

28.     Arkansas and Iowa also have laws limiting access to school multioccupancy restrooms according to biological sex. *See* Ark. Code Ann. § 6-21-120(b)(1); Iowa Code Ann. § 280.33(2). Nebraska permits school districts to "maintain[] separate toilet facilities, locker rooms, or living facilities for the different sexes," Neb. Rev. Stat. Ann. § 79-2,124, with "sex" defined as biological sex, Neb. Exec. Order. No. 23-16 (Aug. 30, 2023). And North Dakota requires dormitory restrooms and showers in single-sex dormitories or dormitory floors to be designated for use by biological sex. N.D. Cent. Code § 15-10-68(1). In addition, Arkansas law provides that on overnight trips, schools must ensure that a student "(1) [s]hares sleeping quarters with a member or, if necessary, multiple members, of the same sex; or (2) [i]s provided single-occupancy sleeping quarters." Ark. Code Ann. § 6-10-137(a).

29.     The States did not submit declarations regarding their enforcement of the cited state laws or any other proof of their claimed injuries in support of their motion.

### *Interests of Amici States and Others*

30.     Amici States—fifteen states and the District of Columbia—"have adopted laws and policies that combat sex discrimination against students on the basis that they appear, act, and identify as a sex different than their sex assigned at birth, or that they are attracted to someone of the same sex." [ECF No. 43 at 2]. Amici States support the Final Rule's "explicit protections for LGBTQ students" and believe that the Final Rule's hostile environment harassment definition "rectifies . . . harm to . . . schools and communities" caused by the 2020 Amendments, which in Amici States' view, "undermined Title IX's nondiscrimination mandate by arbitrarily narrowing

the scope of Title IX's sexual harassment protections." [ECF No. 43 at 2].

31.     Surveys indicate that subjecting LGBTQ students to discrimination and harassment is associated with various harms to such students, including harms to academic achievement and educational aspirations, self-esteem, and mental health. *See* Joseph G. Kosciw *et al*., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xix, 35-36, 41-45 (2022), https://perma.cc/8VQA-QALT [hereinafter Kosciw 2022] [cited in ECF No. 43 at 3]; Joseph G. Kosciw *et al.*, GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xviii-xix, 41-45, 48-49 (2016), https://perma.cc/9LWY-X5A7 [hereinafter Kosciw 2015] [cited in ECF No. 43 at 4].

32.     Further, "guidelines published by well-established medical organizations . . . say that being able to live consistent with one's gender identity is critical to the health and well-being of transgender youth." 89 Fed. Reg. at 33,819 [ECF No. 9-1 at 451] (citing World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022); Jason Rafferty *et al.*, Am. Acad. of Pediatrics, *Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents*, 142 Pediatrics 72 (2018); Tanya Albert Henry, *Exclusionary Bathroom Policies Harm Transgender Students,* American Medical Association (Apr. 17, 2019)).

33.     Amici States state that they have implemented policies that allow students to use restrooms consistent with their gender identity while also accounting for students' privacy concerns. [ECF No. 43 at 5-6]. For example, in Washington State, where districts must allow students to use the restroom or locker room consistent with their gender identity, schools must provide any student "who has a need or desire for increased privacy, regardless of the underlying

reason," with "access to an alternative restroom (e.g., staff restroom, health office restroom)," "a reasonable alternative changing area, such as the use of a private area (e.g., a nearby restroom stall with a door), or a separate changing schedule." *See* Susanne Beauchaine *et al.*, *Prohibiting Discrimination in Washington Public Schools* 30-31 (Wash. Off. of Superintendent of Pub. Instruction 2012), https://perma.cc/N7AC-6AJJ [cited in ECF No. 43 at 5]. Many other states offer comparable guidance. *See, e.g.*, Conn. Safe Sch. Coal., Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws 9-10 (2012), https://perma.cc/U4TS-95G4; Ill. Dep't of Hum. Rts., Non-Regulatory Guidance: Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act 6-7 (2021), https://perma.cc/DH86-JDNV; Mich. Dep't of Educ., State Board of Education Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students 5-6 (2016), https://perma.cc/GK8W-WEB9; N.J. State Dep't of Educ., Transgender Student Guidance for School Districts 7 (2018), https://perma.cc/D7MZ-QRK6; N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices 22-24 (June 2023), https://perma.cc/97DC-3L8E; Vt. Agency of Educ., Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students 6, 8 (2017), https://perma.cc/CK76-7EK4 [all cited in ECF No. 43 at 6].

### IV.    Procedural Background

34.    Plaintiffs filed suit on May 7, 2024. [ECF No. 1]. The Complaint asserts claims under the Administrative Procedure Act ("APA") that the Final Rule exceeds the Department's statutory authority and is not in accordance with law; is contrary to the U.S. Constitution; and is arbitrary and capricious. Compl. ¶¶ 119-156. Plaintiffs' allegations of harm and legal challenges

are limited to just three provisions of the Rule—§§ 106.10 and 106.31(a)(2), and the "hostile environment harassment" definition in § 106.2—and specifically to those provisions' applications to gender identity discrimination. Compl. ¶¶ 92-118, 123-156.

35.    Plaintiffs filed their Motion for a 5 U.S.C. 705 Stay and Preliminary Injunction on May 21, 2024. [ECF No. 9]. Plaintiffs' motion likewise focuses on the three provisions listed above, as applied to gender identity discrimination. [ECF No. 12]. On June 14, 2024, Defendants filed their memorandum in opposition to Plaintiffs' motion for preliminary relief. [ECF No. 18]. Plaintiffs filed their reply on June 21, 2024. [ECF No. 21]. Pursuant to the Court's orders [ECF Nos. 19, 36], the parties subsequently filed supplemental briefs on several issues.

## PROPOSED CONCLUSIONS OF LAW

### I.    Legal Standards

36.     "A preliminary injunction is an extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

37.    In determining whether a preliminary injunction is warranted, the Court considers four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). If relief is warranted, a "preliminary injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022) (quotation marks and citations omitted).

38.    Section 705 of the APA permits a court to stay agency action pending judicial review. 5 U.S.C. § 705. A plaintiff must make the same showing for a preliminary injunction as for a § 705 stay. *See B & D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d. 891, 905 (N.D. Iowa 2008). More fundamentally, § 705 contemplates preliminary relief subject to traditional equitable principles; it expressly provides that courts may delay an action's effective date only "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705; *see* H.R. Rep. No. 79-1980, at 43 (1946) (explaining this relief "is equitable"). As the Supreme Court recently explained, "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024).

39.    Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

40.    Review under the arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A) is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), and the question for the Court is whether the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983).

41.    The Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, -- S. Ct. --, 2024 WL 3208360 (U.S. June 28, 2024), does not affect the APA's "arbitrary and capricious" standard. *See id.* at *12.

42.    *Loper Bright* instead held that courts should no longer apply the doctrine of

*Chevron* deference, applicable to claims that agency action is contrary to statute under § 706(2)(C). *See id.* That holding does not affect the Court's analysis in this case because the Department does not invoke *Chevron* deference in support of any of its interpretations reflected in the Rule.

## II.    Plaintiff A.F. Lacks Standing; State Plaintiffs Adequately Allege Standing.

43.    On a motion for preliminary injunction, as at any other stage of the litigation, the Court must first determine whether it has jurisdiction to decide the matter before it, including whether Plaintiffs have standing for their claims. *See Jones v. Jegley*, 947 F.3d 1100, 1103 (8th Cir. 2020) (explaining, before turning to preliminary injunction elements, that "[o]ur starting point is jurisdiction, and specifically whether [the plaintiff] has established standing to sue").

44.    To establish standing, a plaintiff must show that it has suffered or will imminently suffer an "injury in fact" "caused" by the challenged government action that a favorable decision would likely "redress." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992). To satisfy the injury-in-fact requirement, a plaintiff must allege an invasion of a "legally protected interest" that is "concrete" and "particularized" and "actual or imminent"—not "conjectural" or "hypothetical." *Id.* at 560 (citation omitted).

45.    Where regulatory provisions are severable, a plaintiff must establish standing with respect to each provision it challenges. *See Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) ("Because the code's provisions are properly considered severable, [the plaintiff] must show injury, causation, and redressability with respect to each provision it challenges as overbroad.").

46.    Here, Plaintiff A.F. lacks standing because she has established no "concrete and particularized," "actual or imminent" injury that is fairly traceable to the Rule. *Lujan*, 504 U.S. at 560–62. Her alleged injuries are limited to concerns about transgender students' eligibility for sex-

13

separate sports teams—an issue the Rule does not affect, *cf. Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998 (8th Cir. 2022) (rejecting a "theory of injury" that was "based on a misunderstanding" of the challenged agency action), *cert. denied*, 143 S. Ct. 2638 (2023); speculation about hypothetical future encounters with transgender students; and a fear that her school will punish her for expressing her views about gender identity, even though A.F. identifies no one whom she expects to complain of harassment, and even though the Rule states expressly that recipients must abide by the requirements of the First Amendment. Thus, A.F. cannot demonstrate entitlement to preliminary relief or any relief. *See Murthy v. Missouri*, --- S. Ct. ----, 2024 WL 3165801, at *8 (U.S. June 26, 2024) ("It is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" (citation omitted)); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."); *id.* at 417 (plaintiffs cannot establish standing by burdening themselves based on fears of hypothetical future harm); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159–60 (2014) (plaintiff may bring a pre-enforcement First Amendment challenge only where it intends "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder" (citation omitted)); *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794–95 (8th Cir. 2016) ("In analyzing a claim of standing through self-censorship, the relevant inquiry is whether a party's decision to chill his speech in light of the challenged [regulation] was objectively reasonable." (cleaned up)).

47.    While Defendants dispute that State Plaintiffs have established the irreparable harm element necessary for preliminary relief, they have not contested the States' constitutional standing

to challenge the three provisions of the Rule at issue. At least at this stage of the litigation, the Court concludes that State Plaintiffs have adequately alleged Article III standing based on their status as parties regulated by the challenged provisions. Compl. ¶¶ 75-108; *see generally Lujan*, 504 U.S. at 561–62.

### III.    All Plaintiffs Are Unlikely to Succeed on the Merits.

48.    Plaintiffs in any case are unlikely to succeed on the merits of their claims.

#### A.  Section 106.10's Specification that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text.

49.    Plaintiffs are unlikely to succeed in their challenge to § 106.10 because that provision merely states the plain meaning of Title IX's unambiguous general nondiscrimination mandate, which prohibits recipients of federal funds from discriminating "on the basis of sex," 20 U.S.C. § 1681(a). In § 106.10, the Rule explains that this prohibition of sex discrimination encompasses discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. 89 Fed. Reg. at 33,886 [ECF No. 9-1 at 413].

50.    Plaintiffs take issue with only a portion of § 106.10—its specification that sex discrimination under Title IX includes discrimination on the basis of sexual orientation and gender identity. Their challenge is unlikely to succeed because, per *Bostock*, Title IX's prohibition on discrimination "on the basis of sex" unambiguously means that recipients may not discriminate on the basis of sexual orientation or gender identity. *See Bostock*, 590 U.S. at 661 (explaining when an employer discriminates against an employee for being homosexual or transgender, "sex is necessarily a but-for *cause*" of the discrimination).

51.    Section 106.10 is a straightforward application of *Bostock*'s reasoning.

52.    *Bostock* interpreted Title VII's provision making it unlawful, in relevant part, "for

15

an employer . . . to discriminate against any individual . . . because of such individual's . . . sex." 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Supreme Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656–57 (citation omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of gender identity "because it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660-61 (emphasis omitted).

53.      If, for example, an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female," but "retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. "[T]he individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* That is so even if "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

54.      Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. § 1681(a), employs a causation standard no more stringent than Title VII's "because of . . . sex" language, 42 U.S.C. § 2000e-2(a)(1). Indeed, the Supreme Court used the phrase "on the basis of" interchangeably with Title VII's "because of" language when discussing Title VII's causation standard in *Bostock* itself. *See* 590 U.S. at 650 ("[I]n Title VII, Congress outlawed discrimination in the workplace on the basis of . . . sex."). And the Eighth Circuit has relied on interpretations of Title VII's prohibition against discrimination "because of . . . sex" to interpret Title IX's textually similar provision. *See, e.g.*, *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 866 (8th Cir. 2011) (observing that Title VII's "because of" and Title IX's "on the basis of" language "are treated

16

interchangeably"). Thus, as Defendants explain, just as *Bostock* held that Title VII prohibits an employer from firing a transgender person because of the person's gender identity or a homosexual person because of the person's sexual orientation, *see* 590 U.S. at 660, § 106.10 provides that a school may not put a gay student in detention based on the student's sexual orientation or exclude a transgender student from homecoming based on the student's gender identity. [ECF No. 47 at 4].

55.    Plaintiffs argue that the inclusion of discrimination on the basis of gender identity in § 106.10 is contrary to statute and arbitrary and capricious because Title IX prohibits discrimination based only on "biological sex." [ECF No. 12 at 20-22, 32]. But *Bostock* likewise "proceed[ed] on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female." 590 U.S. at 655. Thus, per *Bostock*, regardless of how one defines "sex," "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660; *see also id.* at 660–61 (explaining "transgender status [is] inextricably bound up with sex"). The Rule faithfully follows *Bostock*'s reasoning. *See* 89 Fed. Reg. at 33,802, 33,804-05, 33,807 [ECF No. 9-1 at 329, 331-32, 334]. To the extent other district courts have found § 106.10's description of the scope of Title IX's general nondiscrimination mandate to exceed the Department's statutory authority on the basis that the Department relied on a definition of "sex" that "includes subjective gender identity," *Tennessee v. Cardona*, --- F. Supp. 3d ---, 2024 WL 3019146, at *13 (E.D. Ky. June 17, 2024), *appeal filed*, No. 24-5588 (6th Cir. June 26, 2024); *see Louisiana v. U.S. Dep't of Educ.*, No. 3:24-CV-00563, 2024 WL 2978786, at *4 (W.D. La. June 13, 2024), *appeal filed*, No. 24-30399 (5th Cir. June 25, 2024), those courts misunderstood the Rule, and their analysis is thus not persuasive.

56.    Moreover, contrary to the suggestions of other district courts, there is no conflict

between § 106.10's description of the scope of Title IX's general prohibition on sex discrimination and the existence of statutory exclusions from Title IX's general nondiscrimination mandate. *Cf. Kansas v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2024 WL 3273285, at *10 (D. Kan. July 2, 2024), *appeal filed*, No. 24-3097 (10th Cir. July 11, 2024); *Tennessee*, 2024 WL 3019146, at *12; *Louisiana*, 2024 WL 2978786, at *11. Indeed, in interpreting Title VII's materially similar prohibition, the *Bostock* Court felt no need to address the fact that Title VII, too, sets forth an exception to its general nondiscrimination mandate. *See* 42 U.S.C. § 2000e-2(e) (allowing employers to hire individuals on the basis of "sex" when sex "is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise"); *see also* 89 Fed. Reg. at 33,807 [ECF No. 9-1 at 334] (noting that "like Title IX, Title VII includes an exception that allows an employer to differentiate or separate individuals on the basis of sex in certain circumstances"). The Rule properly distinguishes between the Department's "interpretation of Title IX's general prohibition on sex discrimination," codified in § 106.10, and "Title IX's limited allowance for separate or different treatment on the basis of sex in certain contexts." *Id.* at 33,807-08 [ECF No. 9-1 at 334-35].

57.    In a related argument, Plaintiffs suggest that *Bostock*'s reasoning cannot apply—and the Court should not adhere to the plain meaning of Title IX's general nondiscrimination mandate—because Title IX must be read to allow bathrooms, locker rooms, and living facilities to be divided by biological sex. [ECF No. 21 at 6; ECF No. 12 at 24]. But as in *Bostock*, § 106.10 does not "purport[] to address bathrooms, locker rooms," or other sex-differentiated contexts. 590 U.S. at 681. For example, § 106.10 does not rescind, modify, or otherwise address 34 C.F.R. § 106.33, which is the preexisting regulation providing that "[a] recipient may provide separate toilet, locker room, and shower facilities on the basis of sex," if the facilities are comparable. *See,*

*e.g.*, 89 Fed. Reg. at 33,809 ("declin[ing] the suggestion to revise § 106.10 to address separation of students based on sex"). Permissible different treatment or separation on the basis of sex under Title IX is instead addressed by § 106.31(a)(2) of the Final Rule, which the Court discusses below.

58.     Plaintiffs are likewise wrong that *Bostock*'s reasoning should not apply because Title VII and Title IX operate in "different contexts" [ECF No. 21 at 4; ECF No. 12 at 24], and the district court opinions that have relied on such reasoning to reject *Bostock*'s applicability are unpersuasive. *Cf. Kansas*, 2024 WL 3273285, at *9; *Tennessee*, 2024 WL 3019146, at *12; *Louisiana*, 2024 WL 2978786, at *12. Despite the differences between Title VII and Title IX, courts have long interpreted the statutes' general nondiscrimination mandates consistently. *See, e.g., Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (citing Supreme Court precedent interpreting Title VII in explaining that school district "[u]nquestionably" was on notice that Title IX prohibits sexual harassment); *Wolfe*, 648 F.3d at 866 ("[T]he Supreme Court's interpretation of Title VII properly informs our examination of Title IX[.]").

59.     Contrary to Plaintiffs' argument, *Bostock*'s holding regarding the meaning of Title VII's general nondiscrimination mandate did not hinge on a determination by the Supreme Court "that an employee's 'sex' or 'homosexuality or transgender status is not relevant to employment decisions.'" [ECF No. 21 at 4]. Rather, the Court's holding rested entirely on the plain meaning of the relevant statutory text. *Bostock*, 590 U.S. at 660. Because "the ordinary public meaning of the statute's language at the time of the law's adoption" was to prohibit firing an employee based in part on sex, "[t]he *statute's* message" was that an "individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 659-60 (emphasis added). As the *Bostock* Court emphasized, its analysis "involve[d] no more than the straightforward application of legal terms with plain and settled meanings." *Id.* at 662; *see id.* at 674 ("[W]hen the meaning of the

statute's terms is plain, our job is at an end.").

60.     Accordingly, applying *Bostock*'s reasoning regarding the meaning of Title VII's general nondiscrimination mandate, the Department engaged in a "straightforward application" of Title IX's materially indistinguishable "legal terms with plain and settled meanings." *See* 590 U.S. at 662, 664. The Department's application of that reasoning was neither in excess of statutory authority [ECF No. 12 at 19], nor "arbitrary" [ECF No. 12 at 32].

61.     The extra-circuit cases cited in Plaintiffs' motion do not undermine this conclusion.

62.     Plaintiffs' reliance on *Adams ex rel. Kasper v. School Board of St. John's County* is misplaced because *Adams*—which was decided before the Rule was issued—did not interpret the scope of discrimination "on the basis of sex" addressed in § 106.10, but rather determined whether a particular school district policy preventing a transgender boy from using the boys' restroom violated Title IX. 57 F.4th 791, 799 (11th Cir. 2022). Section 106.10 does not address sex-separate restrooms or the circumstances under which Title IX permits sex separation. 89 Fed. Reg. at 33,886 [ECF No. 9-1 at 413]; *see id.* at 33,802 [ECF No. 9-1 at 329] (explaining, with respect to § 106.10, that "[t]he text of Title IX unambiguously covers any sex discrimination, except to the extent excluded in certain statutory provisions"); *id.* at 33,809 [ECF No. 9-1 at 336] (declining commenter's suggestion to revise § 106.10 to address separation of students based on sex because sex separation is instead addressed in § 106.31(a)(2)). Instead, that issue is taken up in § 106.31(a)(2), as noted *supra*. Nothing in *Adams* contradicts the Final Rule's specification in § 106.10 that discrimination based on gender identity necessarily constitutes discrimination "on the basis of sex" under Section 1681 of Title IX, read in light of *Bostock*. *See Adams*, 57 F.4th at 808-09 (recognizing that "*Bostock* held that 'discrimination based on . . . transgender status necessarily entails discrimination based on sex'" and maintaining that this "statement is not in

question in this appeal" (citation omitted)).

63.     *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), similarly, did not concern whether Title VII's prohibition on discrimination "because of" sex is materially distinguishable from Title IX's prohibition on discrimination "on the basis of" sex. Rather, the court declined to rely on *Bostock*'s analysis of but-for causation under Title VII in interpreting the Equal Protection Clause, emphasizing that the latter is a constitutional provision not a statutory protection, and that the Equal Protection Clause does not contain comparable language to Title VII. *See id.* at 1228-29.

64.     *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), *cert. granted by United States v. Skrmetti*, --- S. Ct. --- (June 24, 2024), also did not interpret Title IX. In reversing the preliminary injunction of a state law prohibiting health care providers from performing gender-affirming surgeries and administering hormones or puberty blockers to transgender minors, the court considered whether the law would receive heightened review under the Equal Protection Clause. *Id.* at 479-86. The court observed that *Bostock* "does not alter" its conclusion about whether the law should receive increased scrutiny, and suggested in dicta that *Bostock*'s reasoning applied only to Title VII. *Id.* at 484-85 (emphasis omitted). *L.W.* did not consider whether, given *Bostock*'s reasoning, Title IX's prohibition on discrimination "on the basis of sex" could be interpreted to mean something different than Title VII's prohibition on discrimination "because of sex."

65.     *Neese v. Becerra* was a challenge by two physicians to a notice that the Department of Health and Human Services would interpret a prohibition of sex discrimination in Section 1557 of the Affordable Care Act to include discrimination on the basis of sexual orientation and gender identity. 640 F. Supp. 3d 668, 673 (N.D. Tex. 2022), *appeal filed*, No. 23-10078 (5th Cir. Jan. 25,

2023). *Neese* is not persuasive because it concluded that *Bostock*'s reasoning does not extend to Title IX because "Title IX presumes sexual dimorphism" and because Title IX refers to discrimination "on the basis of" sex rather than "because of" sex. *See* 640 F. Supp. 3d at 676-84. But, the Rule, like *Bostock*, explains that discrimination based on gender identity is necessarily a form of discrimination on the basis of sex, even if sex is assumed to be binary—that is, even if "sexual dimorphism" is presumed. 89 Fed. Reg. at 33,802, 33,804-05, 33,807 [ECF No. 9-1 at 329, 331-32, 334]. And in focusing on Title IX's use of the phrase "on the basis" of sex, the court in *Neese* failed to acknowledge that *Bostock* used "on the basis" and "because of" interchangeably. *See, e.g.*, *Bostock*, 590 U.S. at 650, 654, 662, 666.

66.    In sum, none of the cases relied upon by Plaintiffs undermines the conclusion that the Department properly applied *Bostock*'s straightforward textual analysis in interpreting the unambiguous text of Title IX's general nondiscrimination mandate.

67.    For the same reasons discussed above, Plaintiffs' attempt to invoke the "major questions doctrine" with respect to the Rule's description of the scope of Title IX's general nondiscrimination mandate also is unlikely to succeed. Because § 106.10 merely interprets Title IX's unambiguous text, the provision does not implicate the "major questions doctrine." [ECF No. 12 at 25-26]. That doctrine is reserved for only "extraordinary" cases, "in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up).

68.    In articulating the meaning of Title IX's unambiguous text, the Department was not making a policy decision, but rather following the law as dictated by Congress. Indeed, in *Bostock*, the Supreme Court considered the meaning of Title VII's text at the time of enactment and

nonetheless reached conclusions about the application of that text that the Supreme Court acknowledged would have been surprising when Title VII was enacted. *See* 590 U.S. at 675-76. In explaining the meaning of the statute's plain terms, the *Bostock* Court embraced that "many, maybe most, applications of Title VII's sex provision were 'unanticipated' at the time of the law's adoption" and that "many now-obvious applications met with heated opposition early on, even among those tasked with enforcing the law." *Id.* at 679. With respect to Title IX, similarly, § 106.10 only reflects "policy decisions" made by "Congress . . . itself." *West Virginia*, 597 U.S. at 723 (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017)).

69.    Accordingly, Plaintiffs have not shown that the Final Rule's specification that Title IX prohibits discrimination on the basis of gender identity exceeds the Department's statutory authority, or that it is arbitrary and capricious. They thus fail to demonstrate a likelihood of success with respect to their challenge to § 106.10.

**B.  The Limitations on Sex Separation Set Forth in § 106.31(a)(2) Are Lawful and Properly Account for Congressional Direction.**

70.    Plaintiffs take issue with the Final Rule's provision that, with limited exceptions, a recipient may not carry out otherwise permissible different or separate treatment on the basis of sex in a manner that prevents a person from participating in an education program or activity consistent with the person's gender identity. *See* 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)) [ECF No. 9-1 at 414]. Contrary to Plaintiffs' arguments, this provision of the Rule in § 106.31(a)(2) follows naturally from Title IX's text and is not arbitrary or capricious. Plaintiffs are therefore unlikely to succeed on the merits of their challenge to § 106.31(a)(2).

71.    As relevant here, § 106.31(a)(2) has two parts: First, it specifies that, with certain limited exceptions where the statute permits differential treatment on the basis of sex, a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally

cognizable injury (i.e., more than de minimis harm) on the basis of sex. 89 Fed. Reg. at 33,814 [ECF No. 9-1 at 341]; *see id.* at 33,887 [ECF No. 9-1 at 414]. Second, it explains that preventing a person "from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." *Id.* at 33,887 [ECF No. 9-1 at 414]. Taken together, these provisions mean that, because Title IX does not include a statutory exception or exclusion addressing bathrooms or locker rooms, a recipient may not adopt a policy or practice that prevents a person from using sex-separate bathrooms or locker rooms consistent with the person's gender identity.

72.    The central principle applied in § 106.31(a)(2)—that Title IX generally does not permit sex separation or differentiation that causes more than de minimis harm—follows naturally from Title IX's prohibition of "discrimination," 20 U.S.C. § 1681(a), a term which the Supreme Court  has held refers to "distinctions or differences in treatment . . . that injure protected individuals." 89 Fed. Reg. at 33,814 [ECF No. 9-1 at 341] (quoting *Bostock*, 590 U.S. at 681); *see Muldrow v. City of St. Louis*, 601 U.S.---, 144 S. Ct. 967, 974 (2024) ("The words 'discriminate against,' we have explained, refer to 'differences in treatment that injure' employees." (quoting *Bostock*, 590 U.S. at 681)).

73.    The Rule's specification that recipients generally may not prevent a person from using sex-separate facilities consistent with their gender identity is simply an application of this principle. As explained in the Rule, Title IX regulations have long recognized that sex "separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" because separation of such facilities by sex generally imposes no more than de minimis harm on students. 89 Fed. Reg. at 33,818 [ECF No. 9-1 at 345]; *see generally* 34 C.F.R. § 106.33. But, consistent with federal court decisions and guidelines

published by respected medical organizations, the Department determined that sex separation that prevents a person from participating in an education program or activity consistent with their gender identity does cause the person more than de minimis harm. *See* 89 Fed. Reg. at 33,816 [ECF No. 9-1 at 343].

74.     As noted in the Rule, Congress has recognized certain exclusions from Title IX's general prohibition on sex discrimination—that is, certain contexts in which different treatment or separation on the basis of sex is permitted even if it causes harm. *Id.* at 33,816 [ECF No. 9-1 at 343]. However, a recipient's maintenance of sex-separate restrooms and locker rooms is not one of those Congressionally recognized exceptions. *Id.* The Department's regulation permitting a recipient to "provide separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33, was adopted pursuant to Title IX's general nondiscrimination mandate in 20 U.S.C. § 1681 and the Department's regulatory authority under § 1682. It does not implement, for instance, 20 U.S.C. § 1686, the statutory carve out for sex-separate "living facilities." *See* 89 Fed. Reg. at 33,821 [ECF No. 9-1 at 348]. Thus, the regulation permitting sex-separate bathroom, locker room, and toilet facilities is not one of the contexts excepted from application of § 106.31(a)(2)'s de minimis harm standard. *See id.* at 33,887 [ECF No. 9-1 at 414].

75.     Plaintiffs argue that § 106.31(a)(2)'s listing of the statutory "living facilities" carve out, but not the sex-separate bathrooms regulation, as an exception to the de minimis harm rule is somehow contradictory. [ECF No. 12 at 21-22, 34-35]. However, there is no inconsistency. In attending to the distinction between regulations that mirror an express statutory exclusion (as listed at § 106.31(a)(2)) and those that address sex separation in other contexts not specifically exempted by Congress, the Department appropriately followed Congressional direction.

76.     Plaintiffs also are incorrect that the § 106.31(a)(2) is arbitrary and capricious in "its

treatment of athletics." [ECF No. 12 at 35]. As noted above, neither § 106.31(a)(2) nor any other provision of the Final Rule amends or otherwise affects the Department's preexisting regulation allowing sex-separate athletic teams. *See* 89 Fed. Reg. at 33,816-17 [ECF No. 9-1 at 343-44]; *see also Kansas*, 2024 WL 3273285, at *11 (acknowledging that the Final Rule does not amend the Department's regulation regarding sex-separate athletic teams); *Tennessee*, 2024 WL 3019146, at *37 (same). That regulation, which allows a recipient to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," 34 C.F.R. § 106.41(b), is expressly excepted from § 106.31(a)(2)'s specification that recipients may not engage in sex separation that subjects a person to more than de minimis harm on the basis of sex. 89 Fed. Reg. at 33,887 [ECF No. 9-1 at 414].

77.    Simply put, "[c]onsistent with the longstanding athletics regulations, § 106.31(a)(2) does not apply to permissible sex separation on athletic teams." 89 Fed. Reg. at 33,817 [ECF No. 9-1 at 344]. As explained in the Rule, the Department's decision to address athletics through a separate rulemaking is consistent with the fact that Congress recognized by statute that athletics is a special context, *id.*; *see* Education Amendments of 1974, section 844. The Department's athletics regulations reflect Congress's determination that the unique circumstances of athletics merit a different approach, "governed by an overarching nondiscrimination mandate and obligation to provide equal athletic opportunities for students regardless of sex." *Id.* at 33,816 [ECF No. 9-1 at 343] (citing 34 C.F.R. § 106.41(a), (c)). There is nothing arbitrary or capricious in § 106.31(a)(2)'s recognition that Congress specified that athletics are a unique context under Title IX.

78.    Plaintiffs further argue that, in promulgating § 106.31(a)(2), the Department "failed to adequately consider other important aspects of the problem," asserting that the Department did not adequately address commenters' concerns regarding safety, privacy, and compliance. [ECF

No. 12 at 33-34]. Specifically, Plaintiffs argue the Department failed to consider the implications of allowing transgender female "other community members" who are not students to use bathrooms, locker rooms and shower areas; how schools can "authenticate the sincerity of a claimed gender identity"; and how schools should contend with students who identify as nonbinary. [ECF No. 12 at 33-34].

79.    However, the Preamble to the Rule shows that the Department adequately considered and addressed such concerns.

80.    The Rule states that the Department "strongly agrees that recipients have a legitimate interest in protecting all students' safety and privacy," and explains that, under § 106.31(a)(2), "a recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity." 89 Fed. Reg. at 33,820 [ECF No. 9-1 at 347]. For example, "nothing in Title IX or the final regulations prevents a recipient from offering single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason." *Id.* But the Department concluded that there is no "evidence that transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." *Id.* Plaintiffs have not pointed to any evidence before the Department contradicting that conclusion.

81.    As the Department noted, federal courts have rejected "unsubstantiated and generalized concerns that transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." 89 Fed. Reg. at 33,820 [ECF No. 9-1 at 347] (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 626 (4th Cir. 2020) (Wynn, J., concurring), *as amended* (Aug. 28, 2020); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858

27

F.3d 1034, 1052 (7th Cir. 2017); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 521 (3d Cir. 2018); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1228-29 (9th Cir. 2020); *Cruzan v. Special Sch. Dist. #1*, 294 F.3d 981, 984 (8th Cir. 2002) (per curiam)).

82.     The Department also addressed concerns regarding compliance, including "questions about how a recipient should determine a person's gender identity for purposes of § 106.31(a)(2)." *Id.* at 33,819 [ECF No. 9-1 at 346]. Contrary to Plaintiffs' characterization, the Rule does not bar recipients from "verify[ing] a student's claimed gender identity" [ECF No. 12 at 34]. The Rule confirms that a recipient may properly "rely on . . . written confirmation . . . by the student or student's parent, counselor, coach, or teacher." 89 Fed. Reg. at 33,819 [ECF No. 9-1 at 346]. At the same time, the Rule specifies that recipients may not "requir[e] a student to submit to invasive medical inquiries or burdensome documentation requirements" because doing so "imposes more than de minimis harm." *Id.* This distinction is in no way arbitrary or capricious; nor is it tantamount to requiring a recipient to merely "rely[ ] on the student's say-so." [ECF No. 21 at 12].

83.     The Department also adequately considered and addressed commenters' concerns regarding students who identify as nonbinary, explaining that "[f]or nonbinary students, a recipient may, for example, coordinate with the student, and the student's parent or guardian as appropriate, to determine how to best provide the student with safe and nondiscriminatory access to facilities, as required by Title IX." 89 Fed. Reg. at 33,818 [ECF No. 9-1 at 345]. Plaintiffs do not show that the Department's explanation is unreasonable. While in their reply, Plaintiffs claim confusion about the meaning of "nondiscriminatory access" [ECF No. 21 at 12], as § 106.31(a)(2) itself explains, separation or different treatment is discriminatory only if it causes more than de minimis harm.

84.     Accordingly, Plaintiffs fail to show that § 106.31(a)(2) exceeds the Department's statutory authority or is arbitrary and capricious.

### C. The Hostile Environment Harassment Definition in § 106.2 Is Consistent with the Department's Statutory Authority, the APA, and the Requirements of the First Amendment.

85.     Section 106.2 of the Final Rule defines hostile environment sex-based harassment, in relevant part, as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2) [ECF No. 9-1 at 411]. The Department determined that this definition is consistent with "relevant judicial precedent . . . with congressional intent and the Department's longstanding interpretation of Title IX and resulting enforcement practice prior to the 2020 amendments." *Id.* at 33,490 [ECF No. 9-1 at 17]. In addition, the Department recognized that the Rule's definition "closely tracks longstanding case law defining sexual harassment," *id.* at 33,494 [ECF No. 9-1 at 21] (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)), and aligns with the definition used by the Equal Employment Opportunity Commission (EEOC). *Id.* at 33,516 [ECF No. 9-1 at 43].

86.     Plaintiffs argue that the Rule's definition of sex-based "hostile environment harassment" in § 106.2 exceeds the Department's statutory authority; "runs afoul of the First Amendment" [ECF No. 12 at 28]; and is arbitrary and capricious. The Court finds that Plaintiffs are unlikely to succeed on the merits of these claims.

### *The Definition Is Consistent with the Department's Statutory Authority.*

87.     Plaintiffs' statutory authority argument focuses on the difference between the hostile environment harassment definition in § 106.2 and the standard that the Supreme Court held

was applicable when determining whether a recipient of federal funds may be liable for damages for harassment under Title IX's implied private cause of action. [ECF No. 12 at 26-28]. However, there is no conflict between the Rule's definition—which applies to the Department's administrative enforcement of Title IX—and this Supreme Court precedent regarding the standard applicable in a private action for damages.

88.     In *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Supreme Court addressed "whether, and under what circumstances, a recipient of federal educational funds can be liable in a private damages action arising from student-on-student sexual harassment." *Id.* at 637. In *Davis*, it was undisputed that "student-on-student harassment can[] rise to the level of 'discrimination' for purposes of Title IX," and the only question was whether, in a private suit for money damages, "a recipient of federal education funding may be liable for damages under Title IX under any circumstances for discrimination in the form of student-on-student sexual harassment." *Id.* at 639. In answering this limited question, the Supreme Court determined that for a recipient to be liable in a private action for damages, such harassment had to be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

89.     Plaintiffs argue that this standard from *Davis* is incompatible with the definition of "hostile environment harassment" in § 106.2 of the Rule, which specifies that such harassment is "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is *so severe or pervasive* that it *limits or denies* a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884 [ECF No. 9-1 at 411] (emphasis added). But in § 106.2, the Final Rule sets forth definitions applicable to the Department's administrative enforcement of Title IX, not standards applicable in

a private cause of action for damages, *see* 89 Fed. Reg. at 33,499 [ECF No. 9-1 at 26], and the *Davis* Court did not suggest that the Department's enforcement standard had to exactly mirror that case's holding.

90.     Plaintiffs are incorrect that *Davis* "said what the statute means" in proscribing sex-based discrimination. [ECF No. 12 at 28]. Rather, the Supreme Court explained that its task in *Davis* was "to *do more* than define the scope of the behavior that Title IX proscribes." 526 U.S. at 639 (emphasis added). Specifically, the *Davis* Court had to "determine whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages." *Id.* Thus, insofar as it interpreted Title IX, the Court only addressed "the proper definition of 'discrimination' in the context of a private damages action," not what definition should apply in the context of administrative enforcement. *Id.* at 649.

91.     Plaintiffs' suggestion that, in departing from the *Davis* standard, the Department unlawfully broadened the definition of harassment under Title IX is further undermined by the fact that the Rule's definition of sex-based "hostile environment harassment" is consistent with the Department's "longstanding interpretation of Title IX and resulting enforcement practice prior to the 2020 amendments." 89 Fed. Reg. at 33,490 [ECF No. 9-1 at 17]. *Davis* itself approvingly cited the Department's then-recently published guidance setting forth that longstanding interpretation. *Davis*, 526 U.S. at 647-48, 651 (citing 1997 Sexual Harassment Guidance, 62 Fed. Reg. 12,034 (Mar. 13, 1997)); *see* 1997 Sexual Harassment Guidance, 62 Fed. Reg. at 12,040 (stating that schools could be found to violate Title IX if the relevant harassment "was sufficiently severe, persistent, or pervasive to create a hostile environment").

92.     Plaintiffs also object that the Rule's definition of hostile environment harassment differs from the 2020 Amendments, which they characterize as adopting the *Davis* standard. [ECF

No. 12 at 17, 27, 32]. But in 2020, the Department merely explained that it preferred the *Davis* standard, not that the *Davis* standard was the only possibility or somehow compelled by law. *See* 85 Fed. Reg. at 30,036 (2020 Amendments) ("The Department chooses to return to the premise expressed [in earlier guidance]"); *id.* at 30,033 (2020 Amendments) ("Neither *Gebser* nor *Davis* opined as to what the appropriate conditions (e.g., definition of sexual harassment, actual knowledge) and liability standard (e.g., deliberate indifference) must or should be for the Department's administrative enforcement.").

93.     Similarly, Plaintiffs are incorrect to argue that the Rule's harassment definition improperly covers conduct that "limits" a person's ability to participate in an activity because that element of the definition differs from the holding in *Davis*. [ECF No. 12 at 27]. As the Department explained, including conduct that "limits or denies" participation is compelled by the text of Title IX. "If Title IX only covered exclusion from participation or denial of access, there would have been no reason for Congress to add 'be denied the benefits of,'" because "be excluded from" would have supplied the necessary standard. 89 Fed. Reg. at 33,511 [ECF No. 9-1 at 38]. As noted by Defendants, since 1975, Title IX regulations have prohibited recipients from, on the basis of sex, "limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity." 34 C.F.R. § 106.31(b)(7). The "limits or denies" standard in the Final Rule thus gives effect to every word in the statute without rendering any words redundant or superfluous. *See, e.g.*, *Vasseur v. Sowell*, 930 F.3d 994, 996 (8th Cir. 2019) ("We are 'reluctant to treat statutory terms as surplusage in any setting.'" (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

94.     Plaintiffs cite no precedent—and the Court has located none—suggesting that the hostile environment harassment definition in § 106.2 describes conduct falling outside "the scope of the behavior that Title IX proscribes." *Davis*, 526 U.S. at 639.

### *The Definition Is Consistent with the Requirements of the First Amendment.*

95.     Plaintiffs also do not show that the Rule's definition of hostile environment harassment is inconsistent with the requirements of the First Amendment. [ECF No. 12 at 28]. In a facial First Amendment challenge, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). In their reply, Plaintiffs effectively concede they cannot show that a substantial number of the challenged definition's applications are unconstitutional, disavowing an overbreadth challenge. [ECF No. 21 at 8 n.2]. Nor do they suggest there is some basis other than overbreadth on which they could bring a facial First Amendment challenge.[1] Their argument instead appears to be that First Amendment issues purportedly raised by the hostile environment harassment definition somehow render it unlawful under the APA-specific arbitrary and capricious standard. [ECF No. 21 at 8 n.2]. Regardless, Plaintiffs fail to demonstrate that the definition violates the First Amendment.

96.     As an initial matter, the Rule repeatedly explains that its provisions must not be construed or applied in a way that would violate First Amendment rights. For example, the Rule states explicitly: "Nothing in the [Final Rule] limits any rights that would otherwise be protected by the First Amendment," 89 Fed. Reg. at 33,505 [ECF No. 9-1 at 32], and "nothing in the regulations requires or authorizes a recipient to violate anyone's First Amendment rights." *Id.* at 33,516 [ECF No. 9-1 at 43]. And the Rule points to an already existing regulation, which provides

---

[1] Moreover, as noted above, individual Plaintiff A.F. lacks standing for a First Amendment challenge or any other challenge to the Rule. And State Plaintiffs do not allege that their own speech is somehow chilled by the Rule, or that they have standing to raise a First Amendment claim on behalf of any third parties.

that "[n]othing in this part requires a recipient to . . . [r]estrict any rights that would otherwise be protected from government action by the First Amendment," 34 C.F.R. § 106.6(d), and which is maintained and unmodified by the Final Rule. *Id.*

97.    Turning to the specific provision at hand—the Rule's hostile environment harassment definition—Plaintiffs' First Amendment concerns focus on potential applications of the definition to speech about gender identity. [ECF No. 12 at 29; ECF No. 21 at 8, 12]. But, as previously noted, the Rule states unambiguously that a "recipient must formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment." 89 Fed. Reg. at 33,503 [ECF No. 9-1 at 30].  Recipients have long operated under this obligation, despite individuals' differing views on sometimes-controversial matters involving sex. Plaintiffs identify no principle whereby a facially constitutional harassment standard can be held to violate the First Amendment based on its potential application to speech about certain topics.

98.    Plaintiffs cite no case in which a court has held unconstitutional—or otherwise set aside on First Amendment grounds—a definition of harassment analogous to the hostile environment harassment definition to be codified at 34 C.F.R. § 106.2. As Defendants note, the definition is narrow: it "only prohibit[s] conduct that meets all the elements" set forth in the definition and whether harassment has occurred is evaluated based on "the totality of the circumstances . . . to ensure that no element or relevant factual consideration is ignored." 89 Fed. Reg. at 33,506 [ECF No. 9-1 at 33]. While other district courts have faulted this standard for incorporating a fact-specific, multi-element inquiry, *see Kansas*, 2024 WL 3273285, at *14; *Tennessee*, 2024 WL 3019146, at *27, such objections could be lodged against virtually any similar harassment standard, including the *Davis* standard lauded by Plaintiffs, and do not identify

a constitutional defect. *Cf. Rowles v. Curators v. Univ. of Missouri*, 983 F.3d 345, 356 (8th Cir. 2020) ("[T]he individual Appellees' inability to agree on the exact scope of prohibited conduct or the definition of words in the policies does not mean the policies are subject to arbitrary enforcement. Enforcement of student conduct policies requires some degree of judgment.").

99.    In any case, contrary to another court's suggestion, the definition at issue self-evidently is not "an entirely subjective standard that is potentially met whenever the complainant alleges that the conduct or speech somehow impacts the complainant's education." *Kansas*, 2024 WL 3273285, at *14. *Cf.* 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2) [ECF No. 9-1 at 411] (specifying that to constitute hostile environment harassment, sex-based conduct must, among other things, be "objectively offensive" and must "limit[] or den[y] a person's ability to participate in or benefit from the . . . education program or activity"); *id.* at 33,506 [ECF No. 9-1 at 33] ("The final regulations' reference to the totality of the circumstances derives from these very specific and required elements and is meant to ensure that no element or relevant factual consideration is ignored."). Nor does the Rule authorize a recipient to deem speech—including a "refusal to abide by preferred pronouns"—to be harassment merely because "the offended individuals complain with sufficient vigor." *Tennessee*, 2024 WL 3019146, at *22. Indeed, to be deemed hostile environment harassment, conduct must not only be "subjectively *and* objectively offensive," but also "so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's program or activity." 89 Fed. Reg. at 33,884 [ECF No. 9-1 at 411] (emphasis added).

100.    Nonetheless, Plaintiffs suggest that only the *Davis* standard respects principles of free speech. [ECF No. 12 at 28-29]. But the *Davis* Court gave no indication that the definition of actionable harassment it adopted was driven by First Amendment considerations. In fact, the

majority opinion discusses the First Amendment only to correct a misunderstanding by the dissent. *See Davis*, 526 U.S. at 652.

101.    Relatedly, Plaintiffs quibble with the Rule's citation of *Rowles*, 983 F.3d 345, in support of the Rule's departure from the *Davis* standard, arguing that the Eighth Circuit's conclusion that a harassment standard incorporating "severe or pervasive" language posed no First Amendment problem is of limited help to the Department because *Rowles* "involved a graduate student working as a teaching assistant" at a university. [ECF No. 12 at 27]. But like graduate students and university employees at postsecondary institutions, students at elementary and secondary schools do not have a First Amendment right to "speech or action that intrudes upon the work of the schools or the rights of other students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969).

102.    Nor do the other cases cited by Plaintiffs indicate that the Rule's definition of hostile environment harassment transgresses the First Amendment. For example, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), is inapposite, as the Final Rule explains. 89 Fed. Reg. at 33,505 [ECF No. 9-1 at 32]. At issue in *Speech First* was a policy that, among other things, prohibited "a wide range of 'verbal, physical, electronic, and other' expression concerning any of (depending on how you count) some 25 or so characteristics," and "reache[d] not only a student's own speech, but also her conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's speech." 32 F.4th at 1125. In contrast to the Rule, "[t]he policy . . . [was] staggeringly broad," *id.*, and it was not "tailored to harms that have long been covered by hostile environment laws," 89 Fed. Reg. at 33,505 [ECF No. 9-1 at 32] (discussing *Speech First*).[2]

---

[2] The two other *Speech First* cases cited by Plaintiffs likewise do not support a conclusion that the definition at issue is inconsistent with the First Amendment. *See Speech First, Inc. v. Fenves*, 979

103.    Plaintiffs thus fail to show that the hostile environment harassment definition in § 106.2 of the Rule is inconsistent with the First Amendment.

**The Hostile Environment Harassment Definition Is Not Arbitrary and Capricious.**

104.    Plaintiffs' arguments for why the Rule's hostile environment harassment definition is arbitrary and capricious simply reconfigure their *Davis* and First Amendment arguments; they do not show any APA violation. [ECF No. 12 at 36-37].

105.    The Department explained at length its reasons for revisiting the definition in the 2020 Amendments and adopting a definition consistent with the longstanding standard applied by the Department. *See generally* 89 Fed. Reg. at 33,497-501 [ECF No. 9-1 at 24-28]; *see, e.g.*, *id.* at 33,499 [ECF No. 9-1 at 26] (after addressing in detail comments about *Davis*, explaining that "[n]othing in the comments, the 2020 amendments, or previous Department guidance documents dissuades the Department from concluding in these final regulations that distinguishing between damages and administrative enforcement standards is a lawful and well-reasoned approach to effectuating Title IX"). When an agency changes policy, an agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one," but only that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, the Department did precisely that.

106.    Similarly, the Department adequately considered and addressed First Amendment

---

F.3d 319, 337 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (concluding a reasonable observer "must deduce that the University meant to expand its regulatory authority beyond the First Amendment" where, among other things, the challenged University policy did not "state[] succinctly that students will be disciplined . . . for speech that is outside the protection of the First Amendment"); *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480, 482 & n.6 (S.D. Tex. 2022) (concluding, with no analysis, that plaintiff would "likely succeed on the merits because [its] original policy does not comport with the standard adopted by the Supreme Court [in *Davis*]").

concerns, including comments focused on the hostile environment harassment definition's potential application to misgendering or pronoun use. *See* 89 Fed. Reg. at 33,503-08 [ECF No. 9-1 at 30-35]; *id.* at 33,515-16 [ECF No. 9-1 at 42-43]. The Department reiterated the important principle that "whether verbal conduct constitutes sex-based harassment is necessarily fact-specific," but also clearly stated that "a stray remark, such as a misuse of language, would not constitute harassment under [the applicable] standard." *Id.* at 33,516 [ECF No. 9-1 at 43]; *see also id.* at 33,508 [ECF No. 9-1 at 35] (noting that "one stray remark does not satisfy the level of pervasiveness to which the regulations refer"); *id.* at 33,505 [ECF No. 9-1 at 32] ("The final regulations neither silence any particular view nor compel anyone to adopt any particular view on any issue."). It further reiterated that "nothing in the regulations requires or authorizes a recipient to violate anyone's First Amendment rights." *Id.* at 33,516 [ECF No. 9-1 at 43]; *see also id.* at 33,535 [ECF No. 9-1 at 62] (explaining that a recipient can, without infringing on First Amendment rights, "respond to protected speech that affects their community, including by, for example, offering supportive measures to a student who may be targeted by protected speech, providing its own educational programming in response to such speech, and other non-disciplinary measures").

107.    The Department's reluctance to prejudge the harassment standard's application to fact-specific instances of possible future conduct was not arbitrary and capricious, but rather appropriately recognized that the definition in the Rule "requires consideration of the totality of the circumstances in determining whether a person has been subjected to a hostile environment." *Id.* at 33,506 [ECF No. 9-1 at 33]. That inquiry "aims to ensure that recipients consider context when determining whether each element is met, to avoid inappropriately sweeping in conduct or speech that does not actually create a hostile environment under the circumstances." *Id.*

108.    Because the Final Rule's definition of hostile environment harassment "was the product of reasoned decisionmaking," it is not arbitrary and capricious in violation of the APA. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52.

### D.  The Final Rule Does Not Violate the Spending Clause.

109.    The Spending Clause grants Congress broad power to achieve its policy aims through conditioned offers of funding, so long as those conditions are, *inter alia*, (1) "unambiguous[]," (2) not unduly coercive, (3) relate "to the federal interest" in the project, and (4) consistent with "other constitutional provisions." *South Dakota v. Dole*, 483 U.S. 203, 207–08, 211 (1987). The focus of a Spending Clause inquiry is typically on a statute, not an implementing regulation, because the Spending Clause limits Congress's authority to condition federal funds.

110.    Title IX has long been held to be consistent with the Spending Clause, *Davis*, 526 U.S. at 640, and the Final Rule does not purport to expand the funding conditions set forth in the statute itself. Plaintiffs argue, however, that the Rule nonetheless contravenes the Spending Clause, or that if the Rule is "a valid interpretation" of Title IX, then Title IX itself would violate the Spending Clause. [ECF No. 12 at 29].  This theory largely just restates Plaintiffs' other merits arguments and is incorrect.

111.    First, there is no issue of ambiguity relevant to the Spending Clause in Title IX's provisions. The requirement of unambiguity means that Congress "make the existence of the condition itself" "explicitly obvious," not that Congress list all ways in which a recipient could fail to comply. *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (citation omitted). Indeed, "so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Id.* at 1306.

112.    Plaintiffs' Spending Clause argument boils down to an assertion that State Plaintiffs

"did not sign up for the confusion of the Final Rule's gender-identity mandate" [ECF 12 at 31], and thus appears to rest on their disagreement with the Rule's specification in § 106.10 that Title IX prohibits discrimination based on gender identity. But here, as explained above, § 106.10 merely delineates the scope of Title IX's unambiguous prohibition on sex discrimination, based on the plain meaning of the statutory language: Because it is "impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex," *Bostock*, 590 U.S. at 660, Title IX's prohibition on sex discrimination necessarily includes discrimination because of gender identity.

113.    Plaintiffs in essence argue that certain obligations imposed by the Rule are not ones they expected [ECF No. 12 at 30], but Plaintiffs were on notice that they were barred from discriminating based on sex, and "the fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock*, 590 U.S. at 674 (cleaned up).

114.    Indeed, in 2005, the Supreme Court rejected an analogous argument that Title IX did not cover retaliation because it was not specifically mentioned in the statute, concluding that specific forms of discrimination not mentioned in the statute—such as retaliation—were nonetheless discrimination. *Jackson*, 544 U.S. at 175; *see also id.* ("Because Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered."). To the extent Plaintiffs object to the Rule's provisions addressing Title IX's limitations on sex separation or differentiation (§ 106.31(a)(2)) and defining "hostile environment harassment" (§ 106.2), they likewise fail to demonstrate that the Rule depends on the existence of ambiguity in the statute's funding conditions, and thus do not demonstrate any Spending Clause issue.

115.    Nor do Plaintiffs show that the Rule somehow transforms Title IX into a statute that is unconstitutionally coercive. A statute may be unconstitutionally coercive if it "pass[es] the point at which 'pressure turns into compulsion,'" *NFIB v. Sebelius*, 567 U.S. 519, 580 (2012) (quoting *Dole*, 483 U.S. at 211), but generally a state is expected to simply decline the offer of funds, *id.* at 579 (Roberts, C.J.). Plaintiffs here make no effort to meet this high bar. As noted, the Rule does not impose funding conditions beyond those in Title IX itself, which has long been held to be consistent with the Spending Clause, *see Davis*, 526 U.S. at 640. In any case, Plaintiffs do not explain what amount of funding they believe is at risk because of the Rule (much less place the amount of funding at issue in the context of their overall budgets), nor do Plaintiffs present any evidence supporting their argument that the Rule unduly coerces them based on a risk of withdrawal of federal funds. Particularly in the context of this facial challenge, Plaintiffs cannot show that the Rule renders Title IX unduly coercive. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660, 674 (W.D. Va. 2009) (holding that Title IX and certain implementing regulations did not violate the Spending Clause due to enforcement process and that there are penalties "less drastic than the withholding of federal funding"), *aff'd*, 639 F.3d 91 (4th Cir. 2011).

116.    Plaintiffs' remaining Spending Clause theories—that the Rule is contrary to federal interests and is otherwise unconstitutional—restate their other merits arguments. For the same reasons that the Rule is consistent with Title IX and the First Amendment, there also is no Spending Clause violation on these bases.

### IV.    Plaintiffs Fail To Demonstrate They Are Likely To Suffer Imminent, Irreparable Harm in the Absence of Preliminary Relief.

117.    For the reasons set forth above, Plaintiffs have not established a likelihood of success on the merits. Plaintiffs also fail to show they are likely to suffer imminent, irreparable injury in the absence of preliminary relief.

118.    A plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* On a motion for preliminary injunction, a plaintiff must demonstrate irreparable harm by "substantial proof," a "much higher" burden than required to establish standing even at the summary judgment stage. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *see Sleep No. Corp. v. Young*, 33 F.4th 1012, 1018 (8th Cir. 2022) (movant "must prove that 'irreparable injury is likely in the absence of an injunction'" (quoting *Winter*, 555 U.S. at 22)). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

119.    As explained above, plaintiff A.F. lacks standing for her challenges to the Rule. *A fortiori*, she has not demonstrated the imminent, irreparable harm necessary for preliminary relief.

120.    Nor have State Plaintiffs met their burden. State Plaintiffs argue that the Rule is likely to cause them irreparable harm because it conflicts with state laws regarding "[a]thletics" [ECF No. 12 at 38]; "[n]ames and pronouns" [ECF No. 12 at 39]; and "[b]athrooms, locker rooms, showers, and overnight trips" [ECF No. 12 at 40]. These assertions do not meet their burden.

121.    As an initial matter, as explained above, any of State Plaintiffs' alleged injuries stemming from laws regarding sex-separate athletic teams do not flow from the Rule, nor could they because the Rule does not address sex-separate athletic teams. Notably, the only basis for Missouri's and South Dakota's allegations of irreparable harm supporting preliminary relief is the Rule's alleged conflict with those States' laws regarding sex-separate athletic teams. [ECF No. 12

at 38–40]. Because the Rule does not address that issue, Missouri and South Dakota clearly fail to demonstrate a likelihood of imminent, irreparable injury due to the Rule, and their requests for preliminary relief can be denied on that ground alone. *See Grasso Enters.*, 809 F.3d at 1040.

122. As for the remaining State Plaintiffs, even assuming *arguendo* that certain of the Rule's provisions conflict with and thus preempt state laws concerning pronoun use (Ark. Code Ann. § 6-1-108(d)(1), (d)(2); N.D. Cent. Code §§ 14-02.4-15.2(1); Iowa Code Ann. § 279.78.3), bathrooms and locker rooms (Ark. Code Ann. § 6-21-120(b)(1); Iowa Code Ann. § 280.33(2); Neb. Rev. Stat. § 79-2,124; N.D. Cent. Code § 15-10-68(1)), or sleeping arrangements on overnight trips (Ark. Code Ann. § 6-10-137(a)), the States have not proven that any such conflicts constitute imminent, irreparable injuries supporting the preliminary relief sought.

123. First, while State Plaintiffs seek to preliminarily enjoin or stay the entire Rule [ECF No. 9], the harms they claim as a basis for preliminary relief are based on only a small subset of the Rule's provisions and applications and are not even tied to all the portions of the Rule that Plaintiffs argue are unlawful.

124. In particular, State Plaintiffs fail to demonstrate a likelihood that they will suffer any imminent, irreparable injury if the Court fails to stay or enjoin enforcement of § 106.10. As explained above, § 106.10 specifies that Title IX's prohibition on "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 [ECF No. 9-1 at 413]. Plaintiffs' argument that this provision exceeds the Department's statutory authority and is arbitrary and capricious is limited to its references to "gender identity" and "sexual orientation."

[ECF No. 12 at 19-25, 31-33].[3] And even as to those two categories, Plaintiffs do not identify any harm they will suffer based on § 106.10, which describes the scope of Title IX's general nondiscrimination mandate and thus merely prohibits a school from, for instance, placing a student in detention for being gay or banning a student from homecoming because the student is transgender. State Plaintiffs do not allege that they will be harmed by an inability to discriminate against a gay student simply for being gay, or against a transgender student simply for being transgender.[4]

125.    Rather, State Plaintiffs claim the Rule harms their sovereign interests insofar as it requires recipients to allow individuals to participate in sex-separate activities or use sex-separate facilities consistent with their gender identity [ECF No. 12 at 38-39, 40-41], and insofar as the Rule's definition of "hostile environment harassment" could encompass incidents involving pronoun use or other speech related to gender identity, [ECF No. 12 at 39-40]. State Plaintiffs' claims of irreparable harm thus are tied specifically to § 106.31(a)(2), and to the definition of "hostile environment harassment" in § 106.2, as applied to gender identity discrimination.

126.    Second, even as to these provisions and applications of the Rule, the States have not proven imminent, irreparable injury based on the provisions' alleged interference with their "sovereign interests" in enforcing state laws. [ECF No. 12 at 38]. "[I]t is black-letter law that the

---

[3] Plaintiffs' argument focuses almost exclusively on "gender identity," and they object only in passing to the provision's reference to "sexual orientation." [ECF No. 12 at 19, 20, 21, 25, 31].

[4] Indeed, as Amici States point out [ECF No. 43 at 12 n.29], one of the State Plaintiffs—Iowa—already has a state law that is materially indistinguishable from § 106.10. Specifically, Iowa Code § 216.9(1) provides that "[i]t is an unfair or discriminatory practice for any educational institution to discriminate on the basis of race, creed, color, sex, *sexual orientation*, *gender identity*, national origin, religion, or disability in any program or activity" (emphasis added). Prohibited practices include, *inter alia*, "[e]xclusion of a person or persons from participation, in denial of the benefits of, or subjection to discrimination in any academic, extracurricular, research, occupational training, or other program or activity except athletic programs." Iowa Code Ann. § 216.9(1)(a).

federal government does not 'invade[ ]' areas of state sovereignty 'simply because it exercises its authority' in a way that preempts conflicting state laws." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981)). "Indeed, to conclude otherwise would mean that a state would suffer irreparable injury from all . . . federal laws with preemptive effect." *Id.* at 1292.

127.    State Plaintiffs' related argument that a threat of loss of federal funding means they are injured by "coerced compliance" with provisions of the Rule that conflict with state law is simply a restatement of their "sovereign interests" argument, and likewise does not demonstrate any imminent, irreparable injury. [ECF No. 12 at 41]. Indeed, State Plaintiffs do not even attempt to argue—let alone present proof—that they are facing any imminent loss of federal funding or other pocketbook injury based on the Rule, admitting that their claimed "coerced compliance" harm is "intangible." [*Id.*].

128.    State Plaintiffs thus fail to establish that they are likely to suffer imminent, irreparable injury in the absence of preliminary relief.

**V.    The Public Interest and Balance of Equities Weigh Against Preliminary Relief.**

129.    The balance of equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these combined factors likewise counsel against preliminary relief.

130.    The Final Rule implements the Department's authority to enforce the statutory objectives of Title IX. *See* 20 U.S.C. § 1682. "There is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008), *aff'd sub nom. Cornish v. Doll*, 330 F. App'x (Fed. Cir. 2009). The public interest favors allowing the Department to fulfill these

responsibilities.

131.    Further, Title IX mandates that "[n]o person" be subjected to sex discrimination in any education program or activity. 20 U.S.C. § 1681. The Final Rule effectuates Title IX's important goals of "avoid[ing] the use of federal resources to support discriminatory practices . . . [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Needless to say, preventing sex discrimination is in the public interest. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623-24 (1984). And as set forth in the Final Rule, sex discrimination in educational environments has devastating consequences, including the effects of harassment and assault based on sexual orientation and gender identity. *See, e.g.*, 89 Fed. Reg. at 33,478-80 [ECF No. 9-1 at 5-7] (summarizing personal stories submitted by commenters).

132.    The brief submitted by the Amici States in opposition to Plaintiffs' motion for preliminary relief further highlights the importance of the Rule's challenged provisions to effectuation of Title IX's purposes and supports a conclusion that it is in the public interest to allow these provisions to go into effect and be enforced by the Department. [ECF. No. 43].

133.    In particular, the Amici States note that "[t]he Final Rule will promote states' efforts to protect students from harms of all kinds—in part by clarifying that Title IX protections against sex discrimination include protections for LGBTQ students—and will provide broad, significant benefits to LGBTQ students nationwide." [ECF No. 43 at 3]. And Amici States explain, based on their experience, that these benefits can be achieved "without compromising student privacy or safety, and without imposing substantial costs to . . . schools." [*Id*.].

134.    For example, with respect to one of Plaintiffs' main concerns—bathrooms—the Amici States report their experience that "allowing students to use bathrooms consistent with their gender identity helps safeguard against harms common to transgender students, such as students

46

forgoing drinking or eating during the school day to avoid using the restroom for fear of exclusion, reprimand, or bullying." [ECF No. 43 at 3]. And on the flip side, Amici States cite evidence that transgender students "experience better mental health outcomes that are more comparable to their cisgender peers" when allowed to use bathroom and locker room facilities consistent with their gender identity. [*Id.* at 4].

135.    At the same time, Amici States' experience offering protections to transgender students consistent with § 106.31(a)(2) of the Final Rule indicates that Plaintiffs' speculative fears about privacy and safety risks associated with allowing transgender students to use sex-separate facilities consistent with their gender identity are unfounded. [ECF No. 43 at 5]. Amici States cite the "documented experience of school administrators in thirty-one states and the District of Columbia," which they say provides no "evidence that cisgender students pose as transgender to gain improper restroom access." [*Id.*]. Amici States also observe that recipients can both comply with nondiscrimination policies and address privacy concerns, noting that schools have been able to account for privacy concerns with solutions that range from "offering privacy curtains to separate restroom and changing rooms to all who desire them, none of which require costly construction or remodeling." [*Id.* at 6 (citing numerous state guidance documents)].

136.    Amici States' submission also indicates there is a public interest in application of the definition of "hostile environment harassment" adopted in § 106.2 of the Rule rather than the sexual harassment definition from the 2020 Amendments. With respect to hostile environment harassment, "[i]n Amici States' experience, sex-based harassment need not be severe *and* pervasive to create a tangible injury to a student's education." [ECF No. 43 at 9]. "For example, a teacher's repeated inappropriate sexual comments and intrusions of personal space may not be 'severe,' but could be so pervasive that a student feels unsafe and avoids classes, and is effectively

excluded from education." [*Id.*] (citing *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 680-82, 687-89, 693 (4th Cir. 2018); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015)). Amici States note that "no jurisdiction should be burdened or surprised by the Final Rule's return to the 'severe or pervasive' standard," which tracks the standard applied by the Department of Education for approximately 30 years in its enforcement of Title IX and Title VI. [*Id.* at 10 (citing prior Department guidance)].

137. Thus, contrary to Plaintiffs' assertion [ECF No. 12 at 47], the record clearly demonstrates that "other parties will be harmed" if the Court prevents the Rule from going into effect or enjoins the Department's enforcement of the Rule while this litigation is pending.

138. At the same time, for the reasons set forth above, Plaintiffs do not demonstrate that they are likely to suffer imminent, irreparable harm if their motion for a § 705 stay and preliminary injunction is denied.

139. The public interest and balance of equities thus weigh heavily against granting preliminary relief.

## VI. CONCLUSION

140. Accordingly, Plaintiffs' Motion for a 5 U.S.C. 705 Stay and Preliminary Injunction is **DENIED**.

\* \* \*

If the Court disagrees with Defendants about Plaintiffs' satisfaction of the preliminary injunction elements with respect to any of the three challenged provisions of the Rule, Defendants respectfully propose the following alternative conclusions regarding scope of relief:

## PROPOSED ALTERNATIVE CONCLUSIONS ON SCOPE OF RELIEF

141. In granting a preliminary injunction, the Court must adhere to the principle that

"injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *cf. Rodgers v. Bryant*, 942 F.3d 451, 467 (8th Cir. 2019) (Stras, J. concurring in part) (explaining the need for careful consideration before granting broad injunctions). With respect to geographic scope, "[a]t a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government." *Arizona v. Biden*, 40 F.4th 375, 395-96 (6th Cir. 2022) (Sutton, C.J., concurring).

142.    And to the extent Plaintiffs seek relief under 5 U.S.C. § 705, a § 705 stay would raise all the same problems as a nationwide injunction if it applied universally to parties not before the Court. *See DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay). Further, like other APA provisions, § 705 "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Plaintiffs do not identify, and the Court has not found, any pre-APA practice of district courts granting universal stays of agency regulations. Consistent with that backdrop, Congress contemplated that any relief under § 705 "would normally, if not always, be limited to the parties," Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. at 277 (1946).

143.    In addition, as noted above, a "preliminary injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Dakotans for Health*, 52 F.4th at 392. Section 705 likewise contemplates preliminary relief subject to traditional equitable principles; it expressly provides that courts may delay an action's effective date only "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705.

144.    Here, the challenged provisions of the Rule are severable, and Plaintiffs have not

demonstrated that there is any "substantial doubt" that the Department would have adopted the remainder of the Rule absent the challenged provisions—individually or as a group. *Finnbin, LLC v. Consumer Product Safety Commission*, 45 F.4th 127, 136 (D.C. Cir. 2022); *see* 89 Fed. Reg. at 33,848 [ECF No. 9-1 at 375] ("[R]emov[ing] any 'doubt that it would have adopted the remaining provisions of the Final Rule' without any of the other provisions, should any of them be deemed unlawful."); *see also id.* (explaining that the Rule's different provisions are "intended to operate independently of each other" and identifying the Rule's severability provisions to be codified at 34 C.F.R. §§ 106.16 and 106.48, and existing severability provisions at 34 C.F.R. §§ 106.62, 106.72, and 106.82).

145.   The Rule promulgates numerous regulatory provisions running approximately 14 single-spaced pages. *See id.* at 33,882-96 [ECF No. 9-1 at 409-23]. As noted above, Plaintiffs have challenged only a small fraction of these provisions—specifically, § 106.10, § 106.31(a)(2), and the "hostile environment harassment" definition in § 106.2. Moreover, Plaintiffs' claimed harms relate exclusively to those provisions' applications to gender identity discrimination. For example, to the extent Plaintiffs assert injuries based on the Rule's requirement that recipients allow students to use recipients' sex-separate restroom and locker room facilities consistent with the students' gender identity, the Court could fully redress any such injuries by enjoining the Department's enforcement of § 106.31(a)(2), the only provision of the Rule that addresses limits on permissible sex separation under Title IX and the Department's regulations.

146.   Any relief the Court grants therefore will be limited to the parties that have demonstrated they are likely to suffer imminent, irreparable harm based on one or more of the challenged provisions of the Rule. And, with respect to each of those parties, the relief will be limited to enjoining the Department's enforcement of provision(s) and application(s) for which the

party both has shown a likelihood of success on the merits and has demonstrated the required irreparable harm.

Dated: July 12, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

*/s/ Elizabeth Tulis*

ELIZABETH TULIS
REBECCA KOPPLIN
BENJAMIN TAKEMOTO
HANNAH SOLOMON-STRAUSS
PARDIS GHEIBI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-9237
Fax: (202) 616-8470
E-mail: elizabeth.tulis@usdoj.gov

*Counsel for Defendants*